**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Blackjewel, L.L.C., *et al.*, | ) | Case No. 19-[_____] |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |

**DECLARATION OF JEFF A. HOOPS, SR. IN SUPPORT**
**OF CHAPTER 11 FILINGS AND FIRST DAY MOTIONS**

1.      I am President and CEO of Debtors Blackjewel, L.L.C. ("Blackjewel") and

Blackjewel Holdings L.L.C. ("BJH").  I am also the former President and CEO of Debtors

Revelation Energy Holdings, LLC ("REH"), Revelation Management Corporation ("RMC"), and

Revelation Energy, LLC ("Revelation" and, together with Blackjewel, BJH, REH and RMC, the

"Debtors").

2.      As President and CEO of Blackjewel and BJH and the former CEO and President

of Revelation, RMC and REH, I have extensive familiarity with the day-to-day operations,

business affairs, and books and records of the Debtors.  I am familiar with the Debtors'

relationships with the lenders, lessors, trade vendors, and other parties necessary to the Debtors'

ongoing business operations.  I have also been intimately involved in the Debtors' preparation of

these chapter 11 cases.

3.      I submit this declaration (the "Declaration") pursuant to 28 U.S.C. § 1746 in

support of the Debtors' voluntary petitions under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code") and "first day" motions and other applications filed contemporaneously

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number
are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings,
LLC (8795); Revelation Management Corporation (8908) and Revelation Energy, LLC (4605). The headquarters
for each of the Debtors is located at 1051 Main Street, Milton, West Virginia 25541-1215.

therewith.  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, and/or my opinion based upon personal knowledge and experience of the Debtors' business and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

## COMMENCEMENT OF CHAPTER 11 PROCEEDINGS

4.      On July 1, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.  The Debtors intend to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      This Declaration is comprised of four sections.  Part I includes a description of the Debtors and their operations, Part II sets forth the relevant facts giving rise to these chapter 11 cases, Part III provides detail on the Debtors' prepetition capital structure, and Part IV provides information and facts in support of the Debtors' "first day" motions and other applications filed by the Debtors concurrently with, or shortly after, the filing of this Declaration (the "First Day Motions").  I have reviewed and am familiar with the Debtors' First Day Motions.

## THE DEBTORS' BUSINESS

### I.      Coal Business.

6.      The Debtors' core business is mining and processing metallurgical, thermal and other specialty and industrial coals.  Blackjewel, the primary operating Debtor, operates 32 properties, including surface and underground coal mines, preparation or wash plants, and loadouts or tipples.  Combined, the Debtors and their non-Debtor affiliates hold more than 500 mining permits, which is more than any other enterprise in the country.

7.      The Debtors' operations are located in the Central Appalachian Basin in Virginia, Kentucky and West Virginia (the "Eastern Division") and the Powder River Basin in Wyoming

2

(the "<u>Western Division</u>").   The Eastern Division is divided into four subdivisions – Black Mountain/Lone Mountain, Virginia, BHL, and Northern.  Coal mined from the Eastern Division is a mix of mid and high volatility metallurgical coal and specialty and industrial coals, with thermal coal as a by-product.  The Eastern Division holds approximately 600 million reserve tons, has an average mine life of 30+ years, and can produce up to 6 million tons per year.  The Eastern Division produced 3.3 million tons in 2018.  The Eastern Division employees approximately 1,100 employees.  Attached hereto as **<u>Exhibit A</u>** is a graphic showing the various Eastern Division locations throughout Virginia, Kentucky and West Virginia.

8.      The Western Division operates the Eagle Butte and Belle Ayr mines in northeast Wyoming and produces low sulfur, sub-bituminous thermal coal.  The Western Division holds approximately 600 million reserve tons.  The average mine life in the Western Division is 20 years and production capacity is 50 million tons.  The Western Division produced 35.5 million tons in 2018.  The Western Division employs approximately 600 people.  The graphic attached hereto as **<u>Exhibit B</u>** shows the location of Western Division operations in Wyoming.

**II.    Formation of Blackjewel and its Assets.**

9.      In July 2017, in connection with a strategic restructuring of the business, Blackjewel entered into a Purchase and Sale Agreement with Revelation, whereby Blackjewel purchased most, but not all, of Revelation Energy's equipment and rights to mine certain properties in exchange for the assumption of certain reclamation liabilities (the "<u>2017 Transaction</u>").  Revelation thereafter continued to operate in a reclamation only capacity and holds a limited number of permits.  At the time, the 2017 Transaction was intended to (i) transition the business from primarily surface coal mining of thermal coal (as Revelation was primarily focused on) to underground mining of metallurgical coal, and (ii) take advantage of the increase of coal prices in

3

the metallurgical coal market and to move away from the apparent continued depression of the thermal coal market.

10.     Blackjewel's assets were primarily acquired from struggling coal mining firms and then revitalized.  The Northern subdivision assets were acquired from Hylton, the BHL subdivision assets were acquired from James River, the Black Mountain subdivision assets were acquired from Alpha, and the Virginia subdivision assets were acquired from Suncoke.  Since the 2017 Transaction closed, Blackjewel has acquired additional assets, including the Lone Mountain subdivision assets, which are adjacent to the Black Mountain subdivision assets, from Arch Coal and the Western Division assets from Contura.  The purchase of Contura's Powder River Basin assets marked the Debtors' return to the thermal coal business.

## III.    Blackjewel Marketing and Sales.

11.     Once mined and processed, the Debtors' coal is marketed by non-Debtor Blackjewel Marketing and Sales Holdings ("BJMS").  BJMS is a joint venture formed in December 2017 by Blackjewel, Javelin Global Commodities ("Javelin"), and Uniper SE ("Uniper").  Javelin manages and owns 40% of BJMS.  Blackjewel and Uniper each own 30% of BJMS.

12.     BJMS is effectively the only customer of Blackjewel.  Thus, BJMS is tasked with marketing 100% of the thermal and metallurgical coal produced at the Debtors' mines.  The Debtors do not sell coal to any party other than BJMS.  As part of the joint venture arrangement, Javelin has been granted exclusive marketing rights for the domestic and export sale of metallurgical coal and domestic sale of thermal coal. Uniper has the exclusive marketing rights for

4

the export of thermal coal. Javelin and Uniper contribute hedging, logistics, execution and optimization services.[2]

13.     In effect, the BJMS joint venture works as follows: (i) the Debtors contribute 100% of their thermal and metallurgical coal production to BJMS; (ii) Javelin and Uniper market and sell the coal to third-party purchasers across the world; (iii) Javelin and Uniper provide the back end support necessary to market and sell the coal, and (iv) Uniper finances the costs associated with transporting, marketing and selling coal. Once the coal is sold, the proceeds are remitted to the Debtors, less a 1% marketing fee and 4.5% interest due on BJMS' credit facility.

## EVENTS LEADING TO THESE CHAPTER 11 CASES

### I.     Adverse Market Conditions.

14.     Dating back to 2012, the coal industry has been under intense pressure driven by a combination of declining commodity prices, reduced domestic demand for thermal and metallurgical coal, and increased oversight and costs associated with regulatory compliance. As a result, the industry as a whole has been operating in a generally higher cost environment than prior periods.

15.     A combination of an abundant, cheap and reliable alternative fuel in the form of natural gas, increased usage of renewable sources of energy, and the shutting down of coal fired power generation largely due to increased regulatory pressure and costs has severely impacted demand for thermal coal domestically. Thermal coal demand in the domestic electric power sector has declined from 935 million tons in 2011 to 636 million tons in 2018 and coal has seen its share of the domestic electricity generation market reduce from 43% in 2011 to 31% in 2017.

---

[2] BJMS has a $50 million revolving credit facility with Uniper that is guaranteed by Blackjewel on an unsecured basis (the "BJMS Facility"). The BJMS Facility finances the costs associated with transporting, marketing and selling coal.

010-8797-1704/2/AMERICAS

16.     In this period of declining demand, increased federal and state regulatory scrutiny has significantly increased the cost of compliance.  Changes to regulations surrounding health and safety, permitting and licensing requirements, environmental protection and the reclamation and restoration of mining properties along with increased enforcement of existing laws has had a significant impact, reducing mine productivity and increasing the cost of maintaining compliance.

17.     The impact of the macro and regulatory environment is not isolated to the Debtors performance.  The entire U.S. mining complex has been impacted by these events.  A growing number of peers have filed for bankruptcy over the course of the past 5+ years.  The entire industry either has gone through, or is currently going through, a period of financial distress and reorganization.

**II.     Operational Issues Impacting Liquidity.**

18.     In addition to general industry pressure and downturn, the Debtors have encountered a number of operational issues since 2017.  Specifically, the Debtors have faced, among others, the following:

- In October 2017, Noble Group, the Debtors' former partner in MR Coal (the company's exclusive marketing partner prior to BJMS) informed the Debtors of its intention to exercise its put right and terminate its contractual relationship with the Debtors.  Prior to this notification, MR Coal, at the direction of Noble, had started to unwind advances it had made to the Debtors under the operative agreements. These actions resulted in a significant reduction in liquidity at the Debtors.

- On November 6, 2017, a major roof collapse occurred at the Lone Mountain mining complex causing a shutdown that significantly impacted production.  The Debtors believe that the associated impact on production resulted in approximately $1.4 million in lost revenues.

- On October 5, 2017, Kentucky made sweeping changes to its workers' compensation laws, including increasing the compensation rate from 24% to 48% and shifting the burden of black lung claims entirely to insurance companies rather than a shared burden between the state and the insurance company.  The resulting increase in workers' compensation insurance rates cost the Debtors more $20 million dollars and then led the Debtors to decide to become largely self-insured. The decision to become self-insured also had significant costs and required the

6

Debtors to maintain an escrow account with $11 million at a negative impact to liquidity.

