# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Blackjewel, L.L.C., *et al.*, | ) | Case No. 19-bk-30289 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |

**DECLARATION OF ROBERT J. WHITE IN SUPPORT OF MOTION OF DEBTORS AND DEBTORS-IN-POSSESSION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO (A) OBTAIN SECURED SUBORDINATED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1) AND 364(c)(3); (B) AUTHORIZE DEBTORS TO USE CASH COLLATERAL AND OTHER COLLATERAL AND GRANT ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 363; (C) SCHEDULE FINAL HEARING PURSUANT TO RULES 4001(b), 4001(c) AND 9014; AND (D) GRANT RELATED RELIEF**

I, Robert J. White, hereby declare under penalty of perjury as follows:

1. I submit this declaration (this "Declaration") in support of the *Motion of Debtors and Debtors-in-Possession for Interim and Final Orders Authorizing Debtors to: (A) Obtain Secured Subordinated Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1) and 364(c)(3); (B) Authorize Debtors to Use Cash Collateral and Other Collateral and Granting Adequate Protection to Pre-Petition Secured Lenders Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363; (C) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(b), 4001(c) and 9014; and (D) Grant Related Relief,* dated July 1, 2019 (the "Motion"),[2] which seeks approval, among

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtors' taxpayer identification number are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908) and Revelation Energy, LLC (4605). The Debtors' headquarters are located at 1051 Main Street, Milton, West Virginia 25541-1215.

[2] All terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

other things, of a debtor in possession secured subordinated post-petition financing (the "DIP Facility") to be extended by Jeffery A. Hoops, Sr. and Clearwater Investment Holdings, LLC (together, the "DIP Lender"), which is secured by a junior lien on the collateral subject to the Riverstone Agreement. As noted in the DIP Motion, the DIP Facility is in the form of a term loan in the aggregate principal amount of $20,000,000 which consists of (i) the existing balance of the Prepetition Revolving Loans in the total amount of $11,020,131 and (ii) the amounts paid to deliver payroll checks of the Debtors to Wyoming totaling $16,800 (such amounts, collectively, the "Roll-Up"), with the remaining amount of the DIP Facility in the amount of approximately $8.9 million being available to the Debtors as a term loan.

2. The statements in this Declaration are, except where specifically noted, based on my personal knowledge or views, on information that I have received from the Debtors' employees or advisors, from the employees of Jefferies LLC ("Jefferies") working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of their businesses.

3. I am not being specifically compensated for this testimony other than through payments received by Jefferies as a professional retained by the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

### Professional Background and Qualifications

4. Jefferies provides a broad range of corporate advisory services to its clients including, without limitation, services related to the following: (a) general financial advice; (b) mergers, acquisitions, and divestitures; (c) special committee assignments; (d) capital

raising; and (e) corporate restructurings. Jefferies and its senior professionals have extensive experience in the reorganization and restructuring of troubled companies, both out of court and in chapter 11 proceedings. Jefferies has advised debtors, creditor and equity constituencies, and purchasers in numerous reorganizations in the United States and worldwide. Since 2007, Jefferies has been involved in over 250 restructurings representing approximately $500 billion in restructured liabilities. In the coal industry, since 2015, Jefferies has advised Mission Coal and Cambrian Coal in their chapter 11 cases and has also advised the Official Committees of Unsecured Creditors in the chapter 11 cases of Patriot Coal, Alpha Natural Resources, Arch Coal, Peabody Energy, Armstrong Energy, Westmoreland Coal and Cloud Peak Energy.

5. I have approximately 20 years' experience as an advisor in corporate restructurings and distressed situations. I have advised companies, creditors, shareholders, and other stakeholders regarding restructurings and recapitalizations, chapter 11 re-organizations, and mergers and acquisitions. While at Jefferies and at prior firms, I have advised significant stakeholders in chapter 11 cases, including those of Arch Coal, Brookstone, Inc., Blockbuster Inc., Claire's Inc., Eastman Kodak, Extended Stay Hotels, The Great Atlantic & Pacific Tea Co., Hayes-Lemmerz International, Momentive Performance Materials, Reddy Ice Holdings, and Rex Energy.

