## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| In re: | Chapter 11 |
| Blackjewel, L.L.C., *et al.*, | Case No.: 19-30289 |
| Debtors.[1] | (Joint Administration Requested) |

**EMERGENCY MOTION (I) TO COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS; (II) TO COMPEL ADEQUATE ASSURANCE; (III) GRANTING RELIEF FROM THE AUTOMATIC STAY; AND (IV) TO ALLOW AND COMPEL PAYMENT OF ADMINISTRATIVE CLAIMS UNDER 11 U.S.C. § 503**

Wyoming Machinery Company ("**WMC**"), by and through its undersigned counsel, respectfully moves this Court (the "**Motion**") for entry of an order, substantially in the form attached hereto as **Exhibit A**: (1) compelling the Debtors to immediately determine whether to assume or reject the Agreements, pursuant to 11 U.S.C. § 365(d)(2) by the Assumption/Rejection Deadline; (2) to the extent the Debtors seek to assume the Agreements, compelling the Debtors to provide adequate assurance as required by Section 365(b)(1) and in the form acceptable to WMC by the Assumption/Rejection Deadline; (3) should the Agreements be rejected, granting WMC relief from the automatic stay to (a) enter the premises of the Debtors and recover all of WMC's equipment, materials, parts and other goods in the possession of the Debtors, and (b) cease

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Blackjewel, L.L.C. (0821); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908) and Revelation Energy, LLC (4605). The headquarters for each of the Debtors is located at 1051 Main Street, Milton, West Virginia 25541-1215.

performance of all obligations of WMC to the Debtors under the Agreements, including discontinuation of all services and deliverables, including staffing, provided for therein; (4) that, should the Agreements be assumed, and in the event the full amount due under any of the Agreements is not timely paid in accordance therewith, the Debtors shall be deemed to have rejected the Agreements, and WMC shall be granted relief from the automatic stay requested herein; (5) allowing the WMC Administrative Claims and compelling payment of the same in full by the Debtors by the date that is seven (7) days following the Assumption/Rejection Deadline as defined *infra*; (6) that should the Debtors fail to pay the WMC Administrative Claims as provided herein, the Agreements shall be deemed rejected, and WMC shall be granted relief from the automatic stay requested above. In support of the Motion, WMC states as follows:

## Jurisdiction and Venue

1. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

3. The statutory and legal predicates for the relief requested herein are 11 U.S.C. §§ 105, 362, and 365, and Federal Rule of Bankruptcy Procedure 6003.

## Relevant Background

4. On July 1, 2019 (the "**Petition Date**"), Blackjewel, L.L.C. ("**Blackjewel**") and four affiliated entities (collectively with **Blackjewel**, the "**Debtors**") filed their voluntary petitions for relief under the Bankruptcy Code.

5. Immediately after the filing, on the same day, the Court held a hearing on the Debtors' first day motions (the "**First Day Hearing**"), including the Debtors' motion to obtain secured subordinated debtor-in-possession financing with priority over certain administrative

expenses and secured by junior liens on certain property of the Debtors' estates (the "**First DIP Motion**") [Docket No. 12]. The First DIP Motion proposed to obtain debtor-in-possession financing (generally, "**DIP Financing**") from Clearwater Investment Holdings, LLC and Jeffery A. Hoops, Sr., the current President and CEO of certain of the Debtors (collectively, the "**Hoops DIP Lender**").

6. At the First Day Hearing, Debtors' counsel represented that the proposed DIP Financing was no longer available to the Debtors, as the Hoops DIP Lender was unable to access certain credit on which it was relying to fund the same. Debtors' counsel further represented that the Debtor would not be seeking relief on the pleadings docketed for the First Day Hearing, including the First DIP Motion, and that the future of the case was unknown.

7. On July 2, 2019, the Court held an emergency hearing on an alternative financing facility proposal from the Debtors (the "**Second DIP Motion**") [Docket No. 36]. Through the Second DIP Motion and at the hearing, the Debtors' counsel represented that the original DIP Financing from the Hoops DIP Lender was still available, but with some important modifications.

