IN THE UNITED STATES BANKRUPTCY COURT
FOR SOUTHERN DISTRICT OF WEST VIRGINIA (CHARLESTON)

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **BLACKJEWEL L.L.C., et al.,** | ) | Case No. 3:19-bk-30289 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

**EMERGENCY MOTION (I) TO COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS; (II) TO COMPEL ADEQUATE ASSURANCE; (III) GRANTING RELIEF FROM THE AUTOMATIC STAY; AND (IV) TO ALLOW AND COMPEL PAYMENT OF ADMINISTRATIVE CLAIMS UNDER 11 U.S.C. § 503**

Westar Energy, Inc. ("Westar Energy"), as majority owner and exclusive operator of the Jeffrey Energy Center ("Energy Center"), by and through its undersigned counsel, respectfully moves this Court (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**: (1) compelling the Debtors to immediately determine whether to assume or reject the Coal Supply Agreement and all amendments thereto, as defined *infra*, pursuant to 11 U.S.C. § 365(d); (2) to the extent the Debtors seek to assume the Coal Supply Agreement and all amendments thereto, compelling the Debtors to cure all defaults and to provide adequate assurance of their future performance of the delivery obligations set forth in the Coal Supply Agreement, all as required by Section 365(b)(1) and in a form acceptable to Westar Energy; (3) should the Coal Supply Agreement and all amendments thereto be rejected, granting the Buyers relief from the automatic stay, to the extent the automatic stay is applicable, to (a) terminate the Coal Supply Agreement and all amendments thereto; and (b) cease performance of all obligations of the Buyers to the Debtors under the Coal Supply Agreement and all amendments thereto, including purchasing exclusively from Debtors all coal to operate the Energy Center; (4)

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Blackjewel, L.L.C. (0821); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908) and Revelation Energy, LLC (4605). The headquarters for each of the Debtors is located at 1051 Main Street, Milton, West Virginia 25541-1215.

1

that, should the Coal Supply Agreement and all amendments thereto be assumed, and in the event Debtors fail to deliver the coal in the quality and quantity as required under the Coal Supply Agreement and all amendments thereto in accordance therewith, the Debtors shall be deemed to have rejected the Coal Supply Agreement and all amendments thereto, and the Buyers shall be granted relief from the automatic stay requested herein, to the extent the automatic stay is applicable; and (5) allowing the Buyers' Administrative Claims for any damages sustained as a result of the rejection and compelling payment of the same in full by the Debtors by the date that is seven (7) days following the rejection as defined *infra*. In support of the Motion, Westar Energy states as follows:

## **Jurisdiction and Venue**

1. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

3. The statutory and legal predicates for the relief requested herein are 11 U.S.C. §§ 105, 362, and 365, and Federal Rule of Bankruptcy Procedure 6003.

## **Relevant Background**

**A.** **Coal Supply Agreement**

4. Westar Energy is a regulated electric utility corporation, with its principal office located in Topeka, Kansas, and is the majority owner and exclusive operator of the Jeffrey Energy Center ("Energy Center").

5. Westar Energy is the largest electric provider in the State of Kansas and, in conjunction with its affiliate Kansas Gas and Electric Company, it renders electric utility service to nearly 700,000 residential and commercial customers in 55 counties.

6. On or about July 1, 1973, Amax Coal West, Inc. ("Amax" or "Seller")[2], and Western Resources, Inc., Kansas Gas and Electric Company, Missouri Public Service and WestPlains Energy and/or the predecessors or related entities of each entity (collectively referred to as "Buyers")[3] entered into a Coal Supply Agreement for the sale and purchase of coal suitable for use at the jointly-owned Energy Center situated in Pottawatomie County, Kansas ("Coal Supply Agreement"), and operated by Westar Energy.

7. The Coal Supply Agreement was subsequently amended and restated on March 22, 1993 ("Amendment"), on January 1, 1994 ("First Amendment"), on October 2, 2000 ("Second Amendment"), and a third amendment was also entered into on October 2, 2000 ("Third Amendment"). Letter Agreements were also entered into on March 31, 1995, and June 11, 1997 ("Letter Agreements"). The Coal Supply Agreement and all amendments, restatements and letter agreements are collectively referred to herein as "Coal Supply Agreement."

