## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Blackjewel, L.L.C., *et al.*, | ) | Case No. 19-bk-30289 ) |
| | ) | (Joint Administration Requested) |
| Debtors.[1] | | |

**MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES, (B) SCHEDULING AN AUCTION, SALE HEARING AND OTHER DATES AND DEADLINES, (C) APPROVING CONTURA ENERGY, INC. AS A STALKING HORSE PURCHASER, (D) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES AND RELATED CURE PROCEDURES, (E) APPROVING THE PURCHASE DEPOSIT, (F) AUTHORIZING TERMINATION OF THE 401(K) PLAN AND (G) GRANTING RELATED RELIEF, AND (II) AN ORDER APPROVING THE SALE OF THE PURCHASED ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES**

Blackjewel, L.L.C., and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, hereby move this Court, pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of West Virginia (the "Local Rules") for (i) entry of an order (the "Bidding Procedures Order"), substantially in the form attached hereto as **Exhibit A**, that (a) establishes bidding procedures, approves Contura Energy, Inc. ("Contura") as the stalking horse purchaser for certain assets, and otherwise formalizes and governs the sale process for the Debtors' assets consistent with the term sheet attached hereto as **Exhibit B** (the "Term

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213).  The headquarters for each of the Debtors is located at 1051 Main Street, Milton, West Virginia 25541-1215.

Sheet"), (b) approves the liens and claims granted in connection with the Purchase Deposit, and (c) authorizes the termination of the Debtors' 401(k) Plan (as defined below);[2] and (ii) entry of a sale order (the "Sale Order") following an auction (if necessary) (the "Auction") and sale hearing (the "Sale Hearing"), that will approve the sale of assets by the Debtors to the bidder or bidders that submit the highest and best bid, including bids free and clear of liens, claims and encumbrances, in a manner consistent with the dates, deadlines and other requirements provided for herein (the "Successful Bid(s)").   In support of this motion, the Debtors rely upon and incorporate by reference the (i) *the Declaration of David J. Beckman in Support of Sale Motion* (the "Beckman Declaration"), and (ii) *the Declaration of Robert J. White in Support of Sale Motion* (the "White Declaration").   In further support of this motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      As the Court is aware, the Debtors filed these chapter 11 cases under incredibly difficult and exigent circumstances.   As a result of the Debtors' dire liquidity crisis and the deteriorating value of the estate, the Debtors have had no choice but to shut down active coal production, and many of their employees have been furloughed without pay since the commencement of these cases.   Moreover, the Debtors face increasing pressure from governmental regulators due to their inability to pay taxes, royalties or lease payments and their inability to satisfy legally mandated reclamation obligations.   The Debtors have, to this point, avoided a conversion to chapter 7—which would result in further destruction of value, to the detriment of all the Debtors' creditors, employees and other stakeholders—due to the short-term

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed in the Term Sheet.

incremental rescue financing provided by certain parties in interest.  While the Debtors and their advisors have been intensely focused on trying to obtain long-term financing necessary to restart operations, return the Debtors' employees to work, and conduct a value-maximizing going-concern sale process, no party willing to provide such financing has materialized.  The Debtors' existing short-term funding has now been exhausted, and absent additional short-term funding and a viable long-term strategic plan, a conversion to chapter 7 is inevitable.

2.      After weeks of negotiations with many of the Debtors' stakeholders—including the Debtors' prepetition senior lenders and debtor-in-possession financing lenders, Contura, the Creditors' Committee, the State of Wyoming and the U.S. Department of Justice—the Debtors have now secured the best outcome possible under these circumstances, to the benefit of all stakeholders and employees of the Debtors, with the help and support of Contura.  These negotiations culminated in the agreement between the Debtors and Contura to the terms and conditions of the sale transactions set forth in the Term Sheet (the "Stalking Horse Sale"), which will ensure that the Western Mines and the Pax Mines are restored to operating status and up to 700 Wyoming residents are able to continue earning regular wages in jobs associated with the mines for an estimated minimum of six to twelve years. Pursuant to the terms of the Stalking Horse Sale and subject to Court approval and higher and better bids, Contura has agreed to purchase, and the Debtors have agreed to sell, substantially all assets associated with the Western Mines and the Pax Mines in exchange for (i) the assumption of hundreds of millions of dollars in liabilities associated with such assets, including payroll-related payments for employees returning to work in the Western Mines, and (ii) cash consideration in the amount of $20.6 million to be used to administer and keep alive the Debtors' estates and provide cash necessary

3

to achieve other recoveries.  Critically, Contura has agreed to fund a cash deposit toward the purchase price under the Stalking Horse Sale immediately upon entry by the Court of the Bidding Procedures Order, and to allow the Debtors to use this deposit to pay anticipated expenses through the conclusion of an expedited, but efficient sale process for substantially all of their assets.  The deposit will only be repaid if Contura's bid is topped by a higher and better bid (in which case, the Successful Bidder will be obligated to repay such amounts pursuant to the Term Sheet) or if no sale of the Western/Pax Assets to any party is approved by the Court (in which case, the Debtors will return unused amounts from the deposit and Contura will have a super-priority junior secured claim against the Debtors for the balance).

3.     The Debtors and their advisors have determined that the sale process for which the Debtors seek approval, including the terms of the Stalking Horse Sale, is the only opportunity to maximize value, avoid a permanent operational shutdown of the Western Mines and the Pax Surface Mine, return as many employees to work as possible and ensure that, ultimately, the necessary reclamation is undertaken with respect to those mines.  Indeed, pursuant to the Term Sheet, Contura commits to bring back the majority of employees at the sites it seeks to purchase if the Stalking Horse Sale is consummated and assume hundreds of millions of dollars of liabilities currently burdening these assets.  The transaction would further provide real value to the Debtors' creditors through the cash consideration provided under the Stalking Horse Sale, which will be available, after satisfaction of certain administrative expenses, for distribution to the Debtors' creditors.  Moreover, Contura's agreement to fund the sale process through a purchase deposit is absolutely critical, without which no sale process could occur and significant potential value for the Debtors' estates would be lost altogether.  The stalking horse bid and

4

purchase deposit allow the Debtors and their advisors the breathing room necessary to allow them to focus on what is important – achieving a successful sale (or sales) and getting as many people back to work as quickly as possible. Without Contura's agreement to the Stalking Horse Sale, including the purchase deposit to fund the sale process, none of that would be possible and the Debtors would likely be forced to immediately convert these cases to cases under chapter 7. Accordingly, the Debtors believe that the sale process described herein is in the best interest of their estates, creditors, and other stakeholders.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This is a core proceeding under 28 U.S.C. § 157(b), and the Debtors consent to entry of a final order by the Court in connection with this motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory basis for the relief requested herein are sections 105, 363 and 365 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9008 and 9014 and Local Rule 6004-1.

