IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| Blackjewel, L.L.C., *et al.,* | ) | Case No. 19-30289 |
|  | ) |  |
| Debtors[1] | ) | (Joint Administration Pending) |
|  | ) |  |

**OBJECTION OF INDEMNITY NATIONAL INSURANCE COMPANY TO
MOTION OF DEBTORS FOR AN ORDER APPROVING THE SALE OF THE
PURCHASED ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES**

Indemnity National Insurance Company ("INIC"), by and through its undersigned counsel, hereby objects (the "Objection") to the Motion of Debtors for Entry of an Order Approving the Sale of the Purchased Assets Free and Clear of Liens, Claims and Encumbrances (the "Sale Motion") [Docket No. 312].[2] In support of its Objection, INIC respectfully states as follows:

**PRELIMINARY STATEMENT**

1. There can be no dispute that these Debtors have faced difficult financial circumstances that have altered the intended trajectory of these proceedings. Such circumstances, however, cannot justify a non-consensual re-ordering of the Bankruptcy Code's priority scheme or a total disregard for the Debtors' statutory environmental obligations. The Debtors' Sale Motion is nothing more than a 'structured conversion' that would strip the estates of its most valuable assets, use the proceeds of those sales to pay professionals and other favored

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024) and Cumberland River Coal LLC (2213).

[2] All capitalized terms used, but not otherwise defined, herein shall have the meanings attributed to them in the Sale Motion.

1

administrative claimants, and leave state regulatory authorities to address <u>hundreds of millions of dollars</u> of the Debtors' environmental liabilities without adequate funding.

2. It is black-letter bankruptcy law: (i) that chapter 7 administrative expenses have priority over chapter 11 administrative expenses; (ii) that, in an administratively insolvent case, chapter 11 administrative expenses are to be paid pro-rata; and (iii) that a debtor cannot alter the Bankruptcy Code's priority scheme through a 'structured dismissal' or 'structured conversion' without the consent of all affected creditors. It is equally certain that a debtor cannot abandon property in contravention of environmental laws designed to protect society from "imminent and identifiable harm" and that the costs of complying with such laws are entitled to administrative expense priority treatment.

3. The Debtors are asking the Court to ignore all of the above tenets, to approve sales effectuated through a process where the assumption of environmental liabilities was given <u>zero</u> value, and to authorize an immediate (pre-conversion) distribution of the vast majority of the sale proceeds by way of a manufactured 'carveout.' These distributions are to occur with no purchase price allocations, no schedules or statements of financial affairs, no notice, no opportunity to assert administrative claims, no opportunity for a trustee or other creditor to challenge liens or to investigate whether specific acquired assets (such as leases and permits) are encumbered, and (as the auction transcript will evidence) with successful bidders unable to even determine whether or not their successful bids included entire categories of assets.

4. The extraordinary circumstances of this case may have warranted a massively expedited sale process; there is no reason, however, why the distribution of the sale proceeds must occur on that same time table. The Debtors have indicated that they intend to convert these cases to chapter 7 after the sales are consummated. A chapter 7 trustee is more than competent

to review claims, investigate liens, assess professional fee statements, and ultimately make distributions to creditors in accordance with the Bankruptcy Code.

5. INIC respectfully submits that, pursuant to *Midlantic* and its progeny, the Court should not approve any sale that leaves the bankruptcy estates unable to satisfy their statutory environmental obligations (i.e. the Debtors' proposed sales of the Eastern Assets (other than Pax)). To the extent that the Court elects to approve such sales, the proceeds of the sales must remain in the bankruptcy estates and must not be made part of any purported 'carve-out,' so that all parties have the opportunity to assert administrative expense claims and to challenge liens before any distributions are made.

## BACKGROUND

### A. Procedural Background

6. Blackjewel, L.L.C., Blackjewel Holdings, L.L.C., Revelation Energy Holdings, LLC, Revelation Management Corporation, and Revelation Energy, LLC (the "Original Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on July 1, 2019 (the "Original Petition Date"). On July 25, 2019 (the "New Petition Date" and collectively the "Petition Dates"), Dominion Coal Corporation, Harold Keene Coal Co LLC, Vansant Coal Corporation, Lone Mountain Processing, LLC, Powell Mountain Energy, LLC and Cumberland River Coal LLC (the "New Debtors" and collectively with the Original Debtors, the "Debtors") also filed voluntary petitions under chapter 11 of the Bankruptcy Code.

