**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Blackjewel, L.L.C., *et al.*, | ) | Case No. 19-30289 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

**EMERGENCY MOTION OF THE DEBTORS TO REJECT AND TERMINATE
HEALTH INSURANCE PLAN WITH UNITED HEALTHCARE SERVICES, INC. AND
TO ENTER INTO NEW HEALTH INSURANCE PLAN FOR CURRENT EMPLOYEES
PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE**

Blackjewel, L.L.C., and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, hereby move (the "Motion") the Court for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) rejecting and terminating Revelation Energy, LLC's health insurance plan (the "Health Plan")[2] with United HealthCare Services, Inc. ("UHSI") as of August 31, 2019 (the "Termination Date"), and (ii) entering into a new health insurance plan for the Debtors' current, remaining employees only (and any currently furloughed employees who are brought back to work in the future provided that coverage will only be effective upon a date on or after the date they are brought back to work). In support of this Motion, the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**

1. Pursuant to the Health Plan, the Debtors self-fund the payment of premiums and claims for employee medical expenses. Since the Petition Date, the Debtors have paid close to

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213). The headquarters for each of the Debtors is located at 1051 Main Street, Milton, West Virginia 25541-1215.

[2] As described in greater detail below, the Health Plan covers employees at ten companies, only three of which are Debtors. The other companies are controlled directly or indirectly by the Debtors' former Chief Executive Officer, Jeff Hoops.

$2.3 million in respect of premiums and claims under the Health Plan for the Debtors' employees. Notwithstanding these substantial contributions, made with the goal of minimizing the impact of the filings on the employees, circumstances now warrant a change in order to protect the Debtors' employees from unknowingly incurring medical expenses for which the Debtors would ultimately not be able to reimburse them.  Thus, by this Motion, the Debtors are seeking authority to reject and terminate the Health Plan as of the Termination Date because it is the only viable option to avoid the risk that the accumulation of new claims for medical expenses will exceed the Debtors' ability to reimburse such claims.  Termination will provide employees who will not remain with (or who are currently furloughed by) the Debtors an opportunity to obtain replacement insurance from a provider capable of paying covered claims.   In addition, the Debtors are seeking to obtain a new health insurance plan that would cover and protect the remaining employees of the Debtors and any currently furloughed employees who are brought back to work with the Debtors provided that the replacement coverage would only cover furloughed employees on or after the date they are brought back to work.  If the Health Plan is not terminated as of the Termination Date, given the Debtors' current financial situation, it is unclear whether there will be sufficient funds to pay new claims under the existing Health Plan.  Accordingly, termination of the Health Plan now lessens the potential for employees to unwittingly incur additional medical-related obligations for which they would not be reimbursed and provides an opportunity to seek replacement coverage. The decision to terminate the Health Plan is not one that the Debtors take lightly.  However, while a difficult decision to make, termination of the Health Plan is the only choice under the circumstances.

2.     Several factors compel this decision. First, the Debtors expected that they would have completed by now all of the asset sales approved by the Court following the hearing on

August 5 and 6, 2019. Those sales were subject to the completion of necessary transaction documentation and the entry of an order by the Court. While the Debtors have been diligently working to finalize these transactions, for various reasons, the sales that will provide the most cash consideration and the assumption of employee-related obligations – the sales to Kopper Glo Mining, LLC, Rhino Energy, LLC[3] and Contura Energy, Inc. – have not closed at this time.

3. The delayed closings have impacted the Debtors' decision with respect to the Health Plan because the Debtors expected: (i) that, more than two weeks ago, a large number of employees would have been hired by one of the asset purchasers and would have been provided with replacement health coverage, and (ii) that cash from the sales proceeds, as well as the proceeds related to the sale of other assets of the estates, would be available to pay the amounts due under the Health Plan.

4. While the Debtors have tried their very best to find a solution that would allow maintaining the Health Plan without undue risk that claims would not be paid, in the Debtors' business judgment, there is simply no other reasonable alternative for the Debtors but to terminate the Health Plan at this juncture.[4]

## JURISDICTION AND VENUE

5. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b), and the Debtors consent to entry

---

[3] The sale to Rhino Energy, LLC sale is completed subject only to the entry of an order by the Bankruptcy Court in the form uploaded to the Court on August 15, 2019 [Docket number 725]. Upon entry of this order, the sale will close.

