Frank W. Volk, Chief Judge
United States Bankruptcy Court
Southern District of West Virginia

**Dated: October 4th, 2019**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Blackjewel, L.L.C., *et al.*, | ) | Case No. 19-30289 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

### ORDER (I) APPROVING THE SALE OF CERTAIN ASSETS TO EAGLE SPECIALTY MATERIALS, LLC FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

This matter comes before the Court on the *Debtors' Motion for An Order Authorizing the Private Sale of the Western Assets to Eagle Specialty Materials, LLC Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances and Granting Related Relief* (the "Sale Motion")[2] and the *Declaration of Robert J. White in Support of Sale of the Debtors' Western Assets to Eagle Specialty Materials, LLC* [Docket Nos. 1159 and 1173] (the "White Declaration"); and the Court having reviewed the Sale Motion, the White Declaration and all supporting documents and conducted a hearing on October 2, 2019 (the "Sale Hearing") to consider granting the relief requested in the Sale Motion; and the Court being otherwise fully advised of the premises; and all timely objections to the Sale Motion having been withdrawn,

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213).  The headquarters for each of the Debtors is located at 1051 Main Street, Milton, West Virginia 25541-1215.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed in the Sale Motion or the Sale Agreement (as defined below), as applicable.

resolved, or overruled; and the proposed sale to Eagle Specialty Materials, LLC ("ESM") as set forth in the General Assignment and Assumption Agreement and Bill of Sale attached hereto as **Exhibit 1** (collectively, with all related agreements, documents or instruments and all exhibits, schedules and addenda, the "Sale Agreement") being the highest and best offer for the assets that are the subject of the Sale Agreement (collectively, the "Purchased Assets") that will maximize value; and adequate notice of the Sale Motion and the Sale Hearing having been given under the circumstances; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates and creditors, and all other parties-in-interest in these chapter 11 cases; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.      Jurisdiction and Venue.  This Court has jurisdiction to consider the Sale Motion and the sale of the Purchased Assets, as documented in the Sale Agreement, pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a).   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of these cases and the Sale Motion in this District and before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Statutory Predicates.  The statutory and other legal predicates for the relief sought in the Sale Motion are sections 105, 363, 365, 503, 507 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 7052, 9007, 9008, 9014 and 9019, and Local Rule 6004-1. The consummation of the transaction contemplated by the Sale Motion, Sale Agreement and this Order is legal, valid and properly authorized under all applicable provisions of the Bankruptcy

Code, the Bankruptcy Rules and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transaction.

C.     Final Order.  This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

D.     Notice.  Good and sufficient notice of the Sale Motion, the Sale Hearing and the potential assumption and assignment of contracts and leases, and the transaction contemplated by the Sale Agreement (the "Sale Transaction") was provided under the exigent circumstances to all parties entitled to receive notice and any other interested parties, including those whose identities are unknown to the Debtors, and no other or further notice is necessary or appropriate.

E.     Opportunity to Object.  A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all parties in interest.

F.     Reasonable Postpetition Marketing Efforts by the Debtors.  The Sale Transaction represents the highest and best bid for the Purchased Assets and is the product of reasonable efforts by the Debtors and their advisors to market and maximize the value of the Debtors' Purchased Assets and to identify all available reasonable alternatives.  The sale process for the Purchased Assets has been led by the Debtors' investment banker, Jefferies LLC ("Jefferies").  In particular, the Debtors' determination to sell the Purchased Assets to ESM resulted from the prior successful bidder, Contura Energy, Inc. ("Contura"), being unable to obtain the necessary governmental approvals to close on its attempted purchase of the Western Assets.

3

The prior sale process that resulted in Contura being named "successful bidder" represented the most extensive marketing and sale process possible under the exigent circumstances of these cases. As part of that prior sale process, the Debtors and Jefferies contacted over forty strategic purchasers and financial investors, provided confidentiality and non-disclosure agreements to interested parties, received twenty-two signed confidentiality agreements, and ultimately received two offers for the Purchased Assets. When the insurmountable challenges posed by the sale of the Purchased Assets to Contura became clear, the Debtors and their advisors, with Contura's consent, determined that it is in the best interests of the Debtors, their estates and creditors to instead sell the Purchased Assets to ESM in a private sale without any further sale process or auction. In light of the prior sale process, the bids received in that process, and the need to close a sale of the Purchased Assets by October 7, 2019, the sale of the Purchased Assets to ESM pursuant to the terms of the Sale Agreement and the Sale Order, without a further sale process or auction, is in the best interest of the estates and constitutes the best opportunity to maximize the value of the Westerns Assets.

G.     Sale is Appropriate.  The Sale Transaction pursuant to the Sale Agreement meets the standards for sales outside the ordinary course of business under section 363(b)(1) of the Bankruptcy Code. The Sale Transaction represents the sound business judgment of the Debtors and is appropriate in light of the facts and circumstances surrounding the Sale Transaction and these chapter 11 cases because (1) the Sale Transaction was selected as the highest and best offer for the Purchased Assets after reasonable marketing, including the prior marketing of the Debtors' assets during these chapter 11 cases, and will therefore maximize value, and (2) the terms of the sale are fair and reasonable and were negotiated in good faith and at arm's length with ESM.

4

H.    <u>Settlements are Appropriate</u>.  The Settlements with Riverstone, BJMS, the DOL and the Junior DIP Lenders meet the applicable standard for approval under Bankruptcy Rule 9019 and sections 105(a) and 363(b) of the Bankruptcy Code.  The Settlements represent a sound exercise of the Debtors' business judgment and represent the best possible outcome under the circumstances of these chapter 11 cases because of (i) the probability of success in litigation; (ii) the potential difficulties in any collection; (iii) the complexity of the litigation and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors. The terms of each of the Settlements are fair and reasonable and are in the best interests of the Debtors, their estates and creditors.  The Settlements were negotiated on an arm's-length basis and in good faith by the Debtors and the other parties to the Settlements.

I.    <u>Agreements with Contura</u>.  In connection with the Sale Transaction, upon closing of the Sale Transaction, (i) Contura has agreed to waive its right to seek repayment of the $3.05 million remaining portion of the Purchase Deposit; (ii) Contura has agreed to consent to the Junior DIP Lenders Settlement (as defined herein) with respect to the Junior DIP Loan, in conjunction with which Junior DIP Loan Contura provided the Junior DIP Lenders a put option, (iii) Contura will release the Contura Lien it holds on certain Mine Equipment, and (iv) the Debtors shall provide the Contura Release Reaffirmation (as defined herein), which reaffirmation is fair and reasonable and in the best interest of the Debtors, their estates and their creditors in recognition of and exchange for the additional consideration being provided by Contura to the Debtors' estates in the form of (a) the $90 million cash payment by Contura to ESM as an inducement for ESM to purchase the Purchased Assets from the Debtors, (b) Contura's agreement to transfer the Ranches and certain other real estate interests in the state of Wyoming to ESM as an inducement for ESM to purchase the Purchased Assets from the Debtors, (c) Contura's consent to allow ESM to conduct

mining operations at the Western Mines pursuant to the Permit Operating Agreement, which agreement is a necessary condition to ESM's agreement to purchase the Purchased Assets from the Debtors, (d) the release by Contura of its secured claim and lien arising from the remainder of the Purchase Deposit not allocated to the Pax Sale, (e) Contura's consent to the Junior DIP Lenders Settlement with respect to the Junior DIP Loan, in conjunction with which Junior DIP Loan Contura provided the Junior DIP Lenders a put option, and (f) the waiver and release by Contura of all other pre-petition unsecured claims it holds against the Debtors' estates. The Contura Release Reaffirmation is a significant component of Contura's agreement to provide such consideration, and failure to provide such reaffirmation might otherwise jeopardize the opportunity to close the Sale Transaction or result in a material reduction in the consideration being offered by Contura to the Debtors and ESM.

J.    OSMRE Contura Settlement.    As a condition precedent to Contura's consent to and participation in the Sale Transaction and as separately documented pursuant to an agreement between Contura and the United States Department of the Interior's ("DOI") Office of Surface Mining, Reclamation and Enforcement ("OSMRE", and such agreement, the "OSMRE Contura Settlement"), and subject to DOI's written confirmation to be provided prior to the closing of the Sale Transaction that all known and payable post-petition royalty obligations due as of such date to DOI have been received (provided that, for the avoidance of doubt, the existence or failure to pay any unknown royalty obligations due as of such closing shall not limit this paragraph), Contura and OSMRE have agreed that:

i.    Neither ESM nor FM Coal, LLC ("FM Coal") will operate the Permits[3] until such time as ESM or FM Coal posts reclamation bonds for the Permits in an amount that satisfies

---

[3] The "Permits" shall herein refer to the Wyoming Department of Environmental Quality Permit No. 428-T7 for the Eagle Butte Mine located in Campbell County, Wyoming and Wyoming Department of Environmental Quality Permit No. 214-T8 for the Belle Ayr Mine located in Campbell County, Wyoming.

the Wyoming regulatory authority and meets all other federal, state, and local requirements that will allow ESM to operate the Permits;

ii. OSMRE will not attempt to link Contura Coal West, LLC ("Contura Coal West") to any Surface Mining Control and Reclamation Act of 1977 (as revised, "SMCRA") violation created by ESM from the time ESM or its designee or contractor, or any other ESM affiliate assumes operational responsibility for the Permits through and until the time that the Permits are transferred to ESM;

iii. OSMRE will not attempt to make Contura Coal West or any of the owners or controllers of Contura Coal West liable for the abatement of any SMCRA violation created by ESM from the time ESM or its designee or contractor, or any other ESM affiliate assumes operational responsibility for the Permits through and until the time that the Permits are transferred to ESM or its designee or any other ESM affiliate;

iv. ESM will use its best efforts to avoid creating mining conditions that will lead to the issuance of SMCRA violations and will promptly abate any such violation cited or pointed out by OSMRE or the Wyoming regulatory authority;

v. Contura Coal West and ESM will work expeditiously in accordance with SMCRA and the Wyoming regulatory program to complete the transfer of the Permits;

vi. ESM will operate the two mines consistent with the current mining and reclamation plans for the two mines and will re-employ as many of the Debtors' miners as possible;

vii. As long as Contura Coal West is the primary bonded party on the Permits, the Contura Coal West reclamation bonds can be called or forfeited in accordance with Wyoming's counterpart to SMCRA and the rules and regulations that implement it; provided, however, any such bond forfeiture shall not be linked to or held against Contura Coal West or any of its affiliates, officers, directors, owners or controllers under the Applicant Violator System. Contura Coal West's liability as the primary bonded entity will continue until such time as  those reclamation bonds posted as of the date of this Agreement are released or replaced under Wyoming law; and

viii.    The OSMRE Contura Settlement does not establish any precedent and cannot be used by Contura Coal West or ESM or any other organization in an attempt to justify similar terms in any subsequent SMCRA case, administrative appeal, complaint, claim, case, or matter before the courts or administrative tribunals of the United States of America or any state.

