UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

In Re:

BLACKJEWEL, L.L.C. et al.                                     Case No. 19-30289
                                                                    Chapter 11
        Debtors.                                            (Jointly Administered)

**NOTICE OF JOINT MOTION OF BLACK DIAMOND INSURANCE GROUP, LLC,
CLEARWATER INVESTMENT HOLDINGS, LLC, FORREST MACHINE, LLC,
JEFFERY A. HOOPS, LEXINGTON COAL ROYALTY COMPANY, LLC, REPUBLIC
SUPERIOR PRODUCTS, LLC, TRIPLE H AVIATION, LLC, TRIPLE H REAL
ESTATE, LLC AND WALLS & ASSOCIATES, PLLC TO CONVERT TO CHAPTER 7**

        **PLEASE TAKE NOTICE** pursuant to the *Order Establishing Certain Notice and Case
Management Procedures* [DE# 2217] (the "Case Management Order") that a hearing (the
"Hearing") to consider the *Joint Motion of Black Diamond Insurance Group, LLC, Clearwater
Investment Holdings, LLC, Forrest Machine, LLC, Jeffery A. Hoops, Lexington Coal Royalty
Company, LLC, Republic Superior Products, LLC, Triple H Aviation, LLC, Triple H Real Estate,
LLC and Walls & Associates, PLLC to Convert to Chapter 7* (the "Motion") filed by Black
Diamond Insurance Group, LLC, Clearwater Investment Holdings, LLC, Forrest Machine, LLC,
Jeffery A. Hoops, Lexington Coal Royalty company, LLC, Triple H Aviation, LLC, Triple H Real
Estate, LLC and Walls & Associates, PLLC (the "Moving Parties") on November 25, 2020 in the
above captioned bankruptcy case shall be held before the United States Bankruptcy Court for the
Southern District of West Virginia (the "Bankruptcy Court") on December 17, 2020 at 9:30 a.m.

        **PLEASE TAKE FURTHER NOTICE** that the Hearing will be conducted pursuant to
the procedures in the Case Management Order as may be modified by further orders of the Court
from time to time.  **Any party wishing to be heard must comply with the terms and provisions
of the Case Management Order**.

        **PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the relief
requested in the Motion must be in writing and conformed to the Federal Rules of Bankruptcy
Procedure, the Local Rules of the Bankruptcy Court, and the procedures described in the Case
Management Order entered by the Bankruptcy Court on August 3, 2020, as amended on October
6, 2020.  Any responses or objections shall be served in an accordance with the Case Management
Order on the following parties: (i) counsel for the Debtors, Squire Patton Boggs (US) LLP,, 201
E. Fourth Street, Suite 1900, Cincinnati, Ohio 45202, Attn: Stephen D. Lerner
(Stephen.lerner@squirepb.com),, Nava Hazan (nava.hazan@squirepbpb.com) and Travis A.
McRoberts (travis.mcroberts@squirepb.com)0); (ii) local counsel for the Debtors, Supple Law
Office, PLLC, 801 Viand Street, Point Pleasant, West Virginia 25550, Attn: Joe M. Supple
(joe.supple@supplelawoffice.com); and (iii) counsel for the Moving Parties, Dinsmore & Shohl
LLP, 611 Third Avenue, Huntington, West Virginia 25701, Attn: J.H. Mahaney
(john.mahaney@dinsmore.com) and Janet Smith Holbrook (janet.holbrook@dinsmore.com).

1

Any response must be filed and served no later than December 10, 2020 at 11:59 p.m.(the "Objection Deadline").  If you or your attorney do not take these steps, the Court may decide that you do not oppose thee relief south in the Motion and may enter an order granting that relief.

Respectfully submitted, this 25th day of November, 2020.

/s/ *J.H. Mahaney*
J.H. Mahaney, Esquire (WVSB #6993)
Janet Smith Holbrook, Esquire (WVSB #5853)
DINSMORE & SHOHL LLP
611 Third Avenue
Huntington, West Virginia 25701
Telephone (304) 529-6181
Facsimile (304) 522-4312
john.mahaney@dinsmore.com
janet.holbrook@dinsmore.com

***Counsel for Black Diamond Insurance Group, LLC, Clearwater Investment Holdings, LLC, Forrest Machine, LLC, Jeffery A. Hoops, Lexington Coal Royalty Company, LLC, Triple H Aviation, LLC, Triple H Real Estate, LLC and Walls & Associates, PLLC***

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

In re:

BLACKJEWEL L.L.C., *et al*.,

Debtors[1].

Chapter 11
Case No. 19-30289
(Jointly Administered)

## JOINT MOTION OF BLACK DIAMOND INSURANCE GROUP, LLC, CLEARWATER INVESTMENT HOLDINGS, LLC, FORREST MACHINE, LLC, JEFFERY A. HOOPS, LEXINGTON COAL ROYALTY COMPANY, LLC, REPUBLIC SUPERIOR PRODUCTS, LLC, TRIPLE H AVIATION, LLC, TRIPLE H REAL ESTATE, LLC AND WALLS & ASSOCIATES, PLLC TO CONVERT TO CHAPTER 7

NOW COME Black Diamond Insurance Group, LLC, Clearwater Investment Holdings, LLC, Forrest Machine, LLC, Jeffery A. Hoops, Lexington Coal Royalty Company, LLC, Triple H Aviation, LLC, Triple H Real Estate, LLC and Walls & Associates, PLLC (collectively, the "***Moving Parties***"), creditors and parties-in-interest in the above-captioned chapter 11 cases of the Debtors, by and through counsel, and hereby submit this joint motion to convert these chapter 11 cases to chapter 7 pursuant to 11 U.S.C. § 1112(b).[2] As discussed more fully below, cause clearly exists under Section 1112(b)(1) to convert this matter to chapter 7. Given the Debtor's ongoing, and given its lack of operating assets permanent, negative net cash flow, and continuing financial losses, there is no reason to continue this proceeding as a chapter 11 and incur the substantial and unnecessary administrative expenses attendant to doing so. For the reasons contained herein, as well as the reasons contained in the Moving Parties' Preliminary Objection to the Debtors' First

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's Taxpayer identification number are as follows:  Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213).  The headquarters for each of the Debtors is located at P.O. Box 1010, Scott Depot, West Virginia 25560.

[2]    Capitalized terms not otherwise defined in this Joint Motion shall have the meanings given to them in the Disclosure Statement and Plan.

17151516.1

Amended Disclosure Statement and Joint Chapter 11 Plan of Liquidation (to be filed), the Plan

should be rejected and this matter converted to a chapter 7 proceeding.  In support of this joint

motion, the Moving Parties state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELEVANT FACTS

**A.      Procedural History**

3.      Each of the Moving Parties is a party-in-interest in these chapter 11 cases.

4.      Jeffery A. Hoops ("Mr. Hoops") is a secured creditor in funds being held by the

registry of Court.  *See* Claim No. 1182, Doc. No. 1187 at ¶27D and Doc. No. 1294 (funds totaling

$2,619,740.26 were deposited into the registry of the Court on October 24, 2019).  Mr. Hoops also

timely filed pre-petition unsecured claims totaling $3,611,227.71, to which no objections were

made.  *See* Claim Nos. 1085 and 1260.

5.      The other Moving Parties timely filed pre-petition unsecured claims in the total

amount of $26,457,564.14, to which no objections were made.  *See* Claim Nos. 191, 197, 198,

199, 201, 284, 876, 901, 902, 996, 1189, 1227 and 1271.

**B.      Procedural History**

6.      On July 1, 2019 (the "***Petition Date***"), Debtors filed a voluntary petition under

chapter 11.  *See* Doc. No. 1.

7.      On October 21, 2020, Debtors filed their "*First Amended Joint Chapter 11 Plan of

Liquidation*" [Doc. No. 2499] (the "***Plan***").

17151516.1

8.      On October 21, 2020, Debtors filed their "*First Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation*" [Doc. No. 2500] (the "***Disclosure Statement***").

**C.      Ownership and Control of the Debtors**

9.      A corporate organization chart of the Debtors is attached to the Disclosure Statement as Exhibit 3.

10.      LR-Revelation Holdings, L.P. and the John Reynolds Revocable Trust own a majority interest in Blackjewel Holdings L.L.C.  *See* Disclosure Statement at ¶ 3.1(b).

11.      Blackjewel Investment L.L.C. owns a minority interest in Blackjewel Holdings L.L.C.  *Id*.

12.      LR-Revelation Holdings, L.P. is affiliated with Lime Rock Partners, a private equity investor.  *See* Disclosure Statement at ¶ 3.2(a)(1).

13.      The Debtors' boards of directors consisted of John Reynolds, Jeffrey Scofield and Mr. Hoops.  *See* Doc. No. 731.

14.      John Reynolds is the co-founder and managing director of Lime Rock Partners.  *See* https://www.lrpartners.com/team/john-reynolds/.

15.      Jeffrey Scofield is the managing director and chief operating officer of Lime Rock Partners.  *See* https://www.lrpartners.com/team/jeffrey-scofield/.

16.      Mr. Hoops was the president and chief executive officer of Blackjewel, L.L.C. Disclosure Statement at ¶ 5.13.

**D.      The Plan of Liquidation**

17.      The Debtors admit that "virtually all of the Debtors' assets and operations have been sold".  Disclosure Statement at ¶ 3.1(a), n.5.

18.     The only remaining assets appear to be unrestricted cash of $146,243 and existing claims against Clearwater Investment Holdings, LLC, United Bank, Lexington Coal Company and Mr. Hoops.  According to the Debtors, there also exist inchoate and/or undetermined possible future claims against Mr. Hoops, his wife, their children and their families, and several businesses. *See* Doc. No. 2498 and Disclosure Statement at ¶ 5.19.

19.     The Plan proposes the creation of a Liquidation Trust and a Reclamation Trust, however, the Plan neither provides the names of the trustee of either trust nor discloses the amount of compensation they will receive.  *See* Articles 9 and 10 of the Plan.

20.     During a hearing on October 15, 2020, counsel for the Debtors indicated that David Beckman ("***Mr. Beckman***") should be the Liquidating Trustee.  Mr. Beckman is currently employed as the Debtors' chief executive officer and chief restructuring officer.  *See* Disclosure Statement at ¶ 5.3.  Mr. Beckman receives a fixed salary of $150,000 each month, which equates to a staggering annual salary of $1,800,000 for a cumulative total of $2,550,000 through November 2020. *See* Doc. No. 124.  In addition to that amount, Mr. Beckman's colleagues at FTI Consulting, Inc., who regularly assist Mr. Beckman and the Debtors, charge as much as $1,195 per hour.  *Id.*

21.     Though the Plan specifically excludes Mr. Hoops, members of his family and their businesses from any releases, the Plan provides absolute and unconditional releases of the Debtors' other pre-petition and post-petition officers, directors and owners even though they provide no consideration in return.  *See* Article 12 of the Plan.

**E.      The Debtors' Dire Financial Situation**

22.     The Debtors reported assets having a total book value of more than $357 million[3] on the Petition Date.  *See* Doc. No. 1140.  The Debtors, however, realized a total of less than $44

---

[3]      This amount includes a reported net book value of $112,100,771 of machinery, equipment and vehicles.  *See* Doc. No. 1140.  According to an appraisal prepared by Gaddy Engineering Company dated July 12,

million from the sale of nearly all reported assets through October 31, 2020. *See* Cash Receipts and Disbursement Statements included with Debtors' Monthly Operating Reports. Thus, substantially all of the Debtors' assets were sold for **$313 MILLION LESS** than their reported value, <u>before expenses</u>.

23.    Through October 31, 2020, the Debtors reported total cumulative expenses of more than **$80 MILLION**. *See* Income Statements included with Debtors' Monthly Operating Reports. During that time, the Debtors' reported total cumulative net losses of more than **$39 MILLION**. *Id*.

