BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

**Dated: December 7th, 2020**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Lead Case No. 3:19-bk-30289 |
| | ) | |
| Blackjewel L.L.C., *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

**MEMORANDUM ORDER DENYING UNITED BANK'S MOTION FOR ADEQUATE PROTECTION**

This case is before the Court on United Bank's Motion for Adequate Protection.  ECF No. 1285.  For the reasons set forth herein, the Court finds that United Bank does not have a perfected

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Blackjewel, L.L.C. (0823) ("Blackjewel"); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605) ("Revelation"); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213).  The headquarters for each of the Debtors is located at PO Box 1010, Scott Depot, WV 25560.

security interest in the BJMS West PSA, as defined herein, and will deny the Motion for Adequate Protection.

## I.  Jurisdiction and Authority

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  Under 28 U.S.C. § 155(a), the Honorable Roger L. Gregory, Chief Judge of the United States Court of Appeals for the Fourth Circuit, assigned and designated Benjamin A. Kahn, United States Bankruptcy Judge, to this Court and to the captioned, jointly administered cases, together with all associated adversary proceedings.  ECF No. 2011.  Thereafter, the Honorable Joseph R. Goodwin entered an Order referring these cases and all related proceedings to the above signed as contemplated by the order entered by the Honorable Roger L. Gregory and under 11 U.S.C. § 157.  ECF No. 2014.  This is a statutorily core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O). The parties consented to the Court determining the matters set forth herein, and this Court has constitutional authority to enter final judgment.  See Wellness Intern. Network, Ltd. v. Sharif, 135 S.Ct. 1932, 1948 (2015); and Wiswall v. Campbell, 93 U.S. 347, 350-51 (1876).  Venue of these cases and the Motion for Adequate Protection in this District and before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  Procedural History

United Bank filed the Motion for Adequate Protection in these administratively consolidated cases on October 28, 2019.  ECF No. 1285.  The following day, the United States Internal Revenue Service, United States Department of the Interior, and other federal government creditors joined in the motion.  ECF No. 1289. Thereafter, WESCO Distribution, Inc. also joined in the motion. ECF No. 1291. On December 17, 2019, Debtors filed an objection to the motion. ECF No. 1541.

The Court conducted an evidentiary hearing on January 22 and took the matter under advisement.  Thereafter, the Court directed the parties to file post-hearing briefs on or before February 11, 2020.  ECF No. 1714.  On February 11, 2020, United Bank and Debtors timely filed post-hearing briefs.  ECF Nos. 1755 and 1756, respectively.  Each party thereafter filed reply briefs.  ECF Nos. 1814 and 1815.

While the Motion for Adequate Protection remained under advisement, the case and all related proceedings, including the motion, were reassigned to the above-signed judge. On June 11, 2020, the Court scheduled a telephonic status hearing for June 24 on the Motion for Adequate Protection.  ECF No. 2071.  At the hearing [ECF No. 2128 at 22:35-33:32], the Court, under Fed. R. Civ. P. 63 and Fed. R. Bankr. P. 9028, cautioned the parties that the validity of United Bank's asserted lien was not as simple as

3

the evidence proffered at the January 22 hearing.  The Court also stated that it did not believe that a motion for adequate protection is the proper procedural vehicle to determine the validity or extent of United Bank's lien, and that so long as the disputed proceeds were held in escrow, United Bank's interest in those proceeds would be adequately protected while the validity of its lien could be determined in an appropriate proceeding.  The Court pointed out that joining the issue of the validity of the lien in the pending adversary proceeding between the parties might be the most effective and efficient way to resolve the issues between the parties.  The Court also expressed concern whether the determination of the lien in this otherwise summary proceeding would be binding on the parties for purposes of the case.

Despite these concerns, the parties expressed their mutual desire for the Court to determine the efficacy of United Bank's asserted security interest in this proceeding.  Under Fed. R. Civ. P. 63, the Court certified its familiarity with the record and inquired whether any party wished for it to recall any witness from the January 22 evidentiary hearing.  The parties indicated that they did not wish for the Court to recall any witnesses, and each agreed that the validity of the lien could be resolved as a plenary matter in this proceeding.  The Court then inquired whether either party contended that completing the proceeding on the established record would be prejudicial to either party, and

4

neither party asserted any prejudice.   The parties stated that
they wished to resolve the matter as quickly as possible and,
therefore, did not wish to commence an adversary proceeding to
determine the validity or extent of United Bank's lien.   The
parties further specifically declined the opportunity to present
further evidence, and each consented to the Court determining the
efficacy of United Bank's lien in this proceeding and on the record
as it stood at the January 22 evidentiary hearing.

### III. Background

**A.   Prepetition Events**

On July 18, 2012, Revelation Energy and United Bank entered
into a Loan and Security Agreement in connection with a Note and
certain other financial accommodations.   ECF No. 1541 at 3 ¶ 7.
United Bank filed a financing statement with the Kentucky Secretary
of State on July 19, 2012.   ECF No. 1541-2 at 2.   In its original
financing statement, United Bank indicated collateral including,
"Debtor Accounts, Receivables and Inventory."   Id.   The following
year, Revelation Energy and United Bank entered into the Second
Amended and Restated Loan and Security Agreement (the "2013 Loan
and Security Agreement").   ECF No. 1541-1; ECF Nos. 1814-1 and
1814-2.[2]   The 2013 Loan and Security Agreement, in relevant part,
provided:

---

[2] United Bank attached the various loan documents including the 2013 Loan and
Security Agreement to its post-hearing reply brief, ECF No. 1814, but did not
seek leave to supplement the evidentiary record or request to do so when the

Debtor hereby grants, pledges and assigns to Secured
Party a security interest in, and a Lien on, the
following property of Debtor wherever located and
whether now owned or hereafter acquired:

(a) All Debtor Accounts and Receivables.
(b) All guaranties, collateral, Liens on, or security
interests in, real or personal property, leases, letters
of credit, and other rights, agreements, and property
securing or relating to payment of the Receivables . .
. .
(l) All Proceeds and products of all of the foregoing in
any form, including, without limitation, accounts
payable under any policies of insurance insuring the
foregoing against loss or damage, and all increases and
profits received from all of the foregoing.

ECF No. 1541-1 at 21-22.

On February 28, 2013, and in connection with the execution of

the 2013 Loan and Security Agreement, United Bank filed an amended

financing statement (the "2013 Financing Statement"). ECF No.

1541-2 at 3. The 2013 Financing Statement no longer included the

language referring to "Debtor Accounts, Receivables and

Inventory." Instead, in relevant part, the 2013 Financing

---

Court offered for the parties to supplement the record under Fed. R. Civ. P.
63. In their post-hearing brief, Debtors contend that the United Bank's
evidence is limited to the "outdated and superseded version" of the 2012 Loan
and Security Agreement, copies of United Bank's proofs of claim, the declaration
of Peter Pritchard [ECF No. 1651-1 (the "Pritchard Declaration")], and the 2017
Amended Blackjewel Financing Statement discussed below. See ECF No. 1756 at 3
¶ 4. Debtors objected to the admissibility of the Pritchard Declaration at the
evidentiary hearing, and United Bank conceded at the June 24 status conference
that the declaration could be stricken in light of Debtors' concessions in its
filings. Therefore, Debtor's objection to the Pritchard Declaration is
sustained. Despite United Bank's failure to supplement the record or to offer
any loan documents as evidence, Debtors concede the validity and applicability
of the 2013 Loan and Security Agreement in their objection to the motion. ECF
No. 1541 at 3 ¶ 8. Therefore, the Court has considered the 2013 Loan and
Security Agreement as part of the record.

Statement indicated a security interest in the following collateral:

> (i) all of Revelations' bank accounts, except for Account No. 6395-8482; (ii) all of Revelation's account receivables; (iii) all guaranties, collateral, liens on, or security interests in, real or personal property, leases, letters of credit, and other rights, agreements, and property securing or relating to payment of account receivables . . .; and (xi) all proceeds and products of all of the foregoing in any form, including, without limitation, accounts payable under any policies of insurance insuring the foregoing, against loss or damage, and all increases and profits received from all of the foregoing."

ECF No. 1541-2 at 3.

On July 17, 2017, United Bank, Revelation Energy, and Blackjewel entered into the Joinder Agreement. Claim No. 116-2 at 5-9. Under the Joinder Agreement, Blackjewel joined Revelation Energy, on a joint and several basis, as a co-borrower under the 2013 Loan and Security Agreement. Id. That same day, United Bank amended the 2013 Financing Statement to indicate a security interest in the following collateral (in relevant part):

> (i) all of Debtor's accounts, except for Accounts 8573-3238 and 8566-3190 established at Secured Party; (ii) all of Debtor's account receivables; (iii) all guaranties, collateral, liens on, or security interests in, real or personal property, leases, letters of credit, and other rights, agreements, and property securing or relating to payment of account receivables; . . . (xi) all proceeds and products of all the foregoing in any form including, without limitation, accounts payable under any policies of insurance insuring the foregoing against loss or damage, and all increases and profits received from all of the foregoing.

ECF No. 1541-2 at 5.  United Bank also filed a financing statement
in Delaware with respect to Blackjewel on July 17, 2017 (the
"Blackjewel Financing Statement").   ECF No. 1541-3 at 2.   The
Blackjewel Financing Statement similarly indicated (in relevant
part) a security interest in the following collateral:

> (i) all of Debtor's accounts, except for Accounts 8573-
> 3238 and 8566-3190 established at Secured Party; (ii)
> all of Debtor's account receivables; (iii) all
> guaranties, collateral, liens on, or security interests
> in, real or personal property, leases, letters of
> credit, and other rights, agreements, and property
> securing or relating to payment of account receivables
> . . . (xii) all proceeds and products of all the
> foregoing in any form including, without limitation,
> accounts payable under any policies of insurance
> insuring the foregoing against loss or damage, and all
> increases and profits received from all of the
> foregoing.

Id. at 2-3.

