## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| Blackjewel, L.L.C., *et al.,* | ) | Case No. 19-30289 |
|  | ) |  |
| Debtors[1] | ) | (Jointly Administered) |
|  | ) |  |

## OBJECTION OF INDEMNITY NATIONAL INSURANCE COMPANY TO THE FIRST AMENDED DISCLOSURE STATEMENT AND FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR BLACKJEWEL L.L.C. AND ITS AFFILIATED DEBTORS

Indemnity National Insurance Company ("INIC"), by and through its undersigned counsel, hereby objects (the "Objection") to the First Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for Blackjewel L.L.C and its Affiliated Debtors [Docket No. 2499] (the "Disclosure Statement") and the Joint Chapter 11 Plan of Liquidation for Blackjewel L.L.C and its Affiliated Debtors [Docket No. 2500] (the "Plan").   In support of its Objection, INIC respectfully states as follows:

## PRELIMINARY STATEMENT

1.      There can be no dispute that the Debtors' cases have been challenging and, based on any reasonable standard, should be considered a failure.  From a cash perspective, the Debtors are administratively insolvent by tens of millions of dollars with unpaid post-petition payables of more than [$30 million].   Those figures do not even include the cost of any of the Debtors' unresolved and unfunded environmental liabilities.  The Debtors concede, as they must, that,

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024) and Cumberland River Coal LLC (2213).

absent consent of impaired administrative, expense, and priority claimants, they cannot confirm a plan, but argue that the best outcome in this case is for all creditors to make sacrifices and to allow the Debtors' current professionals to remain employed and to pursue various litigation <u>recoveries that only they can obtain</u>.  Based on that premise, on the idea that this case should technically be converted but that there may be a better outcome for everyone under a plan, one would assume that such a Plan would contain no "bells and whistles;" that it would merely provide for a disinterested liquidation trustee with the authority to investigate and pursue <u>any and all</u> causes of action with pro-rata distributions to be made from any resulting proceeds.  That is not the case. Instead, the Plan proposes: broad releases, for no consideration, of the Debtors' insiders and estate professionals, including proposed releases of statutory environmental liability; blanket avoidance-action releases; priority treatment for the fees of "Ongoing Professionals;" a conflicted Liquidation Trustee who will charge $25,000 per month for his services, plus the costs of his professionals; and a "Reclamation Trust," that foists all of the Debtors' obligations on to the sureties, and which is contrary to both law and logic.

2.      The Debtors have had their opportunity (for the past 18 months) to address the issues that have arisen in these cases – they have been unable to do so.  It is now time for someone else to have that same opportunity and to have it with the benefit of all of the Debtors' privileges and causes of action and without the burden of unfounded releases and exculpations.  Stated simply, not every Chapter 11 case is supposed to end in a confirmed plan of reorganization and parties should not seek to distort the requirements of the Bankruptcy Code just to make it happen. Chapter 7 conversions occur for a reason and, although they are often unpleasant, sometimes they are the only appropriate result.  This is one of those cases.

3.      As set forth below, the Plan cannot be confirmed because: (i) the treatment of administrative expense claimants violates § 1129(a)(9) of the Bankruptcy Code; (ii) the Debtors' liquidation analysis relies on erroneous and unprovable assumptions and the Plan does not satisfy § 1129(a)(7)'s "best interests of creditors" test; (iii) the Plan violates the Bankruptcy Code because it does not provide for equal treatment of all administrative expense claimants; (iv) the Plan is not feasible because the operation and funding of the proposed Reclamation Trust is contrary to law; (v) the releases and exculpations granted to the "Released Parties" are impermissible; and (vi) the Plan has not been proposed in "good faith."

4.      Given that the Court was not involved in the first year of this case, and may not have had significant experience with coal mining bankruptcies, INIC has provided a more detailed factual background than it would typically provide in a Plan objection.  INIC hopes that such detail is helpful to the Court, as INIC believes that such context is important when viewing the "totality of the circumstances" surrounding the Debtors' Plan.

## PROCEDURAL BACKGROUND

5.      Blackjewel, L.L.C., Blackjewel Holdings, L.L.C., Revelation Energy Holdings, LLC, Revelation Management Corporation, and Revelation Energy, LLC (the "Original Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on July 1, 2019 (the "Original Petition Date").  On July 25, 2019 (the "New Petition Date" and collectively the "Petition Dates"), Dominion Coal Corporation, Harold Keene Coal Co LLC, Vansant Coal Corporation, Lone Mountain Processing, LLC, Powell Mountain Energy, LLC and Cumberland River Coal LLC (the "New Debtors" and collectively with the Original Debtors, the "Debtors") also filed voluntary petitions under chapter 11 of the Bankruptcy Code.

6.      On October 16, 2020, the Court entered that Order (I) Scheduling a Combined Hearing for Disclosure Statement Approval and Plan Confirmation; (II) Establishing the Solicitation Procedures and Dates, Deadlines, and Notices Related Thereto, and (III) Granting Related Relief [Docket No. 2470] (the "Combined Hearing Order").

7.      Pursuant to the Combined Hearing Order, objections to approval of the Disclosure Statement and confirmation of the Plan must be filed by December 10, 2020 at 4:00 p.m. EST.

## FACTUAL BACKGROUND

### Permits and Environmental Obligations

8.      The Debtors were engaged in the mining and production of metallurgical and thermal coal.  In order to conduct these operations, the Debtors were required to obtain mining and water-discharge permits from, among others, the Kentucky Department for Natural Resources, Energy & Environment Cabinet ("KY DNR"), the Virginia Division of Mines, Minerals & Energy ("VDMME"), and the U.S. Army Corps of Engineers (collectively, and including all other applicable regulatory authorities, the "Regulators").

9.      The Regulators are responsible for enforcing the various reclamation and water treatment standards imposed by each state's version of the Surface Mining Coal and Reclamation Act and the Clean Water Act (each an "Act" and collectively, the "Acts").[2]  "In general, reclamation . . . requires the surface of the land to be restored to its approximate original contour and water polluted by mining operations to be properly treated before leaving the mine site." *Cat Run Coal v. Babbitt*, 932 F. Supp. 772, 774, n. 3 (S.D. W. Va. 1996).

---

[2] In 1977, Congress enacted the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201, *et. seq.* Pursuant to § 1253 of SMCRA, a state may assume primary jurisdiction for regulation and enforcement of surface coal mining operations and reclamation within its borders, so long as its regulatory program is as stringent as the federal program and is approved by the Office of Surface Mining and Reclamation Enforcement. 30 U.S.C. § 1253(a). Kentucky and Virginia each have approved state programs.

10. The Acts were enacted because "unregulated surface coal mining operations cause soil erosion, damage from rolling stones and overburden, landslides, stream pollution, the accumulation of stagnant water and the seepage of contaminated water, increase the likelihood of floods, destroy the value of land for agricultural purposes, destroy aesthetic values, counteract efforts for the conservation of soil, water and other natural resources, destroy or impair the property rights of citizens, create fire hazards and in general create hazards dangerous to life and property, so as to constitute an imminent and inordinate peril . . ." KRS § 350.020. *See also* 30 U.S.C. § 1201(c); VA ST § 45.1-228.