- In the second half of 2017, at the request of its lenders, the Debtors locked-in pricing for its projected 2018 metallurgical coal volumes earlier than would have otherwise been typical. Unfortunately, this was followed by a sharp rise in the benchmark price for metallurgical coal that negatively impacted 2018 revenue by $100-150 million.

- Various flooding events across the midwest in 2019 have severely impacted rail shipments from the Debtors' Western Division mining operations. Starting in March 2019, the Debtor started to experience a material reduction in shipments by rail due to severe damage to the rail lines used to move the Debtors' coal. The impact from the flooding is ongoing, with an estimated $30 million in lost sales directly attributable to it.

## III.    The Debtors' Efforts to Address Liquidity Concerns.

19.    Dating back as far as 2014, the Debtors began taking numerous steps to proactively address the liquidity and other challenges they face. Among others, the Debtors have (i) structurally refocused the Eastern Division to underground metallurgical coal mining through a series of acquisitions and the 2017 Transaction that created Blackjewel and idled legacy thermal assets at Revelation; (ii) replaced the Noble Group and BM Coal with the BJMS joint venture with Javelin and Uniper that also provided a $50 million prepayment for future deliveries; (iii) re-entered the thermal coal business by acquiring the productive Western Division assets from Contura; (iv) switched to a self-insured workers' compensation plan that saves approximately $30 million in premiums per year; and (v) sought out debt financing.

20.    With respect to the latter, in April 2017, to provide working capital and a comprehensive financing solution for the Debtors' acquisition of the Lone Mountain subdivision assets, the Debtors began working with Jefferies LLC ("Jefferies") to locate a financing source. Jefferies' efforts ultimately resulted in the Debtors moving forward with a facility provided by Riverstone Credit Partners ("Riverstone"). The financing provided by Riverstone was an 18-month term loan for up $28 million dollars at an annual interest rate of 15%, plus customary fees

7

(the "Riverstone Facility"). Lime Rock Partners and I personally participated in the Riverstone Facility and provided $3 million each for a total facility size of $34 million.

21. In addition to financing from Riverstone, I (or entities controlled by me) have personally supported the Debtors' liquidity needs on an ongoing basis. Specifically, as the Debtors' liquidity crisis worsened, among other things, I extended an unsecured and undocumented revolving line of credit to fund the Debtors' cash needs (the "Prepetition Revolving Loans"). Interest on the Prepetition Revolving Loans was not paid, but accrued at 4% per annum, during the Prepetition Period. The outstanding balance of the Prepetition Revolving Loans was $11,036,931.23 as of the Petition Date.

## IV. Exhausting Liquidity and Financing Options.

22. During the second half of 2018, the Debtors began a process to refinance the Riverstone Facility due to its impending maturity. The Debtors contacted a number of different parties but were unable to find a party willing to refinance the Riverstone Facility. As a result, on January 2, 2019, the Debtors and Riverstone agree to extend the maturity of the Riverstone Facility by six months through July 17, 2019 (with the ability to receive a further six-month extension through January 17, 2019), in exchange for cash fees totaling 3% of the outstanding principal and the issuance of Series B Units for up to 4% of the equity value of the Company.

23. In January 2019, concurrent with the extension of the Riverstone Facility, the Debtors began working with Jefferies to explore a sale or comprehensive refinancing option to provide additional liquidity and repay the Riverstone Facility and other outstanding debt. As this process was ongoing, on March 11, 2019, the Debtors became aware that they would not meet the leverage ratio negative covenant in the Riverstone Facility for the period ended December 31, 2018 and provided notice of that default to Riverstone. The existence of this default materially

8

impacted the Debtors' ability to refinance the Riverstone Facility and cut-off their right to extend it through January 17, 2020.

24.      Notwithstanding these issues, the Debtors engaged with Riverstone in an effort to extend the Riverstone Facility.  Riverstone was initially supportive and delivered a draft amendment and waiver on May 21, 2019 outlining the terms on which it would be willing to extend the Riverstone Facility.  Final terms of an extension were agreed on June 21, 2019, but the amendment was never fully documented or signed.

25.      On June 26, 2019, Riverstone informed the Debtors that it was no longer willing to extend the maturity and that it expected to paid as and when due on July 17, 2019.  Following that communication, and given the Debtors' other liquidity challenges, the Debtors determined in their business judgment to engage a financial advisor and restructuring counsel to advise on strategic alternatives including the possibility of an emergency chapter 11 filing.

### THE DEBTORS' CAPITAL STRUCTURE

**I.      The Debtors' Prepetition Secured Debt.**

   *A.  The Riverstone Facility*

26.      Pursuant to that certain Credit Agreement dated July 17, 2017 between Blackjewel, L.L.C., as borrower, Blackjewel Holdings, L.L.C., as guarantor, Riverstone Credit Partners – Direct, L.P., as Agent (in such capacity, the "Agent"), Jefferies Finance LLC, as lender, L-R Revelation Holdings, LP, as lender, and Jeffery A. Hoops, Sr. ("Hoops"), as lender (as such agreement has been amended through the date hereof and together with all other documents, agreements, and instruments delivered in connection therewith, the "Riverstone Agreement"), Debtor Blackjewel, L.L.C. obtained a term loan facility in the principal amount of $34,000,000. As part of the $34,000,000 term loan facility, Hoops provided a Hoops Tranche Loan (as defined

therein) in the total amount of $5,000,000. As of the Petition Date, the outstanding balance of this loan was $34 million.

27.     Other than with respect to the Hoops Tranche Loan, which does not bear interest, the borrower pays interest in respect of the outstanding unpaid principal amount of the loans at the Base Rate Option (as defined therein) or LIBOR Rate Option (as defined therein), as applicable, as well as an additional 2% per annum for the default rate (effective December 31, 2018).  The current stated maturity under the Riverstone Agreement is July 17, 2019.

28.     The Agent holds a first-priority security interest in and continuing lien upon substantially all of Blackjewel L.L.C.'s assets, subject only to certain Permitted Prior Liens (as defined in the Riverstone Agreement).  The Permitted Prior Liens are defined in the Riverstone Agreement to be those liens, security interests and other encumbrances set forth on Schedule 6.22 thereof (in respect of personal property) and Schedule 8.01(m) thereof (in respect of real property); copies of such Schedule 6.22 and Schedule 8.01(m) are attached to the DIP Motion (as defined below).  As used herein, the term "DIP Collateral"[3] means any and all property, assets, or collateral, real or personal, whether presently existing or hereafter created or acquired, and wherever located, in each case whether existing, created or acquired prior to the Petition Date or on or after the Petition Date, on which Riverstone, as Agent under the Riverstone Agreement, holds a perfected first priority lien or security interest as of the date of the DIP Credit Agreement, it being the intention hereby that the DIP Collateral shall be all of the Collateral (as defined in the Riverstone Agreement), other than that portion of such Collateral that is subject to the Permitted Prior Liens set forth on said Schedule 6.22 or said Schedule 8.01(m).  An Intercreditor Agreement

---

[3] Unless otherwise defined in this Order or in the DIP Credit Agreement, all terms used in this Order that are defined in the Delaware Uniform Commercial Code, as amended or supplemented from time to time, shall have the meanings given to them in the Delaware Uniform Commercial Code, as amended or supplemented from time to time.

effective as of September 14, 2017 between United Bank, Riverstone, as the Agent, and Blackjewel L.L.C. governs such parties' priorities with respect their respective loans and collateral, according to which the Agent agreed to have a second-priority security interest in the United Bank Collateral

### B. The United Bank Loans.

29.     Pursuant to that certain Second Amended and Restated Loan and Security Agreement dated February 28, 2013 (as amended from time to time, the "<u>United Bank Loan Agreement</u>") between United Bank, Inc. ("<u>United Bank</u>"), Revelation Energy, LLC, as debtor, Blackjewel L.L.C., as debtor, Revelation Energy Holdings, LLC, as guarantor, Alpha Highwall Mining LLC,[4] as guarantor, and Blackjewel Holdings L.L.C., as guarantor, and that certain Amended and Restated Revolving Line of Credit Note dated February 28, 2013, United Bank extended certain loans to Blackjewel L.L.C. under a revolving line of credit with an aggregate principal balance in the total amount of $5,000,000 (as of June 14, 2019) and under a term loan in the principal amount of $8,746,799.36.

30.     In connection with such loans, United Bank was granted a first priority lien on the collateral as further described in sections 3.1 and 3.2 of the United Bank Loan Agreement, which includes but is not limited to all of Debtor Accounts, Receivables and Inventory, and all guaranties, collateral, Liens on, or security interests in, real or personal property, leases, letters of credit, and other rights, agreements, and property securing or relating to payment of the Receivables (each capitalized term, as defined in the United Bank Loan Agreement) (collectively, the "<u>United Bank</u>

---

[4] Alpha Highwall Mining LLC is no longer active and does not have any assets.