6. In virtually all of those cases, I advised clients with respect to issues relating to chapter 11 plan negotiations, DIP financings, cash collateral usage, 363 sale processes, and/or new money recapitalizations, in each case analyzing and evaluating

business plans, cash flow forecasts, and liquidity needs as well as evaluating, negotiating, and structuring DIP financings.

7. Prior to working at Jefferies, I was a Senior Distressed Debt Analyst at Fintech Advisory, Inc., a private investment firm with $4 billion of assets under management. Prior to working at Fintech Advisory, Inc., I was a Director with Barclays Capital's Distressed Debt trading desk. While at Fintech Advisory, Inc. and Barclays Capital, I analyzed, invested, and traded in the securities of distressed companies. Prior to that time, I was a Senior Vice President specializing in restructuring advisory services at Chanin Capital Partners, Inc., a boutique investment bank. I hold an MBA from Boston University and a Bachelor's Degree with Honors from Allegheny College. I also hold FINRA Series 7 and Series 63 licenses.

8. I have testified at trial, deposition, or by proffer in the chapter 11 cases of Arch Coal, Claire's Inc., Forbes Energy, and Real Industry, among others. As a result of my experience and training, I am able to assess a company's ability to raise DIP financing and whether various financing terms are customary and usual.

9. In addition, Jefferies is well acquainted with the current DIP financing market for coal companies based on its extensive experience in recent coal restructuring cases including Cloud Peak, Cambrian Coal, Mission Coal, and Westmoreland, among others.

**The Debtors' Immediate Liquidity Needs**

10. The Debtors have advised that they are in urgent need of an immediate capital infusion. Specifically, as noted in the Motion, the Debtors lack sufficient funds to operate their enterprise and continue paying their debts as they come due. I am also advised that, as of the Petition Date, the Debtors' total cash balance is approximately

$0.1 million, and that they do not have readily available sources of additional financing, other than the proposed DIP Facility.

11. The Debtors believe that they have suffered from company specific and macroeconomic factors that have prevented them from maximizing the value of their mining operations. I am advised that the combination of higher than expected costs required to maximize efficiency at the mines, operational issues that affected production levels and an unforeseen dispute between the Prepetition Lender and the Debtors led to the severe liquidity crisis that was the ultimate cause of these chapter 11 cases.

12. Jefferies reviewed the 13-week cash flow forecast prepared by the Debtors and FTI Consulting, Inc., the Debtors' proposed financial advisor, which takes into account anticipated cash receipts and disbursements during the 13-week projection period and considers a number of factors, including the effect of the chapter 11 filing on the operations of the business, professional fees, and required operational payments. Based upon these forecasts and discussions with the Debtors' management and other advisors, I do not believe it would be possible to administer the Debtors' chapter 11 estates through a cash collateral agreement only given the Debtors' existing liquidity and forecasted receipts and expenditures.

13. Without access to the DIP Facility, moreover, the Debtors will have virtually no cash on hand, and based on the Debtors' liquidity forecast, the Debtors will not be able to generate sufficient levels of operating cash to cover their working capital needs and the costs of these chapter 11 cases. Most critically, I understand that the Debtors are required to make a payment in the amount of approximately $6 million to fund their

employees' salaries, taxes, and benefits on the first day of the chapter 11 cases. Accordingly, without immediate access to funding, the Debtors believe that they will have no choice but to convert their cases to Chapter 7 cases and liquidate their assets, with the attendant loss of thousands of employees' jobs.

**The Terms of the DIP Financing Are Fair and Reasonable**

14. As noted in the Motion, the DIP Lender has agreed to provide a $20 million junior secured term note facility (the "DIP Credit Agreement"), comprising of approximately $8.9 million of new money and $11 million to "roll up" the principal balance of the Prepetition Revolving Loans. The Debtors will have immediate access to approximately $8.9 million upon entry of the interim DIP Order and the Roll-Up will refinance the Prepetition Revolving Loans.

15. I understand that the DIP Term Loan Note will be secured by junior liens only on the Riverstone First Lien Collateral. As a result, as noted in the Motion, the DIP Term Loan Note will not be secured by the other collateral that is currently unencumbered or by the collateral that is encumbered by other secured lenders. The Debtors believe that access to the DIP Term Loan Note will provide the Debtors with capital that is essential to (a) operate throughout these chapter 11 cases; (b) avoid irreparable harm to the Debtors' estates; and (c) provide the Debtors with sufficient runway to pursue either a reorganization or a sale transaction, whichever will provide maximum value for the Debtors and their creditors.