8. At the hearing on the Second DIP Motion, the Debtors also represented that due to the denial of the First DIP Motion, all mining operations were shut down for a 24-hour period on July 2, 2019, and all of the Debtors' employees were asked to not report to work that day. The Debtors further represented that a fire was underway in or nearby one of the Wyoming mines. The Court ultimately denied the Second DIP Motion for reasons stated on the record. Evidence was presented by the Debtors to demonstrate that the shutdown significantly increased the amount of funds necessary for the Debtors' operations moving forward.

9. On July 3, 2019, the Court held a third hearing concerning the Debtors' third attempt to obtain DIP Financing (the "**Third DIP Motion**") [Docket No. 47], this time for $5

million of interim financing from Riverstone Credit Partners (the "**Second DIP Lender**"). Pursuant to the Debtors' representations in the motion, the interim financing will allow the Debtors to avoid immediate conversion of the cases under chapter 7; however, the interim financing only provides cash to fund and operate the Debtors' business on a short-term basis. The Third DIP Motion was granted at the hearing on the matter.

10. Like other trade vendors involved in these cases, WMC is pleased that the Debtors have obtained a path to avoid the Debtors' immediate liquidation, and that interim financing provided through the Court's approval of the Third DIP Motion will fund a runway intended to stabilize the Debtors' exigent financial and operational circumstances. However, in light of this case's late-breaking developments, and due to the unique contractual arrangements between WMC and the Debtors that govern the parties' business relationships in the Powder River Basin, WMC respectfully submits that this Court's relief is necessary to enable WMC to appropriately and responsibly protect its interests, including its interests in property and personnel at the Debtors' mine sites in Wyoming against fire, flood and other immediate hazards.

11. As more specifically described below, WMC is party to multiple executory contracts with Blackjewel and is obligated to continue its performance under these Agreements (as defined hereinafter). Continued performance by WMC under the Agreements will require WMC to extend post-petition goods and services to the Debtors without the requisite assurance that the Debtors possess the financial wherewithal to satisfy their own administrative and contractual obligations to WMC – let alone provide adequate security and proper environmental controls in the vicinity of WMC's workers, heavy machine equipment and other personalty at the Wyoming mine sites.

12. Through this Motion, WMC requests this Court to compel the Debtors to determine their treatment of the Agreements, and, to the extent the Agreements are assumed, to provide WMC with adequate assurance of future performance thereunder and necessary security and environmental protections for operations in Wyoming. To the extent the Debtor must reject the Agreements, WMC request that it be afforded the relief necessary to enable WMC to mitigate damages to its interests, including but not limited to its interests in property and personnel in the Powder River Basin. WMC additionally requests that the Debtors be compelled to pay the post-petition amounts due to WMC in connection with the Agreements pursuant to Section 503(b)(1), as well as all pre-petition amounts qualifying as administrative claims under Section 503(b)(9).

## The Agreements

### A. Maintenance and Repair Contract #70

13. On January 1, 2017, WMC and Contura Coal West, L.L.C. ("**Contura**") entered into the Maintenance and Repair Contract #70 (and together with any addenda, "**Contract #70**") under which WMC agreed to perform certain maintenance and repairs on Caterpillar trucks and machines identified and described in Contract #70.

14. On or about December 8, 2017, Contura assigned and transferred to Blackjewel all rights and obligations under Contract #70. An addendum to Contract #70 was executed on August 1, 2018, extending its term beyond the original termination date of December 31, 2018 based on the total number of scheduled monthly hours for the fleet.

15. From and after the assumption date, WMC duly performed all of its obligations under Contract #70. In that respect, WMC, through its employees, agents or subcontractors, provided to Blackjewel parts, labor and services, such as removal, rebuilding, replacement and

reinstallation of the various machinery components, to ensure the machinery and trucks described in Contract #70 remained in good operating condition.

16. In rendering performance under Contract #70, WMC has continually expanded substantial sums for payroll and other associated costs and expenses, including those for parts, materials and operating supplies, as well as insurance coverage incidental to the performance of Contract #70. Absent payment, WMC is exposed to substantial losses from continued performance under the same.