8. In connection with the Coal Supply Agreement, Seller represented to Buyers that it was experienced in the commercial production of coal and that it owned, leased or controlled certain coal reserves in sufficient quantity and quality to supply Buyers with enough coal to operate the Energy Center.

---

[2] The Coal Supply Agreement inured to the benefit of and was binding on the parties and their respective successors and assigns. Upon information and belief successors and assigns of Amax included the following: in the late 90's or early 2000's RAG Coal West bought the Belle Ayr Mine and Eagle Butte Mine in Gillette, Wyoming (the "Mines"), from Amax. In approximately 2004 Foundation Coal purchased the Mines from RAG. Effective July 31, 2009, Foundation Coal West, Inc., changed its name to Alpha Coal West, Inc., and, effective October 30, 2009, Alpha Coal West. Inc. assigned the Coal Supply Agreement to its affiliate Alpha Coal Sales Co., LLC. Alpha Coal Sales Co., LLC, was succeeded by Contura Coal Sales, LLC, and, effective December 6, 2017, assigned the Coal Supply Agreement to Blackjewel, LLC. Effective January 18, 2018, Blackjewel, LLC, assigned the Coal Supply Agreement to Blackjewel Marketing and Sales, LLC, subsequently Blackjewel Marketing and Sales, LP, effective October 18, 2018.

[3] Successors and assigns of Buyers include Westar Energy, Inc. – current majority owner and plant operator (formerly Western Resources, Inc.); Kansas Gas and Electric Company; KCP&L Greater Missouri Operations Company (formerly Missouri Public Service); Key Equipment Finance Inc. (formerly owned by WestPlains Energy, then sold to Mid-Kansas Electric Company, Inc., and now owned by Key Equipment until August 2, 2019 at which time Key Equipment's 8% interest will be transferred to Westar Energy, Inc.).

3

11852878.1

9. A steady supply of coal with specifications required by the Buyers is critical to maintain electricity production for this 2,178 megawatt base-load coal-fired generation facility in the Southwest Power Pool market, which is the largest generation plant in the State of Kansas.

10. The Coal Supply Agreement is an exclusive "full requirements contract" pursuant to which, and with limited exceptions, Buyers were required to purchase all coal necessary to operate the Energy Center exclusively from Seller. The Coal Supply Agreement is a forward contract of a physical commodity for future business.

11. Prior to the Bankruptcy Filing, Seller had supplied coal to Westar Energy in accordance with the terms of the Coal Supply Agreement.

**B.     The Bankruptcy Filing**

12. On July 1, 2019 (the "Petition Date"), Blackjewel, L.L.C. ("Blackjewel") and four affiliated entities (collectively with Blackjewel, the "Debtors") filed their voluntary petitions for relief under the Bankruptcy Code.

13. Debtor, in its Declaration of Jeff A. Hoops, Sr. In Support of Chapter 11 Filings and First Day Motions, indicate that Debtors' core business is mining and processing metallurgical, thermal and other specialty and industrial coals. Debtors' further indicate operations are located in the "Eastern Division" and the "Western Division." [*ECF #14, pg 2*]

14. The Western Division operates the Eagle Butte and Belle Ayr mines in northeast Wyoming, producing low sulfur, sub-bituminous thermal coal.

15. Immediately after the filing, on the same day, the Court held a hearing on the Debtors' first day motions (the "First Day Hearing"), including the Debtors' motion to obtain secured subordinated debtor-in-possession financing with priority over certain administrative expenses

4

and secured by junior liens on certain property of the Debtors' estates (the "First DIP Motion") [*ECF #12*].

16. The First DIP Motion proposed to obtain debtor-in-possession financing (generally, "DIP Financing") from Clearwater Investment Holdings, LLC, and Jeffery A. Hoops, Sr., the current President and CEO of certain of the Debtors (collectively, the "Hoops DIP Lender").

17. At the First Day Hearing, Debtors' counsel represented that the proposed DIP Financing was no longer available to the Debtors, as the Hoops DIP Lender was unable to access certain credit on which it was relying to fund the same. Debtors' counsel further represented that the Debtor would not be seeking relief on the pleadings docketed for the First Day Hearing, including the First DIP Motion, and that the future of the case was unknown.

18. On July 2, 2019, the Court held an emergency hearing on an alternative financing facility proposal from the Debtors (the "Second DIP Motion") [*ECF #36*].