## BACKGROUND

7.      On July 1, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      On July 3, 2019, the Office of the United States Trustee for Region 4, the District

of West Virginia (the "U.S. Trustee"), appointed an official committee of unsecured creditors

[Docket No. 46] (the "Creditors' Committee").  As of the date hereof, no party has requested the

appointment of a trustee or an examiner in these chapter 11 cases.

9.      A description of the Debtors' business and the reasons for filing these chapter 11

cases is set forth in the *Declaration of Jeff A. Hoops, Sr. in Support of Chapter 11 Filings and

First-Day Motions* [Doc. No. 14] (the "First Day Declaration").[3]

## THE DEBTORS' ASSETS

10.     As provided in the First Day Declaration, the Debtors operate approximately 32

properties, including surface and underground coal mines, preparation or wash plants, and

loadouts or tipples.  Combined, the Debtors and their non-Debtor affiliates hold more than 500

mining permits, which is more than any other mining enterprise in the country.

11.     The Debtors' operations are located in the Central Appalachian Basin in Virginia,

Kentucky and West Virginia (the "Eastern Division") and the Powder River Basin in Wyoming

(the "Western Division").  The Eastern Division is divided into four subdivisions – Black

Mountain/Lone Mountain, Virginia, BHL, and Northern.  Coal mined from the Eastern Division

is a mix of mid and high volatility metallurgical coal and specialty and industrial coals, with

thermal coal as a by-product.  The Eastern Division holds approximately 600 million reserve

tons, has an average mine life of 30+ years, and can produce up to 6 million tons per year.  The

Eastern Division produced 3.3 million tons in 2018.

---

[3] Mr. Hoops resigned his positions as officer and director of each of the Debtors on July 3, 2019 and is no longer involved in the management of the Debtors or their businesses.

12.     The Western Division operates the open-pit surface mines commonly known as the Belle Ayr and Eagle Butte mines (the "Western Mines"), both located in northeast Wyoming, and produces low sulfur, sub-bituminous thermal coal.    The Western Division holds approximately 600 million reserve tons.    The average mine life in the Western Division is 20 years and production capacity is 50 million tons.    The Western Division produced 35.5 million tons in 2018.

13.     The Eastern Division and Western Division assets (collectively, the "Assets") are subject to significant permitting, bonding and other governmental, regulatory and environmental requirements that will be addressed through the sale process, including through a possible assignment of governmental permits and other agreements and rights required to operate the near-term producing projects and to continue exploring the other projects.    The Assets also include a mix of personal property, water rights, mining and other service contracts, leases and other rights that will need to be assigned or otherwise transferred as part of the sale process.

## POSTPETITION EFFORTS TO MARKET
## THE DEBTORS' ASSETS AND FINANCE THE SALE PROCESS

14.     The Debtors, with the assistance of their investment banker and other professionals have been working diligently to seek out third-party purchasers that may be interested in purchasing substantially all or a portion of the Assets.    Specifically, as the date of filing this motion, the Debtors' advisors have reached out to more than twenty-seven (27) parties to solicit interest in acquiring the Assets.    At this time, ten (10) parties have signed non-disclosure agreements and are actively engaged in conducting due diligence (collectively, the "Preliminary Interested Investors").    The Debtors and their professionals are continuing these

efforts and expect additional parties to sign non-disclosure agreements and perform due diligence during the sale process.

15.    In tandem with and in order to fund these efforts, the Debtors have sought financing from multiple sources, including the Debtors' prepetition creditors.  Notwithstanding their efforts, the Debtors have been unable to obtain traditional long-term debtor-in-possession financing.  While the Debtors' prepetition senior secured lenders provided an initial amount of interim financing at the outset of these cases, after weeks of negotiation with the Debtors and their advisors, these lenders ultimately declined to extend the additional financing necessary to allow the Debtors to continue to pursue a value maximizing sale process that would allow the Debtors to achieve the best value for the benefit of all stakeholders.  At the eleventh hour, as the Debtors were facing inevitable chapter 7 conversion, funds managed or advised by Highbridge Capital Management, LLC and Whitebox Advisors LLC agreed to provide incremental financing to the Debtors on a junior secured basis.  This financing, which Contura has agreed to step into as a lender (if so requested by Highbridge Capital Management, LLC and Whitebox Advisors LLC) pursuant to a separate agreement entered into between Contura and the existing lenders, saved the Debtors' estates from a value destructive liquidation.  The Debtors, Contura and each of their respective advisors used the opportunity provided by this incremental financing to formulate a workable sale process and negotiate the Stalking Horse Sale, including Contura's agreement to fund the sale process and provide a stalking horse bid for the Western Purchased Assets and the Pax Purchased Assets.  The Debtors' incremental debtor-in-possession financing liquidity has now been exhausted, and absent approval by the court of the sale process proposed herein and Contura's stalking horse bid, the Debtors will ultimately be forced into chapter 7.

8

## <u>OVERVIEW OF THE TERM SHEET</u>

16.     As set forth above, subject to Court approval and higher and better bids, the

Debtors have agreed to the Stalking Horse Sale with Contura as set forth in the Term Sheet,

which provides the terms and conditions upon which Contura will serve as Stalking Horse

Purchaser for (a) substantially all of the assets in the Western Division, except for the Western

Excluded Assets and the Western Excluded Liabilities, and (b) substantially all of the assets

related to the Pax Surface Mines, excluding the Pax Excluded Assets and Pax Excluded

Liabilities.