7. On July 25, 2019, the Debtors filed the Sale Motion which sought: (i) the approval of bidding and assignment / assumption procedures for the Debtors' assets; (ii) the scheduling of an auction and sale hearing; (iii) the termination of the Debtors' 401(k) plan; (iv)

3

the approval of Contura as the stalking-horse bidder for the Western / Pax Assets; and (v) the entry of an order approving the eventual sale(s) to the Successful Bidder(s).

8. The Court approved the initial relief requested in the Sale Motion by entry of an order (the "Bidding Procedures Order") [Docket No. 356] on July 26, 2019. The Bidding Procedures Order provided in pertinent part that: (i) all bids would be due by 5:00 p.m. on July 31, 2019; (ii) the Auction would be conducted on August 1, 2019; (iii) the Sale Hearing (as amended) would occur on August 5, 2019 and the closing(s) (as amended) would occur no later than August 7, 2019. The Bidding Procedures Order further provided, with certain limited exceptions, that all parties' rights to object to any aspect of the Sale(s) was expressly preserved. [Docket No. 356, ¶ 10].

9. The Debtors stated on the record that, at the conclusion of the above sale process, they intend to immediately convert the Debtors' cases to chapter 7.

### B. Mining Permits and Environmental Obligations

10. The Debtors are engaged in the mining and production of metallurgical and thermal coal and operate mining complexes in Kentucky, West Virginia, Virginia, and Wyoming. In order to conduct these operations, the Debtors are required to obtain mining and water-discharge permits issued by, as applicable, the Kentucky Department for Natural Resources, Energy & Environment Cabinet, the West Virginia Department of Environmental Protection, the Virginia Division of Mineral Mining, and the Wyoming Department of Environmental Quality (each, a "Regulator" and collectively, the "Regulators").

11. The Regulators are responsible for enforcing the various "reclamation" and water treatment obligations imposed by each state's 'version' of the Surface Coal Mining and

Reclamation Act and the Clean Water Act (each an "Act" and collectively, the "Acts").[3] "In general, reclamation . . . requires the surface of the land to be restored to its approximate original contour and water polluted by the mining operations to be properly treated before leaving the mine site." *Cat Run Coal v. Babbitt*, 932 F. Supp. 772, 774, n. 3 (S.D.W. Va. 1996).

12. The Acts were enacted because "unregulated surface coal mining operations cause soil erosion, damage from rolling stones and overburden, landslides, stream pollution, the accumulation of stagnant water and the seepage of contaminated water, increase the likelihood of floods, destroy the value of land for agricultural purposes, destroy aesthetic values, counteract efforts for the conservation of soil, water and other natural resources, destroy or impair the property rights of citizens, create fire hazards and in general create hazards dangerous to life and property, so as to constitute an imminent and inordinate peril . . ." KRS § 350.020. *See also* W. Va. Code § 22-3-2(a); 30 U.S.C. § 1201(c).

13. In order to be issued a mining permit, an operator must submit a reclamation plan and post a penal bond payable to the applicable Regulator in order to secure its environmental obligations. *See* W. Va. Code § 22-3-8; VA ST § 45.1-241; KRS § 350.064(1). Notwithstanding this bonding requirement, a permittee retains the primary responsibility to perform and fund reclamation and water treatment. To the extent that the costs of compliance exceed the face amount of the applicable bond, the permittee (and its agents and "owners and controllers") are solely responsible for those costs – the surety's liability is capped at the face amount of the bond. *See e.g.* W. Va. Code St. R. § 38-2-12.4(d).

---

[3] In 1977, Congress enacted the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201, *et. seq.*, in order to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations and to "assure that surface coal mining operations are so conducted as to protect the environment." 30 U.S.C. § 1202(a), (d). Pursuant to § 1253 of SMCRA, a state may assume primary jurisdiction for regulation and enforcement of surface coal mining operations and reclamation within its borders, so long as its regulatory program is as stringent as the federal program and is approved by the Office of Surface Mining and Reclamation Enforcement. 30 U.S.C. § 1253(a). Kentucky, West Virginia, Virginia and Wyoming each have approved state programs.