[4] In order to provide the Debtors' employees with as much notice as possible under the circumstances, upon filing this Motion, the Debtors will provide notice to the employees covered by the Insurance Agreements (as defined below) by (i) posting a notice in the form attached hereto as **Exhibit D** (the "Notice") on the Debtors' web site, (ii) sending the Notice by email to all employees for whom the Debtors have an email address, and (iii) mailing the Notice to the employee's address on record. The Notice makes clear that termination of the Insurance Agreements is subject to the approval of this Court and encourages all employees (both active and furloughed employees) to make every effort to find replacement coverage. No promises are made in the Notice that the Debtors will provide replacement coverage by a date certain as the Debtors cannot make such promises even though the Debtors are making every effort to find replacement coverage.

of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory predicates for the relief requested herein are sections 105(a), 363, 365 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), Rules 2002 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of West Virginia (the "Local Rules").

## BACKGROUND

**A.    The Insurance Agreements**

8.      Debtor Revelation Energy, LLC (the "Plan Sponsor") and UHSI are parties to an Administrative Services Agreement, Contract No. 905689, dated as of August 1, 2018 (the "ASA"), pursuant to which UHSI administers the Health Plan by, among other things, processing and paying claims under the Health Plan. A copy of the ASA (excluding the confidential schedules thereto) is attached hereto as **Exhibit B**.

9.      Under the ASA, the Debtors are responsible for providing UHSI with funds for the payment of claims under the Health Plan. To provide the funds necessary to pay claims under the Health Plan, the Debtors and UHSI established a bank account (the "ASA Account"), out of which UHSI is reimbursed for claims paid under the Health Plan. The Debtors are required to deposit funds into the ASA Account to ensure that such account maintains a minimum balance (the "Minimum Balance") in an amount set by UHSI that is equal to not less than six days of expected claims activity. The Minimum Balance required for the ASA Account is currently $491,000. The Debtors are required to fund the ASA Account on a weekly basis to maintain the Minimum

Balance.  If the Debtors fail to fund and/or maintain the required Minimum Balance in the ASA Account, UHSI may, among other things (i) suspend processing and paying claims until the underfunding is cured, and (ii) terminate the ASA, effective the first day such funding deficiency began, if the underfunding is not cured within three banking days of receiving notice of such underfunding.

10. Additionally, the Debtors pay UHSI a monthly fee for its services under the ASA due on the first of each month, subject to a fifteen-day grace period.  Under Section 9.2(4) of the ASA, the ASA will terminate upon the Debtors failing to "pay the fees or other amounts [the Debtors] owed United when due under the terms of this Agreement..."

11. UHSI and the Debtors are also parties to a Stop Loss Policy, Policy Number GA-905689 dated as of August 1, 2018 (the "Stop Loss Policy" and together with the ASA, the "Insurance Agreements"), under which, in exchange for a monthly premium, UHSI agreed to reimburse the Debtors for the payment of claims under the Health Plan that either on an individual or aggregate basis exceed a deductible threshold of $250,000 per covered person.  A copy of the Stop Loss Policy is attached hereto as **Exhibit C**.  The Stop Loss Policy terminates upon the termination of the ASA.  In addition, the Stop Loss Policy requires payment of premium on the first day of each month.  If the monthly premium is not paid within a thirty-one day grace period, the Stop Loss Policy automatically terminates.

12. The Debtors also provide prescription drug coverage to their employees through and as a part of the Health Plan pursuant to which UHSI provides prescription costs benefits to the Debtors' eligible employees and their eligible dependents (the "Prescription Plan").

13. UHSI and the Debtors are also parties to a Group Policy, Group Number 905689 (the "Vision Policy"), pursuant to which UHSI provides vision insurance benefits to the Debtors'

eligible employees and their eligible dependents. At this time, the Debtors are not seeking the termination of the Vision Plan, which is not a self-insured plan and for which the Debtors pay monthly premiums.