For the avoidance of doubt, notwithstanding anything else herein, in the event of a conflict between the terms of this Order and the terms of the OSMRE Contura Settlement, the terms of the OSMRE Contura Settlement shall govern and control.

K.    Corporate Authority.  Subject to the entry of this Order, the Debtors have full corporate power and authority to execute the Sale Agreement and all other documents contemplated thereby, and to consummate the transaction contemplated in connection therewith.

L.    Business Justification.  The Debtors have (1) articulated and demonstrated good, sufficient and sound business reasons for consummating the Sale Agreement, the sale of the Purchased Assets and the Sale Transaction; (2) appropriately exercised their business judgment by entering into the Sale Transaction; and (3) demonstrated compelling circumstances for entry into the Sale Transaction pursuant to section 363(b)(1) of the Bankruptcy Code, in that, among other things, the immediate approval by the Court of the Sale Transaction with ESM is necessary and appropriate to maximize the value of the Debtors' estates.

M.    Best Interests.  Approval of the Sale Agreement and the consummation of the Sale Transaction is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

N.    Highest or Otherwise Best.  As demonstrated by (1) the testimony and/or other evidence proffered or adduced at the Sale Hearing; and (2) the representations of counsel made on the record at the Sale Hearing, ESM's offer for the purchase of the Purchased Assets and assumption of certain liabilities as set forth in the Sale Agreement is fair and reasonable and constitutes the highest or otherwise best offer possible for the Purchased Assets and provides for consideration which exceeds the total consideration that the Debtors could have received by any other party for the Purchased Assets.  The consideration for the Purchased Assets is fair and

8

reasonable and constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia. The Sale Transaction will provide a greater recovery for the Debtors' creditors with respect to the Purchased Assets than would be provided by any other practically available alternative. Taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Purchased Assets for greater total economic value to the Debtors or their estates.

O. <u>Arm's Length Transaction and ESM's Good Faith</u>. The Sale Agreement was negotiated, proposed and entered into by the Debtors and ESM from arm's-length bargaining positions, without collusion, in good faith within the meaning of section 363(m) of the Bankruptcy Code. ESM is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. The Sale Agreement was not entered into, and neither the Debtors nor ESM has entered into the Sale Agreement, or proposes to consummate the Sale Transaction, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia. Neither the Debtors nor ESM have entered into the Sale Agreement or is consummating the Sale Transaction with any fraudulent or improper purpose.

P. No <u>*Sub Rosa* Plan</u>. The consummation of the Sale Transaction outside of a chapter 11 plan pursuant to the Sale Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors. The Sale Transaction does not constitute a *sub rosa* plan.

Q. <u>No Liability Under Section 363(n)</u>. Neither the Debtors nor ESM has engaged in any conduct that would cause or permit the Sale Agreement to be avoided under section

363(n) of the Bankruptcy Code.  Specifically, ESM has not acted in a collusive manner with any

person and the purchase price was not controlled by any agreement with unrelated third parties.

      R.   <u>Free and Clear Findings Required by ESM</u>.  The Purchased Assets

constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within

the meaning of section 541(a) of the Bankruptcy Code.  ESM would not have entered into the Sale

Agreement and would not consummate the Sale Transaction if the Purchased Assets were not

being sold pursuant to section 363(f) of the Bankruptcy Code, free and clear, except for Assumed

Liabilities expressly provided for by the Sale Agreement, of all liens, claims, encumbrances and

interests to the fullest extent permitted by section 363(f) of the Bankruptcy Code and any other

applicable law, including, without limitation, (i) all liens (statutory or otherwise), claims,

mortgages, deeds of trust, pledges, charges, security interests, charges, rights of first refusal,

hypothecations, encumbrances, royalties, easements, leases or subleases, rights-of-way,

encroachments, restrictive covenants, restrictions on transferability or other similar restrictions,

rights of offset or recoupment, subleases, leases or conditional sale arrangements (collectively, the

"<u>Liens</u>"), (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights

or causes of action (whether in law or in equity), proceedings, warranties, guarantees, indemnities,

rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands,

restrictions, indemnification claims or liabilities relating to any act or omission of the Debtors or

any other person prior to the closing, consent rights, options, contract rights, covenants and

interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or

contingent and regardless of whether currently exercisable), whether arising prior to or subsequent

to the commencement of these chapter 11 cases, and whether imposed by agreement,

understanding, law, equity or otherwise (collectively the "<u>Claims</u>"), and (iii) all debts, liabilities,

obligations, covenants running with the land, including, with respect to executory leases, royalty

agreements or other encumbrances the existence of which would be deemed to be a default under

the applicable lease or otherwise in violation of applicable law, contractual rights and claims and

labor, employment and pension claims, in each case, whether known or unknown, choate or

inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded,

perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or

unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether

arising prior to or subsequent to the commencement of these chapter 11 cases, and whether

imposed by agreement, understanding, law, equity or otherwise (collectively the "Interests").

Except for Assumed Liabilities expressly provided for by the Sale Agreement, the Sale Transaction

shall be free and clear of, and ESM shall not be responsible for, any Liens, Claims or Interests,

including, without limitation, in respect of the following: (i) any rights or Claims based on any

successor or transferee liability, (ii) any Liens, Claims or Interests that purport to give to any party

a right or option to effect any forfeiture, modification, right of first refusal, or termination of the

Debtors' or ESM's interest in the Purchased Assets, or any similar rights; (iii) any labor or

employment agreements; (iv) mortgages, deeds of trust and security interests; (v) intercompany

loans and receivables between the Debtors or non-Debtor affiliates; (vi) any pension,

multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA),

health or welfare, compensation or other employee benefit plans, agreements, practices and

programs, including, without limitation, any pension plans of the Debtors or any multiemployer

plan to which the Debtors have at any time contributed to or had any liability or potential liability;

(vii) any other employee, worker's compensation, occupational disease or unemployment or

temporary disability related claim, including, without limitation, claims that might otherwise arise

under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (viii) the Federal Mine Safety and Health Act of 1977 or its associated regulations; (ix) penalties of any kind whatsoever assessed against the Debtors by the United States Department of Labor's Mine Safety and Health Administration; (x) any bulk sales or similar law; (xi) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the closing; (xii) any executory contract or unexpired lease that will not be assumed and assigned pursuant to this Order and the Sale Agreement; and (xiii) any other liabilities not expressly assumed as provided in the Sale Agreement.  A sale of the Purchased Assets other than one free and clear of all Liens, Claims, and Interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale Transaction as contemplated.  Therefore, the Sale Transaction contemplated by the Sale Agreement free and clear of all Liens, Claims and Interests, except for Assumed Liabilities, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

S.      <u>Satisfaction of 363(f) Standards</u>.   The Debtors may sell the Purchased

Assets free and clear of all Liens, Claims and Interests of any kind or nature whatsoever, because,

in each case, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy

Code have been satisfied.   Those holders of Liens, Claims and Interests who did not object (or

who withdrew their objections) to the Sale Motion or the Sale Transaction are deemed to have

consented to the Sale Motion and the Sale Transaction pursuant to section 363(f)(2) of the

Bankruptcy Code.   Except as specifically provided in the Sale Agreement or this Order, all persons

and entities asserting or holding any Liens, Claims and Interests in or with respect to the Purchased

Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or

non-contingent, senior or subordinated), however arising, shall be forever barred, estopped, and

permanently enjoined from asserting, prosecuting or otherwise pursuing such Liens, Claims, or

Interests against ESM or the Purchased Assets; <u>provided</u>, <u>however</u>, that notwithstanding anything

contained in this Order to the contrary, such persons and entities asserting or holding any such

Liens, Claims and Interests in or with respect to the proceeds arising from the Sale Agreement and

the entry of this Order are not barred, estopped or permanently enjoined from asserting such Liens,

Claims or Interests solely against such proceeds; <u>provided</u>, <u>further</u>, <u>however</u>, that the rights of the

Debtors and other parties in interest to oppose such actions by persons and entities asserting or

holding such Liens, Claims and Interests are fully preserved.

T.      <u>Executory Contracts</u>.    Upon compliance with the assumption and

assignment procedures, which will be substantially similar to the procedures previously approved

in the Bidding Procedures Order, to be set forth in a *Notice of Executory Contracts and Unexpired*

*Leases that May be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and*

*Related Proposed Cure Costs,* which will be filed as promptly as possible after entry of this Order,

13

(as may be amended from time to time, the "Cure Notice"), the Debtors have demonstrated that it is an exercise of their sound business judgment to sell, assume and assign Executory Contracts to ESM in connection with the consummation of the Sale Transaction, and the assumption and assignment of Executory Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest.  The Executory Contracts assigned to ESM are an integral part of the Purchased Assets being purchased by ESM, and, accordingly, such assumption and assignment of the Executory Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtors' bankruptcy estates.

        U.     Cure and Adequate Assurance.  Upon compliance with the assumption and assignment procedures set forth in the Cure Notice, including the resolution of any Assumption/Assignment Objections, ESM will have cured or demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the closing under any of the Executory Contracts, within the meaning of Section 365(b)(l)(A) of the Bankruptcy Code.  Upon expiration of the applicable objection deadline, the proposed Cure Costs set forth in the Cure Notice or any other cure amount reached by agreement after an Assumption/Assignment Objection are deemed the amounts necessary to "cure" within the meaning of section 365(b)(l) of the Bankruptcy Code all "defaults" within the meaning of Section 365(b) of the Bankruptcy Code under such Executory Contracts.  The final amount of all Cure Costs will be determined and paid pursuant to the terms of the Cure Notice and the Sale Agreement.  ESM's promise to perform the obligations under the relevant Executory Contracts arising after the closing shall constitute adequate assurance of its future performance of and under the relevant Executory Contracts, within the meaning of sections 365(b)(l) and 365(f)(2) of the Bankruptcy Code.  All counterparties to the Executory Contracts who do not file an Assumption/Assignment Objection consistent with the

Cure Notice are deemed to consent to the assumption by the Debtors of their respective Executory

Contract and the assignment thereof to ESM.  This Court finds that, with respect to all Executory

Contracts, the payment of the Cure Costs (subject to compliance with the Cure Notice, including

the right to object) is appropriate and is deemed to fully satisfy the Debtors' obligations under

section 365(b) of the Bankruptcy Code.  This Court further finds that the Assumption/Assignment

Procedures set forth in the Cure Notice are reasonable and give contract counterparties adequate

notice of and opportunity to respond to the proposed assumption and assignment of the Executory

Contracts.  Accordingly, upon compliance with the procedures set forth in the Cure Notice, all of

the requirements of section 365(b) of the Bankruptcy Code will be satisfied for the assumption and

the assignment by the Debtors to ESM of each of the Executory Contracts under the Sale

Agreement.  To the extent any Executory Contract is not an executory contract within the meaning

of section 365 of the Bankruptcy Code, it shall be transferred to ESM in accordance with the terms

of this Order that are applicable to the Purchased Assets.