24.    As of October 31, 2020, the Debtors had only **$146,243** of unrestricted cash remaining, yet there are substantial unresolved administrative and priority claims. *See* Doc. No. 2573. The Department of Labor has filed a substantial administrative claim which has been continued indefinitely. *See* Disclosure Statement at ¶ 5.4 Doc. No. 2500. The Department of Justice is investigating the Debtors alleging relating to the False Claims Act, a fact disclosed in neither the Disclosure Statement nor the Plan. *See* Doc. No. 2201. The Debtors have multiple outstanding permit violations, outstanding reclamation liabilities of untold amounts, unpaid post-petition taxes totaling $3,270,503 [Doc. No. 2498], income tax returns that have yet to be filed and tax liabilities of untold amounts, unpaid healthcare claims totaling $14,983,826.14 [Disclosure Statement at ¶ 5.5(a)], unfunded pension obligations totaling $11,931,278 [*Id.* at ¶ 5.5(b)], other employee benefits that could be asserted as administrative or priority claims, and $13,130,955

---

2018, the fair market value of the Debtors' property and equipment at the Belle Ayr surface mine and Eagle Butte surface mine totaled $165,055,655. *See* Exhibit A. According to an appraisal prepared by Ritchie Brothers dated September 14, 2018, the fair market value of 58 pieces of mining equipment totaled $14,295,000. *See* Exhibit B.

17151516.1

payable to the professionals [Doc. No. 2573], which combined with the $13,202,079 those same

professionals previously received, totals a staggering $26,333,034[4].

**F.      The Debtors' Past-Due Income Tax Returns**

25.      On November 15, 2019, the Internal Revenue Service (the "***IRS***") filed a motion to

compel the Debtors to file numerous past-due payroll, excise, partnership and corporate returns

for 2018 and 2019.  *See* Doc. No. 1430.

26.      On December 13, 2019, the court granted the IRS' motion to compel the Debtors

to file tax returns.  *See* Doc. No. 1523.  In that order, the court ruled that if the Debtors were unable

to prepare and file the required tax returns, the court may, upon further motion of the IRS, appoint

a trustee to prepare and file all required tax returns.  *Id*.

27.      On March 13, 2020, the Debtors' asked the court to authorize the Debtors' chief

executive officer and chief restructuring officer or the Debtors' chief financial officer to sign all

of the Debtors' past-due tax returns as well as any of the Debtors' future tax returns.  *See* Doc. No.

1857.

28.      The Debtors admit that the Federal and various state partnership and corporate

income tax returns for 2018 and 2019 which are the subject of the various motions and orders

described above have yet to be filed.  *See* Doc. No. 2409.

**G.      The Committee's Motion to Convert**

29.      On April 24, 2020, the Official Committee of Unsecured Creditors (the

"***Committee***") filed a motion to convert these cases to chapter 7.  *See* Doc. No. 1938.

30.      At that time, as the Committee acknowledged, "the Debtors' estates are presently

administratively insolvent and it is highly improbably that the Debtors will have sufficient funds

---

[4]      The Debtors' Monthly Operating Reports do not include retainers totaling $475,000 paid to the
Debtors' professionals immediately prior to the Petition Date.  *See* [Doc. Nos. 120-2, 122-2, and 124-2].

17151516.1

available to satisfy, among other provisions, Section 1129(a)(9) of the Bankruptcy Code." *Id*. at ¶ 14.

31.     The Committee further acknowledged that "administrative expenses of the estates far exceed the Debtors' available cash and value of remaining assets" and "the delta between the amount of administrative and priority claims and the amount of available cash and remaining assets is simply too vast to believe that, even with the Debtors' best efforts, they will have sufficient funds available to confirm a chapter 11 plan of liquidation." *Id*. at ¶ 14 and ¶ 22.

32.     According to the Committee, at that time, the Debtors "only had cash available in the amount of $3,990,667" [*Id*. at ¶ 15], "unpaid post-petition payables in the amount of $9,932,118 and unpaid post-petition taxes in the amount of $3,268,514" [*Id*. at ¶ 16], and "accrued and unpaid professional fees and expenses of Debtors' professionals and Committee's professionals alone exceed[ing] $8,000,000". *Id*. at ¶ 19.

33.     By every measure, the Debtors' financial situation has significantly worsened.  As of October 31, 2020, unrestricted cash dwindled to only $146,243, unpaid post-petition payables have grown to $14,911,378, unpaid post-petition taxes now total $3,270,503 and accrued and unpaid professional fees and expenses of Debtors' professionals and Committee's professionals is now $13,130,955, all of which continue to grow at an alarming rate.  *See* Doc. No. 2573.

## **ARGUMENT**

34.     Section 1112(b)(1) provides for ***mandatory*** conversion of a chapter 11 case to chapter 7 upon a showing of cause.  As that provision provides, "on request of a party in interest, and after notice and a hearing, the court ***shall*** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a

trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1) (emphasis added); *see In re Burgess*, Case No. 11-1257, 2013 Bankr. LEXIS 4540, *12 (Bankr. N.D. W. Va. Oct. 30, 2013) (instructing that ***once cause is established, courts are required to either convert to a chapter 7 case or dismiss the case***) (emphasis added); *In re Quail Farm, LLC*, Case No. 09-bk-298, 2010 Bankr. LEXIS 1261, *19 (Bankr. N.D. W. Va. May 5, 2010) (same); *see also In re Ashley Oaks Dev. Corp.*, 458 B.R. 280, 284 (Bankr. D.S.C. 2011).

35.     Section 1112(b)(4) provides a non-exhaustive list of factors that constitute "cause" for purposes of section 1112(b)(1).  11 U.S.C. § 1112(b)(4); *see also In re Emerald Grande, LLC*, Case No. 17-bk-21, 2018 Bankr. LEXIS 1614, at *5–6 (Bankr. N.D. W. Va. June 4, 2018). According to section 1112(b)(4), cause exists where there is:

> (A)     substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; …

> (I)     failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief …

11 U.S.C. § 1112(b)(4).

## A.     CAUSE EXISTS UNDER SECTION 1112(b)(4)(A) BECAUSE THE ADMINISTRATIVE EXPENSES ASSOCIATED WITH THE ESTATE ARE SKY-ROCKETING AND THERE IS NO REASONABLE BASIS TO CONCLUDE THAT THE DEBTORS WILL REHABILITATE.

### (1)     The Debtors' estates are experiencing substantial and continuing loss.

36.     The relevant inquiry under section 1112(b)(4)(A) is whether the estate is suffering substantial or continuing (but not necessarily both) losses.  *In re Paterno*, 66 (citing 11 U.S.C. § 1112(b)(4)(A); *In re Landmark Atlantic Hess Farm, LLC*, 448 B.R. 707, 713 (Bankr. D. Md. 2011); *also citing In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 61 (6th Cir. 2013); *In re Miller*, 496 B.R. 469, 479 (Bankr. E.D. Tenn. 2013)).  Typically, courts review the debtor's

financial records filed with the court to determine whether the debtor is suffering these kinds of losses, and either an absence of reliable income or an inability to pay current expenses as they come due satisfy the standard. *Id.* at 66–67 (citing *In re Park*, 436 B.R. 811, 816 (Bankr. W.D. Va. 2010); *In re Vallambrosa Holdings, LLC*, 419 B.R. 81, 88 (Bankr. S.D. Ga. 2009); *In re Miell*, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009); *Nester v. Gateway Access Sols., Inc. (In re Gateway Access Sols., Inc.)*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007)). The Debtors are no longer operating and are not generating any income or have only minimal assets left to sell. The Debtors have only minimal cash available, untold amounts of administrative and priority claims, and absolutely no reasonable ability whatsoever to pay any expenses as they come due.

37.     The Northern District of West Virginia has held that negative cash flow alone is sufficient to establish cause under section 1112(b)(4)(A), stating:

> To show that the Debtor has incurred substantial or continuing loss or diminution to the estate, the "[m]ovant must show that the Debtor continues to incur losses or maintains a negative cash flow position after the filing of the bankruptcy petition." *In re Roan Valley, LLC*, Case No. 09-13220, 2009 Bankr. LEXIS 4246, at *6 (Bankr. N.D. Ga. November 25, 2009). The absence of a reliable source of income together with the inability to pay current expenses is sufficient to show continuing loss. *E.g.*, *Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Memorial Corp.)*, 386 B.R. 548, 551 (Bankr. D. Del. 2008). Although negative cash flow is sufficient to establish the first element of cause under § 1112(b)(4)(A), even if a debtor has positive cash flow, continuing loss can be shown by an 'actual depreciation in the value of property of the estate.' *In re Tolco Properties, Inc.*, 6 B.R. 482, 486 (Bankr. E.D. Va. 1980) (quoting COLLIER ON BANKRUPTCY)).

*In re Quail Farm, LLC*, 2010 Bankr. LEXIS 1261, at *7; *see In re Emerald Grande, LLC*, Case No. 17-bk-21, 2018 Bankr. LEXIS 1614, at *5–6 (Bankr. N.D. W. Va. June 4, 2018) (quoting *In re Burgess*, 2013 Bankr. LEXIS 4540, at *2 (citing 7 COLLIER ON BANKRUPTCY ¶ 1112.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)).

9

38.     "In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow – including that resulting only from administrative expenses – effectively comes straight from the pockets of the creditors.  This is enough to satisfy the first element of § 1112(b)(1). … *[I]t is difficult to imagine a liquidating debtor who will not meet the criteria for cause described in § 1112(b)(1)*." *Loop Corp. v. United States Tr.*, 379 F.3d 511, 516 (8th Cir. 2004) (emphasis added); *see In re RainTree Healthcare of Forsyth LLC*, Case No. 17-51237, 2018 Bankr. LEXIS 334, *21–22 (Bankr. M.D.N.C. Feb. 7, 2018) (quoting *Loop Corp.*).

39.     The plan filed by the Debtors in this proceeding is one of liquidation, not reorganization.  There can be no doubt that the Debtors are experiencing significant negative cash flow.  The Debtors suffered a staggering cumulative total net loss of more than $39 million through October 31, 2020.  *See e.g.* Debtors' Monthly Operating Reports.  As of October 31, 2020, the Debtors had only $146,243 of unrestricted cash remaining yet have unpaid post-petition taxes totaling $3,270,503 [Doc. No. 2573], unpaid healthcare claims totaling $14,983,826.14 [Disclosure Statement at ¶ 5.5(a)], unfunded pension obligations totaling $11,931,278 [Disclosure Statement at ¶ 5.5(b)], $13,130,955 payable to the professionals [Doc. No. 2573], and untold amounts of other administrative and priority claims.  [Doc. No. 2573].  Thus, the only parties who have benefitted from the bankruptcy are the professionals, who have either received or are owed a combined total of more than $26 million.  This amount will continue to grow, at creditors' expense, if these cases are not converted to chapter 7 expeditiously.

40.     The costs of administering and winding-up an estate always factor into a section 1112(b)(4)(A) analysis.  *See*, *e.g.*, *In re Emerald Grande, LLC*, 2018 Bankr. LEXIS 1614, at *6–7 (*citing In re BH S & B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010)) ("Notably, a

debtor's administrative insolvency can demonstrate cause under § 1112(b)(4)(A) or serve as independent cause for conversion, although not explicitly listed in the statute."); *In re RainTree Healthcare of Forsyth LLC,* 2018 Bankr. LEXIS 334, at *23 ("[T]he continued costs of administering the estate, including counsel fees and quarterly fees, constitutes a sufficient continuing loss to the estate to support a finding of cause under section 1112(b)(4)(A)."); *In re Creech*, 538 B.R. 245, 249 (Bankr. E.D.N.C. 2015) (*citing In re Landmark Atl. Hess Farm, LLC*, 448 B.R. 707, 714 (Bankr. D. Md. 2011)) ("Substantial and continuing loss has been found where a debtor did not engage in any business activity and had no income or funds to make payments, while at the same time continued to accrue post-petition debt and administrative costs."). There can be no denying that the Debtors have significant unpaid administrative costs which only continue to increase and no income or funds with which to pay those costs.