On July 28, 2017, United Bank filed an amended financing
statement in Delaware with respect to Blackjewel (the "Amended
Blackjewel Financing Statement").   Id. at 7-12.   The Amended
Blackjewel Financing Statement purports to restate its indication
of the collateral covered by its security interest.   Id. at 7.
The Amended Blackjewel Financing Statement indicates the following
restatement of the collateral:

> (i) all of Debtor's accounts, except for Accounts 8573-
> 3238 and 8776-7953 established at Secured Party; (ii)
> all of Debtor's account receivables; (iii) all
> guaranties, collateral, liens on, or security interests
> in, real or personal property, leases, letters of
> credit, and other rights, agreements, and property
> securing or relating to payment of account receivables;

8

(iv) all monies, securities, and other property now or hereafter held, or received by, or in transit to, Secured Party from or for Debtor; (v) all intercompany receivables from (a) Alpha Highwall Mining, LLC, a Kentucky limited liability company, (b) Revelation Management Corporation, a Delaware corporation, (c) Revelation, and (d) any other affiliate of Debtor; (vi) all proceeds payable to or sums owed to Debtor under any contracts, agreements or other documents between Debtor and Mercuria Energy Group Limited, a company organized under the laws of Cyprus; (vii) all proceeds payable to or sums owed to Debtor under any contracts, agreements or other documents between Debtor and MR Coal; (viii) all proceeds payable to or sums owed to Debtor under any contracts, agreements or other documents between Debtor and Mercuria US Asset Holdings, LLC, a Delaware limited liability company; (ix) all amounts due to Debtor under that certain Contract Mining Agreement dated June 10, 2011 between Revelation and Jewell Smokeless Coal Corporation, a Virginia corporation (as amended, amended and restated, supplemented or otherwise modified); (x) all of the personal property set forth on Exhibit B of this financing statement, (xi) all books, records, ledger cards, data processing records, computer software, and other property at any time evidencing or relating to the property described in (i) through (x); and (xii) all proceeds and products of all of the foregoing in any form, including, without limitation, accounts payable under any policies of insurance insuring the foregoing, against loss or damage, and all increases and profits received from all of the foregoing.

Id. at 8-9.

On December 11, 2017, Blackjewel and MR Coal Marketing & Trading LLC ("MR Coal") entered into a Master Coal Purchase and Sale Agreement (the "MR Coal East PSA"). ECF No. 1541-4.[3] Under the MR Coal East PSA, Blackjewel agreed to sell all coal produced

---

[3] BJMS is the successor-in-interest to MR Coal under the MR Coal East PSA. ECF No. 2074 at 53, line 9.

at the Debtors' facilities in Virginia, West Virginia, and Kentucky to MR Coal. ECF No. 1541 at 6. On January 1, 2018, Blackjewel and BJMS entered into a Master Coal Purchase and Sale Agreement (the "BJMS West PSA"). ECF No. 1541-5. Under the BJMS West PSA, Blackjewel agreed to sell "all coal produced at the Debtors' facilities in Wyoming to BJMS." ECF No. 1541 at 6. The BJMS Settlement, discussed further below, included payment only for receivables payable under the BJMS West Contract. ECF No. 1541 at 8 ¶ 20; ECF No. 2074 at 45, lines 6-7 and 46, lines 16-19. Under the BJMS West PSA, title to the coal was transferred to BJMS once the coal was loaded for shipment. ECF No. 1541-5 at 7.

According to Debtors, "during June 2019, BJMS paid $23,470,282 to Blackjewel with respect to the delivery of coal in the states of Kentucky and Virginia." ECF No. 1541 at 7. Debtors contend, and United Bank does not dispute, that there were "no outstanding prepetition accounts receivable owed by BJMS to the Debtors" under either the MR Coal East PSA or the BJMS West PSA. ECF No. 1541 at 7. The parties also do not dispute that the BJMS Settlement did not include any payment for prepetition accounts receivable.

## B.   Postpetition Events

On July 1, 2019, Blackjewel and Revelation Energy commenced these cases by filing petitions for relief under chapter 11 of title 11. After Debtors filed their chapter 11 petitions, Debtors

10

failed to pay prepetition wages for employees in Kentucky and Virginia during the period from and including June 10, 2019 to July 1, 2019.  In August 2019, the United States Department of Labor (the "DOL") moved to halt the transport of certain coal shipments from Debtors' property in Kentucky and Virginia.  ECF Nos. 550 and 648, respectively.  The DOL alleged that, because Debtors failed to pay the prepetition wages of the employees who produced the coal in violation of certain minimum wage and overtime provisions of the Fair Labor Standards Act, the coal shipments were "hot goods" under 29 U.S.C. § 215(a)(1).  Therefore, the DOL maintained that it would be unlawful to transport or transfer the coal shipments in interstate commerce until Debtors paid their employees' prepetition wages.

On August 4, 2019, United Bank filed a proof of claim in Blackjewel's case in the amount of $5,937,245.27.  Case No. 3:19-bk-30289, Claim No. 116-1.  That same day, United Bank filed a proof of claim in Revelation Energy's case in the amount of $5,983,619.55.  Case No. 3:19-bk-30292, Claim No. 8-1.  On November 1, 2019, United Bank amended its proof of claim in Blackjewel's case to assert a claim in the amount of $7,125,005.27.  Case No. 3:19-bk-30289, Claim No. 116-2.  United Bank has not amended its proof of claim in Revelation Energy's case.[4]  United Bank did not

---

[4] On June 1, 2020, Debtors commenced an adversary proceeding against United Bank.  Adv. No. 20-3007.  In the first amended complaint, Debtors seek, _inter alia_, to equitably subordinate United Bank's claims, and to transfer any liens

attach the 2013 Loan and Security Agreement to its claim or amended claim, and did not offer any exhibits at the hearing on this matter.

On October 1, 2019, Debtors moved to sell substantially all of their assets related to Debtors' operations in Wyoming to Eagle Specialty Materials, LLC.  ECF No. 1157.  In connection with the proposed sale, Debtors sought the Court's approval of several settlement agreements, two of which are relevant here.  Id. at 11–16.  First, Debtors and BJMS proposed to mutually release all claims against each other in exchange for certain payments from BJMS (the "BJMS Settlement").  Id. at 12.  Specifically, the BJMS Settlement, in relevant part, provided that BJMS would pay Debtors the following sums:

> (i) $5.475 million in cash (to accommodate the Debtors' settlement of the "hot goods" issue [with DOL]; and (ii) the payment in full and in cash for all outstanding accounts receivable generated by the Debtors on September 27, 2019 and continuing through the [effective date of the sale].

Id.  Second, Debtors and DOL agreed to settle the hot goods dispute (the "DOL Settlement").  Id. at 13–14.  In resolution of that dispute, Debtors and DOL agreed that Debtors would use a portion of the BJMS Settlement proceeds to pay the outstanding wage claims of certain employees from the eastern mining operations.  Id.  On

---

of United Bank to the estate under 11 U.S.C. § 510(c)(2).  Id. at ECF No. 28 at 16, ¶ 63.

October 4, 2019, the Court entered an Order approving the proposed
sale to ESM, including the use of the proceeds to settle the hot
goods dispute.  ECF No. 1187.

On October 18, 2019, in accordance with the BJMS Settlement,
BJMS paid Debtors $8,513,496.  ECF No. 1541 at 9.  Of the aggregate
BJMS Settlement proceeds, $3,038,496 was for "post-petition
accounts receivable generated between September 27, 2019 and
[October 18, 2019]" and the remaining $5,475,000 was for "accounts
receivable generated between the Petition Date and September 26,
2019."  Id.  Thereafter, Debtors used approximately $6.3 million
of the BJMS Settlement proceeds to pay "employees for days of
unpaid work, including their net pay and certain applicable tax
withholdings and employee benefit contributions."  Id. at 10.  The
remaining funds received by Debtors under the BJMS Settlement shall
be referred to herein as the Residual BJMS Settlement Proceeds.

On October 28, 2019, United Bank filed the Motion for Adequate
Protection, requesting payment of the Residual BJMS Settlement
Proceeds as a form of adequate protection.  ECF No. 1285.  In the
Motion for Adequate Protection, United Bank asserts that it "holds
a valid security interest in Blackjewel's accounts receivable and
the proceeds thereof."  ECF No. 1285 at 9.  Specifically, United
Bank alleges that "Blackjewel granted United [Bank] a security
interest in accounts receivable arising from [the BJMS West PSA],
as well as related proceeds."  Id. at 10.  United Bank initially

13

argued that the BJMS Settlement Proceeds were proceeds of Debtors' prepetition and postpetition accounts receivable. <u>Id.</u> at 4-5. United Bank further argued that under the Fourth Circuit's interpretation of § 552 in <u>United Virginia Bank v. Slab Fork Coal Co.</u>, 784 F.2d 1188 (4th Cir. 1986), United Bank's lien extended to the BJMS Settlement Proceeds, regardless of whether the BJMS Settlement Proceeds were proceeds of Debtors' prepetition or postpetition accounts receivable. <u>Id.</u> at 10-11.[5] Because United Bank alleges that its claim is undersecured and its interest is not adequately protected, United Bank requests that the Court order Debtors pay the Residual BJMS Settlement Proceeds to United Bank as a form of adequate protection.

On November 1, 2019, the Court entered its Agreed Order Adjourning United Bank's Motion for Adequate Protection. ECF No. 1318 (the "Consent Order"). Among other things, the Consent Order required Debtors to deposit the Residual BJMS Proceeds into a segregated escrow account, and to "remain undisturbed" in the account "[a]bsent an order of the Court or further agreement of the Debtors and United bank to the contrary." <u>Id.</u> at 2-3, ¶¶ 2-3. The funds remain in the escrow account.

---

[5] Based on its post-hearing brief, United Bank now apparently concedes that the BJMS Settlement Proceeds are not proceeds of prepetition accounts receivable. ECF No. 1755 at 1 ("The primary question presented by the Motion [for Adequate Protection] is whether [United Bank's] undisputed pre-petition security interest attaches to <u>post-petition account receivables (or the proceeds thereof)</u> stemming from a pre-petition contract . . . between Blackjewel LLC . . . and Blackjewel Marketing and Sales, LLC . . . .") (emphasis added) (footnote omitted).