11. To be issued a mining permit, an operator must submit a detailed reclamation plan and post a penal bond payable to the applicable Regulator. *See* VA ST § 45.1-241; KRS § 350.064(1). Notwithstanding this bonding requirement, a permittee retains the primary responsibility to perform and fund reclamation and water treatment. To the extent that the costs of compliance exceed the face amount of the applicable bond, the permittee (and its "owners and controllers") are solely responsible for payment of those excess costs. *See* 405 KAR 10:050(4).

12. The Debtors, like most mining companies with multiple operations, divide those operations into mining complexes. Although a single mining complex may contain multiple permits, the mining and reclamation plans incorporated into each permit assume the continuity of the mining complex. As a simple example, the reclamation plan for 'Permit A' may provide that spoil from mining shall be deposited onto "Permit B." The exclusion of a particular permit from a mining complex may make the operation or reclamation of the remainder of that complex impossible or cost-prohibitive.

13. If a permittee fails to comply with the Acts' reclamation requirements, the Regulators can, among other remedies, demand compliance through a notice of violation /

non-compliance, issue civil and criminal fines and penalties, order the cessation of mining activities, revoke the applicable permit, and/or forfeit the applicable bond. *See VA ST §§ 45.1-245-246; 4 VAC 25-130-843.11; KRS § 350.130; 405 KAR 10:050; 405 KAR 12:020. See also Nat'l Resources & Enviro. Protection Cabinet v. Whitley Dev. Corp.*, 940 S.W.2d 904, 908 (Ky. App. 1997) (the cabinet can pursue remedies against the permittee in lieu of bond forfeiture or concurrent with a determination of bond forfeiture).

14.     It is not only the permittee that is subject to liability under the Acts.  The Acts also provide that the permittee's "agents" are jointly and severally liable for the costs necessary to complete reclamation activities and for fines and penalties.  The corporate officers of a permittee and any other party who is "charged with responsibility for protecting society and the environment from the adverse effects of surface mining operations" is an "agent" that is subject to personal liability.[3]  *See e.g. United States v. Dix Fork Coal Co.*, 602 F.2d 436 (6th Cir. 1982); *Couch v. Nat. Resources & Enviro. Protect. Cabinet*, 986 S.W.2d 158 (Ky. 1999).  Additionally, the officers and agents of a permittee are subject to the same civil and criminal penalties as the permittee if they "willfully and knowingly" caused the permittee to violate the Acts.  *See* VA ST § 45.1-246(F); K.R.S. § 350.990(9).

**<u>Reclamation Surety Bonds</u>**

15.     To obtain a mining permit, the proposed permittee must post a surety bond or some other form of financial assurance with the applicable Regulator.  The bonds serve to 'secure' the permittee's compliance with the Acts.  If the permittee does not satisfy its statutory obligations, the Regulators can, and will, seek 'forfeiture' of the bonds.  KRS § 350.130; 405 KAR 10:050;

---

[3] The Debtors' interim CEO and CRO, Mr. David Beckman, is currently identified as an "owner and controller" of the Debtors in the federal applicant-violator system (AVS) and its state counterparts.

VA ST § 45.1-186.1; 4 VAC 25-31-310.  In that event, the surety can either: (a) forfeit the bond(s)

and pay the applicable sum to the Regulators who will perform the required reclamation, or (b)

perform the reclamation itself in lieu of bond forfeiture.  *Id.*

16.    As a practical matter, if the amount of a bond is greater than the cost of the

reclamation, the surety will typically perform the reclamation; if the amount of the bond is less

than the cost of the reclamation, the surety will typically forfeit the bond.  The proceeds of a

forfeited bond can only be used to perform reclamation on the particular permit or "increment"

that is 'secured' by that bond.  *See* 405 KAR 10:015.  In fact, KY DNR utilizes a system of

"incremental bonding," such that a single permit may contain multiple "increments," each of which

is separately bonded.  405 KAR 10:015 at § 4(2).  In that regard, the Debtors' permit listings

attached to the Plan Supplement [Docket Nos. 2602, 2622] are misleading as they provide a permit

number and a single associated bond amount.  In actual fact, that "bond amount" is, in many

instances, the aggregate of dozens of separate bonds on dozens of separate increments, each of

which must be evaluated independently of the rest.

17.    INIC has issued tens of millions of dollars of reclamation surety bonds for the

Debtors.  INIC has not had the opportunity to independently verify the Debtors' "Remaining

Permit" and "Pending Permit" listings prior to the filing of this Objection, but, as a general

proposition, INIC has issued surety bonds in the approximate amount of $35 million on the

Remaining Permits and $45 million on the Pending Permits, and is far and away the Debtors'

largest remaining surety provider.[4]

**Permit Transfers and Bond Replacement**

---

[4] At first glance, it appears that Permit No. 848-0347 with an aggregate bond amount of $6,371,800 has been omitted from the Remaining Permit list.  INIC will endeavor to verify both lists in advance of the Combined Hearing and advise the Court of any omissions or revisions.

18.     The asset sale of a coal mining operation typically involves the proposed transfer of the seller's mining permits.  Any such transfer, however, is subject to the approval of the applicable regulatory authority.  *See* VA ST § 45.1-234(C); KRS § 350.135.  In order to effectuate a transfer, the seller and the purchaser are required to submit, typically on a post-closing basis, permit transfer applications, replacement bonds and associated fees.  Further, to the extent there are outstanding violations on the permit to be transferred, the proposed transferee must negotiate an agreed compliance schedule with the Regulator to abate those violations.

19.     As this Court has learned, the permit transfer process is far from automatic and, during the transfer process, the seller is still statutorily obligated under the permits and the seller's existing bonds remain subject to forfeiture by the regulatory authorities.  This is why most sellers, inside and outside of bankruptcy, conduct extensive due diligence regarding a purchaser's ability to post replacement bonds and effectuate permit transfers before entering into a transaction, and enter into separate "interim operator" agreements, which provide additional rights and remedies to the seller in the event that a purchaser fails to timely transfer the permits or address violations.

**The Debtors' Sale Efforts**

*The Public Sales*

20.     On the evening of July 25, 2019, the Debtors filed a bidding procedures motion for the sale of substantially all of its assets, which was granted by the Court at a hearing the next day. [Docket No. 2500, § 5.14].  After the three (3) day marketing process authorized by the bidding procedures, an auction was conducted which resulted in the sale of the Debtors' most valuable assets to a handful of buyers, including, but not limited to Jewell Valley Mining, LLC ("Rhino"). The Court approved these sales at a hearing on August 5 and 6, with no sale orders or asset purchase documents in the record, but entered final sale orders (with attached sale documents)

over the next two weeks [Docket Nos. 645, 916, 920, 963, 1096, 1100].  The "sale documents" for these complex transactions were mere bills of sale and no "interim operator" or other standard coal industry closing documents (designed to protect the seller) were executed by the parties.