010-8797-1704/2/AMERICAS

Collateral"). United Bank's revolving line of credit and term loan had outstanding principal

balances of $5,000,000 and $1,003,393.21, respectively, as of the Petition Date.[5]

### C. The Caterpillar Loan

31.     Pursuant to the Amended and Restated Security Agreement and Promissory Note,

dated February 28, 2017, between Revelation Energy, LLC and Caterpillar Financial Services

Corporation ("Caterpillar"), as amended by the First Amendment to Amended and Restated

Security Agreement and Promissory Note, dated March 3, 2017, the Second Amendment to

Amended and Restated Security Agreement and Promissory Note dated as of June 29, 2017 and

the Third Amendment to Amended and Restated Security Agreement, dated July 17, 2017,

Caterpillar agreed to finance an equipment loan (the "Caterpillar Loan") in the aggregate amount

of $58,001,949.40, which amount was later reduced to $46,476,941.46.  The Caterpillar Loan was

secured by a first priority lien on several pieces of heavy mining equipment (such as dozers, trucks,

excavators and loaders, as specifically identified in the Caterpillar Loan, the "Caterpillar

Collateral").  At the time of the execution of the Riverstone Agreement, Riverstone agreed to be

secured by a second priority lien on the Caterpillar Collateral.  As of the Petition Date, the Debtors

estimate that they owe approximately $23,837,183.63 to Caterpillar under the Caterpillar Loan.

### D. Fifth Third Bank Loan

32.     Pursuant to a certain Master Loan and Security Agreement dated July 12, 2011 by

and between Fifth Third Bank ("Fifth Third"), and Revelation Energy, LLC, as borrower,

Revelation Energy LLC borrowed $20,000,000.00 to purchase certain heavy mining equipment,

such as dozers, excavator and trucks. By a Loan Agreement dated July 2, 2012 between Fifth

---

[5] The term loan was entered into initially between Revelation Energy, LLC, as debtor, and United Bank, Inc., as secured party, and was later guaranteed by Blackjewel L.L.C., as guarantor.

010-8797-1704/2/AMERICAS

Third, as lender, Revelation Energy, LLC, as borrower, and Revelation Energy Holdings, LLC, as guarantor, an additional sum of $5,200,000.00 was borrowed from Fifth Third to purchase a heavy price of equipment called a Highwall Miner.  The Fifth Third's loans are secured by purchase money security interests in the equipment purchased with the proceeds of the loans.

33.    Revelation Energy LLC and Revelation Energy Holdings LLC were recently involved in litigation with Fifth Third relating to the outstanding balance of the loans extended by Fifth Third.  Fifth Third was awarded a judgment in the amount of $7,324,543.24, plus prejudgment interest in the amount of $18,285.64.  The Highwall Miner equipment is the only remaining property subject to  Fifth Third's lien.

### E.  Javelin Commodities Security Agreement

34.    Pursuant to a certain Purchase and Sale Agreement dated December 11, 2017 and related Security Agreement of the same date, Javelin Global Commodities Ltd. ("Javelin") agreed to purchase from Blackjewel L.L.C. 176,000 short tons of thermal coal to be produced by Blackjewel L.L.C. in the future.  A pre-purchase amount was paid by Javelin as a one-time prepayment in the total amount of $5,000,000.00.  As security for the pre-payment, Blackjewel L.L.C. provided to Javelin a security interest in its right, title and interest in the thermal coal subject to the Purchase and Sale Agreement. As of the Petition Date, the pre-purchase amount was reduced to an amount of $1,791,678.00.

### F. Uniper Security Agreement

35.    Pursuant to a certain Purchase and Sale Agreement dated December 11, 2017 and related Security Agreement of the same date, Uniper S.E. ("Uniper") agreed to purchase from Blackjewel L.L.C. 176,000 short tons of thermal coal to be produced in the future by Blackjewel L.L.C.  A pre-purchase amount was paid by Uniper as a one-time prepayment in an amount of

13

$5,000,000.00.  As security for the pre-payment, Blackjewel L.L.C. provided to Uniper a security interest in its right, title and interest in the thermal coal subject to the Purchase and Sale Agreement. As of the Petition Date, the pre-purchase amount was reduced to an amount $4,952,875.00.

### G.  Other Equipment and Capital Leases

36.     The Debtors have various equipment and capital leases for printers, copiers, heavy mining and crushing equipment and vehicles at various mining sites and locations, which equipment is, in some cases, idle. Some of these leases have buy-out options while others have the option for the Debtors to acquire the equipment or vehicle for fair market value. Many of the lessors have filed financing statements in an effort to secure the Debtors' obligations under these agreements. The Debtors have not determined whether any of these agreements are financings rather than true leases and reserve all rights with respect to the same.

### H.  Other Secured Debt

37.     In the ordinary course of business, the Debtors may incur other miscellaneous secured debt from time to time, including reclamation and other obligations that are backed by surety bonds and/or tax obligations that might be subject to statutory liens in favor of a particular governmental entity.   The Debtors make no acknowledgment or stipulation with respect to any such purported liens that may exist or that may in the future exist, and reserve all rights with respect to the same.

## II.  The Debtors' Prepetition Unsecured Debt.

### A.  Jeff A. Hoops, Sr. Prepetition Loans

38.     Jeff A. Hoops, Sr. the President and Chief Executive Officer of Debtor Blackjewel L.L.C., and Clearwater Investment Holdings, LLC and various entities owned, controlled or otherwise affiliated with Hoops or the spouse or descendants of Hoops (collectively, the "Hoops Prepetition Lenders"), including (but not limited to) Lexington Coal Company, LLC, made several

14

revolving credit advances and other unsecured loans or extensions of credit (collectively, the "Prepetition Revolving Loans") to the Debtors. The Prepetition Revolving Loans, which were advanced and repaid on a revolving basis and were not documented, were made to allow to enable the Debtors to pay ordinary course costs and expenses. As of the Petition Date, the amount outstanding on the Prepetition Revolving Loans was $11,020,131.23. The Prepetition Revolving Loans were intended to be business loans. Payments on the Prepetition Revolving Loans were intended to be payments on the debt owed under the Prepetition Revolving Loans and reduced the balance on the Prepetition Revolving Loans.

### B. Trade Debt

39.    In the ordinary course other business, the Debtors purchase or lease mining equipment and processing supplies and use other services and goods from numerous vendors. These vendors provide numerous services associated with the process of blasting the rock to allow the mining process and the provision of equipment related thereto.  Also, materials to keep the machinery running, such as oil, grease, lube, other equipment parts and hoses are purchased for the maintenance of the equipment.   The Debtors have very large costs associated with the day-to-day operation of the coal mines as well as costs which are less common, but are still incurred thorough the year. As of the Petition Date, the Debtors estimate that they collectively owe approximately $156,258,199.41 million in trade debt.

### III.    The Debtors' Prepetition Equity Ownership.

### A. Senior Preferred Units

40.    On July 4, 2017, the Debtors created a class of units designated as Senior Preferred Units.  As of the Petition Date, 40,000 Senior Preferred Units (which were originally issued on August 21, 2017 at a purchase price of $100 per such Senior Preferred Unit) were issued and

outstanding. The John Reynolds Revocable Trust owns 20,000 Senior Preferred Units or 50% of such units and Blackjewel Investment, LLC own 20,000 Senior Preferred Units or 50% of such units.

### B. Series A Units

41.     On July 4, 2017, a class of units designated as Series A Units was created.  As of the Petition Date, 1,000 Series A Units were issued and outstanding.  LR-Revelation Holdings, L.P. owns 625 Series A Units or 62.5% of such units and Blackjewel Investment L.L.C. owns 375 Series A Units or 37.5% of such units.

42.     The Debtors have determined that, in the reasonable exercise of their business judgment, that commencement of these chapter 11 cases is the best course to preserve and maximize value for all stakeholders.  The Debtors believe that the relief provided by chapter 11 will allow them to continue operating as a going concern and enable them to quickly assess how best to maximize value through a potential section 363 sale process and/or a plan of reorganization.

### FIRST DAY MOTIONS [6]

43.     Concurrently with the filing of the chapter 11 cases, the Debtors filed the First  Day Motions requesting various forms of relief.   Generally, the First Day Motions have been designated to meet the goals of: (a) preserving and protecting the Debtors' chapter 11 estates, including by paying certain claims of employees, essential suppliers, lienholders and vendors; (b) obtaining necessary debtor in possession financing to provide the Debtors' estates with sufficient liquidity to operate; and (c) establishing procedures for the smooth and efficient

---

[6] Capitalized terms used but not otherwise defined in this section of the Declaration shall have the meaning ascribed in the applicable First Day Motion.

010-8797-1704/2/AMERICAS

functioning of the Debtors' estates.[7]  I believe that the relief sought in each of the First Day

Motions is tailored to meet the goals described above and, ultimately, will be critical to the

Debtors' ability to reorganize successfully.

I.      **Debtors' Motion for an Order Authorizing Joint Administration of Their Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b) and Local Rule 1015-1(b) (the "Joint Administration Motion").**

44.     By the Joint Administration Motion, the Debtors are requesting entry of an order

directing (a) the consolidation and joint administration of the Debtors' chapter 11 cases for

procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1(b); (b) the

use of single case docket and Bankruptcy Rule 2002 notice list in these cases; and (c) the use of a

consolidated case caption.  The Debtors are further requesting that the Court approve and require

for use on all documents filed and entered in the jointly administered cases the following

consolidated case caption:

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Blackjewel, L.L.C., *et al.*, | ) | Case No. 19-[_____] |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908) and Revelation Energy, LLC (4605). The headquarters for each of the Debtors is located at 1051 Main Street, Milton, West Virginia 25541-1215

45.     The Debtors are also seeking the Court's directive that a separate docket entry be

---

[7] Given the very short timeline on which these chapter 11 cases were prepared and filed, the Debtors expect that additional First Day Motions necessary to preserve and protect the Debtors' assets and estates will be filed in the coming days.  This Declaration will be supplemented to reflect any additional required relief at the appropriate time.