16. As noted in the Motion, the DIP Credit Agreement includes an interest rate of: LIBOR + 600 bps and interest on the DIP Term Loan Note will accrue through the pendency of the cases and the Debtors will not be required to pay immediate cash

interest. I understand that the accrued interest will be paid on the earliest to occur of (i) entry of an order in the cases approving financing from any lender other than the DIP Lender; (ii) the Maturity Date; (iii) the Financing Order ceasing to be in full force and effect for any reason; (iv) entry of an order of (a) confirmation of any plan of reorganization, or (b) consummation of a sale of substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code; (v) appointment of a Chapter 7 or Chapter 11 trustee; or (vi) the occurrence of an Event of Default. This non-cash pay interest rate feature provides liquidity relief to assist in funding the Debtors' working capital requirements, operating expenditures, and administrative expenses. Importantly, the DIP Credit Agreement also does not include any additional fees such as commitment fees, call premiums, or termination fees.

17. It is also important to note that the DIP Credit Agreement contains no covenants, such that the Debtors will not bear the risk that the Debtors' performance leads to a potential default under the DIP loan.  In addition, the DIP Credit Agreement contains no milestones, such that the Debtors will be able to explore all appropriate options to maximize the value for the Debtors for the benefit of all stakeholders.

18. Based on my experience as a restructuring professional, I believe that the pricing and other financial terms of the DIP Credit Agreement are customary and usual for DIP financings generally and that the terms of the DIP Credit Agreement are in fact more advantageous than recent DIP financings in the coal industry (particularly given the lack of covenants and milestones).

**The DIP "Roll-Up" Feature Is a Result of Good Faith Arms' Length Negotiations**

19. The Roll-Up was required by the DIP Lender as a condition to its commitment to provide postpetition financing.  Also, as noted above, absent approval of the DIP

- 7 -

Facility, the Debtors believe that their ability to continue operating as a going concern will be jeopardized to the detriment of all parties-in-interest, so it is critical that the Debtors be able to access the DIP Facility as quickly as possible after the chapter 11 filing.

20. It is my understanding that the prepetition lender parties to the Riverstone Agreement are unwilling to provide DIP financing to the Debtors.  I also believe that it is unlikely that alternative third-party sources of DIP financing on a junior basis are readily available to the Debtors under the circumstances.  As a result, I believe that the DIP Credit Agreement represents the only viable financing currently available to the Debtors.

**The Debtors Believe that the Proposed DIP Facility is Necessary and Is the Best DIP Financing Option Available to the Debtors**

21. The Debtors believe that the proposed DIP Facility will provide them with immediate access to liquidity that is intended to ensure that the Debtors' business is stabilized and value is maximized for the benefit of all parties-in-interest.  The Debtors also believe that entering into the DIP Facility will position the Debtors for a successful and expeditious restructuring, and will send a strong, positive signal to the Debtors' employees and business partners regarding the Debtors' prospects, which will facilitate the smooth administration and success of these chapter 11 cases.

**Need for Interim Relief**

22. I understand that the Debtors' businesses are cash intensive, with significant daily costs that must be promptly paid in order to continue mining operations and satisfy obligations to vendors and employees.  As such, and due to their current limited liquidity, the Debtors advise that they require immediate access to post petition

financing and the use of cash collateral to operate their businesses, preserve value, and to avoid irreparable harm. Most critically, I understand that the Debtors are required to make a payment in the amount of approximately $6 million to fund their employees' salaries, taxes, and benefits on the first day of these cases. Absent funds available from the DIP Facility and access to cash collateral, the Debtors could face a value-destructive interruption to their businesses and risk a Chapter 7 liquidation of their assets, with the potential loss of jobs.

## **Conclusion**

23. Based on my experience with debtor-in-possession financing transactions as well as my understanding of the immediate liquidity needs of the Debtors, I believe that the DIP Facility is the best financing option currently available to the Debtors under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 1, 2019

/s/ *Robert J. White*
Robert J. White
Managing Director
Jefferies LLC

*Proposed Investment Banker for the Debtors*