### B. Maintenance and Repair Contract #72

17. On November 30, 2017, WMC and Contura entered into the Maintenance and Repair Contract #72 ("**Contract #72**") under which WMC agreed to perform certain maintenance and repairs on Caterpillar haul trucks identified and described in Contract #72, reflecting an expiration term of December 31, 2019, unless, terminated or completed sooner.

18. On or about December 8, 2017, Contura assigned and transferred to Blackjewel all rights and obligations under Contract #72.

19. From and after the assumption date, WMC duly performed all of its obligations under Contract #72. In that respect, WMC, through its employees, agents or subcontractors, provided to Blackjewel parts, labor and services, such as removal and reinstallation of the various machinery components and engine repairs, to ensure the machinery and trucks described in Contract #72 remained in good operating condition.

20. In rendering performance under the Contract #72, WMC has continually expanded substantial sums for payroll and other associated costs and expenses, including those for parts, materials and operating supplies, as well as insurance coverage incidental to the performance of

Contract #72. Absent payment, WMC is exposed to substantial losses from continued performance under the same.

### C. 495HR Parts and Service Alliance Agreement

21. On September 3, 2013, WMC, Alpha Coal West, Inc. ("**ACW**") and Caterpillar Global Mining Field Services LLC ("**CGM**") entered into the Second Amendment to the 495HR Parts and Service Alliance Agreement (and together with the original agreement dated December 17, 2004, and two other addenda, the "**MARC Agreement**") under which WMC agreed to provide parts, technical services and guaranteed availability of a Model 495HR overburden shovel.

22. On or about December 8, 2017, the MARC Agreement was assigned and transferred to Blackjewel. From and after the assumption date, WMC duly performed all of its obligations under the MARC Agreement. In that respect, WMC, through its employees, agents or subcontractors, provided to Blackjewel parts, services and calculations of availability for the shovel pursuant to the terms of the MARC Agreement.

23. In rendering performance under the Marc Agreement, WMC has continually expanded substantial sums for payroll and other associated costs and expenses, including those for parts and materials. Absent payment, WMC is exposed to substantial losses from continued performance under the same.

### D. Master Services Agreement

24. On January 1, 2015, WMC and ACW entered into the Master Services Agreement (the "**MSA**") under which WMC agreed to provide services, such as repair work, to ACW. On or about December 8, 2017, the MSA was assigned and transferred to Blackjewel. From and after the assumption date, WMC duly performed all of its obligations under the MSA. In that respect,

WMC, through its employees, agents or subcontractors, provided to Blackjewel services and other deliverables pursuant to the terms of the MSA.

25.     In rendering performance under the Agreement, WMC has continually expanded substantial sums for payroll and other associated costs and expenses. Absent payment, WMC is exposed to substantial losses from continued performance under the MSA.

### E. WMC's Pre-Petition Claims and Accrual of Post-Petition Expenses

26.     As of the Petition Date, Blackjewel's indebtedness to WMC for the goods and services provided thereto pursuant to the Agreements is in excess of the amounts stated in the Debtors' Voluntary Petition [Docket No. 1].

27.     As WMC continues to provide appropriate staffing, labor, parts and services under the Agreements, Blackjewel, the remaining Debtors, and the Debtors' creditors derive substantial benefits. However, through the provision of these ongoing services and deliverables pursuant to the Agreements, WMC continues to accrue charges at the rate of up to $3.0 million dollars a month. This includes a daily cost of onsite labor of approximately $14,000 plus parts, tax, support staff, sales and management.

## Basis for Relief

28.     By this Motion, WMC seeks entry of an order (1) compelling the Debtors to immediately determine whether to assume or reject the Agreements, pursuant to 11 U.S.C. § 365(d)(2); (2) to the extent the Debtors seek to assume the Agreements, compelling the Debtors to provide adequate assurance as required by Section 365(b)(1) and in a form acceptable to WMC; (3) should the Agreements be rejected, granting WMC relief from the automatic stay to (a) enter the premises of the Debtors and recover all of WMC's equipment, materials, parts and other goods in the possession of the Debtors, and (b) cease performance of all obligations of WMC to the

Debtors under the Agreements, including discontinuation of all services and deliverables, including staffing, provided for therein; and (4) allowing and compelling immediate payment of all post-petition amounts due in connection with the Agreements pursuant to Section 503(b)(1) as well as all pre-petition amounts qualifying as administrative claims under Section 503(b)(9).