19. At the hearing on the Second DIP Motion, the record reflects that Debtors represented that all mining operations were shut down for a 24-hour period on July 2, 2019, and all of the Debtors' employees were asked to not report to work that day. The Debtors further represented that a fire was underway in or nearby one of the Wyoming mines. The Court denied the Second DIP Motion. However, evidence was presented by the Debtors to demonstrate that the shutdown significantly increased the amount of funds necessary for the Debtors' operations moving forward.

20. On July 3, 2019, the Court held a third hearing concerning the Debtors' third attempt to obtain DIP Financing (the "Third DIP Motion") [*ECF #47*], this time for $5 Million of interim financing from Riverstone Credit Partners (the "Second DIP Lender"). Pursuant to the Debtors' representations in the motion, the interim financing will allow the Debtors to avoid immediate

5

conversion of the cases under Chapter 7; however, the interim financing only provides cash to fund and operate the Debtors' business on a short-term basis. The Third DIP Motion was granted at the hearing on the matter with the final hearing continued to July 31, 2019.

21. Upon information and belief that interim financing provided through the Court's approval of the Third DIP Motion will stabilize the Debtors' exigent financial and operational circumstances for only a period of time. However, in light of this case's late-breaking developments, and due to the unique contractual arrangements between Westar Energy and the Debtors that govern the parties' business relationships for the supply of coal, Westar Energy respectfully submits that this Court's relief is necessary to enable Westar Energy to appropriately and responsibly protect its interests, including its interests to be able to continue to provide electricity service to customers.

22. In fact, since the Petition Date, Debtor has failed to adequately supply the Energy Center with the quantities of coal needed by Westar Energy under the Coal Supply Agreement.[4]

23. As more specifically described below, without the Debtors being required to assume or reject, the Buyers are obligated to continue their performance obligations under the Coal Supply Agreement without the requisite assurance that the Debtors possess the financial wherewithal to satisfy the contractual and administrative obligations necessary to permit Westar Energy to adequately and effectively operate the Energy Center.

24. Through this Motion, Westar Energy requests this Court to compel the Debtors to determine their treatment of the Coal Supply Agreement, and, to the extent the Coal Supply Agreement is assumed, to cure any defaults and provide Westar Energy with adequate assurance

---

[4] The failure by Westar Energy to allege a breach of the Coal Supply Agreement in these papers is not intended to constitute a waiver of such breach to the extent one or more breaches exist, and Westar Energy expressly reserves all rights under the Coal Supply Agreement and applicable law to assert such claims in accordance with this Court's procedures at the appropriate time.

6

11852878.1

of future performance thereunder.  To the extent the Debtor must reject the Coal Supply Agreement, Westar Energy requests that the Buyers be afforded the relief necessary to enable Westar Energy to mitigate damages to their interests, including, but not limited to, terminating the Coal Supply Agreement and being allowed to enter into coal supply agreements with other vendors and suppliers.

## Basis For Relief

25.  By this Motion, Westar Energy seeks entry of an order (1) compelling the Debtors to immediately determine whether to assume or reject the Coal Supply Agreement, pursuant to 11 U.S.C. § 365(d)(2); (2) to the extent the Debtors seek to assume the Coal Supply Agreement, compelling the Debtors to cure any defaults under the Coal Supply Agreement, provide adequate assurance as required by Section 365(b)(1) and in a form acceptable to Westar Energy; (3) should the Coal Supply Agreement be rejected, granting the Buyers relief from the automatic stay, to the extent the stay is applicable[5] to (a) terminate the Coal Supply Agreement, and (b) cease performance of all obligations of the Buyers to the Debtor under the Coal Supply Agreements; and (4) allowing and compelling immediate payment of all post-petition amounts due in connection with the breach and/or termination of the Coal Supply Agreement.

## Argument

**A.     The Coal Supply Agreement is an Executory Contract within 11 U.S.C. § 365**

26.  While the Bankruptcy Code does not provide the meaning of "executory," the Fourth Circuit has adopted the "*Countryman*" definition, which provides that an executory contract is one:

---

[5] The failure by the Buyers to terminate the Coal Supply Agreement pursuant to 11 U.S.C. § 556 in these papers is not intended to constitute a waiver of such right, and the Buyers expressly reserves all rights under the Coal Supply Agreement and applicable law to terminate the Coal Supply Agreement in accordance with this Court's procedures or applicable law at the appropriate time.

7

11852878.1

>under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other.