17.     The following chart summarizes the key terms and conditions of the Term Sheet:[4]

| Term Sheet Provision | Summary Description |
|---|---|
| **Parties** | <u>Sellers</u>:    Blackjewel, L.L.C. and Blackjewel Holdings L.L.C.<br><u>Buyers</u>:    One or more subsidiaries of Contura Energy, Inc. (the "<u>Stalking Horse Purchaser</u>") |
| **Financing/Purchase Price Deposit** | In connection with its agreement to serve as Stalking Horse Purchaser, Contura has agreed, subject to entry of the Bidding Procedures Order, to provide a cash deposit equal to $8.1 million to the Seller Parties (the "<u>Purchase Deposit</u>"), to be applied to the purchase price if the Western/Pax Asset Sale.<br><br>The Purchase Deposit (and any resulting Superpriority Purchase Price Claim (as defined below)) shall bear interest at a rate of LIBOR + 12.50% (LIBOR floor of 2.00%), which shall be paid in cash on a monthly basis in arrears.  To the extent such Purchase Deposit (or resulting Superpriority Purchase Price Claim) or any interest on the Purchase Deposit (or resulting Superpriority Purchase Price Claim) is not paid when due, such amounts shall also bear interest at a rate of 2.00%. |

---

[4] This summary is provided for the convenience of the Court and parties-in-interest.  To the extent there is any conflict between this summary and the Term Sheet, the latter governs in all respects.

| | The Purchase Deposit and the proceeds thereof shall be available for use by the Seller Parties, subject to the following conditions: |
| | (a) The Seller Parties must comply with the Budget attached hereto (the "<u>Budget</u>");[5] |
| | (b) The Purchase Deposit and all proceeds thereof shall be held in Escrow, subject to release from Escrow for use by the Debtors solely in accordance with the Budget, including, without limitation, deposits into an escrow account maintained for the exclusive benefit of the professionals retained by the Debtors and the Committee of the funds necessary to pay allowed fees and expenses of those professional (the "<u>Professional Escrow</u>"). For the avoidance of doubt, the Professional Escrow shall not be subject to any lien or security interest and is and shall be maintained for the exclusive benefit of estate professionals even in the event of a future conversion to chapter 7 or dismissal of these cases; and |
| | Any other Bid for the Western/Pax Assets that is a Qualified Bid must include, as a part of such bid, reimbursement to Contura of the Purchase Deposit (in cash in full), unless waived by Contura |
| **Purchase Deposit Liens/Claims** | To the extent that the Debtors use the Purchase Deposit and solely in the event that the Court does not approve a sale of the Western/Pax Assets either to Contura or to another Bidder that reimburses Contura for the Purchase Deposit, Contura shall receive a dollar-for-dollar superpriority claim (the "<u>Superpriority Purchase Deposit Claims</u>") against all Debtors, which claims shall be junior to any allowed superpriority administrative claims granted in connection with the Riverstone DIP Facility and pari passu to the administrative claims granted in connection with the Highbridge/Whitebox DIP Facility but shall be senior to all other administrative expenses, and which claim shall be granted: |

---

[5] A copy of the Budget is attached hereto as **<u>Exhibit C</u>**.

(a)     Liens on all present and after-acquired property (whether tangible, intangible, real, personal or mixed and wherever located) of the Debtors that were not subject to validly perfected liens as of the Petition Date, including without limitation proceeds of avoidance actions, which liens shall be junior to (1) any liens (the "Riverstone DIP Liens") securing the existing interim DIP financing provided by Riverstone Credit Partners – Direct, L.P. (the "Riverstone DIP Facility") and (2) any liens (the "HB/WB DIP Liens") securing the Highbridge/Whitebox DIP Facility; and

(b)     Liens on all present and after-acquired encumbered property (whether tangible, intangible, real, personal or mixed and wherever located) of the Debtors that is subject to validly perfected liens as of the date of the filing of the Chapter 11 Cases, which liens shall be junior to the (i) Riverstone DIP Liens, (ii) the HB/WB DIP Liens and (iii) any and all valid, perfected, enforceable and unavoidable liens as of the July 1, 2019 (the "Petition Date") held or asserted by any person or entity, including, without limitation, Riverstone Credit Partners, United Bank, Inc., Campbell County, Wyoming for unpaid ad valorem taxes, Fifth Third Bank, or Caterpillar Financial Services Corporation (collectively, the "Senior Liens.")

All of the liens granted herein are, to the fullest extent permitted by applicable law, effective and perfected upon entry of the Bidding Procedures Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

Notwithstanding the foregoing, the Company shall take all actions necessary, desirable and/or reasonably requested by Contura to create and perfect all liens in the collateral securing the Purchase Deposit Superpriority Claims, including in any jurisdiction in which the Bidding Procedures Order is not applicable.

In addition, with respect to the Purchase Deposit Superpriority Claims, the Bidding Procedures

| | Order shall provide for waivers of section 506(c), section 552(b)'s equities of the case exception, and any right to apply the equitable doctrine of marshaling (other than as provided in the Bidding Procedures Order), among other customary terms and provisions. |
|---|---|
| **Conditions Precedent to Purchase Deposit** | <ul><li>Entry of the Bidding Procedures Order by the Bankruptcy Court which shall be in form and substance acceptable to Contura, and which shall approve and bind the Debtors to comply with this Term Sheet and the Bidding Procedures; and</li><li>The Debtors shall file voluntary petitions in the Chapter 11 Cases on behalf of any presently non-debtor entities that own or control any assets (including permits, licenses or leases) necessary or desirable to operate either the Western Purchased Assets or the Pax Purchased Assets;</li><li>Delivery of an updated Budget in form and substance acceptable to Contura.</li></ul> |
| **Return of Purchase Price Deposit/Payment of Superpriority Purchase Price Deposit Claim** | Any unused Purchase Deposit shall be remitted to Contura and any Superpriority Purchase Deposit Claim (including accrued interest on the Purchase Price Deposit or Superpriority Purchase Deposit Claim) shall be due and owing to Contura, upon the earlier of:<ul><li>A breach of any term of this Term Sheet by the Debtors;</li><li>Use of the Purchase Deposit in a manner inconsistent with the Budget;</li><li>The approval by the Bankruptcy Court of a Successful Bid for any of the Western Assets or the Pax Assets (unless Contura shall have waived the requirement for such Successful Bid to have reimbursed the Purchase Price Deposit); or</li><li>August 5, 2019, unless the Sale Order for each of the Western Assets and the Pax Assets shall have been approved, which</li></ul> |

|  | shall approve the Western Asset Sale and the Pax Asset Sale to Contura. |
|---|---|
| **Western Division Asset Sale** | Contura will purchase substantially all of the assets of the Debtors related to the open-pit surface mines and related facilities commonly known as the Belle Ayr mine and the Eagle Butte mine, including all equipment, books and records related thereto, other than the Western Excluded Assets, free and clear of all liens, claims and encumbrances.  Contura will assume the Western Assumed Liabilities, but not the Western Excluded Liabilities. |
| **Consideration for the Western Asset Sale and Pax Asset Sale** | As consideration for the Western/Pax Assets, Contura will (i) pay $12.5 million in cash (in addition to the Purchase Deposit), (ii) assume the Western Assumed Obligations and (iii) assume the Pax Assumed Obligations.<br><br>The consideration will be allocated among the Western/Pax Assets in a manner to be determined. |
| **Western Division Transfer of Leases** | The Seller Parties and Contura will cooperate to diligently pursue the transfer to it of all lease agreements ("Leases") held by the Seller Parties, related to the operation of the Western Mines. |
| **Pax Surface Mine Asset Sale** | Contura will purchase substantially all of the assets of the Debtors related to the open-pit surface mine and related facilities commonly known as the Pax Surface Mine, including all equipment, books and records related thereto, other than the Pax Excluded Assets, free and clear of all liens, claims and encumbrances.  Contura will assume the Pax Assumed Liabilities, but not the Pax Excluded Liabilities. |
| **Transfer of Pax Permits and Leases** | The Seller Parties and Contura will cooperate to diligently pursue the transfer to Contura of all permits, licenses consents, authorizations, permit applications and other approvals ("Permits") and Leases held by the Sellers Parties and related to the operation of the Pax Mine. |
| **Representations, Warranties and Covenants** | The Western Asset Sale and Pax Asset Sale will contain mutually agreeable representations, warranties and covenants consistent with customary bankruptcy practice relating to sales |