14. If a permittee fails to comply with the Acts' reclamation requirements, the Regulators can, among other remedies, demand compliance through a notice of violation / non-compliance, issue fines and penalties, order the cessation of mining activities, revoke the applicable permit, and/or forfeit the applicable bond. *See* VA ST §§ 45.1-245-246; KRS § 350.130; W. Va. Code §§ 22-3-16-18. If a cessation order is issued or a bond is forfeited, the permittee is "permit-blocked" and cannot transfer or receive the transfer of any mining permits in any state. *See* 30 U.S.C. § 1260(c).[4]

15. It is not only the permittee or operator that is subject to penalties under the Acts. The Acts also provide that the permittee's "agents" are jointly and severally liable for the costs necessary to complete reclamation activities. Any corporate officer of an entity and/or any other party who is "charged with responsibility for protecting society and the environment from the adverse effects of surface mining operations" is an "agent" that is subject to personal liability under the Acts. *See e.g. United States v. Dix Fork Coal Co.*, 602 F.2d 436 (6th Cir. 1982); *United States v, Peery*, 862 F.2d 567 (6th Cir. 1989); *Couch v. Nat. Resources & Enviro. Protect. Cabinet*, 986 S.W.2d 158 (Ky. 1999). Additionally, the officers and agents of a permittee are subject to the same civil and criminal penalties as the permittee if they "willfully and knowingly" caused the permittee to violate the Acts. *See* VA ST § 45.1-246(F); W. Va. Code § 22-3-18(h); K.R.S. § 350.990(9).

---

[4] To the extent that the permittee is "permit-blocked," that block extends to the "owners and controllers" of the permittee (a term which includes, but is broader than, the definition of an "agent"). That block, if not remedied, would then "infect" any other company to which the "owner and controller" later became affiliated and would "permit-block" that entity as well. The block would also work up the chain, and could "permit block" any other company that an officer of the permittee owns, or for which he holds a management position, and would preclude that entity from entering into contracts with the federal government. *See e.g.* Zaluski and Davis, Eastern Mineral Law Foundation 16th Annual Institute, *Non-Permit Holder Liability Under SMCRA*, 16 E. Min L. Found. § 8.04 (June 1995) (citing cases and regulations); Means and Quinn, Eastern Mineral Law Foundation 17th Annual Institute, *Corporate Separateness and Contemporary Regulation*, 17 E. Min. L. Found. § 2.04 (April 1996) (citing cases and regulations).

### C. Reclamation Surety Bonds

16. As of the Petition Dates, INIC, First Surety Corporation, and Lexon Insurance Company (the "Sureties") issued hundreds, if not thousands, of surety bonds in favor of the Regulators, on behalf of the Debtors, in the combined face amount of approximately $265 million.[5] INIC has issued approximately $115 million of that total. Pursuant to the applicable bond documents and the common law of suretyship, the Debtors indemnified the Sureties for any and all costs incurred by the Sureties in connection with the bonds. To the extent that the Sureties are required to forfeit any or all of the bonds to the Regulators, the Sureties would subrogated to the rights of the Regulators. *See e.g. Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 139, 141 (1962).

17. The Sureties' payment obligations under the bonds run exclusively to the Regulators and are only triggered, absent the election of the Sureties, upon the forfeiture of a bond by the Regulators. Stated differently, unless and until a bond is forfeited by a Regulator, the Sureties have no obligation to pay for or otherwise satisfy the Debtors' reclamation obligations. Surety bonds are not property of a debtor's bankruptcy estate and cannot be assumed and assigned without the consent of the surety. *See e.g. In re Hallmark Builders, Inc.*, 205 B.R. 974, 976 (Bankr. M.D. Fla. 1996); *Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990).

### D. Permit Transfers and Bond Replacements

18. The asset sale of a coal mining operation typically involves the proposed transfer of the seller's mining permits. Any such transfer, however, is subject to the approval of the

---

[5] This figure is the estimated face amount of bonds posted for the Debtors' Eastern Assets. As the Debtors have previously stated, the transfer of mining permits from Contura to the Debtors for the Western Assets has not been approved and, therefore, any bonds issued by the sureties on behalf of the Debtors for the Western Assets are not currently in-force. The bonds previously posted by Contura are in-force and at-risk.

7

applicable regulatory authority. *See* VA ST § 45.1-234(C); KRS § 350.135; W. Va. Code § 22-3-19(d). In order to effectuate a transfer, the seller and the purchaser are required to submit, typically on a post-closing basis, permit transfer applications and replacement bonds.

19. This approval process often requires extensive documentation, diligence, and public comment, and can take a period of months, if not more than a year. Significantly, during this process, the seller is still statutorily obligated under the permits and the seller's existing bonds remain subject to forfeiture by the regulatory authorities. Thus (as the prior transaction between Contura and Blackjewel proves), the mere 'closing' of a sale transaction does not eliminate the liability of the seller or its sureties – that liability remains until the permits transfers are completed and the bonds are released.