14. The Insurance Agreements cover the following ten so-called bill groups (together, the "Bill Groups"):

Bill Group 1- Revelation Energy LLC
Bill Group 2- JBLCO, LLC
Bill Group 3- Active Medical
Bill Group 4- Forrest Machine, LLC
Bill Group 5- Lone Mountain
Bill Group 6- Lexington Coal
Bill Group 7- Blackjewel, LLC
Bill Group 8- Grand Patrician Resort LLC
Bill Group 9- Construction & Reclamation Services
Bill Group 10- Prep Plant Solutions LLC

15. Bill Groups 1, 5 and 7 are the groups covering the Debtors in these cases.[5] All other Bill Groups listed above represent non-debtor companies, which, upon information and belief, are under the direct or indirect control of Jeff Hoops (the "Hoops Bill Groups"). The Hoops Bill Groups continue to participate in the Health Plan and incur claims for their employees. As this Court is aware, Mr. Hoops resigned his positions as officer and director of each of the Debtors on July 3, 2019 and is no longer involved in the management of the Debtors or their businesses. While the entities under the Insurance Agreements are divided among the different Bill Groups for billing purposes, the Plan Sponsor under the agreements is Debtor Revelation Energy LLC. As the Plan Sponsor, Revelation Energy LLC has certain additional rights and obligations, including the right to terminate the Health Plan for all the Bill Groups.[6]

---

[5] It is the Debtors' understanding that Bill Group 5's employees were transferred to Bill Group 1 so Bill Group 5 is currently inactive and has no employees or outstanding balances.

[6] Upon request by the Debtors, counsel for Mr. Hoops confirmed Mr. Hoops' agreement that the Health Plan be terminated as of August 31, 2019 for the Hoops Bill Groups and informed the Debtors that new insurance coverage was being sought for all the employees in the Hoops Bill Groups.

**B.     The Bankruptcy Cases**

16.     Each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code on July 1, 2019 and July 24, 2019 (together, the "Petition Date").  The Debtors are continuing to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

17.     On the Petition Date, the Debtors filed the *Motion for Entry of Interim and Final Orders (A) Authorizing (I) Payment of Prepetition Employee Wages, Salaries, and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Payment of Prepetition Tax and Other Withholdings to Third Parties; (IV) Contributions to Prepetition Employee Health and Other Benefit Programs and Continuation of Such Programs; (V) Payment of Workers' Compensation Obligations and Other Insurance Premiums; (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (C) Granting Related Relief* [Docket No. 6] (the "Employee Benefit Motion").

18.     In the Employee Benefit Motion, the Debtors explained that their employees contribute a portion of the costs of the Health Plan and the Debtors fund the balance of the costs. *See* Employee Benefits Motion ¶ 22.  The Debtors estimated that the weekly cost of the Health Plan (with respect to both claims and administrative fees) is approximately $600,000.  On July 3, 2019 and August 9, 2019, respectively, this Court entered an interim order (the "Interim Order") and a final order (the "Final Order") granting the relief requested in the Employee Benefit Motion. *See* Docket No. 59 and 626.

19.     Although the Debtors have authority to fund the amounts due under the Health Plan, the Debtors have struggled to pay all the amounts due under the Insurance Agreements because of their current financial situation.  Since the Petition Date, however, the Debtors paid a total of

$2,284,000 to UHSI in connection with the Insurance Agreements.[7] On July 9, 2019, UHSI suspended the processing and payment of claims (the "Limited Claim Hold") because the Minimum Balance was not maintained. *See* Motion to Compel (as defined below), ¶ 16. The Limited Claim Hold, however, did not stop the processing and payment of claims with a date of service before the July 9, 2019 claim hold date. *See id.*

20. Thereafter, on or about July 17, 2019, UHSI broadened the claim hold to stop the processing and payment of all claims, notwithstanding the date of service of the claim (the "Extended Claim Hold" and, together with the Limited Claim Hold, the "Claim Holds").[8] *Id* ¶ 17. The Debtors understand that the Extended Claim Hold did not stop the processing and payment of claims submitted prior to the establishment of the Extended Claim Hold, and that claims for prescription drug benefits were generally paid notwithstanding the Extended Claim Hold.

21. On July 30, 2019, UHSI filed the *Emergency Motion to Compel the Assumption or Rejection of the Administrative Services Agreement, Stop Loss Insurance Policy, and Vision Insurance Policy* [Doc. No. 388] (the "Motion to Compel"), seeking to compel the Debtors to assume or reject the Insurance Agreements on or before August 5, 2019. In the Motion to Compel, UHSI cites concerns regarding the Debtors' ability to pay the postpetition liabilities incurred under the Insurance Agreements. The Debtors are unable to assume the Insurance Agreements.