      V.   <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Sale

Motion and at the Sale Hearing establish just cause for the relief granted herein.

      W.   <u>Validity of Transfer</u>.  As of the closing, the transfer of the Purchased Assets

to ESM will be a legal, valid and effective transfer of the Purchased Assets, and will vest ESM

with all right, title and interest of the Debtors in and to the Purchased Assets, free and clear of all

Liens, Claims and Interests, except to the extent provided in the Sale Agreement and this Order.

      X.   <u>Incorporation of Sale Hearing</u>.  All findings of fact and conclusions of law

made or announced by the Court at the Sale Hearing are expressly adopted by, and incorporated

in, this Order as if they had been fully set forth herein.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.      <u>Sale Motion Granted</u>.  The Sale Motion is hereby GRANTED as set forth

herein.

2.      <u>Findings of Fact and Conclusions of Law</u>.  The findings of fact set forth

above and conclusions of law stated herein shall constitute this Court's findings of fact and

conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant

to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a

conclusion of law, it shall be so deemed and deemed so ordered, and to the extent any conclusion

of law shall be determined to be a finding of fact, it shall be so deemed and deemed so ordered.

3.      <u>Objections</u>.  All objections and responses, if any, to the sale of the

Purchased Assets to ESM or related relief requested in the Sale Motion that have not been

withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed

with the Court or pursuant to the terms of this Order, and all reservations of rights included therein,

are hereby overruled on the merits, with prejudice.  All persons and entities given notice of the

Sale Motion that failed to timely object thereto are deemed to consent to the relief sought therein.

4.      <u>Approval of the Sale Agreement</u>.  The Sale Transaction and specific terms

of the Sale Agreement are hereby authorized and approved pursuant to, inter alia, sections 105(a),

363(b) and 365(a) of the Bankruptcy Code.  Pursuant to section 363(b) of the Bankruptcy Code,

the Debtors are authorized to consummate the Sale Transaction pursuant to and in accordance with

the terms and conditions set forth in the Sale Agreement and this Order.  The Debtors, and their

affiliates, officers, employees and agents, are authorized to execute, deliver and perform under,

and otherwise consummate and implement, the Sale Agreement together with all additional

instruments and documents that may be reasonably necessary or desirable to implement the Sale

Agreement, and to take all further actions as may be (a) reasonably requested by ESM for the

purpose of assigning, transferring, granting, conveying and conferring to ESM, or reducing to

possession, the Purchased Assets, or (b) necessary or appropriate to the performance of the

obligations contemplated by the Sale Agreement, including, without limitation, executing any

necessary or appropriate document or instrument, all without further order of the Court.

5.      Good Faith.  The Sale Transaction has been undertaken by ESM in good

faith.  ESM satisfies the good faith requirement of section 363(m) of the Bankruptcy Code and,

accordingly, ESM and the Sale Transaction is entitled to all of the protections afforded by section

363(m) of the Bankruptcy Code.  Pursuant to section 363(m) of the Bankruptcy Code, if any or all

of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order

of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity

and enforceability of any sale, transfer or assignment under the Sale Agreement or obligation or

right granted pursuant to the terms of this Order, and notwithstanding any reversal, modification

or vacatur shall be governed in all respects by the original provisions of this Order or the Sale

Agreement, as the case may be.  The Sale Transaction approved by this Order is not subject to

avoidance and no damages may be awarded pursuant to section 363(n) of the Bankruptcy Code.

6.      Transfer of Assets Free and Clear.

A.      Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code,

the Debtors are authorized and directed to transfer the Purchased Assets in accordance with the

terms of the Sale Agreement free and clear of all Liens, Claims, and Interests (except for Assumed

Liabilities) to the fullest extent permitted by section 363(f) of the Bankruptcy Code and any other

applicable law.  The Purchased Assets shall be transferred to ESM, and upon consummation of the

Sale Agreement, such transfer shall (1) be valid, legal, binding and effective; (2) vest ESM with

all right, title and interest of the Debtors in the Purchased Assets; and (3) be free and clear of all

Liens, Claims and Interests (except for Assumed Liabilities).  All Liens, Claims and Interests shall attach to the net proceeds of the Sale Transaction, in the order of their priority and with the same validity, force and effect that they now have against the Purchased Assets, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto. Nothing herein is intended or shall be deemed to be an adjudication of the extent, validity, enforceability and/or priority of any conflicting or competing Liens, Claims or Interests with respect to the Purchased Assets, and all rights are reserved with respect to the same.  Upon the occurrence of the closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets acquired by ESM under the Sale Agreement transferring good, marketable and indefeasible title and interest in the Purchased Assets to ESM free and clear of all Liens, Claims and Interests (except for Assumed Liabilities).  Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction.  All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to ESM in accordance with the Sale Agreement and this Order.

B.      Except as otherwise provided in the Sale Agreement and this Order, all Governmental Units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) and all persons and entities (and their respective successors and assigns), including, without limitation, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, current and former employees, pension plans, multiemployer pension plans, labor unions, trade creditors and any other creditors holding Liens, Claims or Interests (whether legal or equitable, secured or unsecured, known or unknown, matured or unmatured, contingent or non-

contingent, liquidated or unliquidated, senior or subordinated) arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, or the transfer of the Purchased Assets to ESM, are hereby forever barred, estopped and permanently enjoined from asserting or pursuing any Liens, Claims or Interests (except for Assumed Liabilities) against ESM, its affiliates, successors or assigns, its property or the Purchased Assets, including, without limitation, taking any of the following actions with respect to a Claim: (1) commencing or continuing, in any manner, any action or other proceeding against ESM, its affiliates, successors or assigns, assets (including the Purchased Assets) or properties; (2) enforcing, attaching, collecting or recovering, in any manner, any judgment, award, decree, or order against ESM, its affiliates, successors or assigns, assets, or properties; (3) creating, perfecting, or enforcing any liens, claims, encumbrances or other interests against the Debtors as against ESM, or its affiliates, successors, assigns, assets (including the Purchased Assets) or properties; (4) asserting any setoff, right of subrogation or recoupment of any kind for any obligation of any of the Debtors as against any obligation due to ESM, or its affiliates, successors or assigns or their respective assets, including the Purchased Assets; (5) commencing or continuing any action, in any manner or place, that does not comply, or is inconsistent with, the provisions of this Order or the agreements or actions contemplated or taken in respect thereof; or (6) denying, refusing, delaying or otherwise frustrating the transfer or assignment of any permits, licenses, or other approvals previously held by the Debtors that were necessary for the Purchased Assets.

C.     This Order: (1) shall be effective as a determination that, as of the closing, all Liens, Claims and Interests (except for Assumed Liabilities), have been unconditionally released, discharged and terminated as to ESM and the Purchased Assets, and that the conveyances and transfers described herein have been effected; and (2) is and shall be binding upon and govern

the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transaction contemplated by the Sale Agreement.

D.     Upon the closing, each of the Debtors' creditors and any other holder of a Lien, Claim or Interest is authorized and directed to execute such documents and take all other actions as may be necessary to release its Lien, Claim or Interest in the Purchased Assets (other than Assumed Liabilities), if any, as such Lien, Claim or Interest may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, deeds of trust, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens, Claims or Interests against the Debtors or the Purchased Assets has not delivered to the Debtors prior to the closing of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtors or the Purchased Assets or otherwise, then with regard to the Purchased Assets that are purchased by ESM pursuant to the Sale Agreement and this Order: (1) the Debtors are hereby authorized, and ESM is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets; and (2) ESM is hereby authorized to file, register or otherwise record a

certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims and Interests (except for Permitted Encumbrances and Assumed Liabilities) against the Purchased Assets. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transaction contemplated by the Sale Agreement, including, without limitation, recordation of this Order. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office. This Order shall be binding upon and shall govern the acts of all persons including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests. Notwithstanding and without limiting the foregoing, the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Liens, Claims and Interests (except for Assumed Liabilities), shall be self-executing, and neither the Debtors nor ESM shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.

E.     Following the closing of the Sale Transaction, no holder of any Lien, Claim or Interest shall interfere with ESM's title to or use and enjoyment of the Purchased Assets based

on or related to any such Lien, Claim or Interest or based on any actions the Debtors may take in their chapter 11 cases.

7.    <u>Surrender of Possession</u>.  All entities that are currently, or on the closing may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to ESM on the closing under its Sale Agreement, unless ESM otherwise agrees.

8.    <u>Environmental Matters</u>.  Nothing in this Order or the Sale Agreement releases, discharges, nullifies, precludes, or enjoins the enforcement of any environmental liability to a Governmental Unit or any police or regulatory liability (including but not limited to reclamation and mitigation and any associated long term protection requirements) to a Governmental Unit that any entity would be subject to as the owner or operator of the Purchased Assets after the closing.  Nothing in this Order or the Sale Agreement authorizes the transfer or assignment to ESM of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments. Notwithstanding the foregoing sentence, nothing in this Order shall: (i) be interpreted to deem ESM as the successor to the Debtors under any successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to the closing or for liabilities relating to off-site disposal of waste by the Debtors prior to the closing; (ii) create for any Governmental Unit any substantive right that does not already exist under law; or (iii) be deemed or construed to be an admission of liability by the Debtors.

9.      Assumption and Assignment of Executory Contracts.

A.      Upon compliance with the procedures set forth in the Cure Notice regarding

the assumption and assignment of Executory Contracts (including the resolution of any objections

thereto), without further order of the Court, the Debtors are authorized to assume and assign the

Executory Contracts designated for assignment to ESM pursuant to the Sale Agreement; provided,

however, that there shall be no assumption of any such contract or lease absent simultaneous

assignment thereof to ESM.   Upon assumption and assignment, ESM shall be deemed to be

substituted for the Debtors as a party to each of the Executory Contracts and, pursuant to section

365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any liability

for any post-closing breach of any such Executory Contract after assignment of such Executory

Contract to ESM.   In accordance with section 365(b)(2) and (f) of the Bankruptcy Code, upon

transfer of the Executory Contracts to ESM, (i) ESM shall have all of the rights of the Debtors

thereunder, free and clear of all Liens, Claims and Interests, (except for Assumed Liabilities), and

each provision of such Executory Contracts shall remain in full force and effect for the benefit of

ESM, notwithstanding any provision in such contract, lease or in applicable law that prohibits,

restricts or limits in any way such assignment or transfer; and (ii) none of the Executory Contracts

may be terminated, or the rights of any party modified in any respect, including pursuant to any

"change of control" clause, by any other party thereto as a result of the consummation of the

transactions contemplated by the Sale Agreement.

B.      Subject to applicable provisions of section 365 of the Bankruptcy Code,

compliance with the procedures set forth in the Cure Notice governing the assumption and

assignment of Executory Contracts (including resolution of any objections), the Sale Agreement

and the respective terms thereof with respect to Cure Costs, without further order of the Court, all

23

defaults or other obligations of the Debtors under the Executory Contracts arising or accruing prior

to the closing will be deemed cured or shall be promptly cured in accordance with the terms hereof

as a condition precedent to the assumption and assignment of the respective Executory Contracts

(and without such a cure ESM shall have no rights in or to the respective Executory Contracts).