41.    The estate professionals involved in these cases may be providing legitimate services, but they are nevertheless running up significant debts to the estate, at the expense of the unsecured creditors, which is all that matters for purpose of evaluating whether the first element of section 1112(b)(4)(A) is satisfied. "[P]rofessional services come at a cost … [a]nd the hard fact is that these costs are rapidly mounting expenses for the estate that help put the estate in the position of continuing substantial losses." *In re Brutsche*, 476 B.R. 298, 305 (Bankr. D. N.M. 2012). *See also In re Angel Fire Water Co., LLC*, No. 13-bk-10868, 2015 WL 251570, at *4 (Bankr. D. N.M. 2015) ("The Debtor has no income, cash, or business operations, but continues to incur monthly expenses such as U.S. Trustee fees, attorneys fees … The Court concludes that there is a continuing diminution of Debtor's estate"). The current estate professionals are not providing any services that a chapter 7 trustee in West Virginia would be unwilling and unable to provide at a significantly reduced cost to the estate and ultimately the unsecured creditors.

17151516.1

**(2)      The Debtors have no reasonable likelihood of rehabilitation.**

42.      The second part of section 1112(b)(4)(A) is also easily satisfied because the

Debtors are being liquidated and their rehabilitation is neither envisioned nor possible.   The

concept of rehabilitation has been explained as follows:

> Section 1112(b)(4)(A) requires that a Debtor who has incurred
> substantial or continuing losses to have a reasonable likelihood of
> rehabilitation.
>
> 'Rehabilitation' is a different and, unfortunately for Debtor, much
> more demanding standard than 'reorganization.' "Significantly, the
> second part of the test under section 1112(b)(4)(A) requires a
> reasonable likelihood of 'rehabilitation,' not 'reorganization.' Thus,
> the standard under section 1112(b)(4)(A) is not the technical one of
> whether the debtor can confirm a plan, but, rather, whether the
> debtor's business prospects justify continuance of the reorganization
> effort. Rehabilitation is not another word for reorganization.
> Rehabilitation means to reestablish a business. Whereas
> confirmation of a plan could include a liquidation plan,
> rehabilitation does not include liquidation."

*In re Brutsche*, 476 B.R. at 301-02 (citing 7 Collier on Bankruptcy ¶ 1112.04[6][a][ii]); *see also*

*Moody v. Sec. Pac. Bus. Credit, Inc.*, 85 B.R. 319, 344 (W.D. Pa. 1988) ("Rehabilitation [. . .] may

not include liquidation.  As the term is used in section 1112(b)(1), it means to put back in good

condition: re-establish on a firm, sound basis") (internal citation and quotation omitted).

43.      The sale of substantially all of the Debtors' assets was completed more than one

year ago.  The Debtors are liquidating, not reorganizing.   There is no plan or basis for the Debtors

being re-established as a going business.   The Debtors have absolutely no prospect of

rehabilitation.

**(3)      Cause exists even more so now that it did when the Committee moved the
Court to convert these cases to chapter 7.**

44.      Since the Committee filed its motion to convert these cases to chapter 7 on April

24, 2020, the Debtors' financial situation has become bleaker – significantly more post-petition

expenses and taxes owed, significantly greater professional fees and expenses payable, and significantly less cash available.

45.     If the Committee agreed that the Debtors' estates were administratively insolvent then, they must agree the Debtors' estates are even more so now.

46.     As the Committee was keenly aware, "continuing in chapter 11 will only increase the administrative expense burden on the already administratively insolvent estates and further distance general unsecured creditors from any likelihood of recovery". Doc. No. 1938 at ¶ 22.

47.     As the Committee suggested in its motion to convert, it is now time to "stop the bleeding". *Id*. at ¶ 34.

## B.    CAUSE EXISTS UNDER SECTION 1112(b)(4)(I) AND 521(j)(2) AS A RESULT OF THE DEBTORS' CONTINUED REFUSAL TO FILE TAX RETURNS.

48.     On November 15, 2019, the Internal Revenue Service (the "IRS") filed a motion to compel the Debtors to file numerous past-due payroll, excise, partnership, and corporate returns for 2018 and 2019. *See* Doc. No. 1430.

49.     On December 13, 2019, the court granted the IRS' motion to compel the Debtors to file tax returns. *See* Doc. No. 1523. The court ruled that if the Debtors were unable to prepare and file the required tax returns, the court may, upon further motion of the IRS, appoint a trustee to prepare and file all required tax returns. *Id*.

50.     On March 13, 2020, the Debtors asked the court to authorize the Debtors' chief executive officer and chief restricting officer or the Debtors' chief financial officer to sign all of the Debtors' past-due tax returns as well as any of the Debtors' future tax returns. *See* Doc. No. 1857.

51.     In their March 13, 2020 motion, the Debtors stated the following:

13

15. The Debtors are cognizant of their obligations to file the Tax Returns and are doing everything in their power to comply with the Agreed Order and section 521 of the Bankruptcy Code. However, unless the Court authorizes the Officers to execute the Partnership Returns, Corporate Return, and State Tax Return, ***the Debtors will be unable to do so and will be susceptible to a motion for conversion or dismissal of these cases under section 521(j)(1) of the Bankruptcy Code***….

*Id.* (emphasis added).

52.     Section 521(j) provides:

(1)     Notwithstanding any other provision of this title, if the debtor fails to file a tax return that becomes due after the commencement of the case or to properly obtain an extension of the due date for filing such return, the taxing authority may request that the court enter an order converting or dismissing the case.

(2)     If the debtor does not file the required return or obtain the extension referred to in paragraph (1) within 90 days after a request is filed by the taxing authority under that paragraph, ***the court shall convert or dismiss the case, whichever is in the best interests of creditors and the estate***.

11 U.S.C. 521(j) (emphasis added).

53.     It has been nearly a year since the IRS requested the Debtors to file all of the past-due tax returns.

54.     "[T]he failure to file a tax return or pay taxes post-petition is ground for dismissal." *In re Costa Bonita Beach Resort*, 513 B.R. 184, 196 (Bankr. D.P.R. 2014) (citing *In re Dr. R. C. Samanta Roy Inst. Of Sci Tech. Inc.*, 465 Fed. App'x 93, 98 (3d Cir. 2011)). The failure to file a tax return constitutes cause for dismissal under 11 U.S.C. 1112(b)(4)(I). See *In re Draiman*, 450 B.R. 777, 800 (Bankr. N.D. Ill. 2011). See also *In re Westhampton Coachworks, Ltd.*, 2010 WL 5348422 *5 (Bankr. E.D.N.Y. Dec. 21, 2010) (the failure to pay post-petition taxes is cause to dismiss or convert); *In re Blvd. Entm't Greenville, LLC* *6–7 (quoting *In re Congaree Triton Acquisitions, LLC*, 492 B.R. 843, 850 (Bankr. D.S.C. 2012) (quoting *Jackson v. U.S. (In re*

*Jackson)*, No. 96-1357, 1997 U.S. App. LEXIS 21635, at *3 (4th Cir. Aug. 15, 1997)) (holding

that the failure to pay any taxes owed after the date of the bankruptcy order is sufficient to warrant

dismissal or conversion);  *In re Whitney Lake, LLC*, C/A No. 08-05729-JW, 2009 Bankr. LEXIS

4273, *8 (Bankr. D.S.C. May 5, 2009) (holding that failure to pay taxes when due is sufficient to

establish cause under section 1112(b)(4)(I)).

55.    The Debtors admit that they had the ability to timely file several tax returns.  *See*

Doc. No. 2409.  The Debtors have also repeatedly acknowledged that that they have failed to do

so and continue to refuse to do so.  *Id.*

## C.    CAUSE EXISTS DUE TO THE ADMINISTRATIVE INSOLVENCY OF THE DEBTORS.

56.    Because the list of examples of cause set forth in Section 1112(b)(4) are illustrative

and not exhaustive, courts have also found that the administrative insolvency of a debtor's estate

constitutes separate and independent cause to convert a chapter 11 case to a chapter 7.  *See In re*

*Emerald Grande*, 2018 WL 2703071, at *3 ("[A] debtor's administrative insolvency can

demonstrate cause under [section] 1112(b)(4)(A) or serve as independent cause for conversion,

although not explicitly listed in the statute."); *In re BH S & B Holdings, LLC*, 439 B.R. 342, 349

(Bankr. S.D.N.Y. 2010) ("The Court further concludes that the Debtors' administrative insolvency

constitutes cause to convert these cases."); *In re Bartmann*, 310 B.R. 663 (B.A.P. 10th Cir. 2004)

(affirming bankruptcy court's conversion order based, in part, on administrative insolvency of the

debtor); *In re Desmond*, 331 B.R. 42, 44 (Bankr. D.N.H. 2005) (same).

57.    The Debtors have sold substantially all of their assets and there is no plan or basis

for the Debtors' reestablishment as a going business.  The Debtors have absolutely no prospect of

rehabilitation.  Because the Debtors have only $146,243 of unrestricted cash available as of

17151516.1

October 31, 2020, and few remaining assets, but owe millions in administrative and priority claims,

the Debtors are undoubtedly administratively insolvent.

**D.     CONVERSION IS IN THE BEST INTEREST OF THE ESTATES.**

58.     Once cause is established, the court must determine whether conversion or

dismissal is in the best interests of creditors.  *In re Superior Siding & Window, Inc.*, 14 F.3d 240,

242 (4th Cir. 1994).   In evaluating whether conversion or dismissal is in the best interests of

creditors, the bankruptcy court must consider the interests of all creditors.  *In re Superior Siding*,

14 F.3d at 243. Courts have found conversion best served the interests of all creditors when

conversion was expected to reduce administrative expenses and the chapter 7 trustee would be in

a better position to exercise independent judgment concerning the debtor's claims.  *In re Nelco*

*Ltd.*, 210 B.R. 707, 709–10 (Bankr. E.D. Va. 1997).   Courts have also converted cases when

maintaining the case in chapter 11 would only result in further diminution of the estate.  *In re*

*Bartmann*, 310 B.R. at 663 (B.A.P. 10th Cir. 2004).

59.     It is axiomatic that a debtor may not enjoy the protection of chapter 11 indefinitely.

"[I]t is not the purpose of Chapter 11 to allow a debtor a permanent cloak of protection while the

estate's assets continue to diminish and the operational coherence unravels."  *In re Galvin*, 49 B.R.

665, 669 (Bankr. D.N.D. 1985).  "The function of Chapter 11 is rehabilitation – not disintegration."

*Id*. 50.

60.     Continuing these cases in chapter 11 will only increase the administrative expense

burden on the already administratively insolvent estates.  Conversion will ***dramatically*** reduce the

overall professional costs by terminating the Committee and its professionals, terminating the

Debtors' professionals, and eliminating the Debtors' U.S. Trustee fee obligations.  Conversion

would permit an objective chapter 7 trustee to analyze the viability of any claims that could be

17151516.1

asserted against any third parties, such as the Debtors' other pre-petition and post-petition officers, directors and owners, which the Debtors propose to fully release, and to pursue those claims if the trustee determines them viable, free of any restrictions that may be imposed by the broad release and exculpation provisions in the Plan.

## E.   WHETHER THE DEBTORS CAN CONFIRM THE PLAN IS IRRELEVANT.

61.   Whether or when the Debtors can confirm a plan is irrelevant to the issue of whether these cases should be converted.

62.   Section 1112(b)(2) provides:

> The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that –
>
> (A)   there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> (B)   the grounds for converting or dismissing the case include an act or omission of the debtor *other than under paragraph (4)(A)* –
>
> > (i)   for which there exists a reasonable justification for the act or omission; and
> >
> > (ii)   that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2) (emphasis added).

63.   Although section 1112(b)(2) affords courts discretion to deny a motion to convert if "unusual circumstances" exist and "there is a reasonable likelihood that a plan will be confirmed

17151516.1

… within a reasonable period of time", no such discretion is available where, as here, the motion

seeks conversion for cause under section 1112(b)(4)(A). 11 U.S.C. § 1112(b)(2)(B). Thus, where

cause is shown under section 1112(b)(4)(A), section 1112(b)(2) does not apply and the case must

be converted or dismissed, regardless of the circumstances. *In re Burgess*, 2013 Bankr. LEXIS

4540, at *10–11 (*quoting In re Quail Farm, LLC*, 2010 Bankr. LEXIS 1261, at *2; *citing In re

Ashley Oaks Development Corp.*, 458 B.R. at 284–85; *In re Ramreddy, Inc.*, 440 B.R. 103, 112–

13 (Bankr. E.D. Pa. 2009) (citation omitted); *Brutsche*, 476 B.R. at 306 (citing *ARS*, 433 B.R. at

865, n.25) ("The statute is explicit that the Court may not rely on unusual circumstances to refuse

to convert or dismiss if it finds cause under § 1112(b)(4)(A)"); *In re RainTree Healthcare of

Forsyth LLC*, No. 17-bk-51237, 2018 WL 770367, at *8 n.17 (Bankr. M.D. N.C. Feb. 7, 2018)

("the statute makes clear that the exception under section 1112(b)(2) does not apply where cause

is established under section 1112(b)(4)(A), as it has been here").