Debtors objected to the Motion for Adequate Protection on December 17, 2019. ECF No. 1541. Debtors concede that, at the time of the filing of these cases, "United Bank had a lien on certain of the Debtors' prepetition accounts receivable and the products and proceeds thereof." Id. at 2. However, Debtors assert that United Bank's lien does not encumber the Residual BJMS Settlement Proceeds for several reasons. Debtors allege that the BJMS Settlement Proceeds could not be proceeds of Debtors' prepetition accounts receivable because "[a]s of the Petition Date, there were no accounts receivable owed by BJMS to the Debtors." Id. at 13–15. If the BJMS Settlement Proceeds were proceeds of Debtors' postpetition accounts receivable, Debtors argue that United Bank does not have a lien in such proceeds because § 552(a) severed United Bank's lien in Debtors' accounts receivable as of the petition date. Id. at 12. Moreover, Debtors assert that § 552(b)(1) is inapplicable in this case because postpetition accounts receivable are not proceeds of prepetition accounts receivable. Id. at 15–18. According to Debtors, Slab Fork also is inapplicable because the facts of this case are materially different from the facts in Slab Fork. Id. at 17–18. Finally, Debtors contend that even if United Bank's lien technically extends to the BJMS Settlement proceeds, the Court, in its discretion and pursuant to § 552(b)(1), should determine that

15

the equities of the case preclude United Bank's lien from attaching to the Residual BJMS Settlement Proceeds.  Id. at 18–21.

At the hearing on January 22, 2020, Debtors' counsel argued that the key distinction between this case and Slab Fork is that the creditor in Slab Fork, unlike United Bank, had a lien in the contract at issue and its proceeds, rather than just a lien on the contract proceeds, i.e. accounts receivable arising therefrom. ECF No. 2074 at 54–55.  According to Debtors, since United Bank had a lien in prepetition accounts receivable generated under the BJMS West PSA, but not in the BJMS West PSA itself, Slab Fork is inapposite.  Thus, Debtors maintain that United Bank does not have a lien in the BJMS Settlement Proceeds because (1) to the extent the BJMS Settlement Proceeds are proceeds of Debtors' postpetition accounts receivable, § 552(a) prevents United Bank's lien in Debtors' accounts receivable from attaching to such proceeds; and (2) to the extent that the BJMS Settlement Proceeds are proceeds of the BJMS West PSA itself, Slab Fork is inapplicable because Debtors never granted United Bank a security interest in the BJMS West PSA itself.  ECF No. 1756 at 5–9.

United Bank disputes Debtors' assertion that it does not have a lien in the BJMS West PSA.  ECF No. 1755 at 3.  In contrast to its pre-hearing motion and brief, United Bank argues in its post-hearing brief that it "holds a security interest in the BJMS [West PSA], the Debtors' accounts receivable arising from that contract,

16

and, in each case, the proceeds thereof," <u>id.</u> at 3, based on the 2013 Loan and Security Agreement, the Joinder Agreement, and the Blackjewel Financing Statements.  <u>Id.</u> at 3-4.  According to United Bank, the 2013 Loan and Security Agreement and the Amended Blackjewel Financing Statement demonstrate that "Debtors granted United [Bank] a security interest in the [] all agreements related to accounts receivable, including, without limitation, the [BJMS West PSA]."  <u>Id.</u> at 4.  In fact, United Bank now asserts-for the first time-that it holds a perfected security interest in <u>all</u> of Debtors' contracts.  <u>Id.</u> at 4, n.5 ("The Security Agreement and UCC Financing Statement clearly cover any contract—and much more—by granting United [Bank] a security interest in 'agreements . . . relating to payment of account receivables.'").  <u>See also</u> United Bank's Post-Hearing Reply Brief, ECF No. 1814 at § II.

## IV.   Discussion

### A.   11 U.S.C. § 552 and <u>Slab Fork</u>

The Court's "[a]nalysis properly begins with the pertinent language of the Bankruptcy Code."  <u>U.S. ex rel. Kolbeck v. Point Blank Sols., Inc.</u>, 444 B.R. 336, 338 (E.D. Va. 2011).  Section 552(a) sets forth the general rule that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."  11 U.S.C. § 552(a).  In effect, section 552(a) invalidates after-acquired

17

property clauses in security agreements as of the petition date.

"Section 552(a) is intended to allow a debtor to gather into the

estate as much money as possible to satisfy the claims of all

creditors." In re Bering Trader, Inc., 944 F.2d 500, 502 (9th

Cir. 1991) (citations omitted).

However, § 552(b) contains a narrow exception to the general

rule with respect to proceeds, products, offspring, or profits of

property subject to a creditor's valid prepetition lien. See id.

(holding that § 552(b)(1) constitutes "a narrow exception to the

general rule of 552(a)") (emphasis in original) (citations

omitted).[6] Thus, when a security agreement extends to the proceeds

of a creditor's collateral, the general rule set forth in § 552(a)

is inapplicable, and the creditor's lien will extend to any

postpetition proceeds of the creditor's prepetition collateral,

unless "the court, after notice and a hearing and based on the

equities of the case, orders otherwise." Id. This exception

"balances the Code's interest in freeing the debtor of prepetition

---

[6] Section 552(b)(1) provides in relevant part:

> [I]f the debtor and an entity entered into a security agreement
> before the commencement of the case and if the security interest
> created by such security agreement extends to property of the debtor
> acquired before the commencement of the case and to proceeds,
> products, offspring, or profits of such property, then such security
> interest extends to such proceeds, products, offspring, or profits
> acquired by the estate after the commencement of the case to the
> extent provided by such security agreement and by applicable
> nonbankruptcy law, except to any extent that the court, after notice
> and a hearing and based on the equities of the case, orders
> otherwise.

obligations with a secured creditor's rights to maintain a bargained-for interest in certain items of collateral." Bering Trader, 944 F.2d at 502.

In Slab Fork, the Fourth Circuit addressed whether "cash proceeds generated under a pre-bankruptcy petition contract for the supply of coal," but received by the debtor postpetition, fall within an exception to § 552(a). 784 F.2d at 1189. The debtor entered into a coal supply contract with Armco, Inc. several years before the debtor's bankruptcy case. Id. at 1189. Under that contract, the debtor mined coal and sold it to Armco. Id. Sometime prior to the debtor's bankruptcy case, the debtor granted United Virginia Bank ("UVB") a security interest in the debtor's "contract [with Armco] and such proceeds as might be derived from that contract." Id. at 1190 (emphasis in original). Thereafter, the debtor entered into an agreement with another company, Maben Coal Company. Id. at 1189. Under this contract, Maben agreed to mine and supply coal to Armco for the account of the debtor. Id. Importantly, "the [debtor's] original contract with Armco remained in effect." Id. Thus, Maben supplied Armco with coal, Armco paid the debtor for the coal supplied by Maben, and the debtor paid Maben. Id. The debtor evidently received more money from Armco than the debtor paid to Maben, so a dispute arose between the debtor and UVB regarding the excess proceeds. Id. The bankruptcy court determined that funds paid for pre-petition invoices were

19

encumbered by UVB's lien, but concluded that "the post-petition payments did not constitute cash collateral under § 363" because such a lien was cut off by § 552(a).  Id.

The district court affirmed the bankruptcy court, and UVB appealed to the Fourth Circuit.  Id. at 1190.  The court of appeals reversed, holding that the proceeds of the contract generated postpetition also were subject to UVB's lien.  Id. at 1191. Agreeing with the rationale in In re Sunberg, 729 F.2d 561 (8th Cir. 1984), the court concluded that the postpetition payments received by the debtor were proceeds of the debtor's prepetition contract with Armco in which UVB held a perfected security interest.  Id. at 1190-1191.  Because "the pre-petition lien of UVB clearly covered the contract and such proceeds as might be derived from that contract," UVB's lien was not limited to accounts receivable created under the contract, but instead encumbered the contract itself.  Id. at 1190.  Therefore, the postpetition payments received by the debtor under the contract were proceeds of its prepetition collateral (the contract) that fell within the exception under § 552(b).  Id.

Under Slab Fork, the issue in this case is whether United Bank holds a prepetition, perfected security interest only in accounts receivable generated under the BJMS West PSA and the proceeds thereof, or whether United Bank's perfected security interest further includes the BJMS West PSA itself and the proceeds

20

thereof.  If United Bank's properly perfected security interest covers accounts receivable generated under the BJMS West PSA, but not the BJMS West PSA itself, United Bank will not have a lien in the BJMS Settlement Proceeds under § 552(b).  If, however, United Bank's perfected lien extends to the BJMS West PSA itself, United Bank will have a lien in the BJMS Settlement Proceeds.

**B.    Burden of Proof**

United Bank, both as a creditor asserting a lien against property of the estate and as the party seeking adequate protection under § 363(e),[7] bears "the burden of proof on the issue of the validity, priority, or extent of such interest."  11 U.S.C. § 363(p)(2).  The applicable standard of proof is the preponderance of the evidence.  In re Cruickshanks, 522 B.R. 881, 885 (Bankr. E.D. Va. 2014) (citing, inter alia, Grogan v. Garner, 498 U.S. 279, 286 (1991)).  Accordingly, United Bank must demonstrate by a preponderance of the evidence that it holds a valid, perfected security interest in the BJMS West PSA itself and the proceeds

---

[7] Section 363(e), in relevant part, provides:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).

thereof, and thereby a valid, perfected security interest in the Residual BJMS Settlement Proceeds.

**C.    Waiver of Right to Adversary Proceeding**

Bankruptcy Rule 7001 requires that proceedings "to determine the validity, priority, or extent of a lien or other interest in property" be brought as adversary proceedings. Fed. R. Bankr. P. 7001(2). However, this requirement is not absolute, and it may be waived. See, e.g., In re E-Z Serve Convenience Stores, Inc., 318 B.R. 631, 636 (M.D.N.C. 2004) ("A party may waive its right to protest the lack of an adversary proceeding. Waiver occurs when a party knowingly fails to litigate a Rule 7001 issue that they had the opportunity to litigate." (citing In re Village Mobile Homes, Inc., 947 F.2d 1282, 1283 (5th Cir. 1991))); In re Braniff Int'l Airlines, Inc., 164 B.R. 820, 831 (Bankr. E.D.N.Y. 1994) ("It is true that a party seeking a court determination as to the validity of a lien must ordinarily commence an adversary proceeding . . . . Where a party has proceeded by motion and the record has been adequately developed, however, courts have reached the merits of the dispute despite the procedural irregularity.") (internal citations omitted). In this case, the parties informed the Court at the June 24 status hearing that they wished for the Court to adjudicate this matter as expeditiously as possible and, therefore, did not wish to proceed within the confines of an adversary proceeding. Therefore, the parties waived their right

22

to an adversary proceeding, and the Court may determine the validity or extent of United Bank's lien in connection with United Bank's Motion for Adequate Protection.