21.     INIC, and the other sureties, filed objections to these sales on the basis that zero value was afforded to the assumption of reclamation liabilities in the auction process and that, although it was difficult to tell from the record (or the lack thereof), the sureties were concerned that the Debtors were allowing the purchasers to "cherry-pick" within mining complexes, creating logistical issues, and essentially guaranteeing that certain permits would be stranded in the bankruptcy estate.  [Docket Nos. 327, 333, 479, 524, 528].

***The Private Sales***

22.     After the conclusion of the auction process, the Debtors conducted a supplemental sale process seeking out private buyers for their remaining assets.  On September 6, 2019, the Debtors sent a letter to counsel for INIC inquiring if it wished to purchase any of the Debtors' remaining assets.  In a response letter on September 16, 2019, a copy of which is attached hereto as Exhibit A, counsel for INIC warned the Debtors about the manner in which they were conducting their supplemental sale process:

> [O]ver the objection of the sureties, the Debtors allowed bidders to acquire the Debtors' most valuable assets with no plan for how the Debtors' remaining permit obligations would ultimately be resolved.  As a result, almost all of the permits identified in your letter are 'assets' in only the most technical sense of the term.  In order to 'sell' the vast majority of these permits, the Debtors and/or the sureties will need to provide consideration to the purchaser to incentivize them to assume the associated liabilities.  The Debtors need to stop treating the remaining permits as a potential source of funding – they are liabilities . . . INIC has been informed that the Debtors and their advisors have actually turned down offers for the assumption of millions of dollars of liability (even on permits where the Debtors no longer possess a right of entry) because the consideration to be paid was too de minimis – if accurate, that decision is not in keeping with the realities of the Debtors' current situation.

23.     Nevertheless, the Debtors elected to proceed with a private sale to Black Mountain Resources, Inc. ("BMR") in exchange for cash consideration and without contacting INIC or the other sureties to determine if BMR would be able to obtain replacement bonding. [Docket Nos. 1146, 1217]. Those permits have not transferred and there is a justifiable concern that they will not transfer. The Debtors conducted a similar sale to Bell Energy Partners, LLC, for cash consideration, with a similar result. [Docket No. 1882]. The Debtors have, however, conducted private sales to Civil, LLC, Alden Resources, LLC and Nally & Hamilton, Inc. and, in doing so, have reduced their reclamation liabilities by more than $38 million. [Docket Nos. 1841, 2066, 2211, 2251]. The Debtors use these sales to justify the success of their private sale efforts, but fail to note that INIC brought those three (3) transactions to the Debtors and independently agreed to provide consideration to those 'purchasers' in order to facilitate the transactions. Not surprisingly, those are the only *de minimis* sales where the permits have actually transferred out of the Debtors' estates.

24.     The Debtors did accomplish a transaction for the sale of its Western Assets to Eagle Specialty Materials, LLC ("ESM") that was beneficial to the bankruptcy estates and generated substantial funds. [Docket Nos. 1157, 1187, 1196, 1219].[5] The manner in which the ESM sale was conducted, however, exposed latent issues with certain of the Debtors' prior sales and created new issues for the estates regarding the "LCC Permits."

---

[5] It is worth noting that the Debtors' statement that the ESM transaction resulted in a reduction of bond liability of more than $300 million for the benefit of the estate and the sureties is misleading. First, the permits for the Western Assets had not yet transferred to the Debtors and the associated bonds were never in force – the permits and bonds were still the responsibility of Contura, which is why they were willing to pay millions dollars to ESM to acquire those assets and extinguish Contura's liability. Second, it is disingenuous for the Debtors to take credit for the transfer of the "Eastern Permits" to ESM when in their filing seeking to approve those transfers, the Debtors stated that the Debtors learned "over the weekend" and for the "first time" of Lexon Insurance Company's demand, as a condition of closing the ESM transaction, that ESM acquire the Eastern Permits and apologized to the Court for the emergency nature of the motion, but that it was Lexon's requirement, not theirs. [Docket No. 1196].

10

25.    As part of the ESM transaction, ESM agreed to acquire all of the Debtors'

remaining permits in the "East" that were bonded by Lexon and all associated real property rights

necessary to effectuate the transfer of those permits to ESM.  [Docket Nos. 1196, 1219].  Those

permits included approximately 22 permits in Virginia and West Virginia.  When seeking to

transfer those permits, ESM learned that the Debtors had allowed Rhino to exclude these permits

from the mining complex that Rhino had acquired (the "Virginia Subdivision") [Docket No. 2439].

More incredibly, ESM alleged that it could not enter onto or transfer the acquired permits because,

even though the Debtors had allowed Rhino to exclude those permits (and the associated liabilities)

from the transaction, the Debtors' professionals had nevertheless affirmatively agreed to sell Rhino

all of the Debtors' real and personal property associated with and located on or under those very

same excluded permits.  [Docket No. 916, pg. 48].

26.    As the Court is aware, this dispute now spans two bankruptcy cases, has resulted in

tens (if not hundreds) of thousands of dollars of professional fees, and (despite the presence of two

potential purchasers) will likely result in these liabilities returning to the bankruptcy estate as the

Debtors are still the permittee on those permits, all of which are the subject of pending bond

forfeiture actions by Virginia DMME.[6]

27.    Ironically, in the sale objection filed by the Debtors in the Rhino bankruptcy case,

the Debtors chastise Rhino for their attempts to separate real and personal property from the

---

[6] Upon information and belief, the Debtors' decision to sell property to Rhino without the associated liabilities has
also trapped Permit No. 1102023, with a bond in the amount of $2,680,600, in the bankruptcy estate.  Prior to the
ESM transaction, the Debtors had entered into an agreement with a third party to acquire that permit.  A significant
component of the deal was the potential purchaser's acquisition of all of the equipment that was located on the permit
site.  Based upon this pending deal, the permit was excluded from the ESM transaction and remained in the estate.
When the Debtors later went to complete this transaction, they 'realized' for the first time that they had already sold
that same equipment to Rhino.  That transaction was never consummated and the permit and associated liability still
remains in the bankruptcy estate.  These circumstances make the Debtors statements in their Rhino sale objection
(included above) even more remarkable.

underlying permits and their lack of consideration of reclamation liabilities when conducting a sale:

> It is unclear how [Rhino] could sell the Purchaser the "Purchased Assets" . . . but carve out the . . . Disputed Eastern Permits, and associated reclamation liabilities and environmental obligations. The [Rhino] Debtors have provided no explanation as to how they can lawfully accomplish this feat . . . [O]peration on the Purchased Assets will necessarily create reclamation obligations and generate water discharges that are addressed in the excluded permits . . . This attempt to separate the benefits from the environmental obligations violates SMCRA, [the Clean Water Act], and the Virginia Code.

> The Blackjewel Debtors also object to the sale of machinery and equipment that will be necessary for the [Rhino] Debtors to perform reclamation obligations associated with the Disputed Eastern Permits which are not assumed and assigned to the Purchaser. The Blackjewel Debtors are concerned that the [Rhino] Debtors may have removed such machinery and equipment from the Eastern Property. If the Court permits the [Rhino] Debtors to sell these crucial assets, while at the same time the [Rhino] Debtors remain liable with respect to the reclamation for the Disputed Eastern Permits, it would allow the [Rhino] Debtors to unlawfully skirt their reclamation responsibilities.