17

made on the docket of each of the Debtors' chapter 11 cases, substantially similar to the following:

An order has been entered in this case directing the procedural consolidation and joint administration of the chapter 11 cases of Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908) and Revelation Energy, LLC (4605). All further pleadings and other papers shall be filed in, and all further docket entries shall be made in, the chapter 11 case of Blackjewel, L.L.C. – Case No. 19-[_____].

46.     I believe, and am advised by counsel, that joint administration will allow the Office of the Clerk of the United States Bankruptcy Court for the Southern District of West Virginia (the "Clerk" or the "Clerk's Office") to use a single docket for each of the chapter 11 cases and enable the Clerk to combine notices to creditors and parties in interest in the Debtors' respective chapter 11 cases, relieve the Clerk from entering duplicative orders and relieve the Clerk from maintaining duplicative files and dockets.

47.     Joint administration will also benefit the United States Trustee's Office and other parties in interest by sparing them the time and expense associated with reviewing duplicative pleadings and papers and enabling them to stay apprised of all the various matters before the Court.

48.     Numerous motions, applications and other pleadings are expected to be filed in the chapter 11 cases that will affect each of the Debtors. Joint administration will allow counsel to the various parties in interest to use a single caption for the many pleadings that will be filed and served in the chapter 11 cases.

49.     Joint administration will not adversely affect the rights of any of the Debtors' creditors or other parties in interest because the Joint Administration Motion seeks the consolidation of the Debtors' estates for procedural purposes only. The Joint Administration Motion does not seek substantive consolidation. Accordingly, each creditor may still file its claim against a particular Debtor's estate.

010-8797-1704/2/AMERICAS

50.     The Debtors will also realize substantial cost savings and reduced administrative burdens by sending a single set of notices to a single creditor matrix and Bankruptcy Rule 2002 list, as opposed to utilizing multiple sets of notices to multiple notice lists.  Joint administration will simplify all aspects of the administration of the above-captioned cases and result in substantial cost savings to the Debtors and other parties in interest

**II.     Debtors' Motion for Entry of an Order (A) Extending Time to File Schedules and Statements of Financial Affairs, (B) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of a Mailing Matrix for Each Debtor, (C) Authorizing the Debtors to File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, and (D) Granting Related Relief (the "SOFAs and Schedules Motion").**

51.     By the SOFAs and Schedules Motion, the Debtors are requesting entry of an order (a) extending the deadline by which the Debtors must file the Schedules and Statements by 46 days, for a total of 60 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown, (b) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (c) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors, and (d) granting related relief.

52.     I believe, and am advised by counsel, that the relief requested in the SOFAs and Schedules Motion is in the best interest of the Debtors' estates.  To prepare the Schedules and Statements, the Debtors must compile information from books, records and documents relating to the claims of hundreds of creditors, as well as the Debtors' many assets and contracts.  This information is voluminous and located in numerous places throughout the Debtors' organization. Collecting the necessary information requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term—when these resources would be best used to stabilize the Debtors' business operations.

19

53.     Although the Debtors, with the assistance of their professional advisors, intend to diligently and expeditiously prepare the Schedules and Statements, the Debtors' resources are strained, especially considering the Debtors' extremely expedited timeline for filing these chapter 11 cases.  Considering the amount of work entailed in completing the Schedules and Statements combined with the competing demands on the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period and accomplish tasks that would have otherwise been completed during the prepetition period under normal circumstances, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.

54.     As a result, the Debtors anticipate that they will require at least 60 days after the Petition Date to complete the Schedules and Statements.  The Debtors therefore request that the Court extend the initial 14-day period for an additional 46 days, without prejudice to the Debtors' right to request further extensions, for cause shown.

**III.**     **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Maintain Existing Bank Accounts and Continue Use of Cash Management System, (B) Continue Use of Existing Business Forms, (C) Open New Debtor in Possession Accounts as Needed, and (D) Continue to Perform Intercompany Transactions (the "<u>Cash Management Motion</u>").**

55.     By the Cash Management Motion, the Debtors are requesting entry of interim and final orders authorizing the Debtors to maintain their Bank Accounts and the Postpetition Cash Management System in the ordinary course of business, continue to use existing Business Forms, open new accounts as necessary, and continue Intercompany Transactions.  The Debtors further request that the Court direct United Bank to freeze the Prepetition Bank Accounts and only process and clear amounts drawn on those accounts with the express written consent of the Debtors.

56.     The Debtors have historically used a total of seven bank accounts, six of which are owned by Debtor Blackjewel, L.L.C. and one that is owned by Debtor Revelation Energy, LLC

20

(collectively, the "Prepetition Bank Accounts").   The Prepetition Bank Accounts (and the

Postpetition Master Operating Account described below) are maintained with United Bank and

listed on Exhibit A to the Cash Management Motion.   A description of the Prepetition Bank

Accounts and their historic functions is as follows (the "Cash Management System"):

### A. Description of the Debtors' Prepetition Cash Management System

a) Prepetition Master Operating Account [United Bank Account #8511]:   Prior to the
Petition Date, all incoming funds, including receivables associated with coal sales,
were deposited into the Prepetition Master Operating Account.   All expenses of the
Debtors were then paid either (a) directly from this account, or (b) swept from this
account to fund check, wire or ACH transfers out of one of the Debtors' other accounts.

Importantly, pursuant to an outstanding letter of credit, United Bank had a right to, and
actively did, sweep excess amounts in this account to pay down the fully drawn letter
of credit.

b) Old Revelation Energy Operating Account [United Bank Account #6324]:   This
account is used to pay obligations assumed by Debtor Blackjewel, L.L.C. as part of the
transaction whereby Blackjewel, L.L.C. and Blackjewel Holdings L.L.C. (collectively,
the "Blackjewel Entities") entered into that certain Purchase and Sale Agreement with
Revelation Energy Holdings, LLC; Revelation Management Corporation and
Revelation Energy, LLC (collectively, the "Revelation Entities") on July 2017 whereby
the Blackjewel Entities agreed to purchase certain assets and liabilities from the
Revelation Entities (the "July 2017 Transaction").   This account is a zero balance
account that sweeps from the Prepetition Master Operating Account to satisfy amounts
drawn on it.

c) New Revelation Energy Operating Account [United Bank Account #9129]:   The New
Revelation Energy Operating Account is owned by Debtor Revelation Energy, LLC
and is used to pay outstanding obligations related to the Revelation Entities that arose
after the July 2017  Transaction.   This account is a zero balance account that sweeps
from the Prepetition Master Operating Account to satisfy amounts drawn on it.

d) Blackjewel East Operating Account [United Bank Account #7953]:   This account is
used to pay outstanding obligations of the Blackjewel Entities that arose after the July
2017 Transaction and before January 1, 2019.   While the account is largely dormant,
there are checks outstanding that could be submitted for payment.   The Blackjewel East
Operating Account is a zero balance account that sweeps from the Prepetition Master
Operating Account to satisfy amounts drawn on it.

e) Blackjewel East Payroll Account [United Bank Account #1966]:   This is a payroll
account used to pay the Debtors' employees working in their Eastern operations.   The

Blackjewel East Payroll Account is a zero balance account that sweeps from the Prepetition Master Operating Account to satisfy employee paychecks drawn on it.

f) <u>Blackjewel West Payroll Account [United Bank Account #1518]</u>:  This is a payroll account used to pay in the Debtors' employees working in their Western operations. The Blackjewel West Payroll Account is a zero balance account that sweeps from the Prepetition Master Operating Account to satisfy employee ACH deposits drawn on it.

g) <u>Blackjewel West Petty Cash Account [United Bank Account #1656]</u>:  This petty cash account, which was initially funded with $10,000, currently has a $9,500 balance and is used to fund minor administrative expenses incurred by the Debtors' Western operations in the ordinary course of business.

57.    The following is a graphical representation of the prepetition Cash Management System:

*[Remainder of Page Intentionally Left Blank]*



1. All accounts effectively operate as ZBAs (zero balance accounts).
2. Account 8511 operates as a "concentration account" but also sweeps daily to the United Bank Line of Credit Account.

### B. *Modification of the Historical Cash Management System*

58.      Shortly before the Petition Date, to ease the burden of administration and to protect against payment of unauthorized prepetition obligations, Debtor Blackjewel, L.L.C. opened a new primary operating account (the "Postpetition Master Operating Account" and, together with the Prepetition Bank Accounts, the "Bank Accounts").

59.      From and after the Petition Date, the Debtors intend to utilize the Postpetition Master Operating Account instead of the Prepetition Master Operating Account as their primary operating account.  In other words, on a postpetition basis, the Debtors intend to receive all incoming funds and process all outgoing payments through the Postpetition Master Operating Account, either directly or by virtue of specifically authorizing United Back to process and clear out of the Postpetition Master Operating Account amounts drawn on one of the Prepetition Bank Accounts (the "Postpetition Cash Management System").  The following is a graphical representation of the Postpetition Cash Management System:



1. The above proposed structure will allow control of all outstanding checks to be specifically reviewed prior to authorization to clear.  Account 2824 will "replace" prior account 8511 which operated similar to a concentration account.
2. All accounts with the exception of 2824 will effectively operate as ZBAs (zero balance accounts). All accounts will sweep daily into 2824.

60.     To accomplish this improved postpetition structure, the Debtors are requesting that the Court order United Bank to freeze the Prepetition Bank Accounts and only authorize it to clear amounts drawn on those accounts in respect of checks and other transfers that are approved pursuant to orders of the Court or otherwise with the written consent of the Debtors.  The Debtors believe that this revised structure will greatly reduce their administrative burden and ensure that unauthorized prepetition obligations are not inadvertently paid.