29.    WMC also requests a waiver of the 14-day stay of the effectiveness of any order granting relief from the automatic stay pursuant to Federal Rule of Bankruptcy Procedure 4001(a)(3).

## Argument

### A. The Agreements are Executory Contracts within 11 U.S.C. § 365

30.    While the Bankruptcy Code does not provide the meaning of "executory," the Fourth Circuit has adopted the *"Countryman"* definition, which provides that an executory contract is one:

> under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other.

*See Gloria Mfg. Corp. v. Int'l Ladies' Garment Workers' Union*, 734 F.2d 1020, 1022 (4th Cir. 1984) (citing COUNTRYMAN, EXECUTORY CONTRACTS IN BANKRUPTCY: PART I, 57 Minn. L. Rev. 439, 450-62 (1973)).

31.    Applying this definition to the case at hand, WMC and Blackjewel, as counter-parties, both retain material, unfulfilled obligations under each of the Agreements. Specifically, each of the Agreements require that WMC provide certain goods and services to the Debtors on a continuous basis, and, simultaneously, the Debtors have a continuing obligation to pay for such goods and services as they arise, and otherwise provide WMC with the information necessary to generate invoices to the Debtors, such as by providing the weekly run hours for the fleet.

32. Based on the foregoing, the Agreements are executory contracts within the contemplation of 11 U.S.C. § 365.

### B. Assumption or Rejection of the Agreements Should be Compelled

33. Bankruptcy Code § 365(d)(2) permits a counter-party to an executory contract or unexpired lease of personal property to seek entry of an order compelling the debtor-in-possession to assume or reject such a contract or lease by a time earlier than confirmation of a chapter 11 plan. *See* 11 U.S.C. § 365(d)(2).

34. While Section 365(d)(2) generally "allows the trustee or debtor-in-possession a reasonable time within which to determine whether assumption or rejection of an executory contract would be beneficial to an effective reorganization" it is "not without limits." *In re Adelphia Communs. Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003) (in part, quoting *In Re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002)). "The determination of what constitutes a reasonable time to assume or reject is within the bankruptcy court's discretion based on the particular facts of each case." *Id. See also In re Burger Boys*, 94 F.3d 755, 760 (2d Cir. 1996), *Theatre Holding Corp. v. Mauro (In re Theatre Holding Corp.)*, 681 F.2d 102, 105 (2d Cir. 1982), *In re Teligent, Inc.*, 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001).

35. Bankruptcy courts, such as the Southern District of New York, have employed the following non-exclusive factors in assessing such relief:

   1. the nature of the interests at stake;
   2. the balance of the hurt to the litigants;
   3. the good to be achieved;
   4. the safeguards afforded to the litigants;
   5. whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary;
   6. the debtor's failure or ability to satisfy post-petition obligations;
   7. the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code;
   8. the importance of the contract to the debtor's business and reorganization;

>9. whether the debtor has sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization;
>10. whether there is a need for judicial determination as to whether an executory contract exists;
>11. whether exclusivity has been terminated; and
>12. above all, the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors.

*In re Adelphia Communs, Corp.*, 291 B.R. at 293 (quotation marks and citations omitted).

36.     A balancing of these factors falls in favor of granting WMC relief and shortening the time in which the Debtors may assume or reject the Agreements. In particular, the harm that will befall WMC from continued performance of the Agreements under the current circumstances in Wyoming vastly outweighs any good to be derived by the Debtors from an extended period of deliberation.

37.     Central to this analysis is the Debtors' inadequate capitalization and questionable ability to pay for labor, goods or services provided by WMC pursuant to the Agreements. The unfortunate events of this case, as previously outlined, call into doubt whether the Debtors can access financing sufficient to fund operations on either a near- or long-term basis. Currently, any post-petition goods and services provided by WMC to the Debtor lack protection under the normal safeguards of Bankruptcy Code §§ 365 or 503 typically afforded a non-debtor counter-party to an executory contract or unexpired lease. Without the protections and compensation afforded by the Bankruptcy Code, WMC may continue to suffer acute, immediate and irreparable harm.