*See Gloria Mfg. Corp. v. Int'l Ladies' Garment Workers' Union*, 734 F.2d 1020, 1022 (4th Cir. 1984) (citing COUNTRYMAN, EXECUTORY CONTRACTS IN BANKRUPTCY: PART I, 57 Minn. L. Rev. 439, 450-62 (1973)). See also *In re Sunterra Corp.*, 361 F.3d 257, 264 (4th Cir. 2004) which holds that the Fourth Circuit is obligated to apply the *Countryman* test.

27. Applying this definition to the case at hand, the Buyers and Blackjewel, as counter-parties, both retain material, unfulfilled obligations under the Coal Supply Agreement. Specifically, the Agreement requires that the Buyers purchase exclusively from Debtor all coal, except as provided in the Coal Supply Agreement, necessary for Westar Energy to operate the Energy Center through the term of the Coal Supply Agreement. Simultaneously, the Debtors have a continuing obligation to provide coal of the quantity and quality and with specifications which will allow Westar Energy, as the plant operator, to operate the Energy Center.

28. Based on the foregoing, the Coal Supply Agreement is an executory contract within the contemplation of 11 U.S.C. § 365.

**B.    Assumption or Rejection of the Coal Supply Agreement Should be Compelled**

29. Bankruptcy Code § 365(d)(2) permits a counter-party to an executory contract or unexpired lease of personal property to seek entry of an order compelling the debtor-in-possession to assume or reject such a contract or lease by a time earlier than confirmation of a Chapter 11 plan. *See* 11 U.S.C. § 365(d)(2).

30. While Section 365(d)(2) generally "allows the trustee or debtor-in-possession a reasonable time within which to determine whether assumption or rejection of an executory contract would be beneficial to an effective reorganization" it is "not without limits." *In re*

8

11852878.1

*Adelphia Communs. Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003) (in part, quoting *In Re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002)). "The determination of what constitutes a reasonable time to assume or reject is within the bankruptcy court's discretion based on the particular facts of each case." *Id. See also In re Burger Boys*, 94 F.3d 755, 760 (2d Cir. 1996), *Theatre Holding Corp. v. Mauro (In re Theatre Holding Corp.*), 681 F.2d 102, 105 (2d Cir. 1982), *In re Teligent, Inc.*, 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001).

31. Bankruptcy courts, such as the Southern District of New York, have employed the following non-exclusive factors in assessing such relief:

   a) the nature of the interests at stake;
   b) the balance of the hurt to the litigants;
   c) the good to be achieved;
   d) the safeguards afforded to the litigants;
   e) whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary;
   f) the debtor's failure or ability to satisfy post-petition obligations;
   g) the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code;
   h) the importance of the contract to the debtor's business and reorganization;
   i) whether the debtor has sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization;
   j) whether there is a need for judicial determination as to whether an executory contract exists;
   k) whether exclusivity has been terminated; and
   l) above all, the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors.

*In re Adelphia Communs, Corp.*, 291 B.R. at 293 (quotation marks and citations omitted).

32. A balancing of these factors falls in favor of granting the Buyers relief and shortening the time in which the Debtors may assume or reject the Coal Supply Agreement. In particular, the harm that will befall the Buyers from continued performance of the Coal Supply Agreement under the current circumstances and Westar Energy not having the ability to purchase or obtain the quantity and quality required from other vendors to continue to operate the Energy Center

and supply customers and the Southwest Power Pool market with electricity vastly outweighs any good to be derived by the Debtors from an extended period of deliberation.

33. Central to this analysis is the Debtors' inadequate capitalization and questionable ability to mine the coal in the quantity and quality necessary to supply the Energy Center pursuant to the Coal Supply Agreement. The unfortunate events of this case, as previously outlined, call into doubt whether the Debtors can access financing sufficient to fund operations on either a near-term or long-term basis. Currently, the lack of coal production by Debtors to meet the required quantity and quality pursuant to the Coal Supply Agreement constitutes a lack of protection under the normal safeguards of Bankruptcy Code §§ 365 or 503, which are typically afforded a non-debtor counter-party to an executory contract or unexpired lease. Without the protections and compensation afforded by the Bankruptcy Code, Westar Energy and the Buyers will start to suffer acute, immediate and irreparable harm very soon.