13

| | |
|---|---|
| | conducted pursuant to section 363 of the Bankruptcy Code. |
| **Conditions Precedent to Closing** | The Western Asset Sale and the Pax Asset Sale will be subject to customary conditions to the parties' obligations to effect the closing (which may be waived in the sole discretion of Contura), including, but not limited to: |
| | (a) all specified governmental and regulatory approvals will have been obtained or, if applicable, will have expired, will have been waived by the applicable governmental authority or will have been terminated; |
| | (b) there will not be in effect any order by a governmental body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Term Sheet; |
| | (c) the Bankruptcy Court shall have approved the assumption and assignment of any unexpired leases or executory contracts constituting Western Purchased Assets or Pax Purchased Assets, as applicable; |
| | (d) the Governmental Parties shall have consented to (i) the transfer of the Leases (as defined in the Bidding Procedures) related to the Western Mines and the Pax Mines, and (ii) a mutually agreed settlement regarding any accrued and unpaid royalty payments and production taxes related to the Western Mines or the Pax Surface Mines; |
| | (e) the parties will have executed and delivered all Definitive Documents; and |
| | (f) the Bankruptcy Court will have entered a Sale Order approving the Western Asset Sale or Pax Asset Sale, as applicable and such Sale Order will not be subject to any stay. |

| Releases | The Sale Order will provide for customary releases by the Seller Parties of any claims or causes of action against Contura, and the representatives, professionals and other advisors thereof, including but not limited to release of any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or thereafter arising, in law, equity, or otherwise against the Purchased Assets and Contura and their respective affiliates. In addition, if Sellers file a chapter 11 plan, such plan will include releases and exculpation provisions in favor of Contura and the representatives, professionals and other advisors thereof to the maximum extent permitted by law.

For the avoidance of doubt, Contura and the Highbridge/Whitebox DIP Lenders shall not waive, and shall expressly reserve, all claims against the Seller Parties and the Debtors' estates, whether arising under contract, by law, in equity or otherwise. |

## **THE BIDDING PROCEDURES**

### A.    **Need for a Timely Sale Process**

18.    The proposed bidding procedures (the "Bidding Procedures") for the Purchased Assets and any other portion of the Assets, are attached to the Term Sheet as Exhibit A.  The Bidding Procedures are designed to, among other things, (a) solicit final, binding Bids from Preliminary Interested Investors and any other parties that may be interested in submitting a Qualified Bid, (b) enable the Debtors, in consultation with the Consultation Parties, to evaluate the Bids received in a fair and efficient manner and determine which are Qualified Bids, and (c) facilitate competitive bidding in the event that more than one Qualified Bid is submitted for the Purchased Assets or any other portion of the Assets.

15

19.     The Debtors respectfully request that the Court approve the following proposed expedited timeline for the sale process:

| Action | Deadline |
|---|---|
| **Bid Deadline** | July 31, 2019 at 5:00 p.m. (prevailing Eastern Time) |
| **Auction** | August 1, 2019 at 9:00 a.m. (prevailing Eastern Time), if one is needed, which will be held at the offices of Squire Patton Boggs (US) LLP, 201 E. Fourth Street, Suite 1900, Cincinnati, Ohio 45202. |
| **Sale Objection Deadline** | August 2, 2019, at any time prior to the commencement of the Sale Hearing. |
| **Sale Hearing** | August 2, 2019 |
| **Closing Date** | August 5, 2019 |

20.     While necessarily extremely short due to the Debtors' limited liquidity, the timeline provides Preliminary Interested Investors with the time necessary to formulate a competitive bid, without unduly prejudicing the Debtors' estates.  Importantly, Contura has agreed to finance the sale process on the timeline set forth above through the Purchase Deposit set forth in the Term Sheet.  In formulating the sale timeline, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest with the need move as quickly and efficiently as possible to realize on the Contura bid, achieve a successful sale or sales, and return as many employees work as possible.  Absent approval of these Bidding Procedures, the Debtors will have no choice but to convert their cases to cases under chapter 7 of the Bankruptcy Code.

21.     As described herein, the Debtors and their advisors have been diligently marketing the Assets since the Petition Date to a broad group of strategic and financial buyers

16

and substantial information regarding the Assets has been made available during the marketing process. Accordingly, the Debtors believe that numerous parties that may have an interest in bidding at the Auction are already familiar with the Purchased Assets for the purposes of formulating their Bids. Preliminary Interested Investors, and any other parties that execute confidentiality agreements, will continue to have access to updated information prepared by the Debtors and a substantial body of information that resides in the Debtors' data room.

**B.    Overview of the Bidding Procedures**

22.    The Bidding Procedures are intended, under the exigent circumstances present, to foster a fair and efficient competitive sale process for substantially all of the Debtors' assets that will provide the best opportunity to market test the bids submitted by Contura for the Western Purchased Assets and the Pax Purchased Assets, potentially receive higher and better offers for those assets, and to identify the purchasers for the Debtors' remaining Assets. Because the Bidding Procedures are attached as Exhibit A to the Term Sheet, they are not restated in their entirety herein. Generally speaking, however, the Bidding Procedures establish, among other things:[6]

a)    The requirements that interested parties must satisfy to participate in the bidding process and become "Preliminary Interested Investors" (*see* Bid. Proc., at Preliminary Interested Investors);

b)    The availability of, access to, and conduct during due diligence by Preliminary Interested Investors (see Bid. Proc., at Due Diligence);

c)    The deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger an Auction, including the minimum

---

[6] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Bidding Procedures, the latter governs in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Bidding Procedures.

consideration that must be provided, the terms and conditions that must be satisfied, and deadlines that must be met by any Preliminary Interested Investors (see Bid. Proc., at Qualified Bids);

d)      The manner in which Qualified Bids will be evaluated by the Debtors to determine the Auction Baseline Bid for the Auction (see Bid. Proc., at Auction);

e)      The criteria by which the Successful Bid will be selected by the Debtors (see Bid. Proc., at Auction); and

f)      The condition in which the Assets are to be sold, free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests therein (see Bid. Proc., at Sale Free and Clear; As Is / Where Is).