### E. The Debtors' Environmental Obligations

20. Although the issues described above are implicated in every chapter 11 coal case, they are particularly critical in these cases. The Debtors acquired a substantial percentage of their mining assets through prior chapter 11 proceedings, such as *U.S. Coal, James River Coal. J.W. Resources*, *Appalachian Fuels, Alpha Natural Resources*, and others. In almost all of these cases, the Debtors paid little to no cash consideration for the assets, but instead, assumed other permits burdened with substantial reclamation liabilities.

21. Thus, unlike in the typical case where a debtor may have a handful of permits where the estimated reclamation or water-treatment liability exceeds the face amount of the associated bonds, these Debtors have a substantial number of these permits, particularly in the Commonwealth of Kentucky. This is a critical distinction. Throughout the sale process, the Debtors have utilized the bond amount on a particular permit as a 'shorthand' for the amount of reclamation liability associated with that permit. In some cases that is accurate; in others, the

8

actual liability is millions of dollars in excess of the stated bond amount.[6] The Debtors' estates and the Debtors' current officers and owners are solely responsible for any such excess liability.

22. Upon information and belief, as of the Petition Dates, the Debtors had more than sixty (60) active cessation orders (and hundreds of less significant notices of violation) in Kentucky and Virginia alone. Furthermore, one of the Debtors' few properties in West Virginia is believed to have significant long-term water treatment problems and is also the subject of a cessation order. Despite these dangerous and worsening environmental conditions and the Debtors' clear statutory obligations to remedy same, the Debtors have budgeted and spent a total of $00.00 on reclamation on a post-petition basis.

### E. The Sale Process and Proposed Sale

23. According to the Notice filed by the Debtors on August 4, 2019 [Docket No. 522], the successful bids for the Debtors' Eastern Assets were made by Kopper Glo Mining, LLC, Rhino Energy, LLC, Coking Coal, LLC, and Tye Fork Coal Company, Inc. Based upon a cursory review of the Notice, it would appear that the Debtors had successfully effectuated the sale of substantially all of their Eastern Assets – that is not the case. Bidders were permitted to cherry-pick the Debtors' best assets, even allowed to pick and choose between permits within a single mining complex. At the end of the auction, the Debtors had sold mining operations in the East with bonded liability of approximately $45 million and had <u>failed to sell mining operations with bonded liability of approximately $220 million</u>. Even these numbers are grossly understated, however, given that almost all of the sites with environmental liabilities substantially in excess of the bond amounts are included within the unsold asset grouping.

---

[6] Given the expedited nature of the sale process and the expanse of the Debtors' operations, the Regulators have not been able to conduct inspections of each of the Debtors' permits and, therefore, cannot provide an estimate of the current costs of reclamation on each such permit. Upon information and belief, these inspections are now under way.

During the auction, the Debtors and their advisors refused to attribute <u>any</u> value to the assumption of environmental liabilities by bidders in calculating whether a particular bid was the highest or otherwise best bid.

## OBJECTION

### I. The Debtors Cannot Abandon Property in Violation of Environmental Laws

24. As noted above, the Debtors intend to leave the bankruptcy estates with more than $200 million of environmental liability and no mechanism to perform or pay for the required reclamation and water treatment activities. The United States Supreme Court has held that a trustee or debtor-in-possession "may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identifiable hazards." *Midlantic Nat'l Bank v. N.J. Dept. of Envt'l Prot.*, 474 U.S. 494, 507 (1986). *See also Ohio v. Kovacs*, 469 U.S. 274, 285 (1985). The United States Congress and the legislatures of Kentucky, West Virginia, and Virginia have expressly declared that the Acts were enacted in order to prevent the public health and safety from the identifiable risks of unreclaimed mine sites. [*See* ¶ 12, *supra*]. Further, the Debtors are the subject of active cessation orders in Kentucky, Virginia, and West Virginia. By statute, Regulators may only issue cessation orders if conditions exist which "create[] an <u>imminent danger</u> <u>to the health or safety of the public</u>, or is causing, or can reasonably be expected to cause <u>significant, imminent environmental harm</u> . . ." VA ST § 45.1-245 (emphasis added). *See also* K.R.S. § 350.130(4); W. Va. Code § 22-3-16.