C. **The Postpetition Negotiations**

22. In an effort to reach a consensual resolution with respect to the Motion to Compel, the Debtors have been working with UHSI to negotiate the terms of an agreement under which the

---

[7] The amount of $2,284,000 is comprised of $1,570,000 million for payments of claims and $714,000 for the payment of administrative fees, the Stop Loss Policy and the Vision Policy. In total, since the Petition Date, the Debtors have paid approximately $4.1 million for employee-related benefit claims primarily related to healthcare-related expenditures and workers compensation costs for the employees.

[8] UHSI alleges that the Claim Holds are automatic in the event the Minimum Balance is not met.

- 8 -

Debtors would give UHSI advance notice of their decision to terminate the Health Plan, if they choose to do so, and provide for payment of certain postpetition requests to be made by UHSI against the Debtors on account of the Insurance Agreements.

23. Under the current agreement with UHSI, the Debtors agreed to, among other things, (i) provide UHSI with a specific termination date with respect to the Insurance Agreements (excluding the Vision Policy); (ii) determine on or before August 26, 2019 whether the Debtors will fund the runout[9] under the ASA; (iii) pay all costs under the Health Plan (including all funding, fees and premium due to UHSI) in the ordinary course of business, provided that UHSI does not lift the Extended Claim Hold until the Debtors are in a position to make a determination with respect to such hold; (iv) fund the ASA Account to meet the minimum required balance of $491,000; and (v) determine or before August 30, 2019 whether the Extended Claim Hold should be lifted. The Debtors and UHSI further agreed to work together in good faith to provide each other with information relating to the Health Plan and the potential termination of the Health Plan.

24. On August 23, 2019, the Debtors informed UHSI of their intention to terminate the Insurance Agreements (excluding the Vision Policy) on August 31, 2019, subject to this Court's approval, and that such approval will be sought before the August 31, 2019 termination date. By this Motion, the Debtors are seeking such approval.

**D.    The Debtors' Payment During the Bankruptcy Cases and Current Payment Options**

25. During the bankruptcy cases, the Debtors paid $2,284,000 with respect to the Insurance Agreements (comprised of $1,570,000 for payments of claims and $714,000 for the payment of UHSI's administrative fees, the Stop Loss Policy and the Vision Policy). The Debtors

---

[9] The "runout" refers to the claims incurred prior to August 31, 2019 that have not yet been presented to UHSI but which are expected to be presented to UHSI after the termination date of August 31, 2019. There is generally a time lag between the occurrence of the claims and the submission of such claims to UHSI.

have paid (i) all amounts due under the Vision Plan, (ii) all amounts due under the Prescription Plan, and (iii) a portion of the amounts due for the health insurance claims. The Debtors will continue the Vision Policy, which is not self-funded, and are seeking replacement medical coverage for their current, remaining employees – approximately 150 – starting on September 1, 2019 under a fully-insured medical plan.[10] The new health plan would also cover any additional employees that the Debtors may return to work from furlough provided that such plan would only be effective for furloughed employees on or after the date the employee comes back to work.

26. The Debtors, however, cannot continue to pay their obligations, and now seek to terminate the Insurance Agreements (excluding the Vision Policy) as of August 31, 2019 with respect to all employees that are not currently working for the Debtors. With respect to the claims which have not yet been paid, which include both claims related to the Debtors' employees and the Hoops Bill Groups' employees, the Debtors have three options (together, the "Payment Options"), as described by UHSI,[11] as follows:

**Option One**: The Debtors would pay the claims that have been processed, the premiums due, and the prescription drug costs. The amount to be paid by the Debtors with respect to Option One is $500,000 for the claims related to the Debtors' employees and the Hoops Bill Groups' employees. The Debtors would maintain $491,000 in the ASA Account as a deposit for future payments.

**Option Two**: The Debtors would pay the claims that have been processed, the premiums due, and the prescription drug costs. In addition, the Debtors would pay the claims made to date but currently under the Claim Holds instituted by UHSI and, therefore, not currently processed by UHIC. The amount to be paid by the Debtors with respect to Option Two is estimated to be $2.1 million for the claims related to the Debtors' employees and the Hoops Bill Groups' employees. The Debtors would maintain $491,000 in the ASA Account as a deposit for future payments.