C.      Upon transfer of the applicable Executory Contracts to ESM, without

further order of the Court, there shall be no rent accelerations, assignment fees, increases or any

other fees charged or chargeable to ESM as a result of the assumption, assignment and sale of the

Executory Contracts.  Any provision in any Executory Contract that prohibits or conditions the

assignment of such contract or lease, or allows the counterparty to such contract or lease to

terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or

condition upon the assignment of such contract or lease, constitutes an unenforceable anti-

assignment provision, and is void and of no force and effect.  The validity of the assumption,

assignment and sale of the Executory Contracts to ESM shall not be affected by any existing

dispute between the Debtors and any counterparty to an Executory Contract.

10.     <u>Permanent Injunction</u>.  All persons and entities are prohibited and enjoined

from taking any action to adversely affect or interfere with the ability of the Debtors to transfer

the Purchased Assets to ESM in accordance with the Sale Agreement and this Order.  Following

the closing, except for persons entitled to enforce Assumed Liabilities, all persons (including, but

not limited to, (i) the Debtors and/or their respective successors (including any trustee),

(ii) creditors,    (iii) investors,    (iv) current    and    former    employees    and    shareholders,

(v) administrative  agencies,  (vi) Governmental  Units,  (vii) secretaries  of  state,  (viii) federal,

state, and local officials, including those maintaining any authority relating to any environmental,

health and safety laws, and (ix) the successors and assigns of each of the foregoing) holding Liens,

Claims or Interests in the Purchased Assets or against the Debtors with respect to the Purchased

Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and

permanently enjoined from asserting, prosecuting, or otherwise pursuing any Liens, Claims or

Interests of any kind or nature whatsoever against ESM or any affiliate of ESM or any of its

respective property, successors and assigns, or the Purchased Assets, as an alleged successor or

on any other grounds.  No person shall assert, and ESM and the Purchased Assets shall not be

subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or

otherwise, including, without limitation, any right of recoupment), liabilities, claims and interests,

or basis of any kind or nature whatsoever to delay, defer, or impair any right of ESM or the

Debtors, or any obligation of any other party, under or with respect to, any Purchased Assets,

with respect to any act or omission that occurred prior to the closing or with respect to any other

agreement or any obligation of the Debtors that is not an Assumed Liability.

11.    <u>Exculpation and Release</u>.  Neither ESM nor any of its affiliates, successors,

agents, employees, managers, members, officers, directors, attorneys, and/or assigns, shall have,

or incur any liability to, or be subject to any action by, the Debtors or any of their predecessors,

successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or

delivery of the Sale Agreement and the entry into and consummation of the Sale Transaction,

except as expressly provided in the Sale Agreement and this Order.

12.    <u>No Interference</u>.  Following the closing, no holder of any Lien, Claim or

Interest in the Purchased Assets (except holders of Assumed Liabilities solely in accordance with

applicable law) shall interfere with ESM's title to, or use and enjoyment of, the Purchased Assets

based on, or related to, any such Lien, Claim or Interest, or based on any actions the Debtors may take in these cases.

13.     Post-Closing Actions and Transactions.  The Debtors and ESM, and each of their respective officers, employees, and agents, will be authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or ESM deems necessary or appropriate to implement and effectuate the terms of the Sale Agreement and this Order.  Further, effective as of the closing, ESM and its respective successors and assigns shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, its successors and assigns, to demand and receive any and all of the Purchased Assets, and from time to time institute and prosecute in the name of ESM, for the benefit of ESM, its successors and assigns, any and all proceedings at law, in equity, or otherwise, that ESM, its successors or assigns, may deem proper for the collection or reduction to possession of any of the Purchased Assets, and to do all acts and things with respect to the Purchased Assets that ESM, its successors and assigns, shall deem desirable.  All of the foregoing powers granted to ESM are coupled with an interest and are irrevocable by the Debtors.

14.     Operation by ESM.  To the maximum extent available under applicable law but subject to the final sentence of this paragraph: (a) ESM shall be authorized, as of the closing, to operate under any license, permit, registration, and any other governmental authorization or approval of the Debtors with respect to the Purchased Assets and the Executory Contracts; (b) all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to ESM as of the closing; and (c) to the

extent provided by section 525 of the Bankruptcy Code, a Governmental Unit may not deny, revoke, suspend or refuse to renew any license, permit, charter, franchise, or other similar grant relating to, condition such a grant to, discriminate with respect to such a grant against, a person that is or has been a debtor under Title 11 of the United States Code, or another person with whom such debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under Title 11 of the United States Code, has been insolvent before the commencement of the case under Title 11 of the United States Code, or during the case but before the debtor is granted or denied a discharge, or has not been paid a debt that is dischargeable in the case under Title 11 of the United States Code.  Notwithstanding the foregoing, (x) nothing herein is intended or shall be deemed to relieve ESM from having to comply with any requirements or approval process under applicable non-bankruptcy law with respect to the transfer of any governmental license or permit and (y) ESM's rights to operate the Western Mines under each of the Permits is expressly subject to, and conditioned upon ESM's compliance with, the terms of the applicable "Consent to Operate Under Permit to Mine" executed by Contura Coal West and ESM and attached as an exhibit to the *Notice of Consents to Operate Under Permits to Mine Between Contura Coal West LLC and Eagle Specialty Materials, LLC* [Docket No. 1169].

15.     Debtors' Release From Liabilities.  Pursuant to the terms and provisions of the Sale Agreement, ESM is entering into various settlements, including but not limited to settlement agreements with the State of Wyoming and Campbell County, Wyoming with respect to all outstanding taxes and/or royalties owed by the Debtors to the State of Wyoming and Campbell County.  Except with respect to the United States, effective upon the closing and consummation of the Sale Transaction, the Debtors shall be, without further notice or order of this Court, released from any and all obligations owed to any third parties whose debts and/or claims

27

are being paid, settled or assumed by ESM, including the claims of the State of Wyoming and Campbell County, Wyoming against the Debtors, which are being paid by ESM as per its settlement with the State of Wyoming and Campbell County, Wyoming. Effective upon the closing and consummation of the Sale Transaction, Campbell County, Wyoming shall not be subject to any bar date granted or applicable in any of the Debtors' bankruptcy cases and shall not be required to file a proof of claim or administrative claim request with respect to or on account of any debts and/or claims being assumed by ESM. On and effective as of the Effective Date, the Debtors shall release any and all claims that they or their estates may have against Campbell County, Wyoming, including any claims under Sections 506(c), 547, 548, 549, 550, and 552 of the Bankruptcy Code.

16.     _Enforcement_.  The terms and provisions of the Sale Agreement and this Order, and the transaction contemplated thereby and hereby, shall, as applicable, be specifically enforceable against and be binding in all respects upon, or shall inure to the benefit of, the Debtors, their estates, their creditors (known and unknown), counterparties to Executory Contracts, any Governmental Unit which regulates the Debtors' business, ESM, and their respective affiliates, successors and assigns, and any affected third parties, including all entities asserting any Liens, Claims or Interests, notwithstanding any subsequent appointment of any trustee, examiner or receiver of the Debtors under any chapter of the Bankruptcy Code or any other law, and all such terms and provisions likewise shall be binding on and specifically enforceable against such trustee, examiner or receiver, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, any other representatives of their estates, or any trustee, examiner or receiver.

17.     <u>No Successor Liability</u>.

A.     Except for the Assumed Liabilities and Cure Costs, to be paid solely to the extent provided for in the Sale Agreement and this Order, neither ESM, nor any of its respective successors, assigns, agents, employees, managers, members, officers, directors, attorneys, or affiliates shall have any liability for any Lien, Claim or Interest that (i) arose or occurred prior to the closing, (ii) could have otherwise been asserted against the Debtors prior to the closing, or (iii) is related to the Purchased Assets prior to the closing.  ESM is not and shall not be deemed a "successor" to the Debtors or their estates, have, *de facto* or otherwise, merged with or into the Debtors or be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors under any theory of law or equity as a result of any action taken in connection with the Sale Agreement or the transaction or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets.

B.     Without limiting the foregoing, and except to the extent of the Assumed Liabilities, or as otherwise set forth in the Sale Agreement or this Order, ESM shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Liens, Claims or Interests, including under any theory of successor or transferee liability, *de facto* merger or continuity, whether known or unknown as of the closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to of any of the following: (i) any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, antitrust, environmental, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules or regulations); (ii)  any products liability law, rule, regulation, or doctrine with respect to the Debtors' liability under such law, rule or regulation, or doctrine, or under any product warranty liability law or doctrine; (iii) any employment or labor

29

agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which the Debtors are a party; (iv) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (v) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, or obligations that might otherwise arise from or pursuant to any statute or regulation including but not limited to the (a) Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967, (g) the Americans with Disabilities Act of 1990, (h) the Worker Adjustment and Retraining Notification Act of 1988 or (i) COBRA; (vi) environmental liabilities, debts, Claims, or obligations arising from conditions first existing on or prior to the closing (including, without limitation, the presence of hazardous, toxic, polluting, or contamination substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq*.; (vii) any liabilities, debts, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (viii) any liabilities, debts, commitments, or obligations for any taxes relating to the operation of the Purchased Assets prior to the closing; (ix) any bulk sale law; and (x) any litigation.

18.    <u>Fair Consideration</u>.  The consideration provided by ESM for the Purchased Assets under the Sale Agreement constitutes, and shall be deemed to constitute, reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale Transaction may not

be avoided under section 363(n) of the Bankruptcy Code.  The Sale Agreement was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor ESM have entered into the Sale Agreement or any agreement contemplated thereby or is consummating the Sale Transaction with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.  No other person or entity or group of persons or entities has offered to purchase the Purchased Assets for an amount or on terms that would provide greater value to the Debtors and their estates than the value provided by ESM.  The Court's approval of the Sale Motion and the Sale Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

19.    <u>Retention of Jurisdiction</u>.  This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Purchased Assets to ESM; (ii) interpret, implement, and enforce the provisions of this Order; (iii) protect ESM, any of ESM's affiliates, or any agent of the foregoing, against any Liens, Claims or Interests against the Debtors or the Purchased Assets of any kind or nature whatsoever, except for Assumed Liabilities and (iv) enter any order under sections 363 and 365 of the Bankruptcy Code.

20.    <u>Subsequent Plan Provisions</u>.  Nothing contained in any chapter 11 plan confirmed in any Debtor's bankruptcy case or any order confirming any such plan or in any other

order in these chapter 11 cases shall alter, conflict with, or derogate from, the provisions of the Sale Agreement or this Order.

21.    No Bulk Sales.   No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transaction contemplated by the Sale Agreement, the Sale Motion and this Order.