## RESERVATION OF RIGHTS

64.     The Moving Parties' investigation is on-going.  The Moving Parties reserve their

right to amend, modify or supplement this Motion in response to, or as a result of, any discovery

being conducted in connection with these bankruptcy cases.  Nothing contained herein is intended

to be a waiver by the Moving Parties of any right, objection, argument, claim or defense with

respect to any matter, all of which are hereby expressly reserved.  The Moving Parties reserve all

of their rights to raise the issues contained in this Motion and any other related issues in any

contested matter and/or adversary proceeding.

## CONCLUSION

**WHEREFORE**, for all of the reasons set forth herein and which may later be developed

upon the record, Black Diamond Insurance Group, LLC, Clearwater Investment Holdings, LLC,

17151516.1

Forrest Machine, LLC, Mr. Hoops, Lexington Coal Royalty Company, LLC, Triple H Aviation, LLC, Triple H Real Estate, LLC and Walls & Associates, PLLC respectfully request the Court grant their motion to convert these chapter 11 cases to chapter 7 and for such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**BLACK DIAMOND INSURANCE GROUP, LLC, CLEARWATER INVESTMENT HOLDINGS, LLC, FORREST MACHINE, LLC, JEFFERY A. HOOPS, LEXINGTON COAL ROYALTY COMPANY, LLC, REPUBLIC SUPERIOR PRODUCTS, LLC, TRIPLE H AVIATION, LLC, TRIPLE H REAL ESTATE, LLC AND WALLS & ASSOCIATES, PLLC**

By Counsel:

*/s/ J. H. Mahaney*
J.H. Mahaney, Esquire (WVSB #6993)
Janet Smith Holbrook, Esquire (WVSB #5853)
DINSMORE & SHOHL LLP
Post Office Box 2185
Huntington, WV 25722-2185
Telephone: (304) 529-6181
Facsimile: (304) 522-4312
john.mahaney@dinsmore.com
janet.holbrook@dinsmore.com

***Counsel for Black Diamond Insurance Group, LLC, Clearwater Investment Holdings, LLC, Forrest Machine, LLC, Jeffery A. Hoops, Lexington Coal Royalty Company, LLC, Triple H Aviation, LLC, Triple H Real Estate, LLC and Walls & Associates, PLLC***

19

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

In re:

BLACKJEWEL, L.L.C., *et al.*,

Debtors[1].

Chapter 11
Case No. 19-30289
(Jointly Administered)

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing "**NOTICE OF JOINT MOTION OF BLACK DIAMOND INSURANCE GROUP, LLC, CLEARWATER INVESTMENT HOLDINGS, LLC, FORREST MACHINE, LLC, JEFFERY A. HOOPS, LEXINGTON COAL ROYALTY COMPANY, LLC, REPUBLIC SUPERIOR PRODUCTS, LLC, TRIPLE H AVIATION, LLC, TRIPLE H REAL ESTATE, LLC AND WALLS & ASSOCIATES, PLLC TO CONVERT TO CHAPTER 7**" and "**JOINT MOTION OF BLACK DIAMOND INSURANCE GROUP, LLC, CLEARWATER INVESTMENT HOLDINGS, LLC, FORREST MACHINE, LLC, JEFFERY A. HOOPS, LEXINGTON COAL ROYALTY COMPANY, LLC, REPUBLIC SUPERIOR PRODUCTS, LLC, TRIPLE H AVIATION, LLC, TRIPLE H REAL ESTATE, LLC AND WALLS & ASSOCIATES, PLLC TO CONVERT TO CHAPTER 7**" were filed and served via the Court's CM/ECF system on November 25, 2020.

*/s/ J. H. Mahaney*
J. H. Mahaney, Esquire (WV Bar No. 6993)

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's Taxpayer identification number are as follows:  Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213).  The headquarters for each of the Debtors is located at P.O. Box 1010, Scott Depot, West Virginia 25560.

17151516.1

303 Washington Street, West
Charleston, WV 25302
w// 304-342-0300
f// 304-342-4300
gaddyengineering.com

**gaddy engineering company**

natural resource and mining consultants

July 12, 2018

# Fair Market Value (FMV)
### Of Operating Assets Owned by
## Blackjewel, LLC
### At
## Belle Ayr Surface Mine and Eagle Butte Surface Mine
### Located in Campbell County, Wyoming
## On December 9, 2017

Gaddy Engineering Company (Gaddy) was engaged by Blackjewel, LLC (Blackjewel) on June 8, 2018 to determine the Fair Market Value (FMV) of all non-financial assets owned by Blackjewel at the Belle Ayr Surface Mine (Belle Ayr) and the Eagle Butte Surface Mine (Eagle Butte) in Campbell County, Wyoming on December 9, 2017.

The work by Gaddy included visual inspection of the mining properties and operations of the mines. Gaddy visited the mining operations and met with management of the mines on June 11, 12, and 13 of this year.

The manager of each department was interviewed with respect to his or her business unit. The interview included a review of the skills and experience of each manager and the methods employed in the management of operating assets. Special attention was focused on the company's asset maintenance programs.

The mine visits included visual inspection of all equipment owned by Blackjewel. Gaddy personnel took photos of all the equipment during the visit to each mine. The work included an equipment parts inventory valuation. Life of Mine production projections were provided by Blackjewel for both operations. The projections included a financial pro-forma with revenues and cost by year. Third-party asset retirement obligation reports by CDG Engineers, of Sheridan, Wyoming, were reviewed in detail. Gaddy personnel evaluated the reclamation retirement plans in conjunction with the operation plans. Detailed geologic information defining the recoverable coal reserves of the mines was provided by Blackjewel. This work

1 | P a g e

included a review of the quantity and quality of the coal reserves. It also included an assessment of overburden ratios - the amount of rock (bank cubic yards) required to recover one ton of coal. Gaddy used all of the information obtained to construct a discounted cash flow analysis. The discounted cash flow work was used to investigate the present value of the two mines.

Special attention was given to the coal inventories of the operations and the methods used by the surveyors to estimate the coal inventory.

This Report is transmitted in three books – Book A, Book B and Book C. Book A is the text of the Report and the Exhibits that are referenced in this Report. Book B provides the important source documents used in this Report and Book C contains other information used in preparation of this Report.

The Chief Operating Officer, Vice President of Engineering, and the Controller of the mines provided Gaddy with all information requested and were exceedingly helpful in the engagement. The information provided by Blackjewel was judged by Gaddy to be of very high quality. The principle work of the engagement was performed by John C. Bullock, PE & CPG, John R. Kortas, PE, Dusta Tanner, Vice President of Gaddy, and Drew Maxwell, Engineering Assistant, under the direct supervision of Philip L. Longenecker, PE.

The work by Gaddy determined that the FMV of the operating assets consisting of plant and equipment, coal, warehouse and supply inventories, as indicated in the table below, is approximately $199 million. This Report determined values of approximately $106 million for Belle Ayr and approximately $93 million for Eagle Butte.

| Category | Belle Ayr Mine | Eagle Butte Mine | Total |
|---|---|---|---|
| Plant & Equipment | $91,656,014 | $73,399,641 | $165,055,655 |
| Coal Inventory | $8,501,000 | $12,875,000 | $21,376,000 |
| Warehouse/Supply Inventory | $5,874,269 | $6,579,802 | $12,454,071 |
| Totals | $106,031,283 | $92,854,443 | $198,885,726 |

## Belle Ayr Surface Mine

The Belle Ayr Surface Mine was the original large scale surface mining operation in the Powder River Basin (PRB) and has a permitted capacity of 35 million tons per year. With the acquisition in late 2017 by Blackjewel, a forward plan for recovery of the mine's 231 million tons of reserves has been developed and has been reviewed and evaluated by Gaddy in this Report (See Exhibit A: Belle Ayr – Life of Mine Plan).

Blackjewel is proposing to increase sales to 18 million tons per year and reduce operating costs in its plan to remain competitive in the PRB. The plan is summarized in Exhibit A: Belle Ayr - Mine Life of Mine Plan.

EXHIBIT A PAGE 2

DEBTORSCL_000281

Exhibit A was then used to prepare a discounted cash flow evaluation of the Belle Ayr Mine operations (See Exhibit B: Belle Ayr Mine - Discounted Cash Flow Analysis). Exhibit B indicates the NPV of the Belle Ayr Mine at a discount rate of 16% is approximately $63 million.

Javelin Global Commodities' (Javelin) analysis of PRB pricing for the Belle Ayr Mine indicates $10.93 to $12.36 per ton in 2033 for this mine's 8,600 Btu product (See Exhibit C: PRB Price Curve). Further, these price projections are supported by the Belle Ayr Mine's location in the PRB that enables direct rail access to both BNSF Railroad & UP Railroad customer destinations, a very significant advantage to all mines in the southern PRB. Discussion of these price projections with Management and with members of Javelin Global Commodities (Javelin) confirms Gaddy's confidence that the sales volume and price projections are reasonable and attainable.

Mining costs developed for the Life of Mine Plan are derived from operating experience and are driven primarily by the stripping ratio required for mining the remaining reserves. As indicated on Exhibit A, the Belle Ayr Mine's projected ratio increases from current 3.8:1 to a high of 5.6:1 in 2026 and averages 4.5:1 overall the remaining life of the mine.

Blackjewel's general strategy is to operate lean and low cost operations and to opportunistically take advantage of sales volume opportunities and incremental sales volumes at these operations. These additional sales opportunities can produce powerful cash contributions on the order of $3.00 - $4.00 per net ton.

From Exhibit A, it is also noted that overburden removal is 70-80% of the direct mining cost, with the remainder being coal handling costs. The projected cost for overburden removal for the plan period is $1.00/cubic yard (cyd), approximately 3 - 5% below historic run rates, but a very reasonable forward projection considering Blackjewel's proven operating management track record in cost reduction programs and the Belle Ayr Mine's competitive position in the PRB.

Capital expenditures during the plan period are generally maintenance level expenditures except for the 2020-2021 period when significantly increased capital is projected for a major shovel rebuild. Gaddy's opinion is that the proposal level of CAPX in the Belle Ayr Life of Mine Plan is reasonable and appropriate for maintenance of its fleet of equipment to current standards of availability for the remaining life of the operations.

Gaddy developed a discount and capitalization rate that reflects the return on investment that a hypothetical investor would require. The expectation of the rate of return is driven by the risk of the potential investment. The build-up approach was utilized, which is commonly used for assets of this type. This approach is based on the premise that a buyer's discount rate (and consequently, its related capitalization rate) is composed of identifiable risk factors which result in a total return that a prudent investor would demand from the purchase of these assets. The first step in selecting an appropriate discount rate is to begin with the risk-free rate. The risk-free rate represents the return on an investment with virtual by no default risk, in this report 2.6 % (the yield on 20 year treasury bonds) was chosen to

EXHIBIT A PAGE 3
DEBTORSCL_000282

represent the risk-free rate. Added to the risk-free rate is the equity risk premium, which represents the additional return a hypothetical investor would require for the additional risk of investing in publicly traded equity securities as opposed to risk-free investments. In this instance, Gaddy used a 5.7 % equity risk premium to adjust the discount rate to reflect the required rate of return on large company stocks over and above the risk-free rate.

The sectors within which the assets are developed contribute to the risk and required rate of return on investments. For assets in the coal mining industry, an industry risk premium of 1.7 % was utilized. In addition, to the overall market risk, there are risks that the plans that have been projected will actually occur. That risk is called projection plan risk, and is labeled in the table below:

| Discount Rate Determination | |
| --- | --- |
| Adjustment Factors | Amount |
| Coal Industry Beta | 1.3 |
| Coal Industry Risk Premium | 1.7% |
| Rate Components | |
| Risk Free Rate | 2.6% |
| Equity Risk Premium | 5.7% |
| Coal Industry Risk Premium | 1.7% |
| Projection Plan Risk | 6.0% |
| Total | 16.0% |

In this Report, these rates were used for both of Blackjewel's PRB mines.