**D.  United Bank's security interest in the BJMS West PSA and the proceeds thereof.**

To determine whether United Bank's lien encumbered the BJMS West PSA, the Court must look to state law.  In re Orndorff Const., Inc., 394 B.R. 372, 376 (Bankr. M.D.N.C. 2008) ("The validity and perfection of security interests in bankruptcy are governed by state law." (citing Butner v. United States, 440 U.S. 48, 54 (1979))); In re Lewis, 363 B.R. 477, 482 (Bankr. D.S.C. 2007) (citations omitted) ("The extent of property interests, the requirements for liens, and the priority of liens are defined by state law.").

The 2013 Loan and Security Agreement provides that the agreement is governed by the laws of West Virginia.  ECF No. 1541-1 at 52.  Likewise, the Joinder Agreement provides that "any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Joinder Agreement and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of West Virginia."  ECF No. 1814-11 at 4.  No party has disputed that West Virginia law controls the outcome of this dispute.  Therefore, the Court will apply West Virginia's version of the Uniform Commercial

23

Code (the "UCC") to determine whether United Bank has a valid, perfected lien in the BJMS West PSA itself and its proceeds. <u>See</u> W. Va. Code § 46-1-301(a).

**E.    United Bank established its security interest in the BJMS West PSA.**

Generally, "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral." W. Va. Code § 46-9-203(a). A security interest in collateral is enforceable against the debtor and third parties only if: (1) the secured party has given value; (2) "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party"; and (3) "[t]he debtor has authenticated a security agreement that provides a description of the collateral." W. Va. Code § 46-9-203(b).

The parties agree that United Bank gave value to Debtors and that Debtors had rights in the collateral at issue – the BJMS West PSA. Thus, the first two requirements are satisfied. The parties disagree, however, about whether the BJMS West PSA was included in the description of the collateral subject to United Bank's security interest.

Section 46-9-108(a) of the West Virginia UCC provides that "a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described." Under W. Va. Code § 46-9-108(b),

24

a description of collateral reasonably identifies the collateral if it identifies the collateral by:
> (1) Specific listing;
> (2) Category;
> (3) Except as otherwise provided in subsection (e) of this section, a type of collateral defined in the Uniform Commercial Code;
> (4) Quantity;
> (5) Computational or allocational formula or procedure; or
> (6) Except as otherwise provided in subsection (c), any other method, if the identity of the collateral is objectively determinable.

One "type of collateral defined in the Uniform Commercial Code," W. Va. Code § 46-9-108(b)(3), is an "account." W. Va. Code § 46-9-102(a)(2). The UCC defines an "account" as follows:

> "Account", except as used in "account for", means a right to payment of a monetary obligation, whether or not earned by performance: (i) For property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of; (ii) for services rendered or to be rendered; (iii) for a policy of insurance issued or to be issued; (iv) for a secondary obligation incurred or to be incurred; (v) for energy provided or to be provided; (vi) for the use or hire of a vessel under a charter or other contract; (vii) arising out of the use of a credit or charge card or information contained on or for use with the card; or (viii) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state or person licensed or authorized to operate the game by a state or governmental unit of a state. The term includes health-care-insurance receivables. The term does not include: (i) Rights to payment evidenced by chattel paper or an instrument; (ii) commercial tort claims; (iii) deposit accounts; (iv) investment property; (v) letter-of-credit rights or letters of credit; or (vi) rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

Id.

25

"Previously, the Uniform Commercial Code distinguished between 'contract rights' and 'accounts,' with 'accounts' resulting from contracts only where performance had occurred." In re Delta-T Corp., 475 B.R. 495, 513 (Bankr. E.D. Va. 2012); Cissell v. First Nat'l Bank of Cincinnati, 471 F. Supp. 480, 485 (S.D. Ohio 1976) ("Under this (the 1962) version of the UCC, contract rights ripen into accounts only when they are earned."). However, "[t]he 1974 amendment to [the UCC] did away with 'contract right' altogether." Delta-T, 475 B.R. at 513 (quoting Bank of Stockton v. Diamond Walnut Growers, Inc., 199 Cal. App. 3d 144, 153 (Ct. App. 1988)). Accordingly, "the prior distinction between 'contract rights' and an 'account' has been discarded from the Uniform Commercial Code, and 'contract rights' are now included within the definition of an 'account.'" Delta-T, 475 B.R. at 519 (citations omitted). Subsequent amendments to the UCC "expanded and reformulated" the definition of "account." W. Va. Code § 46-9-102, Comment 5a. As the Comments to § 46-9-102 explain, the term "account" "is no longer limited to rights to payment relating to goods or services." Id. Moreover, "[m]any categories of rights to payment that were classified as general intangibles under former Article 9 are accounts under this Article." Id.

Because the UCC definition of an "account" includes "contract rights," the BJMS West PSA constitutes an "account" under the UCC. Thus, if United Bank has a perfected security interest in either

the BJMS West PSA specifically or more generally in Debtors'
"accounts" as contemplated by the UCC, United Bank's security
interest encumbers the BJMS West PSA itself and the proceeds
thereof.  United Bank did not carry its burden to establish that
the 2013 Loan and Security Agreement, or any other security
agreement in effect between the parties, specifically lists the
BJMS West PSA as collateral.  Therefore, the Court will consider
whether the security agreement grants a security interest in
Debtors' accounts.

The 2013 Loan and Security Agreement provides in relevant
part:

> Debtor hereby grants, pledges and assigns to Secured
> Party a security interest in, and a Lien on, the
> following property of Debtor wherever located and
> whether now owned or hereafter acquired:
>
> (a)  All Debtor Accounts and Receivables.
> (b)  All guaranties, collateral, Liens on, or
> security interests in, real or personal property,
> leases, letters of credit, and other rights,
> agreements, and property securing or relating to
> payment of the Receivables.
> . . .
> (l)  All Proceeds and products of all of the
> foregoing in any form, including, without
> limitation, accounts payable under any policies of
> insurance insuring the foregoing against loss or
> damage, and all increases and profits received from
> all of the foregoing.

ECF No. 1814-1 at 21–22.

Although the 2013 Loan and Security Agreement granted United
Bank a security interest in "Debtor Accounts," the term "Debtor

Accounts" is a defined term under the agreement, meaning "the bank

accounts described in Section 2 of this Agreement." <u>Id.</u> at 10.

Section 2 of the 2013 Loan and Security Agreement describes the

bank accounts that comprise "Debtor Accounts" as follows: "the

United Payment Account, the Debtor Money Market Mutual Fund

Account, the Hourly Employees Payroll Account, and the Management

Payroll Account." <u>Id.</u> at 17.   Therefore, United Bank's security

interest in "Debtor Accounts" under the 2013 Loan and Security

Agreement grants a lien in specific deposit accounts,[8] and does

not include "accounts" as defined in the UCC or contracts such as

the BJMS West PSA.

The 2013 Loan and Security Agreement also defines the term

"Receivable." <u>Id.</u> at 15.   The 2013 Loan and Security Agreement

defines "Receivable" as follows:

> "Receivable" means the Debtor's right to payment of a
> monetary obligation, whether or not earned by
> performance: [(i)] For property that has been or is to
> be sold, leased, licensed, assigned or otherwise
> disposed of; (ii) for services rendered or to be
> rendered; (iii) for a policy of insurance issued or to
> be issued; (iv) for a secondary obligation incurred or
> to be incurred; (v) for energy provided or to be
> provided; (vi) for the use or hire of a vehicle or vessel
> under a charter or other contract; or (vii) arising out
> of the use of a credit or charge card or information

---

[8] As set forth above, "deposit accounts" are specifically excluded from the
statutory definition of "accounts." <u>See</u> W. Va. Code § 46-9-102(a)(2).  "Deposit
account" is separately defined in relevant part as "a demand, time, savings,
passbook or similar account maintained with a bank."   W. Va. Code § 46-9-
102(29).   Therefore, the term "Debtor Accounts" has been defined by the parties
to mean certain deposit accounts as contemplated by the UCC.

> contained on or for use with the card, and may, without
> limitation, in whole or in part be in the form of an
> Account, Chattel Paper, Document, Instrument, Commercial
> Tort Claims, Letter of Credit Rights or Letters of
> Credit, Investment Property or Deposit Accounts with
> Secured Party, and includes without limitation Billed
> Installment Payments.