> The Debtors Must Acknowledge the Importance of the Reclamation Obligations. In [the Virginia Subdivision APA], the [Rhino] Debtors make light of their potential reclamation obligations. . . The Blackjewel Debtors disagree. The Disputed Eastern Permits are tied to the Eastern Property . . . and neither the Sellers nor Buyers have demonstrated how the reclamation obligations and related responsibilities are not encompassed in the Purchased Assets.

[Case 1:20-bk-12043, Docket No. 395, ¶¶ 4, 9, 13].

28.     The list of "Eastern Permits" that were 'sold' by the Debtors to ESM included 21 specific permits with total bond liability of almost $30,000,000. These particular permits (the "LCC Permits") were included in the sale to ESM even though the Debtors had entered into an Asset Purchase Agreement and Permit Transfer Agreement for those same permits with Lexington Coal Company, LLC ("LCC") on a pre-petition basis. [Docket No. 2439, ¶¶ 16-22]. In fact, LLC had already submitted permit transfer application to KY DNR and those transfers were pending as of the Petition Date. Until the ESM transaction, LCC had not disputed its responsibility for the

LCC Permits, even though the vast majority (if not all) of the permits have reclamation costs far in excess of their actual value (*i.e.*, they are net liabilities).  Upon learning that the Debtors had re-sold the permits to ESM, LCC withdrew its transfer applications.  ESM has taken the position that, based on the prior sale to LCC, it cannot be responsible for the permits.  [Docket No. 2439].[7]  As with the disputed Rhino permits, the LCC Permits remain in the bankruptcy estate and KY DNR has initiated administrative hearings to seek forfeiture of the associated bonds. Apparently, under the Plan the Reclamation Trust, to be funded exclusively by the sureties, will be left to deal with the Debtors' errors and to ligate the LCC and Rhino issues.

**Environmental Liabilities and Remediation Efforts**

29.    As outlined in the various letters, motions, and status reports from the Regulators and the environmental groups, and in the adversary proceeding filed by the West Virginia Department of Environmental Protection, the Debtors on a post-petition basis have performed almost no remediation work, have not tested or treated water, and have not even bothered to respond to basic administrative requests to renew their permits.  [Docket Nos. 1534, 1617, 1670, 1741, 1852, 2079, 2450].  Thousands of post-petition violations, cessation orders, and forfeiture proceedings have been initiated by the Regulators and the Debtors' response has been to generally ignore them and to claim that they simply do not have the funds to perform even the most basic tasks. INIC is unaware of any other chapter 11 coal bankruptcy in which a debtor has failed to even pretend to make some minimal effort to ensure basic environmental compliance.

30.    The Debtors state that they have done some emergency work when required and, in response to the KY DNR's motion to compel, much was made of the fact that the Debtors' contractor was on-site at the time of the hearing abating the "imminent danger cessation order."

---

[7] INIC takes no position on whether ESM or LCC is responsible for these disputed permits.  At present, it is the Debtors that are the permittee and are, therefore, the responsible party.

In fact, the existence of that remediation work made its way into this Court's Order denying the motion to compel. [Docket No. 2391 ("The Debtors are required to abate the asserted violations associated with the Imminent Danger Cessation Order . . . Work necessary to do so was in progress at the time of the hearing on September 10, 2020 and the Debtors advise that it has been completed as of the date of this Order."]. What the Debtors conveniently failed to mention to the Court, however, was that it was INIC, and not the Debtors that was actually the one funding the contractor's work.

31.     What is most troubling to INIC, however, is that although the Debtors certainly did not have funds available to them to abate every violation or to conduct final reclamation of their mine sites, they had more than enough cash-on-hand throughout this case to perform routine maintenance, to test water, to file permit renewals, to respond to other administrative requests and to prevent the permits from filing into their current state of physical and administrative disrepair, such that the transfer of many, if not all, of the permits to third parties would have been feasible. The Debtors simply chose to use those funds for other purposes and to focus their efforts only on sales that could generate quick cash for the estate. Despite constantly pleading poverty in response to the inquiries of the Regulators, environmental groups, sureties, and this Court, a review of the Debtors' monthly operating reports reveal that the Debtors had funds to spend, at least on those items that it wanted to spend them on. The Debtors generated total cash receipts of $28,170,988 in October 2019 and had an ending cash balance on October 31, 2019 of $19,839,944. [Docket No. 1439]. At the end of November 2019, after making $7,265,682 in interim payments to professionals, the Debtors still had a month-end cash balance of $10,828,772. [Docket No. 1579]. At the end of February 2020, after making another $1,900,199 of interim payments to professionals, the Debtors still had $6,429,238 in cash on hand. [Docket No. 1867]. At the end

of March 2020, despite <u>another $2,306,704 of interim professional fee payments</u>, the Debtors were left with $3,990,667.  [Docket No. 1920].

## **OBJECTION**

32.    For the reasons set forth below, the Plan cannot be confirmed and the Disclosure Statement cannot be approved.  INIC respectfully submits that the Court should deny confirmation of the Plan and approval of the Disclosure Statement.

**<u>Confirmation and Solicitation Standards</u>**

33.    Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization.  11 U.S.C. § 1129.  The Debtors must establish these statutory requirements by a preponderance of the evidence.  *See e.g. In re Om Shivai, Inc.*, 447 B.R. 459, 462 (Bankr. D.S.C. 2011).  The Court has an independent duty to ensure that the Plan complies with each of the § 1129 elements.  *See Id.*  For the reasons set forth below, the Debtors' Plan does not satisfy all of the requirements of § 1129 and cannot be confirmed.  Because the Debtors' Plan is patently unconfirmable, approval of the Disclosure Statement must also be denied.  *See e.g. In re Firstenergy Solutions Corp.*, 606 B.R. 720, 731 (Bankr. N.D. Ohio 2019).

**<u>The Plan Does Not Pay Administrative Expense Claimants in Accordance with §
1129(a)(9)(A)</u>**

34.    Section 1129(a)(9)(A) of the Bankruptcy Code provides that holders of administrative expense claims must be paid cash equal to the amount of their claim on the effective date unless "the holder of a particular claim has agreed to a different treatment."  11 U.S.C. § 1129(a)(9)(A). The Debtors concede that they cannot pay administrative expense claimants in full in cash on the effective date and that, therefore, to the extent that any holder of an administrative

claim does not agree to a different treatment, the Plan cannot be confirmed. [Docket No. 2500, pgs. 16-17].

35.    INIC filed a timely administrative expense claim for those claims arising prior to October 14, 2019 at Docket No. 1343. As of the date of this Objection, no party has filed an objection to that claim. Further, pursuant to the Plan, holders of administrative expense claims arising after October 14, 2019 have forty-five (45) days after the effective date of the Plan to file such claims. [Docket No. 2500-1, § 1.1.3]. INIC intends to file an additional administrative expense claim related to funds advanced by INIC on behalf of the Debtors after October 14, 2019 and for post-petition surety bonds issued by INIC for the Debtors after October 14, 2019. INIC does <u>not</u> agree to any treatment other than that expressly provided for in section 1129(a)(9). Because INIC does not consent, the Plan cannot be confirmed because INIC is not being paid in full upon confirmation.