### C.  Intercompany Transfers

61.     In the ordinary course of business, the Debtors engage in routine internal transactions (collectively, the "Intercompany Transactions") resulting in intercompany receivables and payables (collectively, the "Intercompany Claims").  Specifically, prior to the Petition Date Debtor Blackjewel, L.L.C. periodically advanced funds to Debtor Revelation Energy, LLC to satisfy certain of its liabilities.  Accordingly, at any given time, there may be Intercompany Claims owing from one Debtor to another.  The Intercompany Claims are reflected in the Debtors' accounting systems.

62.     The Debtors track all transfers of funds in their accounting system and can ascertain, trace and account for all Intercompany Transactions.  The Debtors will also put in place monitoring systems to be able to track postpetition intercompany transfers.  If the Intercompany Transactions were interrupted, the Debtors' operations could be unnecessarily disrupted to the detriment of the Debtors and their creditors and stakeholders.

### D.  The Debtors' Existing Business Forms

63.     As part of the ordinary course of operating their business as a going concern, the Debtors use a variety of checks and other business forms (collectively, and as they may be modified, the "Business Forms") in the name of the Debtors.  To minimize expenses to the

Debtors' estates and to avoid confusion for creditors, the Debtors respectfully request that the Court authorize the Debtors to continue to use the Business Forms in existence immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession; provided, however, that the Debtors will obtain a "Debtors" stamp to use on applicable Business Forms reflecting their status as debtors-in-possession.  While the Debtors will stamp their existing business forms, to avoid the burden associated with stamping more than 1000 employee payroll checks on a bi-weekly basis, the Debtors request authority to not stamp those checks.  All employees will be notified of the chapter 11 filing and respectfully submit that stamping payroll checks is not necessary.  With such authorization, the Debtors will be able to avoid the expense and delay of ordering entirely new Business Forms.

64.    I believe that the requested relief is in the best interests of the Debtors' estates, will materially reduce the Debtors' administrative burden and will permit the Debtors the most efficient entry into chapter 11 possible.

**IV.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing (I) Payment of Prepetition Employee, Wages, Salaries, and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Payment of Prepetition Tax and Other Withholdings to Third Parties; (IV) Contributions to Prepetition Employee Health and Other Benefit Programs and Continuation of Such Programs; (V) Payment of Workers' Compensation Obligations and other Insurance Premiums; (B) Authorizing Banks to Honor and Process Electronic Transfer Requests Related Thereto; and (C) Granting Related Relief (the "Employee Motion").**

65.    By the Employee Motion, the Debtors are requesting entry of interim and final orders (a) authorizing the Debtors to pay certain prepetition claims for (i) employee wages, salaries, and other compensation, (ii) federal and state withholding and/or payroll taxes, (iii) contributions to employee benefit plans, and (iv) all other employee-related benefits that the Debtors pay in the ordinary course of their business (collectively, the "Employee Obligations");

25

(b) scheduling the Final Hearing to consider entry of the Final Order; and (c) granting such other and further relief as may be appropriate

66.      As of the Petition Date, the Debtors employ approximately 1700 individuals, all but very few of which are full-time (collectively, the "Employees"). All of Debtors' employees are employed by Debtor Blackjewel, L.L.C. None of the Debtors' employees is subject to a collective bargaining agreement.

### A. Unpaid Compensation

67.      In the ordinary course of business, the Debtors incur payroll obligations to the Employees. Such obligations are comprised of wages and salaries. Historically, the Debtors have paid all of their employees' wages and salaries on a bi-weekly basis in arrears for work performed two weeks prior and ending the Sunday preceding the paycheck date. The Debtors last paid their Eastern Division Employees on June 28, 2019, and their Western Division Employees on June 29, 2019. Western Division Employees are paid via direct deposit and Eastern Division Employees are paid via check.[8]

68.      The Debtors' next payroll is due on July 12, 2019, which will cover the two-week payroll ending on July 7, 2019, and totals approximately $4,050,000. Of that amount, approximately $2,025,000 will be attributable to the prepetition period – *i.e.*, Monday, June 24 through Friday, June 28, 2019. In addition, because the Eastern Division Employees are paid with individual checks, all of the payroll paid to those individuals on June 28, 2019, approximately $2,514,672, did not clear the Banks prior to the Petition Date. Thus, the Debtors estimate that a

---

[8] The June 29 payroll for Western Division Employees, which was scheduled to be paid on June 28, was paid via cashier's check. While the Debtors attempted to process the June 28 payroll for Western Division Employees through the customary ACH process, the Debtors were denied access to the necessary funds by United Bank. To remedy the situation, United Bank issued cashier's checks to the Debtors on Saturday June 29, 2019 and the checks were flown by private plane to Western Division Employees in Wyoming.

010-8797-1704/2/AMERICAS

total of $4,539,672 will be owed to their Employees for prepetition wages (collectively, the "Unpaid Wages"), and request authorization, in their discretion, to pay the Unpaid Wages after the Petition Date in the ordinary course of their business, including by honoring the checks delivered prepetition.

69.     As of the Petition Date, three Employees were owed Unpaid Wages in excess of the $12,850 statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code. Specifically, the amounts by which these Employees exceed the statutory priority cap are as follows:  $3,652.88, $1,573.07 and $10,226.93.  The Debtors respectfully request authority to pay the amounts in excess of the statutory cap for these Employees.

i. Reimbursement of Expenses

70.     Prior to the Petition Date and in the ordinary course of their business, the Debtors reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Business Expenses").  The Reimbursable Business Expenses include, but are not limited to, reimbursements for (a) business-related travel, (b) mileage, (c) telephone expenses, (d) fuel, (e) attendance at conferences, (f) supplies and equipment, and (g) other business-related expenses that are paid by the Employee. Reimbursable Business Expenses are typically submitted by Employees in the ordinary course and repaid during non-payroll weeks.

71.     Reimbursable Business Expenses are all incurred on the Debtors' behalf and with the understanding that the Employees will be reimbursed in the normal course of business. Accordingly, to avoid harming those who may have incurred the Reimbursable Business Expenses, the Debtors request authority, to be exercised in their sole discretion, to (a) continue paying Reimbursable Business Expenses in accordance with prepetition practices, (b) modify their

27

prepetition policies relating thereto as they deem appropriate, and (c) pay all Reimbursable Business Expenses that relate to the prepetition period and are submitted to the Debtors postpetition.  The Debtors estimate that outstanding prepetition Reimbursable Business Expenses total not more than approximately $75,000.

### B.  Deductions and Withholdings

72.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) any legally ordered deductions such as wage garnishments, child support, and tax levies, and (b) other pre-tax and after tax deductions payable pursuant to certain of the Employee benefit plans described herein, such as an Employee's share of medical, dental and vision benefits and insurance premiums, Employee contributions under flexible spending plans, and other miscellaneous deductions (collectively, the "Employee Deductions").  The Debtors then forward the Employee Deductions to the appropriate third-party recipients.  On average, the Debtor deducts approximately $35,000 per each bi-weekly payroll. Employee Deductions totaling approximately $80,000 have not been forwarded to the appropriate third-party recipients as of the Petition Date.

73.     Further, the Debtors are required by law to withhold from Employees' wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts").  The Debtors must then pay, *inter alia*, FICA, social security and Medicare taxes and federal and state unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes").  Based on the Debtors' most recent payroll, the Payroll Tax withholdings are approximately $1,500,000 per bi-weekly payroll.

Approximately $8,300,000 in prepetition Payroll taxes have been collected as of the Petition Date and not remitted to the appropriate taxing authority.

74.     Accordingly, the Debtors seek authority, but not direction, to (i) continue on a postpetition basis to deduct the Employee Deductions, withhold all Withheld Amounts and pay all Payroll Taxes, and (ii) forward, or to direct third parties to forward, Payroll Taxes and Employee Deductions, and (iii) continue to honor and process the prepetition payments for Employee Deductions and Payroll Taxes on a postpetition basis, in the ordinary course of business.

### C. Employee Benefits

75.     The Debtors maintain various plans and policies to provide their employees with various benefits, including (a) medical, dental, and vision coverage through employee benefit plans and flexible spending accounts, (b) vacation time and other paid time off, (c) life insurance and optional accidental death and long-term disability insurance, and (d) retirement plans (401k) (collectively, the "Employee Benefits").  The Employee Benefits are described in greater detail below.

#### i.  Medical and Dental Plans

76.     The Debtors currently maintain and provide medical benefits to all active eligible employees.  The Debtors offer medical and vision insurance administered by United Healthcare and dental plans administered by Delta Dental (collectively, the "Health Plans").

77.     Employees that wish to participate in the United Healthcare medical plan can choose between a high deductible plan and a PPO plan.  Participants in the high deductible plan pay $75, $50 or $25 per pay period, depending on the type of coverage needed (*i.e.*, family, couple or single coverage).  PPO plan participants pay $145, $95 or $55.  The Debtors pay the balance of the premiums and any administrative costs.  The Debtors self-insure claims under the medical plan,

29

but maintain a stop loss for individual claims above $250,000. Between administrative fees and claims, the medical plan costs the Debtors approximately $600,000 per week.

78.    An Employee's contribution toward medical care also includes dental coverage through Delta Dental. The Debtors pay a monthly premium that is based on the number of participants and averages approximately $125,000. Vision coverage is provided through United Healthcare and is entirely funded by participant Employees.

79.    Participation of those employees who elect to participate in the Health Plans cost the Debtors approximately $2,200,000 in the aggregate per month over the most recent months. As of the Petition Date, the Debtors owed approximately $675,000 on account of prepetition Health Plan obligations.