38.     Every day in which the Debtors are allowed to deliberate over the Agreements, WMC suffers under the threat of increasing damages in the form of mounting post-petition claims against the Debtors' estates and danger to its interests in persons and property. Nonetheless, in due acknowledgment of the Debtors' current financial and operational challenges, WMC is proceeding through this Motion in pursuit of an orderly, court-assisted answer to the many pressing

contractual, environmental, and operational questions facing both WMC and the Debtors as business counterparties in Wyoming.

39.     Based upon the foregoing, sufficient cause exists to shorten the time within which the Debtors must assume or reject the Agreements. WMC specifically asks that the Court compel assumption or rejection by the Debtors by the hearing date on this Motion (the "**Assumption/Rejection Deadline**"). WMC further requests that the Court order that, should the Debtors not make a determination by the Assumption/Rejection Deadline, the Agreements be deemed rejected as of that same date.

### C. Adequate Assurance of Cure and Future Performance Must be Proved

40.     As previously stated, the circumstances of this case call into question whether the Debtors will have sufficient funding to cure existing defaults under the Agreements or perform on accruing liabilities with respect to the same.

41.     To the extent the Debtors seek to assume the Agreements, WMC asks that the Court require the Debtors to satisfy their burdens under Section 365(b)(1)(A), (B) and (C) by the Assumption/Rejection Deadline, to supply WMC with adequate assurance of future performance, and to provide for the appropriate security and environmental controls that are necessary to prevent harm to WMC's personnel and property at the Debtors' mine sites in the Powder River Basin. WMC further requests that the Court order that, should the Debtors fail to carry the foregoing burden by the Assumption/Rejection Deadline, the Agreements shall be deemed rejected as of the same date.

42.     WMC further requests that, as a matter of adequate assurance of future performance in the case of assumption, the Court further order that in the event the full amount due under any of the Agreements is not timely paid in accordance therewith, the Debtors shall be deemed to have

rejected the Agreements, and WMC shall be granted relief from the automatic stay as detailed below.

### D. Relief from the Automatic Stay Should be Granted

43. Section 362(d) of the Bankruptcy Code provides that, after notice and a hearing, the court "shall grant relief from [the automatic stay], such as by terminating, annulling, modifying, or conditioning such stay – (1) for cause …." 11 U.S.C. § 362(d). While the term "cause" is not defined by the Bankruptcy Code, courts have ruled that "cause" generally exists "when the harm that would result from the continuation of the stay would outweigh any harm that might be suffered by the debtor's estate if the stay is lifted." *Peerless Ins. Co. v. Rivera*, 208 B.R. 313, 315 (D. R.I. 1997) (internal citations omitted).

44. In the event the Agreements are rejected, cause exists to grant WMC relief from the stay under Section 362(d) to (a) enter the premises of the Debtors and recover all of WMC's equipment, materials, parts and other goods in the possession of the Debtors, and (b) cease performance of all obligations of WMC to the Debtors under the Agreements, including discontinuation of all services and deliverables provided for therein.

45. If the Agreements are rejected, WMC will need to take immediate action to recover its property in the possession of the Debtors to prevent loss and ensure preservation.

46. Additionally, to avoid any confusion concerning the obligations owing from WMC to the Debtors under the Agreements, and to further avoid exposure in provision of post-petition goods and services that may go unpaid, WMC would also ask that the Court grant it relief to discontinue provision of all goods, services and other deliverables to the Debtors as required under the Agreements.

47. WMC further requests that a waiver of the 14-day stay of the effectiveness of any order granting relief from the automatic stay pursuant to Federal Rule of Bankruptcy Procedure 4001(a)(3).

E. **Administrative Expense Claims Should be Allowed and Payment Compelled**

48. Section 503 of the Bankruptcy Code provides that a party may seek allowance and payment upon notice and hearing before the Court of all "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(a)-(b)(1)(A).