34. Every day in which the Debtors are allowed to deliberate over the Coal Supply Agreement, the Buyers suffer under the threat of increasing damages in the form of added cost to retool the method and delivery of the coal supply and eventual inadequate coal supplies to allow Westar Energy to operate the Energy Center and to generate electricity for customers and the Southwest Power Pool market, resulting in mounting post-petition claims against the Debtors' estates. Nonetheless, in due acknowledgment of the Debtors' current financial and operational challenges, Westar Energy is proceeding through this Motion in pursuit of an orderly, court-assisted answer to the many pressing contractual, environmental, and operational questions facing both the Buyers and the Debtors as business counterparties.

35. Based upon the foregoing, sufficient cause exists to shorten the time within which the Debtors must assume or reject the Coal Supply Agreement. Westar Energy specifically asks that

11852878.1

the Court compel assumption or rejection by the Debtors by the hearing date on this Motion. Westar Energy further requests that the Court order that, should the Debtors not make a determination by the Assumption/Rejection Deadline, the Coal Supply Agreement be deemed rejected as of that same date.

**C.** **Adequate Assurance of Cure and Future Performance Must be Proved**

36. As previously stated, the circumstances of this case call into question whether the Debtors will have sufficient funding to cure existing defaults under the Coal Supply Agreement or provide the quantity and quality of coal required under the Coal Supply Agreement going forward.

37. To the extent the Debtors seek to assume the Coal Supply Agreement, Westar Energy asks that the Court require the Debtors to satisfy their burdens under Section 365(b)(1)(A), (B) and (C) to supply Westar Energy with adequate assurance of future performance. Westar Energy further requests that the Court order that, should the Debtors fail to carry the foregoing burden, the Coal Supply Agreement shall be deemed rejected as of the same date.

**D.** **Relief from the Automatic Stay Should be Granted (in the Event the Automatic Stay is Applicable).**

38. Westar Energy seeks relief from the automatic stay if the Coal Supply Agreement is rejected or deemed rejected, only out of an abundance of caution. 11 U.S.C. § 556 creates an exception to the automatic stay for "forward contract merchants." Westar Energy contends the Coal Supply Agreement falls within this exception. A commodity broker or forward contract merchant is not stayed from exercising contractual rights to liquidate a commodity contract or forward contract, or from enforcing the right to a variation or maintenance margin payment received from a trustee. Additionally, setoffs by commodity brokers, forward contract merchants, stockbrokers, financial institutions, securities clearing agencies, and repo participants against

11

margin accounts and settlement payments are excepted from the automatic stay. Norton Bankruptcy Law and Practice 3d, Part II, Subpart 19, Chapter 125, Automatic Stay (July 2019). In *In re FirstEnergy Solutions Corp.*, the Bankruptcy Court held that the two elements to be considered a forward contract merchant include: (1) the business consists, in whole or in part, of entering into forward contracts with merchants; and (2) the contract must involve a commodity or similar good, article, service, right, or interest. *In re FirstEnergy Solutions Corp.*, 596 B.R. 631, 637-38 (Bankr. N.D. Ohio 2019). In *In re Lehman Bros. Holdings, Inc.*, the Southern District of New York stated that "[e]nacted in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Act, Section 562 is related to a number of preceding provisions, colloquially termed safe harbors because they exempt certain actions from aspects of the Bankruptcy Code, primarily the automatic stay and the ban on ipso facto clauses. See 11 U.S.C. §§ 555–56, 559–61. The rationale underpinning these provisions is that parties may be irreparably harmed if certain contractual rights, such as termination, cannot be exercised because one of the signatories has entered bankruptcy proceedings." *In re Lehman Bros. Holdings Inc.*, 594 B.R. 564, 568 (S.D.N.Y. 2018). The Court En Bank in *CCT Comm.'s, Inc. v. Zone Telecom, Inc.* held that "11 U.S.C. § 365 (e) generally bars the enforcement of contractual ipso facto clauses, on the theory that both the party seeking to reorganize under the protection of the bankruptcy code and its creditors ultimately will benefit if that party is permitted to retain and make full use of its contractual assets. Congress carved out an exception to this rule, however, with respect to "forward contract merchant[s]," who, for countervailing reasons of public policy, are not barred from terminating a "forward contract" agreement with a debtor who petitions for bankruptcy protection. 11 U.S.C. § 556 (2012)." *CCT Comm.'s, Inc. v. Zone Telecom, Inc.*, 172 A.3d 1228, 1254 (Conn. banc 2017). See also *In re Clear Peak Energy, Inc.*, 488 B.R. 647, 661-62 (Bankr.