23.      Importantly, the Bidding Procedures include a mechanism that ensures the Debtors' estates will not be left administratively insolvent by the proposed sales.  Any Bid for any Lot or combination of Lots must, at a minimum, provide for (i) the performance of the Reclamation Commitments associated with the Lots subject to such Bid and (ii) the payment in cash in full of a pro rata portion of (A) fees owing to the United States Trustee incurred in connection with the Debtors' chapter 11 cases and any fees payable to the Clerk of Court, (B) professional fees, expenses, and disbursements incurred by professional persons employed by the Debtors or the UCC (including any out-of-pocket expenses of the members of the Creditors' Committee) ("Professional Fees and Expenses") incurred on and after the Petition Date, (C) certain other allowed administrative expenses of the Debtors' estates as identified by the Debtors and (D) certain costs necessary to wind-down the Debtors' estates as identified by the Debtors (collectively, the "Carve-Out").  The portion of the Minimum Bid representing the amount of the Carve-Out is to be held by the Debtors in a segregated escrow account, not subject to the lien or security interest of any party including, without limitation, parties providing secured debtor in

possession financing and shall be used solely and exclusively to satisfy the fees, expenses and costs included in the Carve-Out.  In the event of a conversion of these chapter 11 cases to cases under chapter 7, the chapter 7 trustee or trustees shall have no right to the segregated account for the Carve-Out and the segregated account shall not be part of the chapter 7 estate or estates.

24.    In addition, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified Bids, select higher and better offers, potentially sell their Assets in lots, and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates.

### STALKING HORSE

25.    As discussed herein, the Debtors have selected Contura as the Stalking Horse Purchaser for the Western Purchased Assets and the Pax Purchased Assets.  It is possible that other Preliminary Interested Investors are designated as a stalking horse purchaser for other portions of the Assets, but as of the date hereof, only Contura has been designated a Stalking Horse Purchaser.  The Debtors request that they be granted the flexibility to designate other Preliminary Interested Investors as stalking horse purchasers and designate Contura as Stalking Horse Purchaser for the Purchased Assets, pursuant to the terms and conditions in the Term Sheet attached hereto.

### FORM AND MANNER OF SALE NOTICE

26.    Within one (1) business day after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "Mailing Date"), the Debtors will serve a notice of the Sale (the "Sale Notice"), substantially in the form attached hereto as **Exhibit D**, by first-class

19

mail or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon the following parties: (a) the Consultation Parties (as defined in the Bidding Procedures); (b) Riverstone; (c) United Bank, Inc.; (d) the Office of the United States Trustee; (e) all counterparties to potentially assigned contracts; (f) any parties known or reasonably believed to have expressed interest in the Assets; (g) all creditors listed in the Debtors' creditor matrix; (h) all parties who have appeared in these cases; (i) all applicable state and local taxing authorities; and (j) each governmental agency that is an interested party with respect to the sale transactions proposed in the Term Sheet.

27.     The Debtors respectfully submit that, under the circumstances, service of the Sale Notice in the manner described herein will provide adequate notice and due process to all parties in interest with respect to the sale process and the proposed sale of the Purchased Assets free and clear of liens, claims, encumbrances and other interests.

## **RELIEF REQUESTED**

28.     The Debtors respectfully request that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, granting, among other things, the following relief:

      a)      Approving the Term Sheet and Bidding Procedures attached hereto as **Exhibit B**;

      b)      Approving the Contract Procedures detailed in this Motion and the Bidding Procedures Order;

      c)      Approving the Sale Notice attached hereto as **Exhibit D**;

      d)      Authorizing, but not directing, the Debtors to continue the existing sale process for the Purchased Assets and remaining Assets in accordance with the Bidding Procedures;

      e)      Approving Contura as the Stalking Horse Purchaser for the Purchased Assets;

      f)      Authorizing, but not directing, the Debtors to coordinate the transfer and/or assignment of necessary governmental permits and licenses directly with the governmental authority responsible for the issuance and/or transfer of the same;

      g)      Authorizing the Debtors to incur junior debtor in possession financing from Contura necessary to finance the sale process; and

      h)      Authorizing, but not directing, the Debtors to terminate their existing 401(k) plan.

29.     The Debtors further request that, following the completion of any Auction and the Sale Hearing, the Court enter the Sale Order that, among other things, (i) approves the sale of the Purchased Assets to Contura and/or any other successful bidder(s) free and clear of liens, claims, encumbrances and other interests pursuant to sections 363(b) and (f) of the Bankruptcy Code, and (ii) approves the assumption and assignment of any executory contracts and unexpired leases designated by the successful bidder for assumption and assignment pursuant to section 365 of the Bankruptcy Code.

## **BASIS FOR RELIEF**

### A.    **Applicable Standard to a Sale or Use of Estate Assets**

30.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  Section 363(b) of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate; however, bankruptcy courts within this jurisdiction have required that the authorization of such use, sale, or lease of property of the

estate, not in the ordinary course of business, must be based upon the sound business judgment of the debtor. *See In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) (adopting the "sound business purpose" test for section 363 purposes and citing *Lionel* as authority therefor); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995) (same); *see also In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale, or lease of property outside the ordinary course of business).

31.     A sound business purpose for the sale of a debtor's assets or equity interests outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors, or interest holders. *See, e.g.*, *Lionel Corp.*, 722 F.2d at 1070. Once a debtor articulates a valid business justification for its actions, courts should "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose." *In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citing *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 n.17 (Del. 1994)); *accord Integrated Res.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (presuming, based on the business judgment rule, "that in making a business decision the directors of [the debtor] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain

objections to the debtor's conduct."). Thus, if a debtor's actions satisfy the business judgment

rule, then the transaction in question should be authorized under section 363(b)(1) of the

Bankruptcy Code.

### B.    Approval of the Bidding Procedures

32.    A debtor's business judgment is entitled to substantial deference with respect to

the procedures to be used in selling assets from the estate. *See, e.g., In re Integrated Resources,*

*Inc.,* 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (noting that bid procedures negotiated by a

debtor are to be reviewed according to the deferential "business judgment" standard; *In re 995*

*Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

33.    Further, in a sale of property of the estate, the debtors' primary goal is to

maximize the proceeds received by the estate. *See, e.g., Integrated Resources, 147 B.R. at 659*

("'It is a well-established principle of bankruptcy law that the . . . [Debtors'] duty with respect to

such sales is to obtain the highest price or greatest overall benefit possible for the estate.'")