25. The Acts, as stated by the enacting legislatures and as confirmed by courts, are "reasonably designed to protect the public health or safety from identifiable hazards." *See In re Appalachian Fuels, LLC*, 521 B.R. 779, 794-95 (Bankr. E.D. Ky. 2014). According to the Fourth Circuit Court of Appeals, a bankruptcy court "does not have the power to substitute its

judgment for that of the state as to what constitutes a public health or safety risk." *Garrett v. Wells Fargo Bus. Credit (In re Smith-Douglass, Inc.)*, 856 F.2d 12, 16 (4th Cir. 1988). *See also In re American Coastal Energy, Inc.*, 399 B.R. 805, 813 (Bankr. S.D. Tex. 2009). Therefore, the Debtors cannot maintain or seek to effectuate a *de facto* abandonment of the Eastern Assets without "formulating conditions that will adequately protect the public's health and safety." *Midlantic*, 474 U.S. at 762. The Debtors have not, and cannot, establish how they intend to do so – they have not even tried.

26. The Fourth Circuit Court of Appeals has stated that *Midlantic's* prohibition on abandonment may be weakened in the event that a debtor does not have unencumbered assets, *see Smith-Douglass, Inc.*, 856 F.2d at 17, and parties have suggested that this is such a case. As an initial matter, the fact that the Debtors are proposing to make payments to certain administrative expense claimants proves that the estate has unencumbered assets. Second, the Debtors' schedules and statement of financial affairs have not been filed, the proof of claim deadlines have not passed, and parties-in-interest are not yet precluded from challenging the validity or scope of any pre-petition liens. Even absent the avoidance of such liens, it is entirely likely that certain acquired assets, such as certain mineral leaseholds and/or mining permits, are not encumbered by the lenders' pre-petition liens. In fact, the acquired assets include certain assets of the New Debtors, whose assets were not encumbered by the DIP Loans and who were not subject to the pre-petition Riverstone facility. Finally, as noted in the objections of the other Sureties [Docket Nos. 479 and 524], a trustee has the right to surcharge a lender's collateral and the Court should not make a determination as to whether the estate possesses unencumbered assets unless and until a trustee has the opportunity to investigate and, if warranted, assert such claims.

27. In sum, the Debtors' proposed sales of a cherry-picked portion of the Eastern Assets cannot be approved unless and until the Debtors make the necessary accommodations to ensure their compliance with their environmental obligations as to both (i) the excluded assets and (ii) the acquired assets (until such time as the permits associated with the acquired assets are transferred to the successful purchasers). The Sureties are willing to work with the Debtors, the purchasers and the Regulators to create a structure that would facilitate such compliance.

## II. The Costs of Environmental Compliance are Entitled to Administrative Expense Priority Treatment

28. The costs required to comply with environmental laws, including the costs necessary to abate existing violations of environmental laws, are entitled to administrative expense priority. *See e.g. Smith-Douglass, Inc.*, 856 F.2d at 17 ("Cleaning up environmental violations is considered an administrative expense"); *Appalachian Fuels, LLC*, 521 B.R. at 794-799; *In re Virginia Builders, Inc.*, 153 B.R. 729, 735 (Bankr. E.D. Va. 1991); *American Coastal Energy*, 399 B.R. at 812-817; *Lancaster v. State of Tennessee (In re Wall Tube & Metal Products Co.)*, 831 F.2d 118, 122-124 (6th Cir. 1987); *In re Chateaugay Corp.*, 944 F.2d 997, 1009-110 (2d Cir. 1991); *In re Vernon Sand & Gravel, Inc.*, 93 B.R. 580, 581-582 (Bankr. N.D. Ohio 1988). This is true regardless of when the initial violation or disturbance occurred and regardless of whether the costs of compliance have been liquidated. *Id.*

29. The Debtors' obligation to comply with environmental laws is an obligation due to the Regulators and, as a general matter, it is the Regulators' claims that are entitled to administrative expense priority treatment. To the extent, however, that the Sureties' bonds are forfeited by the Regulators and/or the Sureties elect to perform reclamation on behalf of the Debtors, the Sureties are subrogated to that claim. *See e.g. In re Wingspread Corp.*, 116 B.R.

915, 931-932 (Bankr. S.D.N.Y. 1990) (subrogee is entitled to administrative priority if original claimant was so entitled).

30. INIC is not requesting that the Court rule that it, or any Regulator, has an allowed administrative expense claim at this juncture. It is merely advising the Court that many bankruptcy courts have afforded administrative priority status to similar claims and is, therefore, requesting that the Court prohibit the payment of any other administrative expenses until INIC (or any other prospective administrative claimant) has a reasonable opportunity to assert and prove its claim.