**Option Three**: The Debtors would pay the claims that have been processed, the premiums due, and the prescription drug costs. In addition, the Debtors would agree to pay the claims made to date but currently under the Claim Holds instituted by UHSI and, therefore, not currently processed

---

[10] The Debtors are diligently working with their insurance broker to obtain new health insurance effective September 1, 2019, but have not yet secured such replacement insurance coverage. The Debtors are planning to hand out medical insurance applications to their approximate 150 current employees on Monday, August 26, 2019.

[11] UHSI has informed the Debtors that all the amounts provided with respect to the Payment Options are only estimates, subject to changes, corrections and readjustments after the claims are fully processed.

by UHSI. In addition, the Debtors would pay the claims runoff, namely the amount of the claims not currently presented to UHSI but which are expected to be presented to UHSI after the termination date of August 31, 2019, although such claims would relate to the pre-termination period because they occurred during the pre-termination period. The amount to be paid by the Debtors with respect to Option Three is estimated to be $6 million for the claims related to the Debtors' employees and the Hoops Bill Groups' employees.[12] The Debtors would maintain $491,000 in the ASA Account as a deposit for future payments.

27. The Debtors are currently assessing how best to address the prospective payment requirements of these Payment Options and, by this Motion, request that the Court authorize the Debtors to select the option that in their business judgment is the best alternative for the Debtors without further order of the Court. As described above, the different Payment Options require different levels of funding to the ASA and such funding would be used to pay (i) the claims that have already been processed to date in Option One, (ii) the claims that have already been processed to date and the claims currently under the Claim Holds in Option Two, or (iii) the claims that have already been processed to date, the claims currently under the Claim Holds and the claims to be presented in the future in a runoff scenario in Option Three. Regardless of the choice relating to the Payment Options, the termination of the Insurance Agreements will need to occur as of August 31, 2019 in order to stop the incurrence of new liabilities, which would put the employees at a greater risk of incurring health related expenses for which the Debtors would simply not be able to reimburse them.

**RELIEF REQUESTED**

28. By this Motion, the Debtors seek entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, rejecting and terminating the Insurance Agreements with UHSI, seeking authority to enter into a new health insurance plan for the Debtors' current employees only, and granting related relief.

---

[12] UHSI has also confirmed that the estimated amount for Option 3 does not take into account the reduction in the number of employees, which may reduce the provided estimate.

- 11 -

**BASIS FOR RELIEF**

A. **The Court Should Authorize the Rejection and Termination of the Health Plan**

29. Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). The authority to reject an executory contract is vital to the basic purpose of a chapter 11 reorganization as it can release the debtor's estate from burdensome obligations that can impede a successful reorganization. *In re Norquist*, 43 B.R. 224, 225-26 (Bankr. E.D. Wash 1984).

30. The Insurance Agreements are executory contracts subject to rejection by the Debtors. The Fourth Circuit Court of Appeals in *Lubrizol Enters. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1045, formally adopted the "Countryman" definition of executory contracts: "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, *Executory Contracts in Bankruptcy*: Part I, 57 Minn. L. R. 439, 460 (1973).

31. Furthermore, courts in this circuit and others have routinely found that insurance contracts where the insured debtor has not paid the policy premium in full are executory in nature. *See, e.g. In re Alpha Natural Res., Inc.*, No.15-33896, 2016 Bankr. LEXIS 3246, *321 (confirming a plan of reorganization that treats insurance contracts as executory contracts); *Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 387 (2d Cir. 1997) (recognizing that a malpractice insurance policy was subject to rejection under section 365); *In re American Medical Imaging Corp.*, 133 B.R. 45, 54 (Bankr. E.D. Pa. 1991) (noting that there is little doubt that if the insurance policy was not terminated prepetition it was a contract under which both parties were required to perform material obligations); *In re Botter*, 261 B.R. 269, 273 (Bankr. D.

Ka. 2000) (recognizing that "[g]enerally, insurance contracts covering future periods are considered to be executory contracts because the debtor has to pay premiums and the insurance company has to provide coverage and process claims"); *In re New England Carpet Co.*, 18 B.R. 514, 516 ( Bank. Vt. 1982) (finding that the debtor had authority to assume or reject and insurance contract where on the petition date both parties "were subject to an obligation of continuing performance under their respective contracts.").

32. There is no doubt that the Insurance Agreements are executory. The stated term runs until August 2019 and automatically continues during which time UHSI has a continuing obligation to provide and invoice for claims and related services and the Debtors have an obligation to pay UHSI for such services. Failure of either party to perform would constitute a material breach under the Insurance Agreements giving rise to additional suspension rights, termination rights and remedies.