22.    Modification.    The Sale Agreement may be modified, amended or supplemented by ESM and the Debtors in a writing signed by both parties without further order of the Court; provided that any such modification, amendment or supplement does not materially change the terms of the Sale Agreement or modify the express terms of this Order.

23.    Survival.   Nothing contained in any subsequent order of this Court or any court of competent jurisdiction in these chapter 11 cases (or any order entered after any conversion of a chapter 11 case of the Debtors to a case under chapter 7 of the Bankruptcy Code) or any chapter 11 plan confirmed in any Debtors' bankruptcy cases or any order confirming any such plan, or any order dismissing any cases of the Debtors shall nullify, alter, conflict with, or in any manner derogate from the provisions of this Order, and the provisions of this Order shall survive and remain in full force and effect.   For the avoidance of doubt, if the Debtors' chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code, the Order shall be binding on the chapter 7 trustee in such chapter 7 cases.

24.    Failure to Specify.    The failure to specifically include any particular provision of the Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors and ESM that the Sale Agreement be authorized and approved in its entirety with such amendments thereto (subject to paragraph 22) as

may be made by the parties in accordance with the Sale Transaction and the terms of the Sale Agreement.

25.   <u>Automatic Stay</u>.   The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of this Court, to allow: (a) ESM to give the Debtors any notice provided for in the Sale Agreement, and (b) ESM to take any and all actions provided under or contemplated by the Sale Agreement in accordance with the terms and conditions thereof.

26.   <u>Appointment of Trustee</u>.   The provisions of the Sale Agreement and this Order may be specifically enforced in accordance with the Sale Agreement notwithstanding the appointment of any chapter 7 or chapter 11 trustee after the closing of the Sale Agreement.

27.   <u>Approval of the Settlements</u>.   The Debtors' Settlements with Riverstone, BJMS, the DOL and the Junior DIP Lenders are hereby authorized and approved pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  The Settlements shall be effectuated in accordance with the following terms:

A.   <u>BJMS Settlement</u>.   BJMS shall make payments to the Debtors on the Effective Date (as defined in the Sale Agreement) of: (i) $5.475 million in cash (to accommodate the Debtors' settlement of the "hot goods" issue described below); and (ii) the payment in full and in cash for all outstanding accounts receivable generated by the Debtors on September 27, 2019 and continuing through the Effective Date.  In exchange for the payments described in this paragraph, all outstanding claims of the Debtors against BJMS and Javelin and by BJMS and Javelin against the Debtors are deemed resolved and the Debtors shall complete the transfer of their 30% ownership interest in BJMS to Javelin Global Commodities (US) LP, as further described in the Sale Agreement.  All claims of BJMS and Javelin against the Debtors and their

estates are also deemed resolved and released.  For the avoidance of doubt, the payments to be

made by BJMS to the Debtors are inclusive of the previously agreed upon payment by BJMS to

the Debtors of $1.4 million.

        B.     <u>DOL Settlement</u>.  In full and final resolution of the "hot goods" issues raised

by the DOL in this Court and others, the Debtors shall pay the eastern employees and the western

employees amounts mutually agreed upon by the Debtors and the DOL (collectively, the "<u>Paid</u>

<u>Employee Amount</u>").  The closing of the Sale Transaction is subject to the DOL and the Debtors

agreeing on the amount of the Paid Employee Amount and the Debtors' agreement to pay such

Paid Employee Amount.  Such amounts shall be comprised of payroll due to eastern employees

and western employees for days of unpaid work, including the net pay and certain applicable tax

withholdings and employee benefit contributions related to the payroll period.  The Debtors will

issue checks to the eastern employees and ESM will assume and pay (consistent with the Sale

Agreement) amounts owed to the western employees for such employees' net pay and the

associated taxes and withholdings that comprise the Paid Employee Amount.  Upon the Debtors'

issuance of checks, the DOL shall file agreed consent judgments with the appropriate U.S. District

Courts.  The Debtors' payment of back wages shall "cool" the alleged "hot goods" coal at the

Eastern Mines and permit it to be moved in interstate commerce.[4]

        C.     <u>Junior DIP Lenders Settlement</u>.  Upon closing of the sale to ESM, the Junior

DIP Lenders waive and release any and all rights they have to collect from the Debtors, including,

the principal amount and all accrued interest and fees, under the loans they extended to Blackjewel

L.L.C. and Blackjewel Holdings L.L.C., as borrowers, and each Debtor affiliate, as guarantors, in

---

[4] The DOL Settlement does not resolve one issue in the Fair Labor Standards Act lawsuits filed by the DOL.  The parties rights with respect to the DOL's additional claims for liquidated damages are expressly reserved.  However, the fact that such additional claims remain unresolved does not impact the resolution of the "hot goods" issues, which are finally resolved by the DOL Settlement approved herein.

the principal amount of $2,900,000, which loan (the "<u>Junior DIP Loan</u>") was approved by this Court pursuant to the Final Order Authorizing Debtors to Obtain Junior Post-Petition Financing dated August 26, 2019 [Docket No. 918] (the "<u>Junior DIP Lender Settlement</u>").   For the avoidance of doubt, following the closing of the sale to ESM, the Debtors will be relieved of making any payments to the Junior DIP Lenders, saving the estates $2,900,000 in principal amount, plus all accrued interest and fees. The release and waiver of the Junior DIP Lenders' claims under the Junior DIP Loan will be automatically effective only upon the closing of the sale to ESM. If the closing does not occur, nothing in this Order shall be deemed to be a release or waiver by the Junior DIP Lenders of their claims arising under or related to the Junior DIP Loan, which claims shall remain in full force and effect.   Effective upon the closing of the sale to ESM, the Debtors, the Debtors' estates and their respective successors and assigns shall, and shall be deemed to have, forever, unconditionally and irrevocably release, discharge, and acquit the Junior DIP Lenders and each of their respective successors, assigns, affiliates, management companies, subsidiaries, parents, and each of their respective officers, shareholders, directors, employees, attorneys, consultants, advisors (including coal industry advisors, but only in their capacity as such) and agents, past, present, and future (together with their respective heirs, predecessors, successors, and assigns, collectively, the "<u>Junior DIP Lenders Releasees</u>") of and from any and all claims, actions, damages, demands, liabilities, and causes of action of any and every nature whatsoever, whether arising at law, in equity, tort or contract, and whether known or unknown, or matured or unmatured, disputed or undisputed, secured or unsecured, that arise out of or relate to the Junior DIP Loan.

D.    <u>Riverstone Settlement</u>.   In full and complete satisfaction of any and all claims (as defined in section 101(5) of the Bankruptcy Code) of any nature, type or extent, and

whenever arising, that Riverstone has against the Debtors and their estates, affiliates, officers, directors, employees, professionals, agents and advisors (all of such claims being forever waived and released), the Debtors and Riverstone have agreed to the following: (i) Riverstone shall be paid the total amount of $32 million in cash comprised of (a) $24 million in cash to be paid by ESM on the Effective Date and (b) $8 million in cash to be paid by the Debtors on the Effective Date; (ii) on the Effective Date, the Debtors will assign to Riverstone through mutually agreeable documentation the Debtors' right, title and interest in that certain *Royalty Agreement*, issued to the Debtors by Rhino Energy, LLC in connection with the sale of certain of Sellers' assets in the amount of $250,000; (iii) the Debtors will pay to Riverstone the first two annual payments that the Debtors receive from Kopper Glo Mining, LLC ("Kopper Glo"), in respect of that certain *Royalty Agreement*, issued to the Debtors by Kopper Glo, by directing such payments to be made to Riverstone directly by Kopper Glo; (iv) on the Effective Date, Contura shall release its purported liens in any and all property comprising Riverstone's collateral and all right, title, and interest in and to any of the consideration paid to Riverstone pursuant hereto; (v) on and effective as of the Effective Date, the Debtors shall release any and all claims that they or their estates may have against Riverstone, including any claims under Sections 506(c), 547, 548, 549, 550, and 552; (vi) on and effective as of the Effective Date, Riverstone shall be directed by the Debtors and the Creditors' Committee to transfer into the registry of this Court any amounts that would otherwise be distributable to Jeffery Hoops and/or any of his affiliates pending further direction by the Court or further Court order, and (vii) on the Effective Date or within 30 days thereafter, Riverstone shall release any liens, security interests, mortgages, claims, interests and encumbrances it asserts against any property of the Debtors; *provided, however,* that it is a condition to the settlement with Riverstone that the Effective Date shall occur on or before October 15, 2019 and the failure of the

36

Effective Date on or before that date shall render the foregoing settlement null and void and of no

further force and effect.  For the avoidance of doubt, the Debtors have already satisfied, in full and

in cash, the debtor in possession financing loan extended by Riverstone and approved by this Court

[Docket No. 1040].

28.    <u>Termination of Stalking Horse Bid</u>.  Contura's rights and obligations to

purchase the Western Assets are deemed to have terminated.

29.    <u>Agreements with Contura</u>.  In connection with the Sale Transaction, upon

closing of the Sale Transaction, (i) Contura's right to seek repayment of the $3.05 million

remaining portion of the Purchase Deposit shall be deemed waived; (ii) the Junior DIP Lender

Settlement shall be deemed executed, (iii) the Contura Lien held by Contura on certain Mine

Equipment shall be released, and (iv) the releases granted to Contura in Section 8.8 of the Asset

Purchase Agreement attached as Exhibit A to the Pax Sale Order, effective as of the closing of the

Sale Transaction shall be deemed reaffirmed (the "<u>Contura Release Reaffirmation</u>").

30.    <u>Sureties Reservation of Rights</u>.  Certain commercial surety companies

(collectively, the "<u>Sureties</u>" and each, individually, a "<u>Surety</u>") – including, Indemnity National

Insurance Company, First Surety Corporation, Lexon Insurance Company – have issued

commercial surety bonds on behalf of the Debtors and their affiliates and certain non-Debtors

(collectively, the "<u>Existing Surety Bonds</u>" and, each individually, an "<u>Existing Surety Bond</u>").

These Existing Surety Bonds were issued pursuant to certain existing indemnity agreements and/or

related agreements by and between the Sureties, on the one hand, and the Debtors and their

affiliates and certain non-Debtors (as applicable) on the other hand (collectively, the "<u>Existing</u>

<u>Indemnity Agreements</u>" and, each, an "<u>Existing Indemnity Agreement</u>").