## Plant & Equipment Assets

A FMV was assigned to each asset of Belle Ayr. The values were based on a comprehensive assessment by 1) Wyoming Machinery Company (WMC), a Caterpillar dealership in Gillette, Wyoming, 2) equipment sales research and 3) the experience of Gaddy professionals. The WMC valuation was conducted in May 2016. Gaddy considers the WMC Report to be a high quality third-party appraisal with very reliable information. The market research included review of equipment trade journals, internet equipment sales sites, and phone conversations with mining equipment specialists. Gaddy professionals have more than 100 years of combined experience in valuing surface mine equipment, preparation plant equipment, mine structures, and conveyance structures (beltlines).

The Belle Ayr Mine has 317 items of plant and equipment. These items were valued as indicated on Exhibit D: Belle Ayr – Plant & Equipment List and are summarized on Exhibit E: Belle Ayr Mine – Operating Assets – FMV Summary). The FMV of these items is approximately $92 million.

EXHIBIT A PAGE 4
DEBTORSCL_000283

Buildings, silos and other fixed facilities were valued by consideration of the importance of the contribution of facility, contribution to the production process, consideration of potential loss of function implications, replacement costs and other factors.   By way of example, coal loading facilities were valued at approximately 50% or more of the replacement cost whereas administrative buildings were valued much lower.

## Eagle Butte Surface Mine

The Eagle Butte Surface Mine is an operational twin to the Belle Ayr Surface Mine.  The mine opened in 1980 and has a permitted capacity of 35 million tons per year.  Blackjewel is proposing to increase sales to 18 million tons per year and reduce operating costs in its plan to remain competitive in the PRB despite the overburden ratio increasing from less than three to over four over the life of the plan.   The plan is summarized in Exhibit F: Eagle Butte Mine - Life of Mine Plan.

Exhibit F was then used to prepare a discounted cash flow evaluation of the Eagle Butte Mine operations (See Exhibit G: Eagle Butte Mine - Discounted Cash Flow Analysis).  Exhibit G indicates the NPV of the Eagle Butte Mine at a discount rate of 16% is approximately $25 million.

Mining costs developed for the Life of Mine Plan are derived from operating experience and are driven primarily by the stripping ratio required for mining the remaining reserves.  As indicated on Exhibit F, the Eagle Butte Mine's projected ratio increases from current 2.8:1 to 4.3:1 over the life of the plan.

However, due to the Eagle Butte Mine having lower quality (8,400 Btu) coal reserves, Javelin's price analysis for the Eagle Butte Mine (See Exhibit C: PRB Price Curve) indicates that the projected sales prices for Eagle Butte at $9.58 to $10.95 over the life of the plan.  Lower quality coal reserves coupled with access to only the BNSF Railroad offer a very challenging future for the Eagle Butte Mine.

Consideration of these factors, very limited, even negative, selling price growth and steadily increasing mining costs driven by overburden ratio increases for the first ten years of the Eagle Butte's Life of Mine Plan, led Gaddy to consider what plan options might result in improved cash flows in the early portion of the plan.  Consequently, Gaddy projected idling of the Eagle Butte operation in 2025-2026 to defer mining of higher ratio reserves until forecast prices come more in line with production costs.  Of course, if sales volumes at acceptable prices can be obtained, this "contingency plan" could be forgone and the Eagle Butte operations would have a seven year period (2018-2024) to establish a record of increasingly lower overburden handling and other (overhead & sales, general and administrative) costs and establish a successful record of obtaining incremental sales volumes, the keys to sustaining this operation.

Gaddy believes the Life of Mine Plan with these contingencies is reasonable and attainable.  As with Belle Ayr Mine, the similar cost structure of the Eagle Butte Mine results in Gaddy's conclusion that there will be little or no inflationary pressure on direct mining costs and, therefore, these costs were not inflated.

Also, in conformance with the Belle Ayr Life of Mine Plan, projected capital expenditures for the Eagle Butte Mine are maintenance level expenditures for the plan operations period. It is Gaddy's opinion that the proposed level of CAPX for the Eagle Butte Life of Mine Plan is reasonable and appropriate for maintenance for its fleet of equipment to current standards of availability for the remaining life of the operations.

Blackjewel's general strategy at Eagle Butte is to operate lean and low cost operations and to opportunistically take advantage of sales volume opportunities and incremental sales volumes at these operations. These additional sales opportunities can produce powerful cash contributions on the order of $3.00 - $4.00 per net ton.

From Exhibit A, it is also noted that overburden removal is 70-80% of direct mining cost, with the remainder being coal handling costs. The projected cost for overburden removal for the plan period is $1.00/cubic yard (cyd), approximately 3-5% below historic run rates, but a very reasonable forward projection considering Blackjewel's proven operating management track record and the Belle Ayr Mine's competitive position in the PRB.

Capital expenditures during the plan period are generally maintenance level expenditures except for the 2020-2021 period when significantly increased capital is in projected for a major shovel rebuild. Gaddy's opinion that the proposal level of CAPX in the Eagle Butte Life of Mine Plan is reasonable and appropriate for maintenance of its fleet of equipment to current standards of availability for the remaining life of the operations.

## Plant & Equipment Assets

A FMV was assigned to each asset or group of assets at Eagle Butte. The values were based on 1) a comprehensive assessment by WMC, a Caterpillar dealership in Gillette, Wyoming, 2) equipment sales research and 3) the experience of Gaddy professionals. The equipment valuations by Caterpillar were performed at the mine in May 2016. Gaddy considers it a high quality third-party appraisal with very reliable information. The market research included a review of equipment trade journals, internet equipment sales sites, and phone conversations with equipment salesmen. Gaddy professionals have more than 100 years of combined experience in valuing surface mine equipment, preparation plant equipment, mine structures, and conveyance structures (beltlines).

The Eagle Butte Mine has 331 items of plant and equipment (See Exhibit H: Eagle Butte Mine – Plant & Equipment List). The FMV of all these items is approximately $73 million (See Exhibit I: Eagle Butte Mine – Operating Assets – FMV Summary).

Buildings, silos and other fixed facilities were valued by consideration of the importance of the contribution of the facility to the production process, consideration of potential loss of function implications, replacement

EXHIBIT A PAGE 6
DEBTORSCL_000285

costs and other factors.  By way of example, coal loading facilities were valued at approximately 50% or more of the replacement cost whereas administrative buildings were valued much lower.

In Gaddy's opinion, the planned capital expenditure program in conjunction with the Eagle Butte Mine's outstanding repair and maintenance program will enable maintenance of the FMV of plant and equipment over the life of the plan.

## Coal Reserves

In late 2017, Blackjewel acquired Contura's interest in 587 million tons of PRB reserves at two mines.  The Belle Ayr Mine is estimated to control approximately 281 million recoverable tons of coal with overburden to coal ratio of approximately 4.5 to 1 (See Exhibit J: PRB Coal Reserves).  The coal reserves lie in the Wyodak Seam of the Fort Union Formation.  The seam averages approximately 70 feet (thickness) of clean coal without partings.  The seams dip to the northwest and overburden ratios gradually increase in that direction.

Of the total coal reserve at Belle Ayr, approximately 121 million tons are proven and approximately 159 million tons are defined as probable.  Proven tons are generally coal reserves lying in commercially recoverable quantities as determined by geological, geophysical and engineering data.  Proven reserves can be demonstrated with a reasonable high degree of certainty.  They are generally defined at Belle Ayr as coal lying within 500 feet of a data point.  Probable tons are described as coal reserves in commercial quantities that are identified with lower confidence than proven reserves.  They are generally recognized as coal reserves lying between 500 feet and 1,000 feet of a data point.  The Belle Ayr coal reserve is defined by approximately 750 data points.  The majority of data points are core holes from which coal samples were obtained.

The Belle Ayr coal reserve has an average sulfur content of 0.28%.  The coal reserve averages approximately 8,598 Btu per pound and has average volatile matter of approximately 32%.  Average moisture is approximately 29%.  Average ash is approximately 4.2%.  The average density of this coal is approximately 80 pounds per cubic foot. Blackjewel owns approximately 14.9 million tons of Wyodak Seam coal at their Belle Ayr Mine; all other tons are leased from the federal and state governments.

The Eagle Butte Mine is estimated to control approximately 306 million recoverable tons of coal with an overburden ratio of approximately 3.8 to 1. (See Exhibit J: PRB Coal Reserves)  The coal reserves lie in the Smith and Roland Seams of the Fort Union Formation.  The seams average approximately 60 feet and 40 feet (thickness) of clean coal, respectively, without partings.   The seams dip to the northwest and overburden ratios gradually increase in that direction.

Of the total coal reserve of Eagle Butte, approximately 175 million tons are proven and approximately 131 million tons are defined as probable.  Proven tons are generally coal reserves lying in commercially recoverable quantities as determined by geological, geophysical and engineering data.  Proven reserves



EXHIBIT A PAGE 7

DEBTORSCL_000286

can be demonstrated with a reasonable high degree of certainty. They are generally defined at Eagle Butte as coal lying within 500 feet of a data point. Probable tons are described as coal reserves in commercial quantities that are less defined than proven reserves. They are generally recognized as coal reserves lying between 500 feet and 1,000 feet of a data point. The coal reserve is defined by approximately 750 data points.

The coal reserve has an average sulfur content of 0.37%. The coal reserve averages 8,385 Btu per pound and has average volatile matter of approximately 32%. Average moisture is approximately 31%. Average ash is approximately 4.2%. The average density of both seams is approximately 80 pounds per cubic foot. All of these reserves are leased from the federal government.

Blackjewel employs a Professional Geologist (Wyoming PG-2108) to assess the physical characteristics of the reserves. Gaddy reviewed the work of this Geologist and found it to be reasonable and prepared in accordance with generally accepted mining engineering principles and practices using acceptable computer software and analytical and characterization methodologies.

## Asset Retirement Obligations

### Belle Ayr Mine

Asset Retirement Obligations of Belle Ayr Mine were determined by CDG Engineers, of Sheridan, Wyoming in a report submitted November 14, 2017. The Report is titled "Belle Ayr Mine, 2017 Closure Summary" (See Book C). The closure cost estimate assumes final reclamation by a third-party contractor after removal of all coal from the mine. The cost estimate is based on aerial topography and mapping as of June 26, 2017 and Belle Ayr's long-term mine plan. The cost estimate is reported in current dollars. Direct cost for closure of the mine was determined to be $89,921,200.

### Eagle Butte Mine

Asset Retirement Obligations of Eagle Butte Mine were also determined by CDG Engineers, of Sheridan, Wyoming in a report submitted June 12, 2018. The report is titled "Eagle Butte Mine, 2018 Closure Summary" (See Book C). The closure cost estimate assumes final reclamation by a third-party contractor after removal of all coal from the mine. The cost estimate is based on a 2010 Closure Study, a list of physical structures derived from the 2017-2018 Reclamation Performance Bond, demolition cost of all physical structures at the mine, and Eagle Butte's long-term mine plan. The cost estimate is reported in current dollars. Direct cost for closure of the mine was determined to be $49,778,200. For details of this expense, see Book C.

Gaddy has reviewed the long-mine plan and all the assumptions of the 2018 Closure Summary and find it professionally prepared by competent engineers that have no beneficial interest Belle Ayr.

EXHIBIT A PAGE 8
DEBTORSCL_000287

Gaddy visited the mine and operations of it on June 11-13, 2018. Gaddy also met with Management and the Chief Engineer of the mine. Gaddy reviewed the mine plans and all the assumptions of the 2017 Closure Summary and found it professionally prepared by competent engineers that have no beneficial interest in Eagle Butte.

These reports, resumes and appropriate non-conflict statements are included in Book C.