Id. This definition is nearly identical to the definition of "account" under the UCC. With the exception of certain "winnings in a lottery or other game of chance," which exception is irrelevant here, the definition of "receivable" under the 2013 Loan and Security Agreement includes all property within the UCC's definition of "accounts," plus additional property not included in the UCC's definition of "accounts." By granting United Bank a security interest in all "Receivables" as defined by the parties under the 2013 Loan and Security Agreement to be the equivalent of the term "account" under the UCC, Debtors granted United Bank a security interest in contract rights, including the BJMS West PSA itself.[9] Accordingly, the third requirement for the attachment of

---

[9] Parties are free to modify or vary provisions of the UCC by agreement. W. Va. Code § 46-1-302(a). This freedom, however, does not permit parties to alter the meaning of defined terms under the UCC. See e.g., In re TSAWD Holdings, Inc., 565 B.R. 292, 300 (Bankr. D. Del. 2017) (finding that the parties were not free to redefine the concept of "consignment" under the UCC). Here, the parties did not redefine a statutory term. Instead, the parties utilized a contractual description of collateral that matched a separately defined term under the UCC. This contractual definition did not purport to alter the meaning of the word "accounts" under the UCC, but instead contractually agreed to a description of a term otherwise undefined under the statutes to match another term defined by the statute. Since the contractual definition of "Receivables" matches for all purposes here the statutory definition of account, it sufficiently describes the collateral to include those types of collateral that statutorily would be included within the definition of "accounts," including the BJMS West PSA.

a security interest—that the debtor authenticate a security agreement describing the collateral—was satisfied as of the date of the petition with respect to the BJMS West PSA and its proceeds, and the Court finds that United Bank held an attached security interest in the BJMS West PSA and its proceeds.[10]

**F.  United Bank failed to carry its burden establishing that its security interest in the BJMS West PSA and its proceeds is perfected.**

Under West Virginia law, secured parties "may generally perfect an attached security interest in one of four ways: (1) automatic perfection upon attachment, (2) filing a financing statement . . . , (3) control or possession of certain collateral, or (4) filing a financing statement with a specified governing body." In re Fairmont Gen. Hosp., Inc., 546 B.R. 659, 666 (Bankr. N.D.W. Va. 2016) (citing W. Va. Code § 46-9-310).  The method of perfection required or permitted under the UCC varies based on the type of collateral at issue.  To perfect a security interest in accounts, a secured party must file a financing statement.  W. Va. Code § 46-9-310.

A financing statement will perfect a security interest in accounts if it: "(1) Provides the name of the debtor; (2) Provides

---

[10]  The Amended Blackjewel Financing Statement purports to "restate" the collateral description between the parties.  Neither party argued that this restated collateral provision in the financing statement modified or replaced the collateral description in the security agreement or loan agreement, and because the Court has determined that any security interest in the BJMS West PSA is unperfected, the Court has not reached this issue.

the name of the secured party or a representative of the secured party; and (3) Indicates the collateral covered by the financing statement." W. Va. Code § 46-9-502(a). Moreover, "[a] financing statement sufficiently indicates the collateral that it covers if the financing statement provides: (1) A description of the collateral pursuant to [W. Va. Code § 46-9-108]; or (2) An indication that the financing statement covers all assets or all personal property." W. Va. Code § 46-9-504.

United Bank contends that it perfected its security interest in the BJMS West PSA by filing the Blackjewel Financing Statement on July 17, 2017. ECF No. 1541-3 at 2-6. The Amended Blackjewel Financing Statement restated the covered collateral and is the operative financing statement for purposes of any continued perfection in this case. Id. at 7-12; see also W. Va. Code § 46-9-512. The Amended Blackjewel Financing Statement identifies Blackjewel as the Debtor and United Bank as the secured party. Thus, the first two requirements under W. Va. Code § 46-9-502 are satisfied. United Bank, however, has not carried its burden to establish that the collateral description in the Amended Blackjewel Financing Statement sufficiently indicates the BJMS West PSA.

The statute provides two "safe harbors" by which a creditor may indicate its collateral. W. Va. Code § 46-9-504, Comment 2. As explained by the Comment, "[a] financing statement sufficiently

indicates collateral claimed to be covered by the financing statement if it satisfies the purpose of conditioning perfection on the filing of a financing statement, i.e., if it provides notice that a person may have a security interest in the collateral claimed." Id. To fall within the safe harbors of W. Va. Code § 46-9-504, a financing statement must indicate the collateral either by "[a] description of the collateral pursuant to [W. Va. Code § 46-9-108]," or by "[a]n indication that the financing statement covers all assets or all personal property." W. Va. Code § 46-9-504.

The safe harbors of W. Va. Code § 46-9-504 do not provide the only method by which a financing statement may sufficiently indicate collateral. "Section 9-504 and its commentary make it clear that a description of the collateral pursuant to Section 9-108 or a description sufficient under old Article 9 will be acceptable as an indication of collateral in the financing statement." 1A Secured Transactions Under the UCC § 6C.06[2] (2015). Therefore, "a non-descriptive indication by type of collateral will also do the job as it would under old Section 9-402(1)." Id. This makes prior case law relevant for determining the sufficiency of an indication of collateral in the financing statement. Id.

West Virginia has adopted the system of notice filing. See W. Va. Code § 46-9-502, Comment 2 ("The notice itself indicates

32

merely that a person may have a security interest in the collateral indicated.   Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs."). "Any perfected security interest, will only secure the collateral where the financing statement generates such inquiry." In re Systems Engineering & Energy Management Associates, Inc., 284 B.R. 226, 231 (Bankr. E.D. Va. 2002)(citing Mahon v. United States, (In re Mahon), 82 B.R. 33, 34 (Bankr. W.D. Va. 1988)).   Even in those states that adopt a notice filing system such as West Virginia, if a description of the collateral in a financing statement is insufficient, "any lien is limited to the collateral properly described." In re The Holladay House, Inc., 387 B.R. 689, 695 (Bankr. E.D.Va. 2008); aff'd, Case No. 3:08cv286, 2008 WL 4682770 (E.D. Va. Oct. 21, 2008).   Moreover, "[a] financing statement more limited in scope than the security agreement which it perfects, limits the collateral in which the creditor has a perfected interest to that described in the financing statement as against third-party creditors and a trustee [or debtor in possession] in bankruptcy." Id.

The purpose of notice filing is to "protect third parties by providing notice of the existing interest in the collateral to subsequent potential creditors of and purchasers from the debtor." Daniel v. Stevens, 183 W.Va. 95, 100 (S.C. App. W.Va. 1990); see also Helms v. Certified Packaging Corp., 551 F.3d 675, 679 (7th

Cir. 2008) ("'The purpose of the financing statement is to put third parties on notice that the secured party who filed it may have a perfected security interest in the collateral described, and that further inquiry into the extent of the security interest is prudent.'" (quoting Magna First Nat'l Bank & Trust Co. v. Bank of Illinois, 195 Ill.App.3d 1015 (1990))).  Even where the financing statement raises a warning flag, the statement itself must provide the key to objectively identifying the collateral. Gray v. Bank of Early, 2018 WL 9415069, at *3 (M.D. Ga. Sept. 20, 2018) (internal citations and quotations omitted) ("[U]nlike a collateral description in a security agreement, it is not wholly necessary that the physical description appearing of record [in a financing statement] be sufficient in itself to identify the property; however, it must raise a warning flag, as it were, providing a key to the identity of the property.").  Interested parties are not required "to contact debtors at their own expense about encumbered collateral" because there is "no guarantee of a timely or accurate answer" and such a requirement would "run contrary to the purpose of the UCC."  Altair Glob. Credit Opportunities Fund (A), LLC v. P.R. AAA Portfolio Bond Fund, Inc. (In re Fin. Oversight & Mgmt. Bd.), 914 F.3d 694, 711–12 (1st Cir. 2019).  Therefore, even if a warning flag is raised, "the prudent creditor need look no further than the security agreement." Helms, 551 F.3d at 681.

**1.    The safe harbors of W. Va. Code § 46-9-504**

The Amended Blackjewel Financing Statement does not purport
to cover all assets or personal property of the debtor.  Therefore,
to fall within the safe harbors, it must contain a description of
the BJMS West PSA that "reasonably identifies what is described."
W. Va. Code § 46-9-108(a).  A collateral description may reasonably
identify the collateral by:

> (1) Specific listing;
> (2) Category;
> (3) Except as otherwise provided in subsection (e)
> of this section, a type of collateral defined in
> the Uniform Commercial Code;
> (4) Quantity;
> (5)  Computational  or  allocational  formula  or
> procedure; or
> (6) Except as otherwise provided in subsection (c),
> any other method, if the identity of the collateral
> is objectively determinable.

W. Va. Code § 46-9-108(b).

The  Amended  Blackjewel  Financing  Statement  fails  to
adequately  indicate  accounts  under  any  of  the  six  methods
prescribed by  W. Va. Code § 46-9-108(b).  For purposes of the
Court's  analysis,  the  relevant  subsections  are:  (1)  specific
listing, (2) category, (3) collateral defined in the UCC, and (6)
the identity of the collateral is objectively determinable.   In
its posthearing brief, United Bank argues that romanettes (ii) and
(iii)  of  the  collateral  description  in  the  Amended  Blackjewel
Financing Statement sufficiently indicate the BJMS West PSA.   ECF

35

No. 1755 at 4.  This portion of the Amended Blackjewel Financing
Statement indicates the following collateral:

> (ii) all of Debtor's account receivables; (iii) all
> guaranties, collateral, liens on, or security interests
> in, real or personal property, leases, letters of
> credit, and other rights, agreements, and property
> securing or relating to payment of account
> receivables[.]

ECF No. 1541-3 at 8.  United Bank has not carried its burden to
establish that the Amended Blackjewel Financing Statement
reasonably indicates the BJMS West PSA by specific reference,
category, by type of collateral as defined in the UCC, or by other
means that is objectively determinable.

> a.   **Romanette (i) of the Amended Blackjewel Financing
> Statement does not sufficiently indicate the BJMS
> West PSA.**

Before considering whether romanettes (ii) and (iii)
sufficiently indicate the BJMS West PSA as argued by United Bank,
the Court first observes what United Bank does not contend.
Romanette (i) indicates a security interest in "Debtor's accounts,
except for Accounts  [*3238] and [*7953] established at Secured
Party." ECF No. 1541-3 at 8.  United Bank does not contend that
the reference to "Debtor's accounts" was intended to or effectively
described "accounts" as a type of collateral defined in the UCC,
nor could it have successfully made such an argument.  Romanette
(i) does not reasonably identify the BJMS West PSA because the
meaning of "Debtor's accounts" is limited both by reference to

deposit account numbers and further by the phrase "established at
Secured Party."   Romanette (i)'s limiting language—"except for
Accounts 8573-3238 and 8776-7953 established at Secured Party"—
makes clear that "Debtor's accounts," as such term is used in the
Amended Blackjewel Financing Statement, is referring to "deposit
accounts."   Under W. Va. Code § 46-9-102(2), the UCC's definition
of "account" specifically excludes "deposit accounts."   Thus, if
the Court were to conclude that the Amended Blackjewel Financing
Statement incorporates the UCC's definition of "account," the
reference in romanette (i) to deposit account numbers would be
contradictory, or at least superfluous.  Put differently, if United
Bank intended to use the UCC's definition of "account" in the
Amended Blackjewel Financing Statement, there would be no reason
to exclude certain deposit accounts because the UCC's definition
of "account" excludes all deposit accounts.   Even in the absence
of the reference to the deposit accounts, the language further
clarifies that it does not apply to the BJMS West PSA, because
that contract was not "established at Secured Party."