36.    Setting aside INIC's objection, the Debtors assert that they do not require the express agreement of all administrative expense claimants (or priority claimants)[8] because the failure of such parties to file objections to the Plan (*i.e.*, their silence) constitutes their "agreement" to the proposed non-conforming treatment. [Docket No. 2500, § 7.7]. The only court to address this issue in this Circuit has found that a mere failure to object is not sufficient, and that a claimant must affirmatively express their agreement to such treatment. *See In re Jankins*, 184 B.R. 488, 482, n. 8 (Bankr. E.D. Va. 1995) ("This court, however, construes the term "has agreed" in Section 1129(a)(9) as requiring the affected creditor's affirmative concurrence and not mere failure to object . . ."). This is the same conclusion reached by the majority of courts. *See e.g. In re Digital Impact, Inc.*, 223 B.R. 1, 7-8 (Bankr. N.D. Okla. 1998); *In re St. Louis Freight Lines, Inc.*, 45 B.R.

---

[8] Section 1129(a)(9)(C) contains a corresponding provision for the treatment of priority claims.

546, 552, n. 13 (Bankr. E.D. Mich. 1984); *In re Real Wilson Enterprises, Inc.*, 2013 WL 5352697, at *8 (Bankr. E.D. Cal. Sept. 23, 2013).

37.    The <u>only</u> reported decision expressing the view of "agreement" espoused by the Debtors is the eighteen (18) year old decision of the Bankruptcy Court of the Southern District of New York in *Teligent. See In re Teligent, Inc.* 282 B.R. 765 (Bankr. S.D.N.Y. 2002).   In addition to being an "outlier" in terms of its analysis and conclusion, Judge Bernstein expressly relied upon several additional protections and notices afforded by the *Teligent* debtors to administrative expense claimants in that case:

> The debtors provided a quick, easy and inexpensive way for each Administrative Creditor to make his election.  He only had to check a box on the Consent Form and mail it in a pre-addressed, stamped envelope, fax it to a toll free number, or email the information to the address provided by the debtors.  If the Administrative Creditor failed to respond for any reason, he received two telephonic contacts from the debtors reminding him to return the consent form.  He did not have to hire an attorney or file a formal objection, and in light of the procedures established by the debtors, there was no danger that he would be lulled into silence.

*Id. at* 772.

38.    These Debtors did not provide claimants with any of the safeguards relied upon by the *Teligent* court in reaching its ruling.  They simply include an explanation of the applicable legal standard and consequences on pgs. 16-17 of their 100 page disclosure statement and require potential administrative claimants, most without counsel, and some with claims of less than $100 to: (i) find, read and understand that explanation; (ii) determine whether their unpaid invoices are entitled to administrative expense priority treatment at all; and (iii) seek out and employ counsel to file an objection if they want to demand treatment that is normally automatic.[9]  Under these

---

[9] It is likely that all that many of these claimants 'know' about chapter 11 bankruptcy is that ordinary course administrative expense claims get paid in full.  Many of these claimants, unfortunately, have experienced multiple coal bankruptcies, have provided ordinary course post-petition goods and services to debtors in those cases, and have

circumstances, it is disingenuous to assert that these claimants' failure to object is equivalent to their affirmative agreement to non-conforming treatment.  It is particularly galling to imply the affirmative agreement of administrative claimants to a particular treatment of their claims where such claimants are not even required to have filed the very claims that are the alleged subject of this present 'agreement.'

39.    Sections 1129(a)(9)(A) and 1129(a)(9)(C) require the express agreement of administrative and priority claimants to the treatment proposed by the Debtors in the Plan; a mere failure to object is not sufficient.  The Debtors do not have the express agreement of all these claimants (in fact, more than one such claimant has affirmatively objected to such treatment) and, therefore, the Plan cannot be confirmed.

**The Plan Does Not Provide Equal Treatment to All Administrative Expense Claimants**

40.    Section 1129(a)(1) of the Bankruptcy Code provides that a plan cannot be confirmed unless it complies with the applicable provisions of the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(1).  According to the United States Supreme Court and the Fourth Circuit Court of Appeals, the Bankruptcy Code requires the equal treatment of all parties with administrative expense claims.  *See Beiger v. I.R.S.*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code.  According to that policy, creditors of equal priority should receive pro-rata shares of the Debtors' property."); *CIT Comm. Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 241 (4th Cir. 2005) ("Of course, the general rule is that all administrative creditors in a case are to be treated equally.").  At first glance, the Plan appears to offer equal treatment to all administrative claimants in that sections

---

never even had to file an administrative expense claim in order to receive payment, let alone object to the proposed treatment of their claim.  A cursory review of the post-petition A/P listing in the most recent monthly operating report provides context as to the nature of many of these claimants and their claims.  [Docket No. 2573, pgs. 8-9].

2.1 and 2.2.2 provide that Administrative Expense and Fee Claims are to be paid according to the priorities contained in the Bankruptcy Code (*i.e*, pro-rata) as Distributable Cash becomes available. [Docket No. 2500-1, §§ 2.1, 2.2.2]. Section 2.2.2, however, contains the following exception to this pro-rata treatment: "*provided, however*, that the Liquidation Trustee shall without any further notice to or action, order, or approval of the Bankruptcy Court, first allocate Distributable Cash to payment of Allowed Fee Claims held by Ongoing Professionals."

41.   "Ongoing Professionals," are not defined as professionals retained by the Liquidating Trustee (there is a separate provision for payment of those professionals in advance of any pre-effective date administrative claimants [Docket No. 2500-1, § 2.2.1), but rather, as "Professional Persons that continued to represent or assist the Debtors or the Committee in carrying out their duties through the effective date." [Docket No. 2500-1, § 1.1.64]. Although this provision would still be objectionable if it limited the super-priority afforded to Ongoing Professionals to fees incurred between confirmation and the effective date, there is no such limiting language – by the plain terms of the Plan, if a professional person continues to assist the Debtors up to the effective date, all of their fees, whenever they were incurred, are entitled to be paid before any other administrative or priority claimant. Under even the more charitable interpretation, however, this super-priority treatment provided to "Ongoing Professionals" violates the equal treatment required by the Bankruptcy Code and precludes Plan confirmation.

42.   Additionally, the Ongoing Professionals have received interim payments on account of their administrative expense claims in the approximate amount of $11,500,000. Of that amount, less than twenty percent (20%) was paid from a carve-out; the remainder was paid from estate property. Equal treatment of administrative expense claimants in an administratively insolvent case requires that professionals return interim payments and allow the funds to be

19

distributed pro-rata to all similarly-situated claimants.[10]  *See e.g. In re Nettel Corp.*, 2020 WL 2047965, at \*17-28 (Bankr. D.C. Apr. 28, 2020); *Shaia v. Durrette, Irvin, Lemons & Bradshaw (In re Metropolitan Electric Supply Corp.)*, 185 B.R. 505, 509-512 (Bankr. E.D. Va. 1995); *In re Cryptek, Inc.*, 2010 WL 5330507, at \*3-4 (Bankr. E.D. Va. Dec. 21, 2010); *Speckert Motor Sales Co. v. Eisen (In re Speckert Motor Sales Co.)*, 393 F.3d 659, 662-64 (6th Cir. 2004).   To the extent that the Court believes that disgorgement of this sort may only be mandated under § 726(b) of the Bankruptcy Code, that is merely one more justification for the conversion of these cases.