80.    The Health Plans represent an integral component of each participating Employee's benefits package, and without these benefits, the Debtors believe they would be unable to retain all of their personnel and would impose a severe hardship on those employees and their families. The Debtors seek authority, in their sole discretion, to (a) continue offering the Health Plans for Employees in the ordinary course of business, (b) continue making the above-described contributions to such benefit programs, and (c) pay any amounts related thereto, including on account of any premiums, claim amounts, and administration fees to the extent that they remain unpaid as of the Petition Date.

### ii. Workers' Compensation Insurance

81.    The Debtors provide workers' compensation insurance for their Employees (the "Workers' Compensation Program"). Eastern Division Employees receive coverage through a self-insured plan administered by Rockwood Casualty Insurance ("Rockwood") and the Western Division Employees' coverage comes from the State of Wyoming and, solely for blacklung,

Rockwood.  The Debtors also maintain a stop loss policy through Rockwood for individual claims above $1 million.  These benefits are provided at no cost to Employees.

82.     The Debtors make monthly payments to Rockwood of approximately $2,070,000. This amount comprises of approximately $700,000 to build a claims paying escrow and $1,370,000 in premium and administration costs.  The amount paid to the State of Wyoming is a function of statutorily define rate.  In 2019, the base rate payable to State of Wyoming is .98% of payroll or approximately $35,000 per month.   On the Petition Date, the Debtors estimate that approximately $6,600,000 remains due to Rockwood and approximately $100,000 to the State of Wyoming.  The Debtors request authority to continue to maintain, in their sole discretion, the Workers' Compensation Program in the ordinary course of business and to pay in their sole discretion any and all prepetition amounts related thereto including, without limitation, any payments for workers' compensation claims, deductibles, premiums and fees owed for administrative costs, and other amounts required in connection with the Workers' Compensation Program, as such amounts become due in the ordinary course of the Debtors' business.

iii.   Vacation Time and Other Leave

83.     The Debtors provide vacation time to Employees as a benefit of employment (including defined Holiday Pay, the "Vacation Time").   Eastern Division Employees accrue vacation time at a rate of one day per month, with the ability to accrue up to 20 days total that can be carried forward each year.  Importantly, an employee is not permitted to accrue more than 20 days at any given time.  Western Division Employees' Vacation Time accrues per pay period, is based on years of service, and is either two weeks (1-4 years of employment), three weeks (5-9 years of employment) or four weeks (10 plus years of employment).  In addition to Vacation Time, Employees receive eight paid holidays per year.

31

84.     The Debtors also permit their Employees to take certain paid and unpaid leaves of absence, including those required under the Family and Medical Leave Act of 1993 as well as bereavement leave (two paid days after the death of an immediate family member) and personal leave (24 hours for Western Division Employees only).

85.     When an Employee elects to take Vacation Time, generally that Employee is paid his or her regular hourly or salaried rate.  If an Employee ceases employment with the Debtors, the Employee's final paycheck will include any accrued unused vacation time. The Debtors estimate that approximately $3,000,000 of earned but unused Vacation Time will have accrued as of the Petition Date for all eligible Employees.

86.     The Debtors request that they be authorized, but not directed, to continue to honor their Vacation Time and other leave commitments in the ordinary course of business, and to honor and pay any prepetition amounts related thereto.  Moreover, the Debtors anticipate that their Employees will utilize any accrued Vacation Time and other leave allowances in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

### iii.  Life and Other Insurance, and Long-Term Disability Benefits

87.     The Debtors provide each Employee with basic life insurance coverage (the "Life Insurance") through Prudential at no cost to the employee.  Employees receive $25,000 of general death benefit coverage and $50,000 of coverage for an on the job accidental death.  Employees also have the ability to purchase supplemental life insurance and long-term disability coverage through Prudential and accidental death coverage through Colonial Life.[9]  The total cost to the

---

[9] Western Division Employees also receive short-term disability coverage that is administered internally.  In the event of a short-term disability hourly employees receive $500 per week.  Salaried employees receive 100% of their pay for four weeks and 60% thereafter.  The cost associated with the short-term disability program is approximately $25,000 per month.

Debtors for the Life Insurance and related insurance program administrative fees is approximately $125,000 per month.  The Debtors estimate that approximately $550,000 in prepetition amounts had not been remitted as of the Petition Date.

88.      The Debtors request that the Court authorize, but not direct, the Debtors to continue providing the Life Insurance and related benefits and to honor and pay any prepetition amounts related thereto.

v. <u>Flexible Benefits Plans</u>

89.      The Debtors offer their Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care costs (the "<u>Flexible Benefit Plan</u>").  The Debtors contribute $61.54 per pay period for each participating Employee and pay fees to Optum Bank for administering the Flexible Benefit Plan.  Employees can also make contributions up to the statutory maximum.

90.      The Debtors' contribution plus the costs of administration totals approximately $125,000 per month.  The Debtors estimate that approximately $300,000 in prepetition amounts had not been remitted as of the Petition Date.  The Debtors request that the Court authorize, but not direct the Debtors to continue providing and administrating the Flexible Benefit Plans and to honor and pay any prepetition amounts related thereto.

vi. <u>Retirement Plans</u>

91.      The Debtors provide Employees a 401(k) retirement plan administered by Benefit Plan Services (the "<u>401(k) Plan</u>").  The Debtors match Employee contributions dollar-for-dollar up to 3% and .5% for each additional 1% contributed by the employer up to a maximum matching contribution of 4%.  Gross withholdings for the 401(k) Plan fluctuates during the year, and averaged approximately $860,000 in the most recent month.  The Debtors also pay Benefit Plan

33

Services a monthly fee of $500 for administering the 401(k) Plan.

92.     The Debtors estimate that $900,000 in prepetition employer matching contributions and $1,200,000 in Employee withholdings have not been remitted.  The Debtors request that the Court authorize, but not direct, the Debtors to continue offering the 401(k) Plan and honor and pay any prepetition amounts related thereto.

vii. Other Benefits

93.     Because of the nature of the Debtors' business, certain employees regularly use their personal vehicle in the performance of their job duties.  These Employees receive a vehicle allowance of $200-400 per month, depending on the frequency in which their vehicle is used to perform work-related tasks.  They also receive reimbursement of fuel and oil change costs as well as one new set of tires per year (the "Vehicle Allowance").  The Debtors estimate that the Vehicle Allowance costs approximately $64,000 per month.  The Debtors request to continue the program in the ordinary course of business and pay any prepetition amounts that have not been remitted to participating Employees.

94.     For the reasons set forth in the Employee Motion, I believe that the relief requested is in the best interest of the Debtors, their estates and creditors.

**V.     Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and Shippers (the "Critical Vendor Motion").**

95.     By the Critical Vendor Motion, the Debtors are requesting entry of interim and final orders (a) authorizing the Debtors to pay, in their discretion, the Obligations in the amount of up to $3 million in the aggregate on an interim basis (the "Interim Cap"), (b) authorizing the Debtors' bank to process, honor and pay any and all checks and transfer requests with respect to the Obligations and to rely on the representations of the Debtors as to which checks are issued or authorized to be paid in accordance with the Critical Vendors Motion without any further duty of

34

inquiry and without liability for following the Debtors' instructions and (c) granting related relief. With respect to the final order, the Debtors are continuing to analyze their books and records to determine the maximum amount of Obligations that may need to be paid and will disclose that amount to the Court and parties in interest in advance of a final hearing.

### A. The Debtors' Critical Vendors

96.     In the ordinary course of business, the Debtors make payments to certain essential trade vendors and service providers (the "Critical Vendors") on a regular basis.  If the Critical Vendors are not paid, their unwillingness to continue to service the Debtors could cause an interruption of the Debtors' businesses.[10]  Such interruption could have drastic consequences for the operations of the Debtors' due to the lack of alternative suppliers or service providers in many situations, or the amount of time needed to locate and convert to alternative sources.  Such interruption would also negatively affect the Debtors' revenue and further strain their liquidity.

97.     The Debtors have reviewed their business relationships and identified vendors, the loss of whose particular goods or services would cause immediate and irreparable harm to the Debtors' businesses.[11]  In identifying Critical Vendors, the Debtors considered the following three general criteria:  (a) whether the Debtors' are required to use the particular vendor by their lenders, customers or another third-party; (b) whether the vendor would be prohibitively expensive or time-consuming to replace, such as where the Debtors' existing inventory, equipment, or coal mining

---

[10] The Debtors may need to identify vendors as Critical Vendors even if the Debtors' relationships with those vendors are contractual. Additionally, for contracts of a short duration or where the vendor is operating under a purchase order, there is a risk that failure to pay prepetition amounts may result in the counterparties refusing to renew those contracts or accept a new purchase order.  To the extent the Debtors' relationships with Critical Vendors are contractual, the Debtors may assume the contracts with those Critical Vendors later in these chapter 11 cases, in which case the prepetition obligations owed to those Critical Vendors would be paid in full.  Accordingly, the relief requested herein should only affect the timing of payment of those Critical Vendor Claims (as defined below) and will not prejudice the rights of other parties in interest.

[11] In view of the exigent circumstances leading up to the filing of these Cases, the Debtors are continuing to review whether additional parties should be afforded Critical Vendor treatment.

and processing are specifically tailored to that vendor's products or services; and (c) whether the vendor is a sole-source or limited-source supplier of goods or services of the quality and quantity required by the Debtors in a particular market, without whom the Debtors could not continue to operate without disruption. The Debtors also considered the financial condition of their vendors and service providers to the extent such information was known, including each vendor's or supplier's level of dependence on the Debtors' continued business and whether such vendor or supplier is itself financially distressed.