49. Section 503(b)(9) of the Bankruptcy Code similarly provides for the allowance and payment of "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."

50. Given the nascence of the Debtors' case, WMC is still in process of assessing and reconciling amounts owed under Sections 503(b)(1)(A) and 503(b)(9), including any amounts qualifying as such and owed in connection with the Agreements. WMC is working to compile these balances and provide them in advance of the Assumption/Rejection Deadline and associated hearing (the "**WMC Administrative Claims**").

51. With respect to Section 503(b)(1)(A), the Fourth Circuit employs a two-part test to determine "whether a cost is actual and necessary to a bankruptcy estate in order to qualify as an administrative expense under § 503(b)(1)(A). First, for an expense to be actual, it must arise from a post-petition transaction between the creditor and the debtor or trustee. . . . Second, for an expense to be necessary, it must confer a benefit on the estate." *Tidewater Fin. Co. v. Henson (In re Henson)*, 57 Fd. Appx. 136, 138 (4thCir. 2003).

52.    WMC asserts that any post-petition goods or services provided to the Debtors, including any supplied pursuant to the Agreements, are actual, necessary costs and expenses of persevering the estate. Specifically, such goods or services benefited the Debtors in the operation of their businesses and mining operations.

53.    In addition to allowing the WMC Administrative Claims under Section 503, and based upon the concerning circumstances of this case as outlined above, WMC respectfully requests that this Court order the Debtors to pay the WMC Administrative Claims in full by the date that is seven (7) calendar days following the Assumption/Rejection Deadline. WMC further requests that should the Debtors fail to make such payment, the Agreements be deemed rejected and WMC shall be granted relief from the automatic stay requested herein.

## Conclusion

WHEREFORE, WMC respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**: (1) compelling the Debtors to immediately determine whether to assume or reject the Agreements, pursuant to 11 U.S.C. § 365(d)(2) by the Assumption/Rejection Deadline; (2) to the extent the Debtors seek to assume the Agreements, compelling the Debtors to provide adequate assurance as required by Section 365(b)(1) and in the form acceptable to WMC by the Assumption/Rejection Deadline; (3) should the Agreements be rejected, granting WMC relief from the automatic stay to (a) enter the premises of the Debtors and recover all of WMC's equipment, materials, parts and other goods in the possession of the Debtors, and (b) cease performance of all obligations of WMC to the Debtors under the Agreements, including discontinuation of all services and deliverables, including staffing, provided for therein; (4) that, should the Agreements be assumed, and in the event the full amount due under any of the Agreements is not timely paid in accordance therewith, the Debtors shall be deemed to have

rejected the Agreements, and WMC shall be granted relief from the automatic stay requested above; (5) allowing the WMC Administrative Claims and compelling payment of the same in full by the Debtors by the date that is seven (7) days following the Assumption/Rejection Deadline; (6) that should the Debtors fail to pay the WMC Administrative Claims as provided herein, the Agreements shall be deemed rejected, and WMC shall be granted relief from the automatic stay requested above; and (7) for such additional relief as the Court deems just and proper.

Dated: July 5, 2019

WYOMING MACHINERY COMPANY

BY: */s/ Zachary J. Rosencrance*

Michael R. Proctor (WV 9122)
Zachary J. Rosencrance (WV 13040)
**BOWLES RICE LLP**
600 Quarrier St
Charleston, WV 25301
Telephone: (304) 347-1161
Facsimile: (304) 347-1756

-   and  -

Cullen D. Speckhart (*Pro hac vice* admission pending)
**WOLCOTT RIVERS GATES**
919 E. Main Street Ste. 1040
Richmond, VA 23219
200 Bendix Road, Ste. 300
Virginia Beach, VA 23452
Telephone: (757) 497-6633
Direct: (757) 470-5566
Email: cspeckhart@wolriv.com

*Counsel to Wyoming Machinery Company*

## **Certificate of Service**

  I certify that on this day, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all CM/ECF participants who have appeared in this case.

                   */s/ Zachary J. Rosencrance*

**<u>Exhibit A</u>**

**Proposed Order**