D. Ariz. 2013) which defined "forward contract merchants," and applied the § 556 test to determine whether the automatic stay was binding.

39. Nonetheless, Westar Energy seeks relief for the Buyers from the automatic stay, to the extent it is applicable if the Coal Supply Agreement is rejected or deemed rejected. 11 U.S.C. § 362(d) of the Bankruptcy Code provides that, after notice and a hearing, the court "shall grant relief from [the automatic stay], such as by terminating, annulling, modifying, or conditioning such stay – (1) for cause ...." 11 U.S.C. § 362(d). While the term "cause" is not defined by the Bankruptcy Code, courts have ruled that "cause" generally exists "when the harm that would result from the continuation of the stay would outweigh any harm that might be suffered by the debtor's estate if the stay is lifted." *Peerless Ins. Co. v. Rivera*, 208 B.R. 313, 315 (D. R.I. 1997) (internal citations omitted).

40. In the event the Coal Supply Agreement is rejected, cause exists to grant the Buyers relief from the stay under Section 362(d) to (a) enter into contract(s) for the purchase of coal from other vendor(s) in both sufficient volumes and with the specifications required by the Buyers thereunder, and (b) cease performance of all obligations of the Buyers to the Debtors under the Coal Supply Agreement.

41. If the Coal Supply Agreement is rejected, Westar Energy will need to take immediate action to locate other sources and vendors from whom to purchase coal to prevent loss and ensure preservation.

42. Additionally, to avoid any confusion concerning the obligations owing from Buyers to the Debtors under the Coal Supply Agreement, Westar Energy would also ask that the Court grant the Buyers relief to discontinue all obligations of the Buyers required under the Coal Supply Agreement.

11852878.1

43. Westar Energy further requests that a waiver of the 14-day stay of the effectiveness of any order granting relief from the automatic stay pursuant to Federal Rule of Bankruptcy Procedure 4001(a)(3).

## Conclusion

WHEREFORE, Westar Energy, Inc., as the majority owner and exclusive operator of the Energy Center, respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit A: (1) compelling the Debtors to immediately determine whether to assume or reject the Coal Supply Agreement, pursuant to 11 U.S.C. § 365(d)(2); (2) to the extent the Debtors seek to assume the Coal Supply Agreement, compelling the Debtors to provide adequate assurance as required by Section 365(b)(1) and in the form acceptable to Westar Energy; (3) should the Coal Supply Agreement be rejected, granting Buyers relief from the automatic stay (to the extent the stay is applicable) to (a) permit Westar Energy to enter into contracts on behalf of the Buyers to purchase coal from other vendors, and (b) cease performance of all obligations of the Buyers to the Debtors under the Coal Supply Agreement; (4) that, should the Coal Supply Agreement be assumed, and in the event Debtors fail to meet the obligations under the Coal Supply Agreement, including, but not limited to, providing the quantity and quality of coal required under any of the Coal Supply Agreement, the Debtors shall be deemed to have rejected the Coal Supply Agreement, and the Buyers shall be granted relief from the automatic stay (to the extent the stay is applicable) requested above; (5) allowing the Buyers Administrative Claims for any damages suffered as a result of the rejection and compelling payment of the same in full by the Debtors by the date that is seven (7) days; and (6) for such additional relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Stephen L. Thompson*
Stephen L. Thompson, Esq. (WVSB# 3751)
Barth & Thompson
P. O. Box 129
Charleston, West Virginia 25321
Telephone 304-342-7111
Telecopy 304-342-6215
E-mail: sthompson@barth-thompson.com

and

Sharon L. Stolte (MO #41133)
SANDBERG PHOENIX & von GONTARD P.C.
4600 Madison Avenue, Suite 1000
Kansas City, MO 64112
Telephone: (816) 627-5543
Facsimile: (816) 627-5532
E-mail: sstolte@sandbergphoenix.com
(*Pro hac vice admission pending*)

***ATTORNEYS FOR WESTAR ENERGY, INC., et al.***

11852878.1

## Certificate of Service

    I hereby certify a copy of the foregoing has been electronically filed and served via with the Court's CM/ECF System on the 22nd day of July, 2019.

<em>/s/ Stephen L. Thompson</em>

11852878.1