(quoting *In re Atlanta Packaging Products, Inc.,* 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

Further, a debtor maximizes value for creditors by selecting the 'highest and best bid, and

thereby protecting the interests of [the] debtor, its creditors, and its equity holders.'" *In re GSC,*

*Inc., et al.,* 453 B.R. 132, 169-170 (Bankr. S.D.N.Y. 2011) (quoting *In re Fin. News Networks,*

*Inc.*, 126 B.R. 152, 157 (S.D.N.Y. 1991).

34.    As a result, courts routinely recognize that procedures intended to enhance

competitive bidding are consistent with the goal of maximizing the value received by the estate

and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., Integrated*

*Resources,* 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets").

35.    The Debtors believe that the proposed Bidding Procedures will promote active bidding from the most interested parties and accordingly, will elicit the best and highest offers available for the sale of the Debtors' assets.  The proposed Bidding Procedures will allow the Debtors to conduct the sale transactions in a controlled, transparent and fair fashion that will encourage meaningful input from key constituents and participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close a transaction.

36.    While the Debtors understand and recognize that the proposed sale process is significantly shorter than the norm in other chapter 11 cases, the Debtors' core source of its value, their operations and people, truly is the proverbial "melting ice cube."  Without Contura's offer to purchase the Western Purchased Assets and Pax Purchase Assets and fund the Debtors' expenses during sale process by pre-funding the purchase price, the Debtors would be out of options, would immediately convert to chapter 7, and substantial value and jobs would be lost. The sale process proposed here, including the Bidding Procedures and proposed timeline truly are the Debtors only and last opportunity to achieve a value-maximizing sale and return as many employees to work as possible.

37.    Moreover, similar procedures in complex chapter 11 cases have been previously approved in this Circuit.  *See, e.g.*, *In re RoomStore, Inc.*, No. 11–37790 (DOT) (Bankr. E.D. Va. Jan. 3, 2012); *In re Movie Gallery, Inc.*, No. 10–30696 (DOT) (Bankr. E.D. Va. Oct. 27, 2010); *In re LandAmerica Fin. Grp., Inc.*, No. 08–35994 (KRH) (Bankr. E.D. Va. April 16, 2009); *In re*

24

*Circuit City Stores, Inc.*, No. 08–35653 (KRH) (Bankr. E.D. Va. Mar. 3, 2009); *In re S & K Famous Brands, Inc.*, No. 09–30805 (KRH) (Bankr. E.D. Va. Feb. 9, 2009); *In re Chesapeake Corp.*, No. 08–36642 (DOT) (Bankr. E.D. Va. Jan. 20, 2009).   Accordingly, the Bidding Procedures should be approved.

**C.    The Stalking Horse Purchaser Should be Approved**

38.    The Debtors also seek authority to designate Contura as the Stalking Horse Purchaser for the Western Purchased Assets and the Pax Purchased Assets and to designate as of yet unknown third-parties as the Stalking Horse Purchaser for other Assets.   Contura's Bid, along with any other interested party who is designated as a Stalking Horse Purchaser, will be subject to higher and better offers pursuant to the Bidding Procedures.   The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, because the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by locking in a purchase price "floor" and helping to garner interest in the assets. Accordingly, the Debtors believe that the use of a stalking horse is appropriate here.[7]

**D.    The Liens and Claims Granted in Connection with the Purchase Deposit**

39.    Section 364 of the Bankruptcy Code provides, in pertinent part:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1)      with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

25

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(c), (d)(1).

40.     Bankruptcy Rule 4001(c) governs the procedures for securing authorization to obtain debtor-in-possession financing and provides, in pertinent part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

41.     As described above and in the Term Sheet, the Debtors seek authorization to grant junior liens and superpriority claims in connection with the Purchase Deposit to avoid immediate and irreparable harm to their estates and creditors.  The realities of the Debtors' current financial condition necessitate their granting junior liens and superpriority claims under sections 364(c) of the Bankruptcy Code to operate the sale process and preserve and maximize the value of their assets.  Indeed, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search

26

for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 113 (N.D. Ga. 1989); *see also, In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable).

42.     The Debtors negotiated the Term Sheet with Contura pursuant to their sound business judgment, which is to be accorded deference so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to sustain seasonal business); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("The cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of post-petition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

43.     Bankruptcy courts generally will defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon debtor's prudent business judgment). Thus, bankruptcy courts will generally not second-guess a debtor-in-possession's

business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513-14.

44.     The Debtors have exercised sound business judgment in determining the appropriateness of entering into the Term Sheet and have satisfied the legal prerequisites to grant junior liens and superpriority claims on the terms and conditions set forth in the Term Sheet. The Purchase Deposit, as described in the Term Sheet, contains terms and conditions that are the best available under the exigent circumstances of these cases and will provide the Debtors with sufficient liquidity during the period necessary to implement the sale process. *See Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into hard bargains to acquire funds).

45.     The funds and liquidity to be provided through the Purchase Deposit are vital to the Debtors' ability to operate during the sale process, a process that is in the best interests of the Debtors' estates, their creditors and stakeholders. Failure to approve the liens and claims granted in respect of the Purchase Deposit pursuant to the Term Sheet would cause the Debtors to be unable to pay their operating expenses in the ordinary course of business during the sale process.

**E.     Termination of the Debtors' 401(k) Plan**

46.     Debtor Blackjewel, L.L.C previously established and maintained the Blackjewel LLC 401(k) Plan (the "401(k) Plan"), which is a qualified plan that is subject to sections 401(a) and 401(k) of the Internal Revenue Code (the "IRC") and the Employee Retirement Income Security Act of 1974 (as amended, "ERISA"). The 401(k) Plan is sponsored and administered by Blackjewel, L.L.C. (in such capacity, the "Plan Sponsor"). Eligible employees (collectively,

the "Plan Participants") can elect to make pre-tax salary deferral contributions and Roth contributions to the 401(k) Plan through payroll deductions that are then paid to a trust shortly thereafter. The 401(k) Plan also provides employer matching contributions. The Plan Sponsor collects contributions from the Plan Participants from each payroll and transfers those contributions into the 401(k) Plan's trust.