### III. The Debtors Cannot Pay Administrative Expenses Other Than as Dictated by the Bankruptcy Code

31. The Debtors have indicated, in the Bidding Procedures and on the record, that they intend to earmark or 'carveout' a portion of the sale proceeds to pay certain administrative expense claims, including professional fees. After these payments are made, and are blessed by the Court as unavoidable, the Debtors will convert their cases to chapter 7. This structure violates the Bankruptcy Code's priority scheme and the Supreme Court's recent holding in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) ("*Jevic*").

32. Absent consent, all chapter 11 administrative expense claimants are entitled to equal treatment. *See CIT Comm'n Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 241 (4th Cir. 2005). In the event that an estate is administratively insolvent, administrative expense claimants must share pro-rata and any prior payments to administrative claimants must be disgorged. *See Speckert Motor Sales Co. v. Eisen*, 393 F.3d 659, 664 (6th Cir. 2004) (professional fees must be disgorged to ensure pro-rata payment of administrative claimants). Furthermore, chapter 7 administrative expense claims are entitled to be paid before chapter 11 administrative expense claims and prior chapter 11 administrative

13

payments must be disgorged if insufficient funds are available. *See e.g. Shaia v. Durrette, Irvin, Lemons & Bradshaw, P.C. (In re Metropolitan Electric Supply Corp.)*, 185 B.R. 505, 509-510 (Bankr. E.D. Va. 1995).

33. The Debtors seek to avoid the above rules and to elevate certain chapter 11 administrative expense claims above both chapter 7 administrative expense claims and above other administrative expense claimants whose claims have not been included in their undisclosed carveout. There is no statutory support for this construct and, as stated by the Supreme Court in *Jevic*, "[t]he importance of the priority system leads us to expect more than simply statutory silence, if and when, Congress were to intend a major departure." *Jevic*, 137 S. Ct. at 984. If a court, per *Jevic*, cannot approve a structured dismissal that violates the Bankruptcy Code's priority scheme, it cannot approve a 'structured conversion' that has the identical effect.

34. The Debtors may assert that above-cited case law is not applicable because the designated funds are not property of the estate and have been specifically earmarked by the bidders for the purposes set forth therein. As can and will be established at the hearing if necessary, that position is inconsistent with the specifics of the bids made by the bidders and the conversations between the bidders and the Debtors' professionals at the auction.

### IV. The Regulators Rights and Remedies Under the Acts Must be Excluded from Any Release or Exculpation Provisions

35. Given that the sale order(s) are not yet on file, INIC cannot determine whether the orders include a release and/or exculpation of the Debtors' professionals (or other third parties) and the scope of any such proposed releases. To the extent that the sale order includes a release / exculpation provision, the rights and remedies of the Regulators under the Acts, including, but not limited to, those rights identified in paragraphs 14 and 15 above, must be excluded from any such release or exculpation.

### **V.** **Reservation of Rights**

36. INIC respectfully reserves the right to raise additional objections at the sale hearing after the Debtors file the sale orders, asset purchase agreements, and any and all other necessary sale documentation.

WHEREFORE, INIC respectfully requests that the Court deny the sale of the Eastern Assets (other than Pax) until such time as the Debtors formulate conditions to protect the public health and safety from the conditions on the excluded assets. To the extent that the Court approves any sale, INIC further respectfully requests that the Court prohibit the Debtors from distributing sale proceeds until parties have had the opportunity to assert administrative claims and a trustee has had the opportunity to investigate pre-petition liens and to determine which of the acquired assets are subject to unavoidable liens.

Respectfully submitted,

*/s/ Stephen L. Thompson*
Stephen L. Thompson (WV 3751)
BARTH & THOMPSON
P.O. Box 129
Charleston, West Virginia 25321
Telephone: (304) 342-7111
Facsimile: (304) 342-6215
E-mail: sthompson@barth-thompson.com
and

Daniel I. Waxman (KY 92736)
(*admitted pro hac vice*)
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, Kentucky 40507
Telephone: (859) 233-2012
Facsimile: (859) 259-0649
E-mail: dwaxman@wyattfirm.com

*Counsel for Indemnity National Insurance Company*

## **CERTIFICATE OF SERVICE**

    This is to certify that a true and correct copy of the foregoing has been served electronically via the Court's CM/ECF system upon all parties designated to receive electronic service on August 4, 2018.

                                            */s/ Stephen L. Thompson*
                                            Stephen L. Thompson

61862407.1
8/4/2019 4:01 pm