33. The Debtors believe that rejection and termination of the Insurance Agreements is the only option available to them and that their decision is supported by a sound exercise of their business judgment. The standard governing motions to assume or reject an executory contract or unexpired lease is the business judgment test. *Lubrizol Enters. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985) (finding that courts contemplating whether rejection of the executory contract would be advantageous to the bankrupt "must start with the proposition that the bankrupt's decision . . . is to be accorded the deference mandated by the sound business judgment rule"); *In re National Oil Co.*, 80 B.R. 525, 526 (Bankr. D. Colo. 1987) (creditors and the court [have] an opportunity to examine the efficacy of a debtor's decision to reject a lease under the guidelines of the business judgment test."); *In re Grayhall Resources, Inc.*, 63 B.R. 382, 384 (Bankr. D. Colo. 1986). The business judgment test is a flexible and deferential standard calling

for the court to determine "whether rejection of the contract would benefit general unsecured creditors." *In re Meehan*, 59 B.R. 380, 385 (E.D.N.Y. 1986) (prohibiting rejection on different grounds).

34. Here, there is no doubt that rejection and termination of the Insurance Agreements with UHSI is the only viable choice the Debtors have. As this Court is well aware, since the Petition Date, the Debtors have struggled to obtain postpetition financing, and indeed have been able to obtain only short term financing in the form of two-bridge loans and a sale deposit to be used to fund a sale process with respect to substantially all of the Debtors' assets. As a result of their financial difficulties, the Debtors were unable to perform some of their obligations under the Insurance Agreements on a timely basis, such that UHSI established the Claims Holds because the required Minimum Amount had not been maintained. In addition, the non-Debtors entities covered under the Hoops Bill Groups were also unable to perform some of their obligations under the Insurance Agreements on a timely basis, which precipitated the imposition of the Claims Holds. After the Claims Holds were instituted on July 17, 2019, the Debtors were able to pay some, but not all, amounts due and have accrued liability under the Insurance Agreements. Given the circumstances, the Debtors have no choice but to reject the Insurance Agreements as of August 31, 2019 and will seek to make a determination with respect to the Payment Options currently available to them shortly thereafter.

35. The Debtors believe that they have no choice but to reject the Insurance Agreements because the Debtors do not foresee a situation in which they would be able to meet the requirements of section 365(b)(1). First, the Debtors would be required to make a substantial cure payment under section 365(b)(1)(A) of the Bankruptcy Code which would make assumption of the Insurance Agreements too costly for the estates. Second, the Debtors would be required to

provide UHSI with evidence of their ability to perform under the Insurance Agreements going forward. Given the financial difficulties facing the Debtors in these cases as explained above, the Debtors recognize their inability to provide satisfactory assurance of future performance under the Insurance Agreements. Thus, it is clear that there is no benefit to the Debtors, their estates, and creditors to the continuation of the Insurance Agreements during these cases and that rejection of the Insurance Agreements is the only option available to the Debtors under the circumstances.

36. Lastly, the Debtors are currently seeking new coverage for their approximately 150 current employees and the Debtors intend to secure replacement health insurance coverage effective September 1, 2019. With respect to the employees not currently working for the Debtors, the Debtors will advise them of the anticipated termination of the Health Plan effective August 31, 2019, subject to this Court's approval, as soon as this Motion is filed. The Debtors are also seeking coverage under the new plan for currently furloughed employees who may be brought back to work in the future by the Debtors provided that such coverage will only be effective on a date on or after the date such employee comes back to work.

**B.     The Court Should Allow the Debtors to Enter Into a New Health Insurance Agreement for their Current Employees.**

37. Section 363(c) of the Bankruptcy Code authorizes a debtor-in-possession operating its business pursuant to section 1108 of the Bankruptcy Code to use property of the estate in the ordinary course of business without notice or hearing. The Debtors submit that maintaining, renewing, and obtaining replacement or additional insurance coverage, would be in the ordinary course of business pursuant to sections 363(c), 1107(a), and 1108 of the Bankruptcy Code, and would be allowed without further application to the Court. Nonetheless, out of an abundance of caution, the Debtors are seeking the Court's authorization to enter into a new agreement for health insurance coverage for current employees in the ordinary course of business.