31.     If the closing of the Sale Agreement occurs prior to (i) ESM's procurement of new operating permits, either replaced or transferred (the "Replacement Permits") with respect to the Purchased Assets, (ii) the execution of new indemnity agreements by and between the Sureties, on the one hand, and ESM, on the other hand (the "Replacement Indemnity Agreements"), and (iii) the replacement of all Existing Surety Bonds with new surety bonds (collectively, the "Replacement Surety Bonds"), the Debtors will consult with the relevant Sureties with respect to entering into an agreement (an "Interim Agreement"), subject to regulatory authority approval, that would, among other provisions acceptable to the Sureties in their sole and absolute discretion, allow ESM to operate the Purchased Assets under the Debtors' existing mining permits (collectively, the "Existing Permits"), Existing Indemnity Agreements and Existing Surety Bonds until ESM obtains Replacement Permits, Replacement Indemnity Agreements and Replacement Bonds.  An Interim Agreement may require, among other provisions acceptable to the Sureties in their sole and absolute discretion, that ESM (a) assumes all obligations under the Existing Permits, Existing Indemnity Agreements and the Existing Surety Bonds for the mining and other activities ESM conducts during the term of the Interim Agreement and (b) indemnifies the Debtors and the Sureties from and against any and all claims, liability, loss or default that occur during the term of the Interim Agreement.

32.     With respect to each Surety, upon the (a) issuance of the Replacement Permits, (b) execution of the Replacement Indemnity Agreements and (c) termination and/or release of all Existing Surety Bonds, (d) satisfaction of all payment and performance obligations under the Existing Indemnity Agreements in accordance with paragraph 30, the Debtors shall have no further obligations to the Sureties under the Existing Indemnity Agreements on account of the Purchased Assets or any obligations related thereto; provided, however, that nothing in this

paragraph or this Order shall be deemed to alter, limit or affect any rights or claims of the Sureties

or any applicable state or regulatory authority, in respect of any asset, permit or other obligation

not transferred or assumed by ESM.

33.    Nothing in this Order, the Sale Agreement or any documents related to any

of the foregoing shall be construed to authorize or permit the Debtors' assumption and assignment

of any Existing Surety Bond or Existing Indemnity Agreement or to obligate any Surety to replace

any Existing Surety Bond in connection with the Sale Agreement.

34.    Nothing herein or in the Sale Agreement shall be deemed to provide a

Surety's consent to the involuntary substitution of any principal under any Existing Surety Bond

or Existing Indemnity Agreement.

35.    Except as set forth in an Interim Agreement referenced in paragraph 31

above, ESM shall not be (a) liable for any Existing Surety Bonds and/or obligations arising under

the Existing Indemnity Agreements to the extent they relate to any assets that are not transferred

to ESM or (b) deemed a substitute principal under any Existing Surety Bond or an indemnitor

under any Existing Indemnity Agreement.

36.    For the avoidance of doubt, nothing in this Order, the Sale Agreement, or

otherwise shall be deemed to:  (a) alter, limit, expand, modify, release, waive or prejudice any

rights, remedies and/or defenses of any Surety under any Existing Surety Bond relating to any

assets, obligations or liabilities to be transferred to ESM, including, without limitation, mining

permits, surface and coal leases and mine-related facilities and other contractual obligations; (b)

authorize or permit the assignment or assumption of any Existing Surety Bonds, any Existing

Indemnity Agreements, including without limitation, any coal bond reclamation agreement,

collateral agreement or other agreements of the Debtors or any non-Debtor with such Surety or

Sureties, (collectively, the "Surety Agreements"); (c) alter, limit, expand, modify, prejudice, release or waive any rights of such Sureties under the Surety Agreements; (d) alter, limit, expand, modify, prejudice, waive or release any rights of such sureties in any and all collateral of such Surety or Sureties that secures any and all obligations of the Debtors or any non-Debtor under any Existing Surety Bonds or Existing Indemnity Agreements; or (e) alter, limit, expand, modify, prejudice, waive or release any rights of the Sureties in connection with any of the Debtors' chapter 11 cases or any case under Title 11 of the United States Code.

37.     Nothing in the Order, the Sale Agreement, or any other document or agreement executed in connection with or contemplated under the Sale Agreement, including, without limitation, any releases included therein, shall be deemed to alter, limit, modify or release any right, claim or interest of XL Specialty Insurance Company and XL Reinsurance Company (collectively, "XL") under any of XL's bonds, its indemnity agreements or in its collateral, including, without limitation, any rights, claims or interests against any non-Debtors, and all such rights and claims are expressly reserved and preserved in all respects.

38.     United States of America.   Notwithstanding any provisions in the Sale Motion, this Order, the Sale Agreement or any other documents approved in connection with this Order (collectively, the "Sale Documents") to the contrary, nothing in this Order authorizes the sale (free and clear or otherwise), transfer, assumption and/or assignment of the Debtors' interests in executory contracts, unexpired leases, rights-of-use and easements, and rights-of-way or other interests or agreements with the federal government (collectively, the "Federal Leases"), and no transfer and/or assignment of Federal Leases shall occur absent entry of a specific order entered pursuant to section 365 and subject to the consent of the United States as provided for in 11 U.S.C. § 365(c) and applicable non-bankruptcy laws.  Any and all of the United States' objections to the

40

assumption, assignment and/or transfer of the Federal Leases pursuant to 11 U.S.C. § 365 are expressly preserved including, without limitation, with respect to any proposed cure of any defaults under the Federal Leases, the United States' consent rights to any assignment or transfer of the Federal Leases and adequate assurance of future performance.  Notwithstanding any provisions in the Sale Documents to the contrary, nothing in the Sale Documents shall affect the United States' police and regulatory powers, and the United States' (including any and all of its agencies) rights to offset or recoup any amounts due under, or relating to, claims or debts that the United States (including any and all of its agencies) may have or assert are expressly preserved.

39.    Notwithstanding any other provision of Sale Documents or any other Order of this Court, no sale, transfer or assignment of any rights and interests of the Debtor in any federal license or authorization issued by the Federal Communications Commission ("FCC") shall take place prior to the issuance of FCC regulatory approval for such sale, transfer or assignment pursuant to the Communications Act of 1934, as amended, and the rules and regulations promulgated thereunder.  The FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on such sales, transfers and assignments and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

40.    Nothing in the Sale Documents releases, discharges, nullifies, precludes, or enjoins the enforcement of any environmental liability to a Governmental Unit or any police or regulatory liability (including, but not limited to, reclamation and mitigation and any associated long term protection requirements) to a Governmental Unit that any entity would be subject to as owner, lessee, permittee, controller or operator of the Purchased Assets after the closing.  Nothing

in this Order or the Sale Agreement authorizes the transfer or assignment to ESM of any governmental (a) license, (b) permit, (c) registration, (d) authorization, (e) lease or (f) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments. Notwithstanding the foregoing sentence, nothing in this Order shall: (i) be interpreted to deem ESM as the successor to the Debtors under any successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to the closing or for liabilities relating to off-site disposal of waste by the Debtors prior to the closing; (ii) create for any Governmental Unit any substantive right that does not already exist under law; or (iii) be deemed or construed to be an admission of liability by the Debtors. Notwithstanding anything to the contrary in the Sale Documents, paragraphs 38 to 40 of this Order shall expressly supersede and control to the extent that any other provision in the Sale Documents conflicts with the terms of these paragraphs. Nothing in the Sale Documents divests any tribunal of any jurisdiction that it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

41.    <u>Komatsu Mining Corporation</u>.  This Order does not authorize (a) the sale of the Sellers' right, title and interest to ESM in the following two electric mining shovels: (i) Electric Shovel Model 4100XPB, Serial No. ES41125 and (ii) Electric Shovel Model 4100, Serial No. ES55301 (together the "<u>Shovels</u>") against which Komatsu Mining Corporation and Joy Global Surface Mining Inc. (together, "<u>Komatsu</u>") assert a valid and perfected prepetition security interest or (b) the assumption and assignment to ESM of any executory contracts related to the Shovels.  Komatsu and ESM shall work in good faith to attempt to reach a consensual agreement with respect to ESM's acquisition of some or all of the Shovels and related executory contracts.  If

no agreement is reached and ESM desires to acquire any of the assets in which Komatsu has an interest, the parties will come before the Court for resolution. All parties' rights are reserved with respect to any further proceedings relating to such assets; <u>provided</u>, <u>however</u> that the Debtors will have no obligation to make any cure or other payments to Komatsu in respect of ESM's acquisition of any of such assets.

42. <u>Order Immediately Enforceable</u>. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after its entry, and shall be effective immediately upon entry, and the Debtors and ESM are authorized to close the Sale Transaction immediately upon entry of this Order. Time is of the essence in closing the Sale Transaction referenced herein, and the Debtors and ESM intend to close the transaction as soon as practicable. This Order is a final order and the period in which an appeal must be filed shall commence upon the entry of this Order.

43. <u>Conflicts</u>. In the event of a direct conflict between the terms of this Order and the terms of (a) the Sale Agreement, or (b) any other order of this Court, the terms of this Order shall govern and control.

44. <u>No Waiver</u>. Except as otherwise expressly set forth herein, nothing in this Order shall modify or waive any closing conditions or termination rights in the Sale Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

45. <u>Time Periods</u>. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

46. <u>Nonseverability</u>. The provisions of this Order are nonseverable and mutually dependent.

Presented By:

**SUPPLE LAW OFFICE, PLLC**

Joe M. Supple, No. 8013
801 Viand St.
Point Pleasant, WV 25550
Telephone: 304.675.6249
Facsimile: 304.675.4372
joe.supple@supplelaw.net

– and –

**SQUIRE PATTON BOGGS (US) LLP**

/s/ Stephen D. Lerner
Stephen D. Lerner (admitted *pro hac vice*)
Nava Hazan (admitted *pro hac vice*)
Travis A. McRoberts (admitted *pro hac vice*)
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201
stephen.lerner@squirepb.com
nava.hazan@squirepb.com
travis.mcroberts@squirepb.com

*Co-Counsel to the Debtors and
Debtors-in-Possession*

# **EXHIBIT 1**

**Sale Agreement**

## GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT AND BILL OF SALE

This **GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT AND BILL OF SALE** (this "**Agreement**"), dated as of October __, 2019 (the "**Effective Date**"), is made and entered into by and among Blackjewel L.L.C., a Delaware limited liability company ("**Blackjewel**"), Blackjewel Holdings L.L.C., a Delaware limited liability company ("**Holdings**", and together with Blackjewel, Dominion Coal Corporation, a Virginia corporation, Harold Keene Coal Co. LLC, a Virginia limited liability company, Vansant Coal Corporation, a Virginia corporation, Lone Mountain Processing LLC, a Delaware limited liability company, Powell Mountain Energy, LLC, a Delaware limited liability company and Cumberland River Coal LLC, a Delaware limited liability company, each a "**Seller**" and collectively, "**Sellers**"), Eagle Specialty Materials, LLC, an Ohio limited liability company ("**Buyer**"), Javelin Global Commodities (US) LP, a Delaware limited partnership ("**Javelin**"), and Blackjewel Marketing and Sales, LP, a Delaware limited partnership ("**BJMS**").

In consideration of the mutual representations, warranties, covenants and agreements contained herein, the parties hereto agree as follows:

1.  This Agreement is subject in all respects to approval by the United States Bankruptcy Court for the Southern District of West Virginia (the "**Bankruptcy Court**") by entry of an order in form and substance acceptable to Buyer, Javelin and BJMS.