## Coal Inventories

In-pit and silo inventories and the calculation methods used to estimate the coal inventory were reviewed. In-pit inventory is determined by monthly survey and volumes determined by CAD analysis. A "lower of cost or market" value is assigned to the inventory as illustrated on Exhibit K: Summary of Coal Inventories. Exhibit K indicates that on December 9, 2017, coal inventory at the Belle Ayr Mine was approximately three million tons valued at approximately $8.5 million and coal inventory at the Eagle Butte Mine was approximately five million tons and valued at approximately $12.9 million. Gaddy's review of these methods and results indicate that they are appropriate for establishment of inventory value and that the values thus determined are reasonable.

## Warehouse & Supply Inventories

Warehouse and supply inventories were viewed during the field visits to the operations. Significant inventory of diesel fuel and tires to support the operations are closely monitored by a very thorough and extensive operations and maintenance management program. While visiting the Belle Ayr Mine, an active tire audit was observed. The balance of inventory consists of critical truck and shovel components and conveyor belt along with in excess of approximately 2,000 smaller replacement parts and supply. Exhibit L is a summary of warehouse and supply inventories. The quantity, value (cost), and composition of these inventories are very reasonable in Gaddy's opinion.

## Summary

This Report determined the Fair Market Value of the operating assets of the Belle Ayr Surface Mine and the Eagle Butte Surface Mine owned by Blackjewel, LLC on December 9, 2017. The Report does not include financial assets owned by or controlled by Blackjewel, LLC. Operating assets are defined in the Report as plant and equipment, warehouse and operating supplies inventories and coal inventories.

The total Fair Market Value of both mining operations as defined on December 9, 2017 was determined to be approximately $199 million. The Belle Ayr Mine was determined to be approximately $106 million. The Eagle Butte Mine was determined to be approximately $93 million. The details of this valuation are included in the exhibits and supporting information attached herein in Book A, Book B and Book C.

EXHIBIT A PAGE 9
DEBTORSCL_000288

We three Professional Engineers of Gaddy Engineering Company, John C. Bullock, John R. Kortas, and Philip Longenecker certify that to the best of our knowledge and belief that:

1. The statements of fact contained in this Report are true and correct.

2. The Reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and our unbiased professional analyses, opinions and conclusions.

3. The three of us and Gaddy Engineering Company have no present or prospective interest in the property that is the subject of this Report and that we have no personal interest or bias with respect to the parties involved. We also affirm that our engagement in this assignment was not contingent upon developing or reporting pre-determined results. This Report is not based on a requested minimum valuation, a specific valuation or the approval of a loan. Our compensation is not contingent upon the reporting of a pre-determined value or direction in value that favors the cause of the Client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

4. This work is for the benefit of Blackjewel, LLC and no other party.

The resumes of the responsible authors of this Report are attached as Exhibit M: Resumes.

Respectfully Submitted,


John C. Bullock, PE & CPG
Senior Vice President of Gaddy Engineering Company
WV #15474
VA #048983


Philip L. Longenecker, PE
Mining Engineer, Gaddy Engineering Company
WV #7352


John R. Kortas, PE
Mining Engineer, Gaddy Engineering Company
WV #7487


10 | P a g e

DEBTORSCL_000289



# Appraisal Report

**Certain Assets currently held by Revelation Energy**

Prepared For:

**Mr. James David Mills**
United Bank
500 Virginia Street East
Charleston, WV 25301

Effective Date of Appraisal: September 7, 2018

Report Date:  September 14, 2018

3880 Hulen Street, Ste 200,  Fort Worth, TX 76107 USA    **tel** 901-494-3757

EXHIBIT B PAGE 1

DEBTORSCL_000256

## Table of Contents (In report order)

| | |
|---|---|
| Transmittal Letter | 3 |
| Summary/Scope of Work | 4 |
| Intended Use and Intended Users | 4 |
| Purpose of the Appraisal | 4 |
| Premises of Value | 4-5 |
| Identification of Equipment | 5 |
| Basic Appraisal Concepts | 5 |
| High Wall Miner Market | 6 |
| Final Opinion of Value | 6 |
| Assumptions and Limiting Conditions | 6 |
| Certification | 7 |
| Qualifications and Credentials | 8-9 |
| Schedule A | 10-23 |

EXHIBIT B PAGE 2

DEBTORSCL_000257

September 7, 2018

Mr. James David Mills
United Bank
500 Virginia Street East
Charleston, WV 25301

RE: Equipment appraisal completion

Mr. Mills,

Per your request, Ritchie Brothers has completed a desktop appraisal of approximately 58 pieces of
mining equipment as described in the IronPlanet Summary Appraisal Report dated February 7, 2017.

The purpose of this appraisal is to arrive at an opinion of Fair Market and Orderly Liquidation Values for
the subject equipment. This report sets forth my findings and conclusions as detailed in the summary
section of the report.

Enclosed you will find our report on the findings.  Our opinion of value, as detailed in this study is as
follows:

| | |
|---|---|
| **Fair Market Value (FMV):** | **$14,295,000.00** |
| **Orderly Liquidation Value (OLV):** | **$12,824,500.00** |

I have made such investigations and studies, as deemed necessary, to arrive at this opinion of value.
Additional data and total estimated value summary are contained within the enclosed report.

Thank you for this opportunity.  If you have any questions concerning this appraisal, please contact me.

Sincerely,

Joe Roberts
Appraisal Specialist
Ritchie Brothers

EXHIBIT B PAGE 3

DEBTORSCL_000258

## Summary:

### *Scope of work:*
The appraisal assignment is to identify and give an opinion of value for approximately 54 pieces of mining equipment and 4 Highwall Miners of Revelation Energy as listed in the IronPlanet Summary Appraisal Report dated February 7, 2017.

The work involved was a desktop analysis.

Our investigation included a visual field inspection of the 4 Highwall Miners. The remaining 54 units were not inspected and valued as a desktop appraisal. For these units, we relied solely on information provided by United Bank and Revelation Energy   The valuation analysis was based on the information provided, and value conclusions were based on equipment functioning as intended and properly prepared for sale unless otherwise noted.

This appraisal focused primarily on the sale comparison and cost approach. The sales comparison approach compares the subject property with similar recently sold properties of like and kind units. When adequate data was available, sales comparisons were limited to those units having sold within 90 days of the appraisal date.   As necessary for identification of sufficient market comparables, the time-period for sales comparisons was extended to 180 days of the appraisal date or longer (never exceeding a full year). For those units where direct comparables were not available, sales of similar units were considered in the valuation analysis.

For those equipment types where no marketplace information was available, the cost approach was utilized, which includes an estimate of cost new less depreciation.

The income approach was not appropriate for the development of value opinions for the subject equipment, and hence was not utilized in the analysis.

Once opinions of value were established for each equipment unit and the valuation analysis was complete, the report was developed, reviewed, and finalized. For units requiring supplementary data, we were provided with additional information from Revelation Energy and the accuracy of our valuation analysis was limited by the extent of the additional information provided.

### *Intended Use and Intended Users of the Appraisal*

The intended use of this report is to provide a desktop opinion of the Fair Market and Orderly Liquidation Values related to the subject equipment for financial purposes.

The client and Intended users for the appraisal engagement is Mr. James David Mills, and other personnel of United Bank.

*The Purpose* of this appraisal and property interest appraised is an opinion of the value, in fee simple or absolute unencumbered ownership of the subject property.

### *Premise of Value*

The premises of value in the appraisal as required by United Bank are **Orderly Liquidation Value** and **Fair Market Value** as defined below by the American Society of Appraisers, *Valuing Machinery & Equipment,* 2nd Edition:

**Orderly Liquidation Value (OLV)** *is the estimated gross amount expressed in terms of money which could be typically realized from a sale, given a reasonable period of time to find a purchaser(s), with the seller being compelled to sell on an as-is where is basis, as of a specific date.*

**Fair Market Value (FMV)** *is the estimated amount expressed in terms of money that may reasonably be expected for property in an exchange between a willing buyer and a willing seller, with equity to both, neither under any compulsion to buy or sell, and both fully aware of the relevant facts, as of a specific date.*

## *Identification and Description of Equipment*

The subject property consists of certain assets currently held by Revelation Energy. The assets in scope of the appraisal include approximately 54 mining equipment and 4 Highwall Miners. An itemized list of equipment with descriptions is included in Schedule A.

The subject equipment is classified as machinery and equipment.

The **effective date of the appraisal** is September 7, 2018. The **date of the report** is September 14, 2018.

## *Basic Appraisal Concepts:*

Personal Property Appraisals consider the three approaches to value:
- Cost Approach
- Market Approach
- Income Approach

The Cost Approach estimates current replacement or reproduction cost of an item minus physical depreciation, functional and economic obsolescence.

The Market Approach compares the subject property with similar recently sold properties. In the absence of recent sales, property listed for sale is used to trend market range.

The Income Approach is a method to measure the present value of a property's expected future returns. A decision to purchase any property is an investment decision. Investment decisions are made in consideration of the expected return generated from the investment, the period of time over which the return will be earned and the risk of not receiving the expected return.
With some exceptions, personal property proves difficult to value using an income approach. The prediction of a reasonable income depends on readily available market rates and data of similar properties.

The Principal of substitution assumes that a knowledgeable buyer will buy the property with the most utility for the lowest price. Therefore, cost less depreciation and the sales comparison approaches are the most practical way to value machinery and equipment.

EXHIBIT B PAGE 5

DEBTORSCL_000260

### High Wall Miner Market:

Currently, the market for High Wall Miners is very strong versus this time last year. There's been an increased production demand in the coal industry and these machines are the most productive mining product at the lowest cost to operate.

### Final Opinion of Value

*Fair Market Value (FMV):*      *$14,295,000.00*

*Orderly Liquidation Value (OLV):*   *$12,824,500.00*


### *Assumptions and Limiting Conditions*

The opinion of value provided in this summary report is based on the best judgment of the appraiser given the facts and conditions as of the effective date of the appraisal.

It is assumed that there are no hidden or unknown conditions of the equipment, which would render it valuable.

The market is ever changing and what is true as of the effective date of the appraisal may not be true immediately before or afterward. With this understanding, normal business prudence is recommended in the use of this opinion of value.

The appraiser reserves the right to recall this summary appraisal report and adjust the opinion of value if new information is made available after the effective date, or if any unintentional miscalculations, errors, omissions, or other mistakes are found. The client shall notify the appraiser of any error, omission, or invalid data herein within 10 days of receipt and return the report, along with all copies, to the appraiser for corrections prior to any use whatsoever.

No investigation has been made into the title of the property and all items listed are assumed to be the property of the subject company.

No investigation has been made as to potential hazardous waste or environmental problems that may affect the opinion of value. This appraisal was prepared under the assumption that the assets, as viewed and appraised, contained no toxic waste materials, hazardous substances or regulated substances that would prohibit resale, removal, and reinstallation. All engines are assumed to meet E.P.A. regulations.

The appraisal report is prepared based on statements and information from the client. Information contained in the appraisal report, or used as a basis of value, comes from sources customarily relied upon. Ritchie Brothers/IronPlanet does not independently verify the accuracy or completeness of third party information reviewed or received during the course of the appraisal and, does not guarantee the accuracy or completeness of that information.

Any additional research or testimony required by the client or a court of law will be subject to additional fees plus expenses.

EXHIBIT B PAGE 6

DEBTORSCL_000261

## Certification

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

My engagement in this assignment was not contingent upon developing or reporting predetermined results.

My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

I have not made a personal inspection of the property that is the subject of this report. (If more than one person signs this certification, the certification must clearly specify which individuals did and which individuals did not make a personal inspection of the appraised property.)

No one provided significant personal property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant personal property appraisal assistance must be stated.

The American Society of Appraisers has a mandatory recertification program for all of its senior members. I am in compliance with that program.

Joe Roberts
Accredited Senior Appraiser, ASA
Ritchie Brothers/IronPlanet



EXHIBIT B PAGE 7

DEBTORSCL_000262

## Qualifications & Credentials

**Joseph E. Roberts**

**Ritchie Brothers Auctioneers,** Nashville, TN  6/01/2017 to present;


**IronPlanet Auctioneers,** Pleasanton, CA

Accredited Senior Appraiser (ASA), 4/11 to 6/01/2017:   Appraise equipment for contractors, financial institutions and national rental companies.