Even if the reference to "Debtor's accounts" in the Amended
Blackjewel Financing Statement and in the context of deposit
accounts could have created an ambiguity or put a creditor on
inquiry notice (neither of which was argued by United Bank), United
Bank did not offer any such evidence and therefore failed to carry
its burden to establish that such an inquiry would have clarified

37

the meaning of "Debtor's accounts" in a way to encompass the UCC definition of "accounts." "Accounts" and "deposit accounts" are mutually exclusive categories of collateral under the UCC. Therefore, if a creditor were to review the underlying security agreement to determine whether "Debtor's accounts" referred to "accounts" as defined by the UCC or "deposit accounts," the definition of "Debtor's Accounts" in the security agreement which contained the same depository account exclusions would have made clear that it was a reference solely to deposit accounts. ECF No. 1814-1 at 17 (defining "Debtor Accounts" as certain deposit accounts, more specifically, "the United Payment Account, the Debtor Money Market Mutual Fund Account, the Hourly Employees Payroll Account, and the Management Payroll Account").[11]

---

[11] United Bank did not, and cannot now, successfully argue that, if a duty to review the security agreement were raised with respect to a single term, the indication becomes sufficient as to any additional categories of property that are not adequately indicated in the financing statement, but which are discovered during the process of the review. To illustrate, if a creditor were reviewing the security agreement in this case to determine the meaning of "Debtor's accounts" and during its review discovered that the security agreement also granted a security interest in all Debtors' equipment that was not indicated in the security agreement, the review would not somehow magically confer perfection on this equipment. Such a conclusion would effectively undo the notice provisions of the UCC and encourage non-sensical or intentionally ambiguous indications in financing statements such that a review of the security agreement would divulge what was not indicated adequately in the financing statement. Therefore, although a review of the security agreement to divine the meaning of "Debtor's accounts" may in the process disclose an additional unperfected security interest in "Receivables" as defined therein, the review of the agreement itself does not confer perfection on the separate category of "Receivables" as defined in the agreement if the UCC defined category of "accounts" in insufficiently indicated in the financing statement itself. For the reasons set forth herein, the Amended Blackjewel Financing Statement does not sufficiently indicate "accounts" as defined by the UCC.

b.  **"Accounts receivable" does not sufficiently identify the BJMS West PSA by category or type as defined in the UCC.**

United Bank has not carried its burden in establishing that romanette (ii) reasonably indicates "accounts" as defined under the UCC or "Receivables" as defined under the 2013 Loan and Security Agreement.  Romanette (ii) does not indicate the BJMS West PSA specifically, but categorically indicates "all of Debtor's account receivables."  Account receivables is not a defined type of collateral under the UCC, and therefore does not sufficiently indicate the collateral by a type defined under the UCC as contemplated by W. Va. Code § 46-9-108(b)(3).

Accounts receivable also does not sufficiently indicate the BJMS West PSA by category.  The collateral categories of accounts receivable and accounts are no longer coextensive or synonymous under the UCC, and United Bank did not cite any authority that

they are.[12]  Although the UCC term accounts includes the subcategory

of accounts receivable, Interbusiness Bank, N.A. v. First National

Bank of Mifflintown, 318 F.Supp.2d 230, 244 (M.D. Pa. 2004)(Under

the Pennsylvania UCC, "'accounts' include 'the ordinary commercial

account receivable,'")(citing PA Code § 9109, Comment 5 "A 'sale'

of an account, chattel paper, a promissory note, or a payment

intangible includes a sale of a right in the receivable, such as

a sale of a participation interest."); Pascack Community Bank v.

---

[12] The Court located one pre-amendment case from the Fourth Circuit in which the
court equated accounts receivable and accounts.  In In re Varney Wood Products,
Inc., the Fourth Circuit found, with regards to the 1962 version of the UCC
adopted in Virginia, that a financing statement that described the collateral
as "accounts receivable" was sufficient to indicate and therefore perfect a
security interest in the proceeds of a contract. 458 F.2d 435 (4th Cir. 1972).
The Court found that the term "accounts receivable" was synonymous with
"accounts," and was "sufficiently descriptive, as witnessed by the definition
in the official comments, its use in other jurisdictions, and the analysis of
code commentators, to put third parties on notice that a security interest."
Id. at 437 (relying on the official comment to former Va. Code Ann. § 8.9-106,
stating that "'accounts' is defined as the 'ordinary commercial account
receivable'").  As reflected in the definition and discussion above, accounts
are no longer limited solely to "the ordinary commercial account receivable."
See W. Va. Code § 46-9-102 Comment 5.a. ("The definition of "account" has been
expanded and reformulated.  It is no longer limited to rights to payment relating
to goods or services." (emphasis added)).

At the time the Fourth Circuit decided Varney Wood, the Virginia UCC
distinguished between "contract rights" and "accounts," with "accounts"
resulting from contracts only where performance had already occurred—therefore,
it could be said that payment was at that time "receivable."  As a result, a
security interest in any particular account could not arise until the contract
had been performed and the debtor's rights in the collateral came to exist.
The UCC definition for account has changed and broadened post-Varney Wood, and
it is no longer appropriate to read account receivable, which previously only
referred to existing obligations, to encompass all obligations now contemplated
by the broader term "account."  In fact, when the Fourth Circuit issued its
opinion in Varney Wood, the UCC term "accounts" did not include "contract
rights" as it now does.  See e.g., Cissell v. First Nat. Bank of Cinn., 471
F.Supp. 480, 485 (S.D. Oh. 1976) (applying Ohio UCC, noting the then recent
change in the definition of accounts, observing that Ohio had not adopted the
change, and determining that the prior version excluded contract rights from
the term accounts).  Account receivable now is merely a subset of the UCC term
"account."  As such, the analysis in Varney and case law interpreting the pre-
amended UCC definition of "account" is not instructive.

Universal Funding, LLP, 419 N.J. Super. 279, 289 (N.J. Super. A.D. 2011)(citing New Jersey UCC provisions and stating that "[a]ccounts receivable fall within the definition of 'payment intangible,' i.e., 'a general intangible under which the account debtor's principal obligation is a monetary obligation,' N.J.S.A. 12A:9-102(a)(61), and, therefore, lie within the scope of Chapter 9 of the UCC."), accounts receivable is not as broad a category as accounts under either the UCC or § 552(b) of the Bankruptcy Code.

The opinion in Slab Fork and § 552(a) further illustrate that accounts receivable and accounts are distinct categories of collateral. By basing its decision on the distinction between a security interest in accounts receivable generated postpetition and a security interest in the underlying contract and its proceeds (which proceeds may include accounts receivable generated postpetition), 784 F.2d at 1191, the Fourth Circuit necessarily recognized the distinction between a security interest in accounts receivable on the one hand, and a security interest in the underlying contract or "accounts" as defined under the UCC on the other. This distinction is critical because it is well settled that § 552(b) cuts off any security interest in accounts receivable arising post-petition. See e.g., In re Skagit Pacific Corp., 316 B.R. 330, 336 (9th Cir. BAP 2004) ("[p]roceeds of post-petition accounts receivable do not fall within the § 552(b) proceeds

exception") (citing In re HRC Joint Venture, 175 B.R. 948, 953 (Bankr. S.D. Ohio 1994); In re Texas Tri-Collar, Inc., 29 B.R. 724, 726-27 (Bankr. W.D. La. 1983); and In re Cross Baking Co., 818 F.2d 1027, 1032 (1st Cir. 1987)).   By necessary implication, therefore, a financing statement that indicates a security interest in accounts receivable is insufficient to perfect a security interest in the broader UCC category of "accounts" generally, or the BJMS West PSA specifically.   Therefore, the BJMS West PSA is not sufficiently indicated in the Amended Blackjewel Financing Statement by the category or defined type of "accounts receivable."

> **c.    The Amended Blackjewel Financing Statement does not sufficiently indicate the BJMS West PSA by specific listing.**

The financing statement does not contain any specific reference to the BJMS West PSA.   Notably, however, the collateral description in the Amended Blackjewel Financing Statement describes other specific contracts.   For example, the Amended Blackjewel Financing Statement, in relevant part, asserts a lien on the following contracts:

> (vi) all proceeds payable to or sums owed to Debtor under any contracts agreements or other documents between Debtor and Mercuria Energy Group Limited, a company organized under the laws of Cyprus; (vii) all proceeds payable to or sums owed to Debtor under any contracts, agreements or other documents between Debtor and MR Coal; (viii) all proceeds payable to or sums owed to Debtor under any contracts, agreements or other documents between Debtor and Mercuria US Asset Holdings,

42

LLC, a Delaware limited liability company; (ix) all
amounts due to Debtor under that certain Contract Mining
Agreement dated June 10, 2011 between Revelation and
Jewell Smokeless Coal Corporation, a Virginia
corporation (as amended, amended and restated,
supplemented or otherwise modified)

ECF No. 1541-3 at 9.[13]  The BJMS West PSA, however, is not
specifically indicated in the Amended Blackjewel Financing
Statement, and therefore is not sufficiently indicated by specific
reference.

> **d.   Romanette (iii) of the Amended Blackjewel Financing
> Statement does not sufficiently indicate the BJMS
> West PSA.**

Romanette (iii) indicates the following collateral:

(iii) all guaranties, collateral, liens on, or security
interests in, real or personal property, leases, letters
of credit, and other rights, agreements, and property
securing or relating to payment of account receivables.