**The Plan Does Not Satisfy the "Best Interests of Creditors" Test**

43.    Under section 1129(a)(7)'s "best interest of creditors" test, an individual creditor in an impaired class, who votes to reject a plan, must receive a recovery under the plan that is at least as much as he or she would receive in a chapter 7 liquidation.  *See* 11 U.S.C. § 1129(a)(7). In order to establish compliance with this requirement, the debtor must provide "a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions."  *In re Smith,* 357 B.R. 60, 67 (Bankr. M.D.N.C. 2006) (citing cases).

44.    INIC filed timely proofs of claim at Claim Nos. 1498 and 1501, which included, among other claims, a liquidated general unsecured claim for pre-petition bond premiums, due jointly and severally by Blackjewel and Revelation, in the amount of $3,765,856.[11]  Accordingly,

---

[10] This principle only applies to professionals who have received interim compensation and not to recipients of ordinary course administration expense claimants who may have received payments during the pendency of the case. "Professional fees allowed pursuant to § 503(b) are distinct from administrative expenses paid by the trustee in the ordinary course of business pursuant to § 363(c)(1).  Unlike professional fees, payments made by the trustee in the ordinary course are not subject to court approval, can be paid immediately and will not be subject to any pro rata reductions." *Metropolitan Elec. Supply Corp.*, 185 B.R. at 509 (quoting *Guinee v. Toombs (In re Kearing)*, 170 B.R. 1, 7-8 (Bankr. D.C. 1994)).

[11] The Debtors list a non-contingent, liquidated, undisputed unsecured claim of "Smith-Manus" in the amount of $2,382,837.81 on the schedules for Revelation Energy, LLC [Docket No. 736, pg. 69] and in the amount of $3,287,024.70 on the schedules for Blackjewel, LLC.  [Docket No. 730, pg. 150].  Acrisure, LLC d/b/a Smith-Manus is INIC's broker for purposes of its bonding relationship with the Debtors and is the party to whom the Debtors were instructed to direct their premium payments.

INIC received ballots to vote in Class 3, an impaired class, and timely cast such ballots (in the amount of $3,765,756) in opposition to the Plan. As such, the "best interests" test must be satisfied as to INIC's general unsecured claims.

45.      The Debtors' liquidation analysis purports to show that general unsecured creditors and administrative claimants would fare better under the proposed Plan than in Chapter 7.  This analysis is almost entirely predicated on the Debtors' unsupported assertion that litigation recoveries would be $20 million higher if the Debtors' current professionals pursued these claims on behalf of a liquidation trustee.  There is no supporting evidence and no ability for anyone to determine the validity of this bare assertion, but, at a minimum, it seems to discount the reasonable possibility that, assuming the current professionals could actually obtain a markedly better result, a chapter 7 trustee would simply elect to retain the same professionals on the same terms.

46.      Additionally, the Debtors' liquidation analysis incorrectly assumes that the recovery on preference claims would be identical under both the confirmed Plan and in a chapter 7 case.  The Plan, however, expressly provides for the release all of the Debtors' avoidance actions (with certain enumerated exceptions).  [Docket No. 2500-1, § 7.4(ii)(e)].  Neither the liquidation documents, nor the solicitation documents provide any information regarding the value of the released avoidance actions or explain why that value would not be realized in a hypothetical chapter 7.

47.      The liquidation analysis also affords zero value to the Debtors' potential claims against the "Released Parties," which claims would not be released (or subject to any exculpation) in the event of a chapter 7 conversion.  It is conceivable that there are no viable claims against these parties, or that such claims have a *de minimis* value, but based on the circumstances identified in the Factual Background, and until a disinterested third party has the opportunity to review the

conduct of this case with the benefit of the Debtors' privileges, those claims should not merely be ignored for purposes of the liquidation analysis

48.      The liquidation analysis also posits that in a chapter 7 case the "liquidation / wind-down expenses" will be $4,120,000 (almost 50%) higher than under a confirmed Plan.  This is apparently true even though the Liquidating Trustee is to be paid $25,000 per month [Docket No. 2602-1, § 2.9(a)], litigation counsel with rates of more than $1,200 are to be retained by the Liquidating Trustee to pursue litigation on an hourly basis, and the non-litigation wind-down matters will be handled by the same FTI personnel who currently bill the Debtors more than $1,100 per hour to perform these same tasks.  This cost analysis is further flawed in that it necessarily assumes that, notwithstanding the Debtors' bold predictions regarding the strength and potential value of the retained litigation claims, a chapter 7 trustee would somehow be unable to find a competent law firm to handle these matters on a contingent fee basis.

**The Plan is Not Feasible Because the Reclamation Trust is Contrary to Applicable Law**

49.      Section 1129(a)(11) provides that the Court must determine that a plan is "feasible" before it can be confirmed.  *See e.g. In re Om Shivai, Inc.*, 447 B.R. 459, 462 (Bankr. D.S.C. 2011).  To be feasible, a plan "must present a workable scheme of organization and operation from which there may be a reasonable expectation of success." *Id.* at 462 (quoting *In re Gyro-Trac (USA), Inc.*, 441 B.R. 470, 482-83 (Bankr. D.S.C. 2010)).  Stated differently, "the important consideration is whether . . . the things which are to be done after confirmation can be done as a practical matter." *Id.*  The Debtors' Plan is predicated, in part, on the formation and funding of a Reclamation Trust to address its remaining mining permits and associated liabilities.  [Docket No. 2500-1, Art. 10].  For the reasons set forth below, the proposed funding and operation of the Reclamation Trust, and therefore the Plan, is contrary to law and is not feasible.

50.     INIC has participated in, and has supported, reclamation trusts in prior bankruptcy proceedings.  What those trusts had in common, however, were: (i) substantial contributions by all, or substantially all, of the parties with alleged reclamation liability; (ii) a trust *res* that all parties agreed, in advance, was sufficient to perform the required reclamation; (iii) a definitive and final listing of the permits that would be the subject of the trust; (iv) permits with on-ground conditions that had been maintained to at least some minimal standard during the bankruptcy case; (v) an economic benefit to INIC and the other sureties that would not exist in the absence of the proposed trust; (vi) a sale process that was conducted with a focus on minimizing remaining orphan permits; and (vii) debtor management and professionals with sufficient knowledge to assist in assessing and developing the required reclamation plans.  None of these conditions exist in this case.