98.     The Critical Vendors provide various products, services and goods essential to the Debtors' businesses, including, but not limited to, security, safety, parts and equipment, maintenance and repair, environmental testing, drilling and blasting, fuel and lubricants, raw materials, technical, engineering, permitting, surveying and mapping, and information technology. If required, the Debtors will provide a schedule of Critical Vendors to the Court or the United States Trustee for the Southern District of West Virginia under seal.

99.     The continued availability of trade credit in amounts and on terms consistent with those that the Debtors enjoyed prepetition is necessary for the Debtors to maintain liquidity for operations and preserve the customer base and vendor network that is essential to the Debtors' efforts to maximize the value of their estates. The Debtors believe that preserving working capital through the retention or reinstatement of Customary Trade Terms will enable the Debtors to maintain their competitiveness and to maximize the value of their businesses. Conversely, a deterioration of trade credit and disruption or cancellation of deliveries of goods and services would hinder the Debtors' operations and undermine their ability to generate revenue and ultimately to maximize the value of these estates.

100.    In sum, the failure to pay prepetition claims owed to Critical Vendors (the "Critical Vendor Claims") could critically damage the Debtors, their estates, their creditors and other parties in interest and undermine the prospects for a successful chapter 11 process.  In addition, without Customary Trade Terms, the Debtors could lose an inexpensive and existing source of financing. Indeed, failure to pay Critical Vendor Claims may result in Critical Vendors ceasing to do business with the Debtors altogether.  Accordingly, I believe that satisfying Critical Vendor Claims is necessary to preserve value.

### B. The Debtors' Shippers

101.    In the normal course of their business, the Debtors utilize and make payments to delivery services, trucking and rail transport companies, freight terminal operators, transloaders, shippers, and other transportation service providers (the "Shippers" and, their claims, the "Shippers Claims" and, together with the Critical Vendor Claims, the "Obligations") that ship, transport, store and otherwise facilitate the movement of parts, materials and other goods used in the Debtors' operations.  The services provided by the Shippers are essential to the Debtors' day-to-day operations as the Debtors rely on the Shippers to transport coal from the mines to preparation plants and from the preparation plants to dock and rail terminals.  In many cases, the Shippers are irreplaceable and represent the only means to transport the Debtors' goods.  For example, the Debtors' business depends critically on their relationships with several trucking and rail transport companies for which there are no adequate or available substitutes in the market.  The Debtors also rely heavily on operators of key dock and rail terminals, many of which represent the only practicable method of accessing and transporting the Debtors' goods.  The inability to locate suitable replacements for these and similar Shippers would result in the Debtors' mining operations coming to an immediate halt.

37

102.     Accordingly, I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtors, their estates and creditors.

**VI.     Emergency Motion of Debtors and Debtors-in-Possession for Interim and Final Orders Authorizing Debtors to (A) Obtain Secured Subordinated Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1) and 364(c)(3); (B) Authorize Debtors to Use Cash Collateral and Grant Adequate Protection to Pre-Petition Secured Lenders Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363; (C) Schedule Final Hearing Pursuant to Rules 4001(b), 4001(c) and 9014; and (D) Grant Related Relief (the "<u>DIP Motion</u>").**

103.     By the DIP Motion, the Debtors are requesting entry of interim and final orders (a) authorizing the Debtors to obtain secured subordinated debtor-in-possession financing with priority over certain administrative expenses and secured by junior liens on certain property of the Debtors' estates; (b) authorizing the Debtors to use cash collateral and other collateral and grant adequate protection; (c) modifying the automatic stay to the extent necessary to implement the terms of the DIP Orders; (d) scheduling a final hearing; and (e) granting related relief.

104.     The filing of these chapter 11 cases was precipitated by a severe and unforeseen liquidity crisis faced by the Debtors.  A dispute between the Lenders and Agent under the Riverstone Agreement and the Debtors compelled the Debtors to seek this Court's protection on an emergency basis. The Debtors are entering chapter 11 with insufficient cash to operate their businesses and the Debtors need additional liquidity, in addition to the cash flow from operations, to fund and operate their business.  Most critically, the Debtors are required to make a payment in the amount of approximately $6 million to fund their employees' salaries, taxes and benefits on the first day of the chapter 11 cases.  If the Debtors cannot satisfy their payroll obligations on July 1, 2019, the Debtors will lose the support of their employees and will not be able to continue as a going concern.  The failure to meet their payroll obligations, coupled with the lack of available funding for the Debtors' day-to-day operations, will, in turn, destroy the Debtors' business value and any hope for a reorganization for the Debtors will be lost.

010-8797-1704/2/AMERICAS

105.    Therefore, by the DIP Motion, the Debtors are requesting entry of the DIP Orders authorizing them to obtain post-petition financing from Jeffery A. Hoops, Sr. and Clearwater Investment Holdings, LLC (together, as their interests may appear, the "DIP Lender") pursuant to the terms and conditions of that certain Debtor-in-Possession Term Loan Note entered by and among Blackjewel and the DIP Lender, dated as of July 1, 2019 (the "DIP Credit Agreement"). A true and correct copy of the DIP Credit Agreement is attached to the DIP Motion as Exhibit B.

106.    The Debtors request authorization to obtain a term loan (the "DIP Loan") up to an aggregate principal amount of $20,000,000 from the DIP Lender, which amount consists of (i) existing prepetition revolving debt owed to the DIP Lender in the total amount of $11,036,931.23, (ii) the amounts totaling $16,800.00 paid by the DIP Lender on behalf of the Debtors to deliver payroll checks of the Debtors to their Wyoming employees, and (iii) the reasonable fees and expenses of the DIP Lender associated with the DIP Credit Agreement in amount not to exceed $50,000 (such amounts in clauses (i) and (ii) being, collectively, the "Roll-up"), with the remaining amount of $8,963,068.77 being loaned to the Debtors in a single advance upon the grant of the DIP Motion, subject to the terms of the DIP Credit Agreement.

107.    The obligations incurred by the Debtors under the DIP Credit Agreement will be secured, pursuant to section 364(c)(2) and section 364(d) of the Bankruptcy Code, by a perfected lien and security interest only in the Riverstone First Lien Collateral,[12] subject only to (i) the Carve-Out, (ii) the liens and security interests of the Agent under the Riverstone Agreement, and (iii) other valid and perfected liens or security interests in the Riverstone First Lien Collateral held by other creditors, if any, existing as of the Petition Date. Thus, the obligations incurred by the

---

[12] As used herein, the term "Riverstone First Lien Collateral" shall mean all "Collateral" (as such term is defined in the Riverstone Agreement) on which the Agent under the Riverstone Agreement holds a perfected first priority lien or security interest as of the date of the Petition Date.

010-8797-1704/2/AMERICAS

Debtors under the DIP Credit Agreement will only be secured by the Riverstone First Lien Collateral and **not by any other property of any Debtor**.

108.    While the Debtors acknowledge that the request for the Roll-up is uncommon, the Debtors are faced with a stark and existential dilemma. The DIP Lender is the only party that is prepared to provide post-petition financing to the Debtors and is willing to advance funds to the Debtors only upon the terms and subject to the conditions contained in the DIP Credit Agreement and the Interim Order, including the Roll-up. If the Debtors are not able to obtain approval by the Court of the DIP Motion and the DIP Loan, they will likely have to convert these chapter 11 cases to chapter 7 cases, liquidate their business, and terminate the employment of their approximately 1,700 employees, an outcome that would destroy the value of the Debtors' business and would be extremely prejudicial to all of the Debtors' stakeholders.

109.    It goes without saying that allowing the Debtors to remain a viable going concern will best maximize the value of the Debtors for the benefit of their estates and creditors. The Debtors believe that it would be far more detrimental to all stakeholders, including the unsecured creditors in these chapter 11 cases, to have the Debtors liquidated than to authorize the DIP Loan, including the Roll-up. Any adverse impact of the Roll-up is vastly outweighed by the benefits of the Debtors receiving the DIP Loan.

110.    As explained in the *Robert White Declaration* and as the evidence to be adduced during the hearing on the DIP Motion will show, the Debtors believe in their sound business judgment that the DIP Loan is in the best interests of the Debtors' estates, their creditors and stakeholders for the following reasons:

- The financial terms of the DIP Loan – as further described below - are significantly below market terms because, among other things, (a) the per annum interest rate of daily one-month LIBOR, plus six percent (6%), is lower than market, (b) no interest will be required to be paid on the DIP Loan until maturity, (c) the DIP Loan does not

40

include any additional fees such as commitment fees, call premiums, or termination fees, (d) the DIP Loan contains no financial, affirmative or negative covenants, such that the Debtors will not be constrained by the customary covenants generally imposed in chapter 11 cases, and (e) the DIP Loan contains no milestones, so that the Debtors will be able to explore all appropriate options to maximize the value for the Debtors for the benefit of all stakeholders;

- The severe and unforeseen liquidity crisis facing the Debtors and the emergency need for the DIP Loan on an extraordinarily short time frame does not allow the Debtors enough time to seek alternative funding from sources that are not already familiar with the Debtors' business;

- None of the Debtors' prepetition lenders, including the Agent under the Riverstone Agreement and United Bank, has indicated any interest in providing DIP financing, and it is extraordinarily unlikely that any lender would be willing to entertain an offer for DIP financing under such tight time constraints and on better terms than those currently proposed; and

- The liens and security interests granted to the DIP Lender are **not** priming liens and security interests: they are junior to (a) the Carve-Out, (b) the liens and security interests of the Agent under the Riverstone Agreement existing as of the Petition Date and (c) other valid and perfected liens or security interest in the Riverstone First Lien Collateral held by other creditors, if any, existing as of the Petition Date.