47.    As contemplated by the Sale Motion, the 401(k) Plan is not being conveyed to, or assumed by, Contura.  In light of that, and in order to facilitate distributions to Plan Participants the Plan Sponsor has determined that it is in the best interests of the Plan Participants to take the necessary steps to terminate the 401(k) Plan immediately, subject to this Court's approval. Accordingly, the Board of Directors of the Plan Sponsor have adopted resolutions to terminate the 401(k) Plan effective upon the date the Court enters an order approving this Motion.

48.    Pursuant to the terms of the 401(k) Plan, the Plan Sponsor may terminate the 401(k) Plan at any time. The Plan Sponsor's contractual right to terminate the 401(k) Plan constitutes property of the estate within the meaning of section 541 of the Bankruptcy Code, and the Plan Sponsor's use of that right may arguably constitute a use of property of its bankruptcy estate outside of the ordinary course of business.  Thus, the Plan Sponsor seeks this Court's authorization, out of an abundance of caution, to exercise its contractual right to terminate the 401(k) Plan.

49.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate ...."  11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court

29

to authorize the use of a debtor's assets outside of the ordinary course of business. However, courts have required that the decision to sell or use assets outside the ordinary course of business be based upon the sound business judgment of the debtor. *See In re Augusta Tissue Mill, LLC*, Case No. 07-10531, 2007 Bankr. LEXIS 3038, *9 (Bankr. M.D. N.C. Sept. 5, 2007) (approving the debtor's sale of assets under section 363(b) where the sale "reflects the exercise of the Debtor's sound business judgment"); *WBQ P'ship v. Virginia Dep't of Med. Assistance Servs. (In re WBQ P'ship)*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995) (adopting the "sound business purpose" test for purposes of a sale under section 363).

50.     A debtor's showing of a sound business purpose need not be unduly exhaustive. Rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

51.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Section 105 of the Bankruptcy Code essentially codifies the bankruptcy court's inherent equitable powers.

52.     Debtor Blackjewel, L.L.C., as Plan Sponsor, submits that sound business reasons exist to terminate the 401(k) Plan. First, the Debtors are in the process of selling all of their assets and won't remain in business. As such, the 401(k) Plan will not be conveyed to, or assumed by, Contura or any other potential purchaser of the Debtors' assets. Second, the Debtors will soon no longer have any employees to administer the 401(k) Plan. Moreover, if the

401(k) Plan is not terminated, the Plan Sponsor's estate will incur additional, unwarranted costs in connection with the ongoing administration of the 401(k) Plan.  The termination of the 401(k) Plan will eliminate the Plan Sponsor's obligation to perform under the 401(k) Plan (subject to the actions that the Plan Sponsor must take to distribute the 401(k) Plan assets and wind up the 401(k) Plan) and associated costs of administration thereunder.

53.     Accordingly, the Plan Sponsor has determined, in its sound business judgment, that it is in the best interests of the Plan Sponsor, the Plan Participants and the Plan Sponsor's estate and creditors to terminate the 401(k) Plan.

54.     Based upon the foregoing, the Plan Sponsor submits that termination of the 401(k) Plan is supported by sound business judgment, and are necessary, prudent, and in the best interests of the Debtor and its estate and creditors.

**F.     Sales Free and Clear of Liens, Claims, and Other Interests**

55.     Under section 363(f) of the Bankruptcy Code, the Court may authorize the sale of assets free and clear of existing liens, claims and encumbrances, if any, if:

> (a)     applicable non-bankruptcy law permits the sale of such property free and clear of such interest;
>
> (b)     the entity holding the lien, claim or encumbrance consents to the proposed sale;
>
> (c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (d)     such interest is in bona fide dispute; or
>
> (e)     such entity could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Old CarCo LLC*, 2010 U.S. Dist. LEXIS 143101, at *6 (S.D.N.Y. July 2, 2010).

56. The Debtors submit that one or more of the circumstances permitting sales free and clear will be met by or before the Sale Hearing is held. In addition, absent any objection to this motion, certain holders of claims may be deemed to have consented to the sale of the Purchased Assets. Finally, any claims that are interests in property being sold will attach to the net proceeds of the sale transaction, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors shall hold such proceeds in escrow pending the final resolution of any conflicting claims thereto. Accordingly, the Debtors believe that (a) the sale transaction will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and (b) the sale of the Purchased Assets and any remaining Assets should be approved free and clear of claims.

57. Moreover, courts in the Fourth Circuit have held that section 363(f)(5) of the Bankruptcy Code permits a debtor to sell its assets in a 363 bankruptcy asset sale free and clear of liens as long as the third-parties' interests transfer to the sale proceeds according to the same priority they had in the assets. *See In re Lady H Coal Co.*, 199 B.R. 595, 605, 1996 Bankr. LEXIS 1010, *23 n.6 (Bankr. S.D. W. Va. Mar. 29, 1996) ("It is clear in the Bankruptcy Code that a secured creditor receives payment from proceeds before payment to an unsecured creditor and it is also clear that a bankruptcy sale is free and clear of a secured creditor's claim."); *In re Ricco, Inc.*, 2014 Bankr. LEXIS 1265, *8 (Bankr. N.D. W. Va. Apr. 1, 2014) ("This court agrees that § 363(f)(5) authorizes a sale free and clear of liens and interests when the lien or interest holder could be compelled to accept less than the value of the claim secured by the claim or interest.).

58. The Bankruptcy Court for the Southern District of West Virginia has also specifically held that, under the bankruptcy court's inherent equitable power, the court can

32

authorize the debtor to sell its property free and clear under section 363(f)(5) of the Bankruptcy Code. *See Lady H Coal Co.*, 199 B.R. at *23-26 ("The well established rule that sales within a bankruptcy proceeding occur free and clear of any interest is founded upon the principle that good faith purchasers receive clean title to the property and that any claims against the property attach to the proceeds. . . . This channeling effect of claims to the proceeds protects good faith purchasers and thus encourages full value offers to bankruptcy estates. The channeling of claims to proceeds also precludes creditors from receiving preferential treatment and ensures that all creditors are treated according to the priorities of distribution as established by Congress in the Bankruptcy Code.

59.     As stated by the Second Circuit:  'In *Van Huffel v. Harkelrode*, 284 U.S. 225, 76 L. Ed. 256, 52 S. Ct. 115 (1931), the Supreme Court explained that even absent express statutory authority, the Bankruptcy Court had the inherent equitable power to sell a debtor's property and to transfer third-party interests to the proceeds of the sale. 284 U.S. at 227-228. *See also Ray v. Norseworthy*, 90 U.S. (23 Wall.) 128, 134-135, 23 L. Ed. 116 (1874) (court may sell bankrupt's property encumbered by third party claims as long as third parties retain their respective priorities in the proceeds of the sale); *Fierman v. Seward National Bank*, 37 F.2d 11, 13 (2d Cir. 1930) ("When the bankrupt's property was sold free of liens, the liens upon the property became rights against the substituted proceeds of sale, and claimants to this fund were obliged to assert their rights by applying to the court in whose custody it was."); *In re Penn Central Transportation Co.*, 383 F. Supp. 1128, 1130 (E.D. Pa. 1974) (power of a reorganization court to transfer interests in debtor's property to the proceeds of a sale is well established) *In re Johns-Manville Corporation*, 837 F.2d 89, 93 (2d Cir. 1988), *cert. denied*, 488 U.S. 868 (1988).'