38. In addition, to the extent applicable, section 363(b) of the Bankruptcy Code permits a court to authorize debtors to pay premium payments outside the ordinary course of business. Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). *See Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992). To permit the use of property of the estate outside the ordinary course of business, the debtor must show a sound business purpose. *See In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) (adopting the "sound business purpose" test for section 363 purposes and citing *Lionel* as authority therefor); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995) (same); *see also In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale, or lease of property outside the ordinary course of business). The Debtors are seeking to enter into a fully-insured medical plan to provide health coverage to their current employees because the insurance coverage is critical to the retention of the Debtors' current 150 employees and any additional employees that the Debtors may return to work from furlough in the future provided that such coverage for furloughed employees shall only be effective on a date on or after the date the furloughed employee returns to work. Accordingly, the Debtors have a sound business justification for seeking authority to contract for new health insurance coverage for their current employees.

39. Likewise, the Court is empowered to approve payment of insurance premiums under section 105 of the Bankruptcy Code and the "doctrine of necessity." Section 105(a) of the Bankruptcy Code authorizes this Court to "issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). For the reasons set forth herein, and in light of the critical need for the Debtors to maintain affordable health insurance for its

current employees, authorizing the Debtors to enter into new insurance agreement and to pay premiums related thereto, is proper in accordance with section 105 of the Bankruptcy Code. *See, e.g., In re United Am., Inc.*, 327 B.R. 776, 782 (Bankr. E.D. Va. 2005) (the doctrine of necessity may be invoked when "(1) the vendor [is] necessary for the successful reorganization of the debtor; (2) the transaction [is] in the sound business judgment of the debtor; and (3) the favorable treatment of the . . . vendor must not prejudice other unsecured creditors.").

## CONCLUSION

40.     For these reasons, the Debtors believe that allowing the Debtors to reject and terminate the Insurance Agreements as requested in the Motion is the only option available to the Debtors given the circumstances of these cases.  In addition, the Debtors believe that it is appropriate for this Court to grant the Debtors authority to enter into a new health insurance plan for their current employees.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

41.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

42.     The Debtors, with the assistance of their claims and noticing agent, will provide notice of this Motion by email and/or first class mail to: (i) the Office of the United States Trustee for the Southern District of West Virginia, (ii) the Debtors' prepetition secured lenders, (iii) the creditors appearing on the Debtors' consolidated list of top 30 unsecured creditors, (iv) the Office of the United States Attorney for the District of West Virginia, (v) the Internal Revenue Service, (vi) any local, state, or federal agencies that regulate the Debtors' businesses, (vii) counsel to

Case 3:19-bk-30289   Doc 879   Filed 08/25/19   Entered 08/25/19 20:05:14   Desc Main
Document      Page 18 of 19

Riverstone Credit Partners – Direct, L.P., Bailey & Glasser LLP, (viii) counsel to United Bank, Inc., Steptoe & Johnson PLLC, (ix) counsel to The Official Committee of Unsecured Creditors, Whiteford Taylor & Preston, LLP, (x) all parties requesting notices pursuant to Bankruptcy Rule 2002, and (xi) counsel to UHSI.

43. Additionally, the Debtors will provide notice to the employees covered by the Insurance Agreements as soon as this Motion is filed on August 25, 2019 by (i) posting a notice (the "Notice") on the Debtors' web site, (ii) sending the Notice by email to all employees for whom the Debtors have an email address, and (iii) by mailing the Notice to the employee's address on record. A copy of the Notice is provided at **Exhibit D** hereto.

44. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order granting the relief requested in the Motion and such other and further relief as may be just and proper.

DATED: August 25, 2019

**SUPPLE LAW OFFICE, PLLC**

Joe M. Supple, Bar. No. 8013
801 Viand St.
Point Pleasant, WV 25550
Telephone: 304.675.6249
Facsimile: 304.675.4372
joe.supple@supplelaw.net

– and –

**SQUIRE PATTON BOGGS (US) LLP**

*/s/ Stephen D. Lerner*
Stephen D. Lerner (admitted *pro hac vice*)
Nava Hazan (admitted *pro hac vice*)
Travis A. McRoberts (admitted *pro hac vice*)
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201
stephen.lerner@squirepb.com
nava.hazan@squirepb.com
travis.mcroberts@squirepb.com

*Co-Counsel to the Debtors and
Debtors-in-Possession*