2.  Each Seller does hereby sell, transfer, assign, convey and deliver to Buyer all of the right, title and interest of such Seller in, to and under the Purchased Assets described on <u>Exhibit A</u> and incorporated herein by reference, free and clear of all liens, claims, interests and encumbrances, to the fullest extent permitted by the Bankruptcy Code and by the order of the Bankruptcy Court authorizing and approving the transactions described in this Agreement ("**Liens**") (other than those Liens created by Buyer) and Excluded Liabilities described on <u>Exhibit B</u> and incorporated herein by reference, and Buyer hereby accepts the sale, transfer, assignment, conveyance and delivery of such Seller's right, title and interest in all such Purchased Assets.  This Agreement does not sell, transfer, assign, convey or deliver to Buyer any right, title or interest in, to or under the Excluded Assets described on <u>Exhibit C</u> and incorporated herein by reference.

3.  Buyer does hereby assume from Sellers and agrees to timely pay, perform and discharge in accordance with their respective terms, the Assumed Liabilities described on <u>Exhibit D</u> attached hereto and incorporated herein by reference. Nothing in this Agreement shall be construed as the assumption by Buyer of any Excluded Liabilities.

4.  Each Seller does hereby sell, transfer, assign, convey, and deliver to Buyer all of the right, title and interest of such Seller in, to and under the Assumed Leases described on <u>Exhibit E</u>, attached hereto and incorporated herein by reference, to which such Seller is a party, free and clear of all Liens (other than those Liens created by Buyer) and Excluded Liabilities, and Buyer hereby accepts such assignment, and Buyer does hereby assume and agree to pay, perform and discharge, as and when due, all of the duties and obligations of such Seller under all such Assumed Leases arising from and after the Effective Date, except to the extent such duties and obligations constitute Excluded Liabilities.

5.    Each Seller does hereby sell, transfer, assign, convey and deliver to Buyer all of the right, title and interest of such Seller in, to and under the Assumed Purchased Contracts described on Exhibit F, attached hereto and incorporated herein by reference, to which such Seller is a party, free and clear of all Liens (other than those Liens created by Buyer) and Excluded Liabilities, and Buyer hereby accepts such assignment, and Buyer does hereby assume and agree to pay, perform and discharge, as and when due, all of the duties and obligations of such Seller under all such Assumed Purchased Contracts arising from and after the Effective Date, except to the extent such duties and obligations constitute Excluded Liabilities.

6.    In consideration for the purchase of the Purchased Assets and in addition to the assumption of the Assumed Liabilities, Buyer shall pay the amount of $16,200,000 (plus the amount of accounts receivable to the extent not paid on or prior to Closing by BJMS under the BJMS Settlement) in immediately available funds to Sellers.

7.    Each Seller is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of formation and, subject to any limitations that may be imposed on such Sellers resulting from or relating to the Bankruptcy Case (as defined herein), has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Pursuant to entry of an order of the Bankruptcy Court approving this Agreement and the transactions contemplated thereby, the execution, delivery and performance of this Agreement have been duly authorized by each Seller and which constitutes all necessary action on the part of each Seller for such authorization.

8.    As of the Effective Date, Buyer will be vested with good, marketable, and valid title to the Purchased Assets, free and clear of all Liens (other than those Liens created by Buyer) and Excluded Liabilities, to the fullest extent permissible under law, including Sections 105, 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

9.    The Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transaction contemplated under this Agreement. Any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes; provided, however, that if the bankruptcy case captioned *in re Blackjewel, L.L.C., et. al* (the "**Bankruptcy Case**") has been closed pursuant to Section 350 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the State Courts located in New York County, New York (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such proceeding, in the United States District Court for the Southern District of New York) and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties agrees that a judgment in any such dispute

- 2 -

may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

10.  It is the intention of the parties that Buyer acquire, lease or sublease all assets, properties and rights necessary for the operation of the business that was previously operated utilizing the Purchased Assets (the "**Purchased Business**") as conducted, including all mining, processing, loading, transporting, marketing, and selling of coal and all reclamation activities, but excluding the Excluded Assets.  Accordingly, in the event that, within twelve (12) months following the Effective Date, it is discovered that certain assets, properties or rights, including fractional real property interests, owned, leased or subleased by Sellers, other than the Excluded Assets, were not included in the Purchased Assets to be sold to Buyer, and such assets, properties or rights are needed by Buyer in the operation of the Purchased Business, including all mining, processing, loading, transporting, marketing, and selling of coal and all reclamation activities, then Sellers shall use their commercially reasonable efforts to assign, convey, lease or sublease, as applicable, such assets, properties, or rights to Buyer, in each case upon the reasonable request of Buyer, at no additional cost or expense to Buyer. Additionally, in the event that, within twelve (12) months following the Effective Date, it is discovered that certain assets, properties or rights, including fractional real property interests, owned, leased or subleased by Sellers but not used or held for use in connection with the Purchased Business were conveyed to Buyer, then Buyer shall use its commercially reasonable efforts to assign, convey, lease or sublease, as applicable, such assets, properties, or rights to Seller (or its designee), in each case upon the reasonable request of Seller (or its designee), at no additional cost or expense to Seller (or its designee).

11.  The closing of this Agreement will be conditioned upon the following occurring on, or prior to the Effective Date:

a.  Buyer entering into settlement agreements with the State of Wyoming and Campbell County, Wyoming with respect to all outstanding taxes and/or royalties owed by Blackjewel to the State of Wyoming and Campbell County, respectively;

b.  Buyer negotiating a draft term sheet with the  applicable agencies of the federal government that sets forth the terms and conditions pursuant to which Buyer agrees to cure the delinquent royalty payments and abandoned mine land fees owed by Blackjewel to the federal government (the "**Draft Cure Term Sheet**"); provided, however, that Buyer and Sellers acknowledge that (i) negotiation of the Draft Cure Term Sheet does not authorize the sale (free and clear or otherwise), transfer, assumption and/or assignment of Sellers' interests in executory contracts, unexpired leases, rights-of-use and easements, and rights-of-way or other interests or agreements with the federal government (collectively, the "**Federal Leases**"), (ii) no transfer and/or assignment of Federal Leases shall occur absent entry of a specific order entered pursuant to section 365 and subject to the consent of the United States as provided for in 11 U.S.C. § 365(c) and applicable non-bankruptcy laws, (iii) any and all of the United States' objections to the assumption, assignment and/or transfer of the Federal Leases are expressly preserved including, without limitation, with respect to any proposed cure of any defaults under the Federal

- 3 -

Leases, the United States' consent rights to any assignment or transfer of the Federal Leases and adequate assurance of future performance and (iv) nothing in the Draft Cure Term Sheet shall affect the United States' police and regulatory powers, and the United States' (including any and all of its agencies) rights to offset or recoup any amounts due under, or relating to, claims or debts that the United States (including any and all of its agencies) may have or assert are expressly preserved;

c.      Blackjewel transferring ownership of all of its limited partnership interests in Blackjewel Marketing and Sales Holdings, LP ("**BJMS Holdings**") to Javelin as described in paragraph 12 and Buyer entering into a coal marketing agreement and master coal purchase and sale agreement with BJMS, Javelin or Javelin's designated affiliate;

d.      Buyer posting collateral to the relevant sureties in the form of cash or letters of credit for an amount equal to, or in excess of, the amount required by such sureties to release (i) the bonds with the DEQ securing the Reclamation Obligations (as defined in Exhibit D) related to the Western Mines; and (ii) certain collateral and corporate guarantees in respect of certain bonds of Blackjewel;

e.      Buyer causing one or more duly qualified sureties to issue reclamation bonds, for the benefit of the Land Quality Division of the Wyoming Department of Environmental Quality ("**DEQ**") that are required to release (a) the bonds posted by Contura Coal West, LLC, a Delaware limited liability company ("**Contura Coal West**") with the DEQ that are currently securing the Reclamation Obligations (as defined below) related to the Belle Ayr and Eagle Butte Mines (the "**Western Mines**");

f.      Highbridge and Whitebox will have executed releases forever waiving and releasing Sellers' obligation to repay the $2.9 million junior DIP financing, including any interest and fees, currently outstanding.

g.      Contura Energy, Inc., a Delaware corporation ("**Contura**") (i) paying $90,000,000 in cash to Buyer, (ii) paying $13,500,000 to Campbell County for ad valorem back taxes and (iii) waiving its rights to its remaining $3,050,000 deposit provided to Sellers;

h.      Buyer (i) being issued a mining license by the State of Wyoming, (ii) being authorized to operate the Western Mines pursuant to the Permit Operating Agreement, dated December 8, 2017, between Contura Coal West and Blackjewel and (iii) being authorized to conduct mining operations on the federal leases associated with the Western Mines and

i.      Blackjewel receiving approval from the Federal Communications Commission ("**FCC**") to assign its FCC licenses to Buyer; provided, however, that Buyer and Sellers hereby acknowledge that (i) no sale, transfer or assignment of any rights and interests of Blackjewel in any federal license or authorization issued by the

- 4 -

FCC shall take place prior to the issuance of FCC regulatory approval for such sale, transfer or assignment pursuant to the Communications Act of 1934, as amended, and the rules and regulations promulgated thereunder and (ii) the FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on such sales, transfers and assignments and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

12. BJMS and Sellers (together with three affiliated debtors, Revelation Energy Holdings, LLC, a Delaware limited liability company, Revelation Management Corp., a Delaware corporation, Revelation Energy, LLC, a Kentucky limited liability company, "**Debtors**") have reached a settlement (the "**BJMS Settlement**") providing for payment by BJMS on the Effective Date of: (i) $5.475 million in cash (to accommodate Blackjewel's settlement of the "hot goods" issue described below), and (ii) payments in cash for all sales generated by Blackjewel on September 27, 2019 and continuing through the Effective Date that have not otherwise been paid to Blackjewel by BJMS ((i) and (ii), collectively, the "**BJMS Settlement Payments**"). In exchange for these payments, all outstanding claims by Debtors against BJMS, Javelin and/or any of their respective affiliates, directors, officers and equity holders and all outstanding claims by BJMS, Javelin and/or any of their respective affiliates, directors, officers and equity holders against Debtors and their current directors, officers, employees, professionals and agents are resolved in full and Blackjewel will complete the transfer of its 30% limited partnership interest in BJMS Holdings to Javelin for $125,000 (as previously approved by the Bankruptcy Court) pursuant to an assignment and assumption agreement and bill of sale by and among Debtors and Javelin. For the avoidance of doubt, the payments to be made by BJMS to Debtors as described in this paragraph 12 are inclusive of the previously agreed upon payment by BJMS to Debtors of $1.4 million described in the *Revised Notice of Auction Results and Selection of Successful Bids and Backup Bids* [Docket No. 529]. Debtors agree that they shall use the BJMS Settlement Payments for the purpose of issuing payroll checks to Blackjewel employees in accordance with paragraph 13 below in connection with the DOL Settlement (as defined below) with any excess over the amount of the payroll checks being retained by Debtors.