Territory Manager, 6/03 to 4/11:  Consigned equipment to IronPlanet auctions primarily from large end-users, dealers and government agencies; appraising packages of equipment.

**Mid-South Equipment Sales, Inc.,** Collierville, TN, 8/93 to 12/02:  Rental & Sales Company; Managed an operation that bought and sold used construction equipment to dealers and end users.

**Case Power & Equipment Co. (J.I. Case Co.),** Memphis, TN, 10/83 – 4/92

**Professional Associations and Education**


**Accredited Senior Appraiser (ASA),** American Society of Appraisers, Machinery & Equipment

**American Society of Appraisers:** Successful completion of ASA's Machinery & Equipment Valuation and Methodology Courses ME201, ME202, ME203 & ME204 and Ethics Exam

**Uniform Standards of Professional Appraisal Practices (USPAP)**

**University of Alabama,** Tuscaloosa, Alabama
General Business Administration

**Shelton State Technical College,** Tuscaloosa, Alabama
Computer Numerical Control Technology.

**Holt High School,** Holt, Alabama

- Member of the American Society of Appraisers.

- Valuation experience in Construction, Cranes, Mining, Trucks & Trailers, Asphalt / Concrete and Crushing Plants.

- Expert Witness Experience.

EXHIBIT B PAGE 8

DEBTORSCL_000263

**Joe Roberts, ASA**
Accredited Senior Appraiser
USPAP
Collierville, TN
Phone:  (901) 494-3757
Email:  JoeRoberts@RitchieBros.com

Role: Valuation of equipment
       Report Writing.

**James Shiflett**
Inspector
Houston, TX

Role:  Visual Inspection and Photos.

EXHIBIT B PAGE 9

DEBTORSCL_000264

## Schedule A

(on the following pages, sorted by Make and Model)

EXHIBIT B PAGE 10

DEBTORSCL_000265

1    **H-1**



**Category:** HWM
2010 Caterpillar / Bucyrus SHM
**S/N:** SHM-72
**Features:** Superior Highwall Miner consisting of modular components assembled
on a tracked mobile frame and including enclosed climate controlled & pressurized
Control Station, Siemans Programmable Logic Center w/touch pad functional &
remote capabilities, (3) in cab cameras, Low Seam Cutter Module, fifty (50) Type
IV Push Beams w/dual 19 in. augers, Power Head Assembly w/dual hyd sump
cylinders rated @ 147 ton pushing force & 303 ton pulling force, rated to 1,000 ft
penetration depth, Variable Frequency Drive, (2) 8 ft vertical drill Anchoring
System, 995v system w/470hp cutting motors, 800hp auger motors, 300hp hyd
pump motor, 134hp gathering motors, 100hp base frame conveyor, 100hp right
angle discharge conveyor, self contained, enclosed & portable Cummins
1500DQGAB 2000kw gen set on T/A gooseneck carrier.
**Hours/Miles:** NA
**Location:** Pax, WV
**Comments & Assumptions:** Visual Inspection:  This unit is currently being
reassembled and looks to be complete.  Assuming that this unit is operating as
intended, with Low Seam Cutter Module, 45 Type IV Push Beams (900' per
foreman on site) and components in 50% or better condition. Unit appears to be in
Good Condition
**OLV: $4,000,000**
**FMV: $4,500,000**

2    **H-2**



**Category:** HWM
2011 Caterpillar / Bucyrus SHM
**S/N:** SHM-76
**Features:** Superior Highwall Miner, Horizontal Boring Machine:   consisting of
modular components assembled on a tracked mobile frame and including enclosed
climate controlled & pressurized Control Station, Siemans Programmable Logic
Center w/touch pad functional & remote capabilities, (3) in cab cameras, Low Seam
Cutter Module, fifty (50) Type IV Push Beams w/dual 19 in. augers, Power Head
Assembly w/dual hyd sump cylinders rated @ 147 ton pushing force & 303 ton
pulling force, rated to 1,000 ft penetration depth, Variable Frequency Drive, (2) 8 ft
vertical drill Anchoring System, 995v system w/470hp cutting motors, 800hp auger
motors, 300hp hyd pump motor, 134hp gathering motors, 100hp base frame
conveyor, 100hp right angle discharge conveyor, self contained, enclosed &
portable Cummins 1500DQGAB 2000kw gen set on T/A gooseneck carrier.
**Hours/Miles:** NA
**Location:** Charleston, WV
**Comments & Assumptions:** Visual Inspection:  This unit is currently being
reassembled and looks to be complete.  Assuming that this unit is operating as
intended, with Low Seam Cutter Module, 45 Type IV Push Beams (680' per
foreman on site) and components in 50% or better condition. Unit appears to be in
Good Condition
**OLV: $3,600,000**
**FMV: $4,000,000**

EXHIBIT B PAGE 11

DEBTORSCL_000266

3     N/A
      **Category:** HWM
      2004 Superior HWM PTM-2
      **S/N:** SHM-31
      **Features:** Superior HighWall Miner, Horizontal Boring Machine. 36" Tracks (Pads
      Missing). Undercarriage in Fair Condition
      **Hours/Miles:** NA
      **Location:** Cumberland, KY
      **Comments & Assumptions:** Visual Inspection:   This unit is partially
      disassembled. Assuming that all components are avaliable to make this unit whole
      and operating as intended with 1415 Midseam Cutter Head, 35 Type IV Push Beams
      (700' per foreman on site) in 50% or better condition. No genset was available for
      inspection.   36" Tracks (Pads Missing). Overall this unit looks to be in fair
      condition.
      **OLV: $2,250,000**
      **FMV: $2,500,000**



4     N/A
      **Category:** HWM
      2005 Superior HWM PTM-2
      **S/N:** SHM-39
      **Features:** Superior HighWall Miner, Horizontal Boring Machine, 1415 Midseam
      Cutter Head, Undercarriage in Good Condition, Caterpillar 1750kw Genset, Cat
      3516 Diesel Engine, Mounted on T/A Trailer, 11-22.5 Tires in Fair Condition -
      assumes (32) 20' SHM Push Beams will be included with this machine. Augers for
      push beans will be furnished upon purchase.
      **Hours/Miles:** NA
      **Location:** ColdIron, KY
      **Comments & Assumptions:** Visual Inspection:  This unit is currently disassembled
      and appears to be a parts machine. Valued in its current condition.  Estimates are
      that it would take approximately $1,000,000 to $1,500,000 to bring it to operational
      status.
      **OLV: $450,000**
      **FMV: $500,000**



5     AT5
      **Category:** CE-Artic
      2004 Caterpillar 735
      **S/N:** PAWR00748
      **Features:** 35 Ton Articulating Haul Truck
      **Hours/Miles:** 14,529
      **Location:** S4A CALLOWAY NORTH
      **Comments & Assumptions:** Unit Not Inspected
      **OLV: $50,000**
      **FMV: $55,000**



EXHIBIT B PAGE 12

DEBTORSCL_000267

| 6 | RG15 |
|---|------|

**Category:** CE-MG
1979 Caterpillar 16G
**S/N:** 93U-01619
**Features:** Road Grader
**Hours/Miles:** 28,550
**Location:** P3/Plant
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $23,000
**FMV:** $26,000



| 7 | SS3 |
|---|-----|

**Category:** CE-SS
2008 Caterpillar 272C
**S/N:** RED01588
**Features:** Coal Bucket Equipped, Forks
**Hours/Miles:** 1,487
**Location:** T2 SUNNY RIDGE
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $17,000
**FMV:** $19,000



| 8 | E17 |
|---|-----|

**Category:** CE-EX
2000 Caterpillar 322BL
**S/N:** 1YS01214
**Features:** Long Boom
**Hours/Miles:** 15,574
**Location:** S1 HUNTS BRANCH
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $27,000
**FMV:** $30,000



| 9 | E16 |
|---|-----|

**Category:** CE-EX
2009 Caterpillar 336DL
**S/N:** W3K00321
**Features:** Standard Boom Excavator
**Hours/Miles:** 11,080
**Location:** P7 PIGEON CREEK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $75,000
**FMV:** $82,500



| 10 | BH4 |
|----|-----|

**Category:** CE-LB
2004 Caterpillar 420D
**S/N:** FDP20323
**Features:** Extend-A-Hoe Equipped
**Hours/Miles:** 8,792
**Location:** P8 CAVE BRANCH
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $26,000
**FMV:** $28,500



EXHIBIT B PAGE 13

DEBTORSCL_000268

11      BH3
        **Category:** CE-LB
        2008 Caterpillar 420E
        **S/N:** KMW03157
        **Features:** Extend-A-Hoe Equipped
        **Hours/Miles:** 5,459
        **Location:** P7 PIGEON CREEK
        **Comments & Assumptions:** Unit Not Inspected
        **OLV:** $30,000
        **FMV:** $33,000



12      WT8
        **Category:** Water
        1996 Caterpillar 769C
        **S/N:** 5TR00144
        **Features:** 8,000 Gallon Kelin Water Truck Bed
        **Hours/Miles:** 34,291
        **Location:** S1 HUNTS BRANCH
        **Comments & Assumptions:** Unit Not Inspected
        **OLV:** $25,000
        **FMV:** $28,000



13      L40
        **Category:** CE-WL
        2005 Caterpillar 924G
        **S/N:** DDA01858
        **Features:** Coal Bucket Equipped
        **Hours/Miles:** 12,552
        **Location:** P6 COLDIRON
        **Comments & Assumptions:** Unit Not Inspected
        **OLV:** $25,000
        **FMV:** $28,000



14      L42
        **Category:** CE-WL
        2008 Caterpillar 930H
        **S/N:** DHC01135
        **Features:** Coal Bucket Equipped
        **Hours/Miles:** 7,913
        **Location:** P3/Plant
        **Comments & Assumptions:** Unit Not Inspected
        **OLV:** $40,000
        **FMV:** $44,000



15      L35
        **Category:** CE-WL
        2011 Caterpillar 930H
        **S/N:** DHC02240
        **Features:** Bucket, Broom, Fork Attachment
        **Hours/Miles:** 7,440
        **Location:** T3 STONE COAL
        **Comments & Assumptions:** Unit Not Inspected
        **OLV:** $53,000
        **FMV:** $58,500



EXHIBIT B PAGE 14

DEBTORSCL_000269

**16**    L36
**Category:** CE-WL
2004 Caterpillar 950G
**S/N:** BAA00468
**Features:** Coal Bucket Equipped, Forks
**Hours/Miles:** 19,637
**Location:** P2 PONTIKI
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $37,000
**FMV:** $41,000



**17**    L57
**Category:** CE-WL
1996 Caterpillar 970F
**S/N:** 7SK00681
**Features:** Coal Bucket Equipped
**Hours/Miles:** 9,993
**Location:** P7 PIGEON CREEK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $59,000
**FMV:** $65,000



**18**    L50
**Category:** CE-WL
2003 Caterpillar IT14G
**S/N:** 1WN02262
**Features:** Bucket, Broom, Fork Attachment
**Hours/Miles:** 5,901
**Location:** T9/Loadout
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $24,000
**FMV:** $26,500



**19**    L64
**Category:** CE-WL
1996 Caterpillar IT28F
**S/N:** 3CI.02107
**Features:** Coal Bucket Equipped, Forks
**Hours/Miles:** 15,784
**Location:** P7 PIGEON CREEK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $19,000
**FMV:** $21,000



**20**    M46
**Category:** Trk
2007 Ford F750
**S/N:** 3FRXF7FL8BV091457
**Features:** Lube Truck, Oil and Grease Tanks
**Hours/Miles:** 11,154
**Location:** P7 PIGEON CREEK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $32,000
**FMV:** $35,000