ECF No. 1541-3 at 8. United Bank redacts this indication, and
contends that it should be read in relevant part to indicate
collateral consisting of "agreements . . . related to the payment
of accounts receivable." Debtors disagree. Instead, Debtors
contend:

[R]omanette (iii) grants United Bank a lien on
Blackjewel's then existing liens or security interests
in "real or personal property, leases, letters of
credit, andother rights, agreements and property" to the
extent such enumerated items relate to Blackjewel's

---

[13] Counsel for Debtors drew the further distinction between the effect of section
552(b) and <u>Slab Fork</u> on a security interest in the underlying contract itself
and a security interest in the proceeds of the contract. ECF No. 2074 at 53,
lines 20-25, and 54, lines 1-7. Because the BJMS West PSA is not specifically
indicated regardless, the Court need not consider the effect, if any, of that
distinction for these purposes.

accounts receivables. It is effectively a lien on
Blackjewel's liens and not an independent lien on the
Prepetition PSA.

ECF No. 1756 at 5 ¶ 8.

Parsing the phraseology and punctuation, the Court agrees
with Debtors' reading of the indication. Including the entirety
of the indication, romanette (iii) indicates any property of the
debtor constituting:

(1)  (a)  guaranties,
     (b)  collateral, or
     (c)  lien rights (including security interests) in real
          or personal property, leases, letters of credit and
          other rights, agreements, and property;

(2)  that secure or relate to Blackjewel's rights to payment
     against third parties for payment of its accounts
     receivable.

This is the only way to read the indication romanette (iii) that
does not lead to an absurd result for several reasons. First,
"liens on, or security interests in" must modify the entire
remaining list of property contained in (1)(c) because, if it did
not, then the phrase would not modify the significantly broader
term "property" either. If property is not limited to property in
which Debtors hold a lien, it would broaden the sub-category to
include all "property related to the payment of accounts
receivable." This category would be so amorphous as to be
meaningless. Second, the categorical indication in romanette
(iii) (as with any other reference to collateral in a financing
statement filed to perfect a lien in Debtors' property) only can

44

refer to Debtor's property because Debtors only may grant a
security interest in their assets.   Therefore, United Bank cannot
circularly argue that this indication includes its own lien rights
on Receivables (including the BJMS West PSA) under the 2013 Loan
and Security Agreement.   As such, this category indicates Debtors'
lien rights in any agreements relating to the payment of accounts
receivable.   This categorical indication makes sense, and it is
understandable why a secured party may desire a lien in this
additional category of collateral in order for the bank to secure
and enforce payment of the Debtors' outstanding accounts
receivable against third party obligors.   Nevertheless, there is
no evidence that any such liens (or guaranties or collateral) in
favor of Debtors exist, and to the extent that they do, they are
not at issue in this proceeding.

By emphasizing only certain words and wholly ignoring the
remainder of the indication, United Bank encourages the Court to
read the indication other than by its plain language.   Such an
indication, if it existed, would be sufficient to indicate the
BJMS West PSA, but requires a complete re-write of the indication,
and further would require the reader, including any third-party
who attempts to determine the extent of the property subject to
any putative perfected lien, to ignore the remainder of the
indication.

Unlike United Bank's proposed redaction, the plain reading interpretation is consistent with both the prior iterations of the financing statements between the parties and the language in the 2013 Loan and Security Agreement and does not lead to an absurd indication.  First, the original financing statement specifically indicated a security interest in all "Receivables," which, for the reasons stated above, would include all Debtors' agreements.  The original financing statement then further provided an indication almost identical to romanette (iii) as follows:

> (b) all guaranties, collateral, Liens on, or security
> interest in, real or personal property, leases, letters
> of credit, and other rights, agreements, and property
> securing or relating to payment of the Receivables.

ECF No. 1541-2 at 2.  If interpreted as proposed by United Bank, the original financing statement would be completely circular and non-sensical because it would grant a lien in all of Debtors' agreements, and then additionally grant a lien in all of Debtors' agreements related to the payment of Debtors' agreements.

Interpreting the language as proposed by United Bank would lead to a similarly circular description of the collateral in the 2013 Loan and Security Agreement.  The security agreement describes the collateral as:

> (a)  All Debtor Accounts and Receivables.
> (b)  All guaranties, collateral, Liens on, or
> security interests in, real or personal property,
> leases, letters of credit, and other rights,
> agreements, and property securing or relating to
> payment of the Receivables.

46

ECF No. 1541-1 at 21.  Again, if read as proposed by United Bank, this description would absurdly purport to grant a security interest in all Debtors' agreements and in all Debtors' agreements relating to the payment of Debtors' agreements.  Therefore, the writings between the parties further illustrate why United Bank's proposed redaction of the indication is erroneous, and, as written, the indication does not include any category into which the BJMS Contract falls.  It therefore does not indicate the BJMS West PSA.

United Bank cannot successfully argue that the failure to properly describe the collateral in the Amended Blackjewel Financing Statement is saved by review of the 2013 Loan and Security Agreement and the broad grant of a security interest in all of Debtors' "Receivables" any more than it could avail itself of the granting of a security interest in any other collateral that might be included in the security agreement, but is not indicated in the financing statement.  To illustrate the problem that would be created by such a result, and one that the UCC notice requirements are designed to avoid, a reasonably prudent title searcher acting on behalf of a third-party that was considering whether to loan funds in exchange for a security interest in a portion or all of Debtors' contract rights would not be able to determine from either the Amended Blackjewel Financing Statement or the 2013 Loan and Security Agreement whether any particular contract, including the BJMS West PSA, was encumbered by a

47

perfected lien. See 1A Secured Transactions Under the UCC §
6C.06[1] ("To describe in a technical Article 9 sense, requires
the draftsperson to draw a verbal circle around the assets covered
so that it is later possible to segregate assets within the
collateral circle from those not included."). The language in the
Amended Blackjewel Financing Statement only extends so far as its
description, regardless of whether the 2013 Loan and Security
Agreement grants a broader interest in all "Receivables" or
accounts. Holladay House, 387 B.R. at 695 (citing Suntrust Bank
v. Hudgins (In re Sys. Eng'g & Engergy Mgmt, 284 B.R. 226, 232
(Bankr. E.D. Va. 2002)); see also Amex-Protein Dev. Corp., 504
F.2d 1056, 1061 (9th Cir. 1974); In re Door Supply Center, Inc.,
3 B.R. 103, 106 (Bankr. D. Idaho 1980)("A financing statement, if
more limited in scope than the security agreement which it
perfects, limits the collateral in which the creditor has a
perfected security interest to that description as against third
party creditors and a trustee in bankruptcy." (citations
omitted)). Regardless how the indication in the financing
statement is read, the description is as broad as the definition
of "Receivables" under the 2013 Loan and Security Agreement.
Therefore, this is not a case in which an ambiguous description in
the financing statement may include the entirety of the collateral
described in the underlying security agreement and reference to
the security agreement simply clarifies the ambiguity, or where a

48

nonspecific broad indication in the financing statement is
clarified and limited by the security agreement. Instead, the
description, at best, indicates a subset of "Receivables." Thus,
the indication itself defines and limits the category of collateral
it covers and must enable a third-party to determine what is
included.[14]   For the reasons stated above, the description as
written fails to adequately identify the BJMS West PSA or any
category into which it would fall, and therefore is deficient.

### e. The Amended Blackjewel Financing Statement does not indicate the BJMS West PSA by some other objectively determinable method.

Courts have permitted a financing statement to indicate
collateral by incorporation of the description in an identified
security agreement by reference.  See Leasing Service Corp. v.
Hobbs Equipment Co., 894 F.2d 1287, 1290 (11th Cir. 1990)("The
financing statement filed by LSC . . . provided that LSC's security
interest covered "[a]ll machinery, inventory, equipment and goods

---

[14] Even if the indication were ambiguous, United Bank failed to carry its burden
to demonstrate that the financing statement sufficiently indicated the BJMS
West PSA.  When the financing statement contains an ambiguous indication,
further inquiry from the parties will be necessary.  W. Va. Code § 46-9-502,
Comment 2.  Nevertheless, interested parties are not required "to contact
debtors at their own expense about encumbered collateral" because there is "no
guarantee of a timely or accurate answer" and such a requirement would "run
contrary to the purpose of the UCC." Altair Glob. Credit Opportunities Fund
(A), LLC v. P.R. AAA Portfolio Bond Fund, Inc. (In re Fin. Oversight & Mgmt.
Bd.), 914 F.3d 694, 711–12 (1st Cir. 2019).  An interested party need look no
further than the security agreement.  Helms, 551 F.3d at 681.  Regardless, even
if an interested party had contacted Debtors or the bank to attempt to clarify
the meaning of romanette (iii), United Bank did not offer any evidence
regarding what such an inquiry would have revealed.

as described in attached *entire* agreement. . .." (emphasis added).
This puts the reader on notice that he should read the entire lease
agreement."); <u>In re I80 Equipment, LLC</u>, 938 F.3d 866, 874 (7th
Cir. 2019) (reversing and remanding after holding the UCC permits
a financing statement to specify collateral by referencing the
security agreement) ("The financing statement covers: 'All
Collateral described in First Amended and Restated Security
Agreement dated March 9, 2015 between Debtor and Secured Party.'");
<u>see also</u> <u>Holladay House</u>, 387 B.R. at 696 ("Courts have routinely
held that creditors may incorporate by reference security
agreements into financing statements and such incorporation is
sufficient notice.").

United Bank did not contend that the reference to the 2013
Loan and Security Agreement in the Amended Blackjewel Fincing
Statement properly indicated the BJMS West PSA, and the Court need
not determine whether a financing statement may incorporate a
description from a security agreement by reference because no such
incorporation occurred here.  <u>See</u> <u>Holladay House</u>, 387 B.R. at 696
(distinguishing <u>Leasing Service Corp.</u>, and holding that, although
the creditor actually filed a copy of the security agreement that
contained an adequate description of the collateral with the
financing statement, it did not incorporate that description into
the collateral indication in the financing statement, and
therefore the financing statement did not sufficiently indicate

50

the collateral); cf. In re DeNauw's Inc., 47 B.R. 290, 293 (Bankr.
D. N.H. 1985) (applying the standards under former Article 9, and
observing that a reasonable title searcher "might well have
concluded that the reference to the loan agreement simply would
give further details as to the structuring of the debt obligations
involved," rather than constitute an incorporation of any
collateral description therein).