51.     The Reclamation Trust is proposed to be funded almost exclusively with the "Reclamation Trust Reserve."  [Docket No. 2500-1, § 1.1.79].  The Reclamation Trust Reserve constitutes "cash in an amount equal to the total bonding in place for the Remaining Permits, which shall be transferred by the Sureties to the Reclamation Trust."  [Docket No. 2500-1, § 1.1.81].  As an initial matter, the Debtors have no legal or equitable interest in the surety bonds issued by INIC (or the other sureties) and no legal right to direct that INIC forfeit cash to the trust, or otherwise direct payment, on account of such bonds.  *See e.g. In re Buna Painting & Drywall Co., Inc.*, 503 F.2d. 618, 619 (9th Cir. 1974) ("The Trustee may not compel payment of the penal sums to him because the bonds are not property of the bankruptcy estate . . . . Those bonds are essentially third-party beneficiary contracts . . .   The [principal] is never entitled to the penal sum . . ."); *In re McLean Trucking*, 74 B.R. 820, 826-28 (Bankr. W.D.N.C. 1987); *In re Hallmark Builders, Inc.*, 205 B.R. 974, 976 (Bankr. M.D. Fla. 1996).  The surety bonds are issued for the sole benefit of

23

the regulatory authority obligees and those obligees are the only parties that can mandate the forfeiture of the bonds and payment of the penal sums. *See* KRS § 350.130; 405 KAR 10:050.

52.     Furthermore, as discussed above, INIC has an absolute right to perform reclamation in lieu of bond forfeiture if it believes that the cost of reclamation on a particular permit or increment, as applicable, is less than the penal sum of the bond. *See* KRS § 350.130(1) ("Any bonding company or financial institution providing bond to the cabinet shall have the right to perform those measures necessary to secure bond releases . . ."). As such, there is no practical reason for INIC, or any surety, to agree to the funding scheme proposed by the Debtors. The Debtors are effectively asking the sureties to pay liabilities well in excess of what they would pay outside of this bankruptcy case in order to solve the Debtors' problems and to obtain a release of the statutory liability of the Debtors, David Beckman, and FTI.[12]

53.     The Reclamation Trust Agreement further provides that "the Debtors' interest in any bonds issued by the Sureties in connection with the Remaining Permits" is to be assigned to the Reclamation Trust. [Docket No. 2500, §1.1.79]. First, as explained immediately above, the Debtors have no interest in the bonds. Second, the bonds are financial accommodations that are not subject to assumption and assignment. *See e.g. Edwards Mobile Homes Sales, Inc. v. Ohio Casualty Ins. Co. (In re Edwards Mobile Homes Sales, Inc.)*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990); *In re Wegner Farms Co.*, 409 B.R. 440, 443 (Bankr. N.D. Iowa 1985). In fact, the substitution of the obligor on a bond without the consent of the surety will serve to discharge the surety from liability. *See e.g. Leila Hospital & Health Center v. Xonics Medical Systems, Inc.*, 948 F.3d 271, 275 (6th Cir. 1991) ("Surety law suggests that a substitution of obligors releases the

---

[12] Presumably, it is the Reclamation Trust, and, therefore the sureties, that will now be responsible for the legal costs of seeking to remedy the errors of the Debtors' professionals and to compel purchasers to comply with permit transfer orders and to litigate the issues related to the Lexington Coal Company and Rhino permits.

surety because it creates a different contract on which [the surety] never intended to become liable.").

54.     The Plan and Reclamation Trust Agreement also further a misconception that the Debtors have had since the beginning of these cases.  These documents provide that the state regulatory authorities shall have a claim for any reclamation costs in <u>excess</u> of the forfeited bond amounts against the Liquidating Trust assets and that any distributions on account of those claims shall be paid into the Reclamation Trust.  [Docket No. 2500, § 7.9(b)(iii)].  The Debtors assume that the proposed forfeiture of the surety bonds to the states eliminates any claim that the states have for reclamation costs up to the amount of the forfeited bonds. That is simply not true. "[T]here are few doctrines better established than that a surety who pays the debts of another is entitled to all of the rights of the person he paid to enforce his right to be reimbursed." *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 136-37 (1962).[13] Thus, under non-bankruptcy law and § 509 of the Bankruptcy Code, if the sureties are required to forfeit their bonds or to perform reclamation in lieu of forfeiture, the sureties will be subrogated to the rights and priorities of the state regulatory authorities, including any unsecured or administrative claim held by those states.  *See e.g. In re Wingspread Corp.*, 116 B.R. 915, 931-932 (Bankr. S.D.N.Y. 1990) (subrogee is entitled to assert administrative priority claim).

55.     The proposed Reclamation Trust is contrary to law, serves no practical purpose, and is not feasible.  It is nothing more than a fiction designed to give the illusion that the Debtors have crafted a consensual solution to address their environmental liabilities and to justify the

---

[13] The Debtors seem to equate surety bonds with insurance, but "suretyship is not insurance." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 139 n.19 (1962).  With an insurance policy, "[t]he insurer undertakes the obligation based on an evaluation of the market's wide risks and losses. An insurer expects losses, and they are actually predicted… [i]n contrast, a surety bond is written based on an evaluation of a particular contractor and the capacity to perform a given contract. Compensation for the issuance of a surety bond is based on fact-specific evaluation of the risks involved in each individual case. No losses are expected." *Buck Run Baptist Church v. Cumberland Surety Ins. Co.*, 983 S.W.2d 501, 504-505 (Ky. 1998) ("a contract of suretyship is not insurance").

improper release of the Debtors, David Beckman (and potentially FTI) from their non-dischargeable statutory liability under SMCRA.  INIC does not consent to the payment of the penal sum of its bonds or the assignment of its bonds to the Reclamation Trust.

**The Releases and Exculpations are Impermissible**

56.    The Debtors' Plan provides for exculpations and three general categories of releases: (i) third party releases; (ii) debtor-releases; and (iii) avoidance action releases.  The inclusion of improper releases and/or exculpations precludes confirmation of a plan pursuant to sections 1129(a)(1) and/or 1129(a)(3) of the Bankruptcy Code.  As set forth below, the proposed releases and exculpations do not satisfy the requisite standards and the Plan cannot be confirmed unless these provisions are excised.

57.    Based upon the Court's comments at the preliminary disclosure statement hearing, the third-party releases will only be granted in the event that a particular creditor "opts-in" to such releases.  [Docket No. 2500, § 7.1.4].  INIC has not "opted in" and will not grant any releases.  INIC does not believe that the regulatory authorities intend to "opt-in" to the SMCRA release of David Beckman and FTI, but to the extent they do, INIC reserves its right to assert that that release that any such release constitutes a material change in the bonded obligations adverse to the surety and, therefore, would result in the discharge of its bonds.  *See e.g. Penn. Nat. Mut. Cas. Inc. Co. v. City of Pine Bluff*, 354 F.3d 945, 953 (8th Cir. 2004) (citing cases); *National Surety Corp. v. U.S.*, 118 F.3d 1542, 1544 (Fed. Cir. 1997).