111.    Given their current financial condition, financing arrangements, and capital structure, and the exigent circumstances of these chapter 11 cases, the Debtors have been unable to obtain financing from sources other than from the DIP Lender on terms more favorable than those under the DIP Credit Agreement.  The Debtors were also unable to obtain the required funds in the form of unsecured credit or unsecured debt allowable under Section 503(b)(1) as an administrative expense pursuant to Section 364(a) or (b), unsecured debt having the priority afforded by Section 364(c)(1), or debt secured only as described in Section 364(c)(2).

112.    The Debtors also request entry of the DIP Orders to authorize them to use the Cash Collateral of the Agent under the Riverstone Agreement and of United Bank, Inc. ("United Bank") pursuant to the terms of the DIP Orders.  In addition, to be allowed to use the Cash Collateral and other collateral, as applicable, the Debtors propose an adequate protection package for the benefit

010-8797-1704/2/AMERICAS

of the Agent under the Riverstone Agreement, for the benefit of the Secured Parties, and United

Bank consisting of replacement liens and security interests in all post-petition property of the

Debtors of the same extent, type and priority as the Agent under the Riverstone Agreement and

United Bank have in the pre-petition property of the Debtors.

113.    The Debtors believe that the proposed adequate protection packages are appropriate

given, among other things, (i) the junior position that the DIP Lender seeks to obtain through the

DIP Loan and (ii) the Agent under the Riverstone Agreement and United Bank are meaningfully

oversecured.  For example, and without undertaking a going concern valuation of the Debtors, it

is worth noting that, based on an Appraisal Report dated October 17, 2018 prepared by Ritchie

Brothers Auctioneers Canada Ltd., an orderly liquidation valuation of the majority of the **Debtors'**

**equipment** in the Western Division, which assumed a forty-five days' notice and sale (generally

considered a conservative assessment of valuation), yielded a value of approximately $74,000,000.

Therefore, the value of the Debtors' collateral (even taking only into consideration the Debtors'

equipment in the Western Division) supports approval of the proposed adequate protection

packages.

114.    If approved, as demonstrated by the Debtors' 13-week cash flow forecast, (the

"Budget"),[13] the DIP Loan will provide sufficient liquidity to pay the Debtors' employees on the

first day of the chapter 11 cases and to fund the Debtors' operations going forward. It will allow

the Debtors to send a strong message to their employees, vendors and customers that the Debtors

are well-capitalized and well positioned for a successful reorganization. The Debtors simply have

no choice but to seek access to the additional liquidity to fund their chapter 11 cases while working

toward a successful reorganization.

---

[13] A copy of the Budget is attached to this Declaration as **Exhibit C**.

42

115.    The Debtors' use of cash collateral and post-petition financing is thus critical to allow the Debtors to maintain their day-to-day operations in the ordinary course of business. Absent use of cash collateral and access to post-petition financing, the Debtors will not be able to continue operating in the ordinary course and the maximization of the value of the Debtors' assets and business, through its reorganization, will be severely jeopardized. Accordingly, it is imperative that the Debtors have sufficient liquidity to avoid imminent and irreparable harm and to allow them to successfully reorganize their business.

116.    The Debtors negotiated the DIP Loan with the DIP Lender in good faith and at arm's length.  The Debtors believe that the terms of the DIP Credit Agreement are reasonable under the circumstances, below market, and the best terms that could be obtained under the totality of the circumstances and the emergency facing the Debtors. In connection with the use of the cash collateral, the Debtors also propose appropriate adequate protection packages for the benefit of (i) the Agent under the Riverstone Agreement, on behalf of the Secured Parties, and (ii) United Bank

117.    A summary of the salient terms of the DIP Loan are as follows:

- DIP Loan Amount. The Debtors request authorization for Blackjewel to obtain the postpetition DIP Loan financing described in the DIP Credit Agreement and Interim Order up to the aggregate principal amount of $20,000,000 (the "Principal Sum") from the DIP Lender, which amount consists of (i) existing prepetition revolving debt owed to the DIP Lender in the total amount of $11,036,931.23, and (ii) the amounts totaling $16,800.00 paid by the DIP Lender on behalf of the Debtors to deliver payroll checks of the Debtors to their Wyoming employees, (collectively, the "Roll-up"), with the remaining amount of $8,963,068.77 being loaned to the Debtors in a single advance upon the grant of the DIP Motion, subject to the terms of the DIP Credit Agreement. *See* DIP Credit Agreement at p. 1; Interim Order at p. 8.

- Interest Rates. The Principal Sum under the DIP Loan bears interest at the per annum rate equal to the Daily LIBO Rate (as defined in the DIP Credit Agreement), plus six percent (6%) (the "Contract Rate"), and the default rate of interest shall be 4.00% in excess of the Contract Rate.  *See* DIP Credit Agreement at p. 1 - 2.

43

- <u>Maturity Date</u>. The Principal Sum under the DIP Loan and all accrued interest shall be payable in one (1) installment in the aggregate amount of (a) the entire remaining unpaid Principal Sum, <u>plus</u> (b) the entire amount of all interest accrued thereon and reasonable fees and expenses of the DIP Lender in an amount not to exceed $50,000 to, but not including, the date of payment, on the earliest to occur of (i) entry of an order in the Case approving financing from any lender other than the DIP Lender; (ii) the Maturity Date (as defined in the DIP Orders); (iii) the DIP Orders ceasing to be in full force and effect for any reason; (iv) entry of an order in the chapter 11 cases of (a) confirmation of any plan of reorganization, or (b) consummation of a sale of substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code; (v) appointment of a Chapter 7 or Chapter 11 trustee in the chapter 11 cases; or (vi) the occurrence of an Event of Default (as defined in the DIP Orders). *See* DIP Credit Agreement at p. 2.

- <u>Default</u>. Default under the DIP Loan includes, (a) the failure of the Debtors to perform in any material respect any of its obligations pursuant to the DIP Orders; (b) the Termination Date (as defined in the DIP Orders); (c) the Debtors' bankruptcy case is either dismissed or converted to a case under chapter 7 of the Bankruptcy Code; (d) a trustee or examiner with expanded powers is appointed in the Debtors' bankruptcy case; or (e) the termination of any DIP Credit Agreement, or if terminated sooner by an order of the Bankruptcy Court, the DIP Lender may, at the DIP Lender's option, without notice or demand, accelerate the maturity of the obligations evidenced thereby, which obligations shall become immediately due and payable. *See* DIP Credit Agreement at p. 3.

- <u>Superpriority Claims</u>. Obligations incurred by Blackjewel under the DIP Credit Agreement shall have priority, pursuant to section 364(c)(1) of the Bankruptcy Code, over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject to the Carve-Out. *See* Interim Order at p. 10.

- <u>Liens and Security Interests</u>. Obligations incurred by Blackjewel under the DIP Credit Agreement shall be secured, pursuant to section 364(c)(2) and section 364(d) of the Bankruptcy Code, by a perfected lien and security interest in all Riverstone First Lien Collateral that is junior in priority only to (i) the Carve-Out (as defined herein), (ii) the valid, perfected and enforceable first-priority liens of the Agent for the benefit of the Secured Parties, and (iii) any other valid, perfected and enforceable liens against the Riverstone First Lien Collateral existing as of the Petition Date. *See* DIP Credit Agreement at p. 2, 3; Interim Order at p. 9, 10. Thus, the obligations incurred by the Debtors under the DIP Credit Agreement are only secured by the Riverstone First Lien Collateral, they are not secured by any other property of any Debtor.

- <u>Guaranty</u>.  Obligations incurred by Blackjewel under the DIP Credit Agreement shall be guaranteed by Blackjewel Holdings LLC, a debtor and debtor-in-Possession ("<u>Holdings</u>").

- <u>Modification of Automatic Stay</u>. The Debtors agree and acknowledge that the automatic stay in effect pursuant to section 362 of the Bankruptcy Code be vacated and modified so as to permit (i) all payments and applications with respect to the obligations as provided in the DIP Credit Agreement and the Interim Order, (ii) the DIP Lender to exercise, upon the occurrence and continuation of an event of default, and the giving of ten (10) days' written notice to any Official Committee of Unsecured Creditors appointed in this case, counsel for Riverstone, counsel for United Bank, the Office of the United States Trustee and the Debtors' counsel, all rights and remedies the Lender has pursuant to the DIP Credit Agreement and under the Interim Order; and (iii) the implementation of other provisions of the Interim Order. *See* Interim Order at p. 12-13.

- <u>Interests In Cash Collateral</u>. The Agent under the Riverstone Agreement and United Bank are the only entities of which the Debtors are aware that have an interest in Cash Collateral.

- <u>Use Of Cash Collateral</u>.    It is critical that the Debtors are able to utilize Cash Collateral to fund their ordinary business operations and preserve and maximize the value of their business. The Debtors' use of Cash Collateral will be subject to compliance with the Budget.

- <u>Adequate Protection</u>. The Debtors shall provide adequate protection to the Agent under the Riverstone Agreement and United Bank in the form of replacement liens and security interests in all post-petition collateral, as applicable, to the same extent, type and priority they had prepetition. *See* Interim Order at p. 11.

118.    Accordingly, as set forth herein, as the Debtors' President and CEO, I believe that the DIP Loan and the relief requested in the DIP Motion is in the best interests of the Debtors, their estates and creditors.

I, Jeff A. Hoops, Sr. declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 1, 2019

Jeff A. Hoops, Sr.
President and CEO
Blackjewel, L.L.C. and
Blackjewel Holding L.L.C.