33

Extensive case law exists that claims are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a successor. *In re Johns-Manville Corporation*, 837 F.2d 89 (2d Cir. 1988), *cert. denied*, 488 U.S. 868 (1988) (channeling of claims to proceeds consistent with intent of sale free and clear under § 363(f))").

60.     Importantly, the Debtors, Contura and their respective advisors have been in constant dialogue and engaged in extensive negotiations with the Debtors' secured creditors regarding the potential sale and the sale process, and have encouraged them to put forth a viable bid for the Assets.  While such creditors have not put forth a bid for the Assets, the Bidding Procedures expressly reserve their right to credit bid for the purchase of the Assets to the extent of their liens.

**G.      The Proposed Sale Meets the Business Judgment Standard and Should be Approved**

61.     The Debtors have determined, in an exercise of their business judgment, that the proposed sale of the Purchased Assets to the successful bidder(s) following the conclusion of the sale process will maximize value and benefit their estates and creditors.  As a result of the postpetition efforts of the Debtors and the Debtors' professionals, the Debtors believe that the process is the only option to achieve the best possible sale for the Purchased Assets and any other Assets under the circumstances.  The sale process is designed to, under the circumstances, maximize value and market the Assets in a full, fair and transparent manner.  For these reasons, the Debtors respectfully submit that the proposed sale is in the best interest of the Debtors' estates and creditors, will maximize value, is the best opportunity to return employees to work, and should be approved.

**H.     Assumption and Assignment of the Designated Contracts and Approval of Proposed Cure Amounts**

62.     The Debtors also seek authority to assume and assign the executory contracts and unexpired leases to the successful bidder(s).  The Debtors have the power to assume executory contracts or unexpired leases subject to the Court's approval so long as the statutory requirements for assumption under section 365 of the Bankruptcy code are met.  11 U.S.C. § 365(a).    Section 365(b)(1) of the Bankruptcy Code codifies the statutory assumption requirements, and provides in relevant part as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> > (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

63.     The standard that is applied in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests.  *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's

35

business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code.").

64.     To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).  Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." *In re Network Access Solutions Corp.*, 330 B.R. 67, 75 (Bankr. Del. 2005).  Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion.  *See, Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003); *Lubrizol Enters. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985).

65.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992); *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *see also, In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("[a]though no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

66.     Adequate assurance of future performance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of

enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

67.     In addition, section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of or impose an economic impairment to an executory contract or unexpired lease. *See, e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365."), *cert. denied*, 522 U.S. 1148 (1998). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (finding that section 365(f)(3) prohibits enforcement of any lease clause creating a right to a terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

68.     Here, the assumption and assignment of contracts and leases to the successful bidder(s) meets the business judgment standard and satisfies all requirements for assumption and assignment under section 365 of the Bankruptcy Code. The contracts and leases to be assigned relate specifically to the Assets being sold. The Stalking Horse Purchaser will identify the

37

contracts and leases potentially needed to operate the Western Purchased Assets and the Pax Purchased Assets going forward. Purchasers of any other Assets will similarly designate contracts and leases necessary to operate those assets. Notice of the schedules of the contracts and leases to be assumed and assigned, and the cure amount thereof, will be provided to all applicable counterparties, and a process will be established pursuant to which such parties may object to such assumption and assignment or cure amounts, and the Court may resolve any such disputes that may arise. As such, the assumption and assignment of contracts and leases is essential to facilitating the proposed sale(s).

69.     The Debtors expect to receive evidence of the successful bidder(s)'s ability to close the proposed sale and to otherwise perform its obligations under any contracts and leases to be assigned and will share such confidential information with any counterparty to a contract or lease that to be assigned that requests the information in writing. Accordingly, the Debtors submit that assumption and assignment of executory contracts and leases to the successful bidder(s) is appropriate under the circumstances.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

70.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

71.     The Debtors, with the assistance of their proposed claims and noticing agent, will provide notice of this motion by email and/or fax to: (i) the Office of the United States Trustee

38

for the Southern District of West Virginia; (ii) the Debtors' prepetition secured lenders; (iii) the creditors appearing on the Debtors' consolidated list of top 30 unsecured creditors; (iv) the Office of the United States Attorney for the District of West Virginia; (v) the Internal Revenue Service; (vi) any local, state, or federal agencies that regulate the Debtors' businesses, (vii) counsel to Riverstone Credit Partners – Direct, L.P., Bailey & Glasser LLP, (viii) counsel to United Bank, Inc., Steptoe & Johnson PLLC, (ix) counsel to Highbridge Capital Management, LLC and Whitebox Advisors LLC, Paul, Weiss, Rifkind, Wharton & Garrison LLP, (x) counsel to Contura Energy, Inc., David Polk & Wardwell LLP, (xi) proposed counsel to Creditors' Committee, Whiteford Taylor & Preston, LLP; and (xii) all parties requesting notices pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[Remainder of Page Intentionally Left Blank]

WHEREFORE, the Debtors respectfully request the Court (a) to enter the Bidding

Procedures Order, substantially in the form attached as **Exhibit A**, (b) after the conclusion of the

Auction (if any) and the Sale Hearing, enter the Sale Order, and (c) grant such other relief the

Court deems just and proper.

DATED: July 25, 2019                    **SUPPLE LAW OFFICE, PLLC**


    */s/ Joe M. Supple*                   
Joe M. Supple, Bar. No. 8013
801 Viand St.
Point Pleasant, WV 25550
Telephone: 304.675.6249
Facsimile: 304.675.4372
joe.supple@supplelaw.net

   – and –

**SQUIRE PATTON BOGGS (US) LLP**

Stephen D. Lerner (admitted *pro hac vice*)
Nava Hazan (admitted *pro hac vice*)
Travis A. McRoberts  (admitted *pro hac vice*)
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201
stephen.lerner@squirepb.com
nava.hazan@squirepb.com_
travis.mcroberts@squirepb.com

*Proposed Co-Counsel to the Debtors and*
*Debtors-in-Possession*