13. Blackjewel and the Department of Labor ("**DOL**") have reached a settlement providing for the release of the "hot goods" owned by BJMS (the "**DOL Settlement**"). BJMS will fund the BJMS Settlement Payments (described above), following which Blackjewel will issue payroll checks to its employees in West Virginia, Virginia and Kentucky, in an amount equal to $3,440,937 as agreed upon by Blackjewel and DOL, in full satisfaction of the DOL Settlement, from the BJMS Settlement Payments. Upon issuance of the payroll checks, DOL will file with the relevant United States District Courts agreed upon consent judgments. Upon the filing of the agreed upon consent judgments, the coal will be released from its status as "hot goods". In the event that the Sellers fail to issue the payroll checks within fourteen (14) days after the Effective Date, then (a) the Sellers shall immediately refund the amount of $5.475 million to BJMS, (b) the Sellers shall retain the balance of the BJMS Settlement Payments (including payment for all sales generated by Blackjewel on September 27, 2019 and continuing through the Effective Date that have not otherwise

been paid to Blackjewel by BJMS), (c) the Sellers and BJMS each will retain the right to assert any and all claims against each other for amounts owed prior to September 27, 2019 and (d) the BJMS Settlement shall otherwise be null and void.  In furtherance of the foregoing, DOL will confirm its agreement to the DOL Settlement on the terms set forth in this paragraph 13 on the record at a hearing in the Bankruptcy Court.  For the avoidance of doubt, the transfer of the 30% limited partnership interest in BJMS Holdings by Blackjewel to Javelin for $125,000 (which amount shall be retained by the Sellers) shall not be unwound or otherwise affected by any refund of the BJMS Settlement Payments.

14.  Debtors and Riverstone have also agreed to a settlement of disputes between them and the treatment of Riverstone's prepetition claims.  Debtors have already satisfied Riverstone's debtor in possession financing loan. In full and complete satisfaction of any and all claims (as defined in section 101(5) of the Bankruptcy Code) of any nature, type or extent, and whenever arising, that Riverstone has against Debtors and their estates, affiliates, officers, directors, employees, professionals, agents and advisors (all of such claims being forever waived and released), Debtors and Riverstone have agreed to the following: (i) Riverstone will be paid the total amount of $32 million in cash comprised of (a) $24 million in cash to be paid by Buyer on the Effective Date and (b) $8 million in cash to be paid by Debtors on the Effective Date, (ii) on the Effective Date, Debtors will assign to Riverstone through mutually agreeable documentation Debtors' right, title and interest in that certain Royalty Agreement, issued to Debtors by Rhino Energy, LLC in connection with the sale of certain of Debtors' assets in the amount of $250,000, (iii) Debtors will pay to Riverstone the first two annual payments that Debtors receive from Kopper Glo Mining, LLC ("Kopper Glo"), in respect of that certain Royalty Agreement, issued to Debtors by Kopper Glo, by directing such payments being made to Riverstone directly by Kopper Glo., (iv) on the Effective Date, Contura shall release its purported liens in any and all property comprising Riverstone's collateral and all right, title, and interest in and to any of the consideration paid to Riverstone pursuant hereto; (v) the Debtors shall release any and all claims that they or their estates may have against Riverstone, including any claims under Sections 506(c), 547, 548, 549, 550, and 552; (vi) Riverstone shall be directed by the Debtors and the Creditors' Committee to hold any amounts that would otherwise be distributable to Jeffery Hoops and/or any of his affiliates pending further direction by the Debtors, the Creditors' Committee or any successor representative of the Debtors' estates or further Court order and (vii) Riverstone shall release any liens, security interests, mortgages, claims, interests and encumbrances it asserts against any property of the Debtors; *provided, however,* that it is a condition to the settlement with Riverstone that the Effective Date shall occur on or before October 15, 2019 and the failure of the Effective Date on or before that date shall render the foregoing settlement null and void and of no further force and effect. Riverstone has agreed to support the sale described in this Agreement, including the release of any liens, security interests, mortgages, claims, interests and encumbrances it asserts against any property of Debtors.

15.  As soon as reasonably practicable following the Effective Date, Buyer will (a) prepare, in conjunction with Contura the applications necessary to transfer all permits included within the Purchased Assets (the "**Permit Applications**") from Contura to Buyer and (b) submit the Permit Applications to DEQ.

16.     As soon as reasonably practicable following the Effective Date, Buyer shall arrange to have one or more of the sureties issue the reclamation bonds, for the benefit of the DEQ, that are required in connection with the submission of the Permit Applications.

17.     As soon as reasonably practicable following the Effective Date, but not prior to receiving final approval of the Draft Cure Term Sheet by the Department of Justice, including any modifications to the Draft Cure Term Sheet requested by the Department of Justice and approved by Buyer in its sole discretion, Buyer will (a) prepare, in conjunction with Sellers, the applications necessary to transfer to Buyer the federal and state leases for the Western Mines (the "**Lease Applications**"), (b) submit the Lease Applications to the Bureau of Land Management (the "**BLM**") and the State of Wyoming and (c) arrange to have one or more of the sureties issue the lease bonds, for the benefit of the BLM and the State of Wyoming, that are required in connection with the submission of the Lease Applications. Buyer will use its best efforts to cause the Lease Applications to be approved as promptly as possible with a full release of Sellers with respect to any and all reclamation liabilities.

18.     Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

19.     This Agreement represents the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

20.     This Agreement will be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and, where state law is implicated, the laws of the State of New York applicable to contracts made and performed in such State.

21.     This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

22.     Each party hereto agrees, upon the reasonable request of any other party hereto (and at such other party's expense), to make, execute and deliver any and all documents or instruments of any kind or character, and to perform all such other actions, that may be reasonably necessary or proper to effectuate, confirm, perform or carry out the terms or provisions of this Agreement.

23.     This Agreement may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by the parties hereto. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

24.     Nothing in this Agreement (a) releases, discharges, nullifies, precludes, or enjoins the enforcement of any environmental liability to a governmental unit or any police or

- 7 -

regulatory liability (including, but not limited to, reclamation and mitigation and any associated long term protection requirements) to a governmental unit that any entity would be subject to as owner, lessee, permittee, controller or operator of the Purchased Assets after the closing, (b) authorizes the transfer or assignment to Buyer of any governmental license, permit, registration, authorization, lease or approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments, (c) shall be interpreted to deem Buyer as the successor to Sellers under any successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to the closing or for liabilities relating to off-site disposal of waste by Sellers prior to the closing, (d) create for any governmental unit any substantive right that does not already exist under law, (e) be deemed or construed to be an admission of liability by Sellers or (f) divests any tribunal of any jurisdiction that it may have under police or regulatory law to interpret this Agreement or to adjudicate any defense asserted under this Agreement.

25.     WITH RESPECT TO ALL MATTERS SOLD, ASSIGNED, TRANSFERRED AND CONVEYED PURSUANT HERETO, SUCH MATTERS ARE HEREBY SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO BUYER ON AN "AS IS", "WHERE IS", "WITH ALL FAULTS" BASIS, WITHOUT ANY REPRESENTATION, WARRANTY, GUARANTY, PROMISE, PROJECTION OR PREDICTION WHATSOEVER WITH RESPECT TO SUCH MATTERS, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW OR UNDER THE UNIFORM COMMERCIAL CODE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

<u>**SELLERS:**</u>

**Blackjewel L.L.C.**

By: _____
Name: _____
Title: _____

**Blackjewel Holdings L.L.C.**

By: _____
Name: _____
Title: _____

**Dominion Coal Corporation**

By: _____
Name: _____
Title: _____

**Harold Keene Coal Co. LLC**

By: _____
Name: _____
Title: _____

**Vansant Coal Corporation**

By: _____
Name: _____
Title: _____

*Signature Page to General Assignment and Assumption Agreement and Bill of Sale*

**Lone Mountain Processing LLC**

By: _____

Name: _____

Title: _____


**Powell Mountain Energy, LLC**

By: _____

Name: _____

Title: _____

**Cumberland River Coal LLC**

By: _____

Name: _____

Title: _____

## **BUYER:**

**Eagle Specialty Materials, LLC**

By: _____

Name: _____

Title: _____

## **JAVELIN:**

**Javelin Global Commodities (US) LP**

**By: Javelin Global Commodities (US) GP LLC, its general partner**

By: _____

Name: _____

Title: _____


*Signature Page to General Assignment and Assumption Agreement and Bill of Sale*

**<u>BJMS</u>:**


**Blackjewel Marketing and Sales, LP**


By:
Name: _____
Title: _____

*Signature Page to General Assignment and Assumption Agreement and Bill of Sale*

## EXHIBIT A

**Purchased Assets**

Substantially all of the assets held by Sellers and related to the Western Mines, which shall include, for the avoidance of doubt, all owned and leased real property, accounts receivable (less any amounts paid on or prior to Closing by BJMS for outstanding accounts receivable through Closing under the BJMS Settlement) and equipment held by Sellers and related to the Western Mines, other than the Excluded Assets set forth on Exhibit D hereto (collectively, the "**Purchased Assets**").

*Exhibit A to General Assignment and Assumption Agreement and Bill of Sale*

# EXHIBIT B

## Excluded Liabilities

All liabilities other than Assumed Liabilities.

## EXHIBIT C

### Excluded Assets

All cash, prepayments, deposits, tax refunds, any avoidance, preference, recovery, claim, right or cause of action of Sellers arising under Chapter 5 of the Bankruptcy Code or under any analogous state or federal laws relating to the Purchased Assets and any claim or cause of action related to the Purchased Assets.

*Exhibit C to General Assignment and Assumption Agreement and Bill of Sale*

## EXHIBIT D

### Assumed Liabilities

(i) all obligations under applicable law, or applicable permits, to prevent, mitigate or otherwise address the effects of mining activities (including the exploration, permitting, extraction, processing, storage and transportation of coal, non-coal minerals, natural gas and coalbed methane gas), including the reclamation or restoration of lands used for such activities in each case related to the Western Mines (collectively, the "**Reclamation Obligations**");

(ii) assumed contracts and associated cure costs;

(iii) all incurred, but unpaid, post-petition payables, expenses, taxes (federal, state and local), costs and administrative costs associated with the Purchased Assets in an amount not to exceed $4,310,000;

(iv) unpaid employee and employee related liabilities (including all taxes, benefits and other costs relating to employees and benefits) in an amount not to exceed $1,790,000; and

(v) liabilities and encumbrances expressly provided in this Agreement.

*Exhibit D to General Assignment and Assumption Agreement and Bill of Sale*

## EXHIBIT E

**Assumed Leases**

Leases expressly designated by Buyer after the Effective Date.

## **EXHIBIT F**

### **Assumed Purchased Contracts**

Contracts expressly designated by Buyer after the Effective Date.

*Exhibit F to General Assignment and Assumption Agreement and Bill of Sale*