EXHIBIT B PAGE 15

DEBTORSCL_000270

| 21 | M14 |
|---|---|

**Category:** Trk
2005 Freightliner M2 106
**S/N:** 1FVACXDCX5HU71806
**Features:** 6 Wheeled, Equipped With Elliot Lube Bed
**Hours/Miles:** 289,900
**Location:** S10 POMPEY BRANCH
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $26,000
**FMV:** $28,500



| 22 | M22 |
|---|---|

**Category:** Trk
2007 Freightliner M2 106
**S/N:** 1FVACXDC07HX41533
**Features:** 6 Wheeled Lube Truck, Equipped With Elliot Lube Bed
**Hours/Miles:** 207,526
**Location:** S26 STRAIGHT CREEK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $31,000
**FMV:** $34,500



| 23 | E14 |
|---|---|

**Category:** CE-EX
2010 Hitachi ZX 270
**S/N:** 1FFASROXHA0820148
**Features:** Standard Boom and Long Boom Stick Attachment
**Hours/Miles:** 4,758
**Location:** P4/Plant
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $76,000
**FMV:** $84,000



| 24 | ST10 |
|---|---|

**Category:** Misc
2008 International 4300
**S/N:** J3058D, CHASSIS #1HTMMAN8
**Features:** Elgin Crosswind Street Sweeper, Six Wheeler
**Hours/Miles:** 69,835
**Location:** P7 PIGEON CREEK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $30,000
**FMV:** $33,000



| 25 | M25 |
|---|---|

**Category:** Trk
2011 International DURASTAR 4400
**S/N:** 1HTMKAAN0BH356628
**Features:** 10,000 lb. Boom, Equipped With Tool Bed
**Hours/Miles:** 112,900
**Location:** S14 TRACE FORK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $56,000
**FMV:** $62,000

EXHIBIT B PAGE 16

DEBTORSCL_000271

**26**   M45
**Category:** Trk
2012 International DURASTAR 4400
**S/N:** 1HTMKAAN3CH600757
**Features:** 10,000 lb. Boom, Equipped With Tool Bed
**Hours/Miles:** 15,755
**Location:** S17 CUMBERLAND RIVER
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $62,000
**FMV:** $68,500



**27**   AL1
**Category:** CE-WL
2009 John Deere 724K
**S/N:** 1DW724KX624523
**Features:** Fork Attachment Equipped
**Hours/Miles:** 21,908
**Location:** H1 SENG BRANCH
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $35,000
**FMV:** $38,500



**28**   AL3
**Category:** CE-WL
2011 John Deere 724K
**S/N:** 1DW724KZCBE637149
**Features:** Fork Attachment Equipped
**Hours/Miles:** 23,589
**Location:** H2 SOUTH FORK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $38,000
**FMV:** $42,000



**29**   AL5
**Category:** CE-WL
2011 John Deere 724K
**S/N:** 1DW724KZCBE638172
**Features:** Fork Attachment Equipped
**Hours/Miles:** 22,640
**Location:** H3 CUMBERLAND RIVER
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $38,000
**FMV:** $42,000



**30**   AL7
**Category:** CE-WL
2012 John Deere 724K
**S/N:** 1DW724KZALE643450
**Features:** Fork Attachment Equipped
**Hours/Miles:** 22,638
**Location:** H4 CUMBERLAND RIVER
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $38,000
**FMV:** $42,000



EXHIBIT B PAGE 17

DEBTORSCL_000272

**31**   RG14
**Category:** CE-MG
1998 John Deere 770C
**S/N:** CX567035
**Features:** Road Grader
**Hours/Miles:** 7,591
**Location:** P3/Plant
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $40,000
**FMV:** $44,000



**32**   AL2
**Category:** CE-WL
2010 John Deere 844K
**S/N:** 1DW844KXHA0631499
**Features:** Wheel Loader, Standard Coal Bucket
**Hours/Miles:** 20,192
**Location:** H1 SENG BRANCH
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $50,000
**FMV:** $55,000



**33**   AL4
**Category:** CE-WL
2011 John Deere 844K
**S/N:** 1DW844KXCBD637033
**Features:** Wheel Loader, Standard Coal Bucket
**Hours/Miles:** 14,899
**Location:** H2 SOUTH FORK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $82,500
**FMV:** $91,000



**34**   AL6
**Category:** CE-WL
2011 John Deere 844K
**S/N:** 1DW844KXHBD637863
**Features:** Wheel Loader, Standard Coal Bucket
**Hours/Miles:** 17,155
**Location:** H3 CUMBERLAND RIVER
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $75,000
**FMV:** $83,000



**35**   AL8
**Category:** CE-WL
2011 John Deere 844K
**S/N:** 1DW844KXHBD637751
**Features:** Wheel Loader, Standard Coal Bucket
**Hours/Miles:** 16,789
**Location:** H4 CUMBERLAND RIVER
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $76,000
**FMV:** $84,000



EXHIBIT B PAGE 18

DEBTORSCL_000273

| 36 | M6 |
|---|---|

**Category:** Trk
2004 Kenworth T300
**S/N:** 2NKMHD7X94M050732
**Features:** 10,000 lb. Boom, Equipped With Tool Bed
**Hours/Miles:** 253,782
**Location:** S14 TRACE FORK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $27,000
**FMV:** $30,000



| 37 | M8 |
|---|---|

**Category:** Trk
2007 Kenworth T300
**S/N:** 2NKMHD7X37M166044
**Features:** 10,000 lb. Boom, Equipped With Tool Bed
**Hours/Miles:** 279,639
**Location:** S18 SENG BRANCH
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $34,000
**FMV:** $38,000



| 38 | L54 |
|---|---|

**Category:** CE-WL
2003 Komatsu WA500-3LK
**S/N:** A71195
**Features:** Coal Bucket Equipped
**Hours/Miles:** 23,439
**Location:** P6 COLDIRON
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $22,500
**FMV:** $25,000



| 39 | L3 |
|---|---|

**Category:** CE-WL
2009 Komatsu WA500-6
**S/N:** A92963
**Features:** Coal Bucket Equipped
**Hours/Miles:** 20,705
**Location:** P1 FLINT RIDGE
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $32,000
**FMV:** $35,000



| 40 | L4 |
|---|---|

**Category:** CE-WL
2009 Komatsu WA500-6
**S/N:** A92568
**Features:** Coal Bucket Equipped
**Hours/Miles:** 24,109
**Location:** P2 PONTIKI
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $29,000
**FMV:** $32,000



EXHIBIT B PAGE 19

DEBTORSCL_000274

41   DT1
     **Category:** Trk
     2009 Mack GU713
     **S/N:** 1M2AX07C59M004529
     **Features:** 10 Wheeled Lube Truck, Elliot Bed
     **Hours/Miles:** 24,131
     **Location:** P7 PIGEON CREEK
     **Comments & Assumptions:** Unit Not Inspected
     **OLV:** $75,000
     **FMV:** $83,000



42   M11
     **Category:** Trk
     2010 Mack GU713
     **S/N:** 1M2AX04C0AM008142
     **Features:** 10 Wheeled Lube Truck, Elliot Bed
     **Hours/Miles:** 40,702
     **Location:** S7 PAX
     **Comments & Assumptions:** Unit Not Inspected
     **OLV:** $83,000
     **FMV:** $92,500



43   M9
     **Category:** Trk
     2010 Mack GU713
     **S/N:** 1M2AX04C2AM008367
     **Features:** 10 Wheeled Lube Truck, Elliot Bed
     **Hours/Miles:** 47,280
     **Location:** S18 SENG BRANCH
     **Comments & Assumptions:** Unit Not Inspected
     **OLV:** $83,000
     **FMV:** $92,500



44   M4
     **Category:** Trk
     2010 Mack GU713
     **S/N:** 1M2AX07C2AM008168
     **Features:** 10 Wheeled Lube Truck, Elliot Bed
     **Hours/Miles:** 36,688
     **Location:** S21 WOLFPEN
     **Comments & Assumptions:** Unit Not Inspected
     **OLV:** $83,000
     **FMV:** $92,500



45   M1
     **Category:** Trk
     2010 Mack GU713
     **S/N:** 1M2AX07C0AM008167
     **Features:** 10 Wheeled Lube Truck, Elliot Bed
     **Hours/Miles:** 77,262
     **Location:** S1 HUNT'S BRANCH
     **Comments & Assumptions:** Unit Not Inspected
     **OLV:** $83,000
     **FMV:** $92,500

EXHIBIT B PAGE 20

DEBTORSCL_000275

| 46 | M5 |
|---|---|

**Category:** Trk
2010 Mack GU713
**S/N:** 1M2AX04C2AM008370
**Features:** 10 Wheel Lube Truck, Elliot Bed
**Hours/Miles:** 47,263
**Location:** S12 CALHOUN
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $83,000
**FMV:** $92,500



| 47 | M12 |
|---|---|

**Category:** Trk
2012 Mack GU713
**S/N:** 1M2AX07C7CM010680
**Features:** 10 Wheeled Lube Truck, Elliot Bed
**Hours/Miles:** 34,275
**Location:** S14 TRACE FORK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $86,500
**FMV:** $96,000



| 48 | ST9 |
|---|---|

**Category:** Misc
2010 Nissan UD3300
**S/N:** JNAPC81L0AAF80025
**Features:** Schwarz A7000 Street Sweeper, Six Wheeler
**Hours/Miles:** 15,725
**Location:** P7 PIGEON CREEK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $41,000
**FMV:** $45,000



| 49 | M27 |
|---|---|

**Category:** Trk
2007 Peterbilt 335
**S/N:** 2NPLHD7X37M681406
**Features:** 10,000 lb. Boom, Equipped With Tool Bed
**Hours/Miles:** 9,417
**Location:** S21 WOLFPEN
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $57,000
**FMV:** $63,000



| 50 | M26 |
|---|---|

**Category:** Trk
2007 Peterbilt 335
**S/N:** 2NPLHD7X17M681405
**Features:** 10,000 lb. Boom, Equipped With Tool Bed
**Hours/Miles:** 98,037
**Location:** T10 Sunny Knott
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $57,000
**FMV:** $63,000



EXHIBIT B PAGE 21

DEBTORSCL_000276

51    WT23
**Category:** Trk
2007 Peterbilt 335
**S/N:** 2NPLLD0X27M694902
**Features:** 10 Wheeled Water Truck
**Hours/Miles:** 64,006
**Location:** P7 PIGEON CREEK
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $54,000
**FMV:** $60,000



52    M16
**Category:** Trk
2009 Peterbilt 335
**S/N:** 2NPLHN7X89M777492
**Features:** 10,000 lb. Boom, Equipped With Tool Bed
**Hours/Miles:** 56,487
**Location:** S1 HUNT'S BRANCH
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $68,500
**FMV:** $76,000



53    HS2
**Category:** Trk
1984 Peterbilt 359
**S/N:** 1XP9DB9X7EN163339
**Features:** 10 Wheeled Hydroseed Truck, Finn Hydroseed Bed
**Hours/Miles:** 326,421
**Location:** S4A CALLOWAY NORTH
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $9,000
**FMV:** $10,000



54    M33
**Category:** Trk
2003 Sterling L7500
**S/N:** 2FZHATAK73AL06206
**Features:** 10 Wheeled Truck Equipped With 50 TON Terex Boom
**Hours/Miles:** 38,002
**Location:** P4/Plant
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $53,000
**FMV:** $59,000



55    AT2
**Category:** CE-Artic
1992 Volvo A35
**S/N:** A35V1756
**Features:** 37 Ton Articulating Haul Truck
**Hours/Miles:** 22,899
**Location:** P4/Plant
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $15,000
**FMV:** $16,500



EXHIBIT B PAGE 22

DEBTORSCL_000277

56     AT3
**Category:** CE-Artic
1997 Volvo A35C
**S/N:** A35CV5021
**Features:** 36 Ton Articulating Haul Truck
**Hours/Miles:** 18,489
**Location:** P4/Plant
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $22,500
**FMV:** $25,000



57     AT4
**Category:** CE-Artic
2003 Volvo A35D
**S/N:** 71092
**Features:** 38 Ton Articulating Haul Truck
**Hours/Miles:** 16,847
**Location:** S4A CALLOWAY NORTH
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $45,000
**FMV:** $50,000



58     AT1
**Category:** CE-Artic
2006 Volvo A35D
**S/N:** A3572501
**Features:** 39 Ton Articulating Haul Truck
**Hours/Miles:** 6,369
**Location:** P4/Plant
**Comments & Assumptions:** Unit Not Inspected
**OLV:** $66,000
**FMV:** $73,000



**Totals:**

**OLV:** $12,824,500
**FMV:** $14,295,000

EXHIBIT B PAGE 23

DEBTORSCL_000278