Unlike the creditor in Holladay House, United Bank did not
file any version of the security agreement with the Amended
Blackjewel Financing Statement.   Moreover, although the Amended
Blackjewel Financing Statement references the 2013 Loan and
Security Agreement, it does not incorporate the collateral
description from the 2013 Loan and Security Agreement.   See ECF
No. 1541-3 at 7 ("This financing statement is being filed pursuant
to that certain Loan and Security Agreement dated July 18, 2012
among Debtor, Revelation Energy, LLC ("Revelation"), Revelation
Energy Holdings, LLC and Secured Party (as amended, amended and
restated, supplemented, or otherwise modified) and that certain
Business Loan Agreement dated May 28, 2013 among Debtor, Revelation
and Secured Party (as amended, amended and restated, supplemented,
or otherwise modified)").   This distinction is particularly
important here because the filed Amended Blackjewel Financing
Statement expressly provides that it was filed to restate the
collateral securing any obligations owed to United Bank.

51

Therefore, the reference to the 2013 Loan and Security Agreement does not incorporate any collateral description from that agreement into the indication in the filed Amended Blackjewel Financing Statement.

### 2. The BJMS West PSA is not sufficiently indicated under former Article 9 § 9-402(1).

The safe harbors for identification under W. Va. Code. § 46-9-504 are not the only way for a financing statement to indicate the collateral sufficiently. Indications that would be sufficient under old Article 9 still suffice. 1A Secured Transactions Under the UCC § 6C.06[2]. Nevertheless, "[d]escription under both versions of Article 9 demands a reasonable identification of the assets." Id. at § 6C.06[1]. Former W. Va. Code § 46-9-402(1) (1999), was more exacting, and required that a financing statement contain "a statement indicating the types, or describing the items, of collateral." Cf. In re I80 Equip., LLC, 938 F.3d 866, 871 (7th Cir. 2019) (noting the distinction, finding the additional method of indication in § 9-108(b)(6) determinative in permitting a financing statement to incorporate a collateral description by reference to the security agreement, and noting that "after the revision [of Article 9] the statement must only 'indicate' collateral,'" even if it would not have satisfied former § 9-402(1)). As explained by one court under former Article 9:

> [T]he description of personal property is a sufficient
> description if it reasonably identifies what is

52

described.  If the description is sufficient, then the credit searcher must make inquiry as to the exact nature and extent of the collateral secured.  However, collateral not listed is not encumbered.

Cissell v. First Nat. Bank of Cincinnati, 471 F.Supp. 480, 486 (S.D. Oh. 1976).  For the reasons previously stated, the indication in the Amended Blackjewel Financing Statement does not sufficiently describe the BJMS West PSA either specifically or by category or type, and would have been insufficient under former Article 9.

## G.   Equities of the Case

Even if United Bank had a lien in the BJMS West PSA, Debtor asks the Court to find that its lien does not attach to the post-petition proceeds of the contract based on the equities of the case under § 552(b).  United Bank contends that the equities of the case tilt in its favor, and the Court should order that a security interest attaches to the BJMS Settlement Proceeds.  For the reasons that follow, the Court concludes that it would be inequitable for any liens to attach to the postpetition proceeds in this case because those proceeds arose out of unencumbered inventory of the estate, and allowing United Bank to receive the proceeds of unencumbered estate assets would be inequitable to the unsecured creditors.

As noted above, § 552(a) provides the general rule that property acquired by the estate or by the debtor post-petition is

not subject to any lien resulting from any prepetition security agreement, except as provided by subsection (b).  11 U.S.C. § 552(a).[15]  Subsection (b) of § 552 contains the sole exceptions "to the general rule that property acquired post-petition is not subject to a security interest created by a pre-petition security agreement." In re Laurel Hill Paper Co., 393 B.R. 89, 92 (Bankr. M.D.N.C. 2008)(citations omitted).   "The exceptions found in § 552(b)(1) are, in turn, subject to the exception that the court may order otherwise based on the 'equities of the case.'" In re Endresen, 548 B.R. 258, 268 (9th Cir. BAP 2016).

Bankruptcy courts have "considerable latitude" in deciding whether to apply the equities of the case exception. See, e.g., Slab Fork, 784 F.2d at 1191 ("[I]t should be noted that § 552(b) gives the bankruptcy court considerable latitude in applying pre-petition security interests to post-petition proceeds.   As evidenced by the final clause in § 552(b), a bankruptcy court may

---

[15] Specifically, subsection (b)(1) provides:

> Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, **except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise**.

11 U.S.C. § 552(b)(1) (emphasis added).

choose not to apply a pre-petition security interest to post-petition proceeds 'based on the equities of the case.'"). The legislative history of section 522 indicates that the equitable exception to section 522(b) is intended to "cover[] the situation where raw materials, for example, are converted into inventory, or inventory into accounts, at some expense to the estate, thus depleting the funds available for general unsecured creditors, but is limited to the benefit inuring to the secured party thereby." H.R. Rep. No. 95-989, at 91 (1978).

To determine whether to apply the equities of the case exception, courts look to the following three factors: (1) "the amount of time and estate funds expended on the collateral," (2) "the position of the secured party," and (3) "the rehabilitative nature of the bankruptcy case." Laurel Hill, 393 B.R. at 93. Because Debtor has filed a liquidating plan, the third factor is not at issue. Here, the inequitable expense to the estate is not limited to any actual funds expended, but further includes the loss to the estate occasioned by the conversion of unencumbered coal inventory to post-petition proceeds of a potentially encumbered but unassumed contract.

As United Bank correctly points out, courts place the most weight on the second factor, where the "debtor expend[s] unencumbered funds of the estate, at the expense of the unsecured creditors, to enhance the value of the collateral." Id. at 93

(citing In re Tower Air, Inc., 397 F.3d 191, 205 (3rd Cir. 2005)
and In re Delbridge, 61 B.R. 484, 490 (Bankr. E.D. Mich. 1986)
(internal citations omitted)).   To the extent that United Bank
held a lien in the BJMS West PSA, the estate was significantly
depleted by selling millions of dolloars of otherwise unencumbered
estate   assets   under   the   putatively   encumbered   contract.
Therefore, allowing United Bank to receive the proceeds of these
unencumbered assets would create a windfall to the bank at the
expense of the estate and unsecured creditors.

The record reflects that all the coal sold in connection with
the BJMS settlement was property of Blackjewel mined from its
Wyoming operations.   ECF No. 1541 at 8, ¶ 20; ECF No. 2074 at 45,
lines 6-7 and 46, lines 16-19.   United Bank failed to carry its
burden establishing a perfected security interest in any mined
coal owned by Blackjewel in Wyoming for a number of reasons.
Debtors' mined coal constitutes "inventory."   See W. Va. Code §
46-9-102(a)(48).   Under the July 18, 2012 Loan and Security
Agreement, Revelation granted United Bank a security interest in
inventory, among other collateral, see ECF No. 1541 at 3, ¶ 7
(citing § 3.1 of the 2012 agreement), and Blackjewel joined that
agreement under the 2017 Joinder Agreement.   Case No. 3:19-bk-
30289, Claim 116-2 at 5.   In connection with the security interest
in inventory granted under the 2012 agreement, United Bank recorded
a mortgage related to certain Kentucky mining operations that

granted an interest, among other things, in as-extracted coal.
See Case No. 3:19-bk-30292, Claim 8-1 at 9 (the "Kentucky
Mortgage"). On February 28, 2013, however, the parties entered
the 2013 Loan and Security Agreement, which did not include
inventory among the collateral in which Debtors granted a security
interest. ECF No. 1541-1 § 3.1. In fact, although the 2013 Loan
and Security Agreement granted a lien in the coal mining *facilities*
in Kentucky, it no longer purported to grant a lien in the minerals
derived from the premises. Id. § 3.2. Regardless, neither the
Kentucky Mortgage, the 2012 Loan and Security Agreement, nor the
2013 Loan and Security Agreement purported to grant a lien in as
extracted coal from the Wyoming operations.

Even if the security agreements or Kentucky Mortgage had
purported to convey a security interest in the Wyoming coal, such
an interest would have been unperfected. Unmined coal is part of
an interest in real property. Once removed from the real property,
mined coal constitutes "as-extracted collateral." W. Va. Code §
46-9-102(a)(6). In order to perfect a security interest in as-
extracted collateral, a secured creditor must include an
indication of the collateral (in this case, inventory) in its
recorded financing statement, and either: (1) indicate that it is
to be filed for record in the real property records and provide a
legal description of the real property to which the collateral is
related; or (2) record a mortgage indicating the goods it covers.

W. Va. Code § 46-9-502(b) and (c). First, "inventory" is not among those types of collateral listed in the Amended Blackjewel Financing Statement. Therefore, even if the recorded Kentucky Mortgage satisfied W. Va. Code § 46-9-502(c) with respect to the Wyoming coal, the financing statement failed to meet the first requirement for perfection of that interest. But the Kentucky Mortgage also did not purport to encumber the Wyoming Coal. Instead, the mortgage: (1) secured only those obligations under the Note and 2012 Loan and Security Agreement, as amended, Case No. 3:19-bk-30292, Claim 8-1, p. 10, and the amended security agreement did not assert a lien in inventory; (2) was not recorded in the land records in Wyoming; (3) did not contain a legal description of the property in Wyoming; and (4) did not grant a security interest in coal extracted in Wyoming. For these reasons, the coal sold by Debtors to BJMS post-petition was unencumbered by United Bank's liens, and to the extent, if any, it was converted to create encumbered proceeds under the BJMS West PSA, allowing any pre-petition security interest to attach to these post-petition proceeds would constitute a windfall to United Bank at the expense of the estate and unsecured creditors. Therefore, it would be inequitable to permit any lien held by United Bank to attach to the post-petition proceeds of the unencumbered coal, even if those proceeds ultimately were realized under the BJMS West PSA.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** as follows:

1.     The Motion for Adequate Protection is denied;

2.     The Agreed Order Adjourning United Bank's Motion for Adequate Protection, ECF No. 1318, is terminated;

3.     The Residual BJMS Settlement Proceeds are unencumbered by any perfected security interest in favor of United Bank; and

4.     This Order is hereby stayed until the expiration of fourteen (14) days after its entry.