The Debtors propose to release any and all direct or derivative claims, whether arising before or after the petition date, that they may have against the following list of parties:

(1) each Debtor and (2) each of its respective employees, agents, current and former officers, current and former directors, managers, trustees, members, professionals, representatives, advisors, attorneys, financial advisors,

26

accountants, investment bankers, and consultants; provided that the Hoops Parties shall not receive any release under this Plan; (b) (1) the Committee and (2) each of its members, and each of their respective current employees, agents, officers, directors, managers, trustees, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants; and (c) (1) FTI Consulting Inc. and (2) David J. Beckman, individually and in his capacity as interim Chief Executive Officer and Chief Restructuring Officer for the Debtors, to the extent of any purported liability under section 1260(c) of the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201 et seq. ("SMCRA") related to Mr. Beckman's or FTI's alleged control, ownership, or operation of the Debtors.

[Docket No. 2500-1, §§1.1.84, 12.3].  As an initial matter, it seems counter-intuitive to grant a release, for no consideration, to the Debtors' pre-petition officers, directors and advisors, when the Debtors have already filed claims against one of those officers and directors (who is carved out of the release) for multiple alleged breaches of fiduciary duty.  More broadly, however, the Debtors do not even attempt to justify these broad releases other than a cursory statement that "the Debtors believe that each of the Released Parties has provided value to the Debtors and played a role in the Chapter 11 process."  [Docket No. 2500, § 8.3].

58.    Courts have held that a plan may provide for releases by a debtor of non-debtor third parties after "considering the specific facts and equities of each case[,]" *U.S. Bank N.A. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 142-43 (Bankr. D. Del. 2010), including, whether there was "a substantial contribution to the plan by the non-debtor;" "the necessity of the release to the reorganization;" "the overwhelming acceptance of the plan and release by creditors and interest holders;" and "the payment of all or substantially all of the claims of the creditors and interest holders under the plan."  *In re Washington Mutual, Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011).  Clearly, the facts and equities of this case do not warrant releases for third parties. Judge Walrath's reasoning in *Washington Mutual*, a case where § 1129(a)(9) was actually being satisfied, is particularly telling:

> [T]he Court finds that there is no basis whatsoever to grant a release to directors and officers or any professionals of the Debtors, current or former. . . . Specifically, there has been no evidence presented of any "substantial contribution" made to the case by the directors, officers or professionals. Nor is there any evidence that any of the legends [sic] of directors, officers, or professionals covered by the Debtors' releases are necessary for the reorganization . . . Finally, while the Plan has been accepted by many of the creditors classes, that is not because of any contribution by the directors, officers, or professionals; it is because those creditors are getting paid in full. Further, some of the creditor classes did not accept the Plan and none of the equity classes (which are getting nothing under the Plan) voiced any support for the Plan. There is quite simply no basis for the Debtors' releases of their directors, officers or professionals.

*Id.* at 349-50.

59.     Finally, the Debtors also propose to release all avoidance actions against unsecured creditors (other than the Hoops Parties). [Docket No. 2500-1, § 7.4(ii)(e)]. Once again, the Debtors do not attempt to justify the basis for this release, nor do they provide any analysis of the potential value of the avoidance actions that are being released, for no consideration. This release is particularly offensive in that the Debtors have previously employed special counsel, sent preference demand letters, and already settled with certain parties on account of these very claims. [Docket No. 2309].

60.     In addition to the Debtors' proposed release of its post-petition officers, directors and professionals, the Debtor also seek to exculpate those parties (presumably from third-party claims given that the Debtors' claims are to have been released pursuant to section 12.3) from all claims other than those for gross negligence or willful misconduct. [Docket No. 2500-1, §§ 1.1.38, 12.5]. The Debtors provide no justification for this provision or explain why it is warranted by the facts and circumstances of this particular case. It is simply not enough to state that exculpations of this sort are now 'typical' in chapter 11 plans. Although that may very well be true, it is also

28

'typical' for chapter 11 plans to provide for the payment-in-full of administrative expense claimants – that is not occurring in this case either.

**The Plan Has Not Been Proposed in "Good Faith"**

61.    Pursuant to section 1129(a)(3) of the Bankruptcy Code, a plan must be proposed in "good faith."  *See In re Tara Retail Group, LLC*, 614 B.R. 215, 220 (Bankr. N.D. W. Va. 2020). "The overriding standard for good faith within the meaning of [§] 1129(a)(3) is whether there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code."  *Id.* (quoting *In re Walker*, 165 B.R. 994, 1000 (E.D. Va. 1994)).  "In that regard, the court looks to the totality of the circumstances surrounding the proposed plan."  *Id.* (quoting *In re Bate Land & Timber, LLC*, 523 B.R. 483, 493 (Bankr. E.D.N.C. 2015).  The "totality of the circumstances" in this case is as follows:

- As of the date of this Objection, the Debtors are administratively insolvent by tens of millions of dollars (excluding any claims related to environmental liabilities) and admit that they cannot satisfy § 1129(a)(9)(A) absent consent.  [Docket No. 2500, pgs. 16-17].

- The Plan provides payment priority, over other administrative expense claimants, to the fee claims of the "Ongoing Professionals."  [Docket No. 2500-1, § 2.2.3]

- The Plan provides that the CRO will become the liquidating trustee at a cost of $25,000 per month, his firm will be retained to provide services at hourly rates in excess of $1,100, and the Debtors' lawyers will be retained to pursue litigation on an hourly basis with rates in excess of $1,200 – all of these costs will be paid from the limited funds of the estate before any pre-confirmation administrative claimant is paid.

- The Plan proposes the release of all estate claims against estate professionals for no consideration and exculpates those professionals in case of any third-party claims.  [Docket No. 2500-1, §§ 12.3, 12.4]

- Even absent such releases, the very same professionals that represented the Debtors will be tasked with determining (i) whether to investigate and/or pursue claims against themselves, and (ii) whether to object to their own fees.

- The Plan provides zero estate funding for environmental liabilities and seeks to release the Debtors and its professionals from statutory environmental liability.

- The Plan seeks to sway the votes of unsecured creditors with potential preference liability in exchange for a release of that liability, even though the Debtors have already hired avoidance action counsel and settled with certain of those claimants.  [[Docket No. 2500-1, § 7.4(ii)(e)]].

These are not circumstances that are indicative of good faith; they are an indicative of a last-ditch effort by professionals in a failed case to protect themselves, at the expense of other administrative claimants, from the consequences of a chapter 7 conversion.

WHEREFORE, INIC respectfully requests that the Court deny (i) approval of the Disclosure Statement and (ii) confirmation of the Plan.

Respectfully submitted,


*/s/ Stephen L. Thompson*
Stephen L. Thompson (WV 3751)
BARTH & THOMPSON
P.O. Box 129
Charleston, West Virginia 25321
Telephone:  (304) 342-7111
Facsimile:  (304) 342-6215
E-mail:  sthompson@barth-thompson.com
and

Daniel I. Waxman (KY 92736)
(*admitted pro hac vice*)
KEWA Financial Inc.
340 S. Broadway, Suite 100
Lexington, Kentucky 40508
Telephone:  (859) 233-0352
E-mail:  diw@kewafinancial.com

*Counsel for Indemnity National Insurance
Company*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served electronically via the Court's CM/ECF system upon all parties designated to receive electronic service on December 10, 2020.

*/s/ Stephen L. Thompson*
Stephen L. Thompson