**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Blackjewel L.L.C., *et al.*, | ) | Case No. 19-30289 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

**NOTICE OF HEARING ON LIQUIDATION TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (I) COMPELLING KOPPER GLO TO COMPLY WITH THE SALE ORDER, ASSIGNMENT AGREEMENT, AND ROYALTY AGREEMENTS, (II) HOLDING KOPPER GLO IN CONTEMPT AND SANCTIONING KOPPER GLO AND ITS DIRECTORS AND OFFICERS TO THE EXTENT NECESSARY, AND (III) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** pursuant to the *Order Establishing Certain Notice and Case Management Procedures* [ECF No. 2217] (the "Case Management Order") that a hearing (the "Hearing") to consider the *Liquidation Trustee's Motion for Entry of an Order (I) Compelling Kopper Glo to Comply with the Sale Order, Assignment Agreement, and Royalty Agreements, (II) Holding Kopper Glo in Contempt and Sanctioning Kopper Glo and Its Directors and Officers to the Extent Necessary, and (III) Granting Related Relief* (the "Motion") filed by the Liquidation Trustee for the Blackjewel Liquidation Trust (the "Movant") on December 20, 2021 in the above-captioned bankruptcy cases shall be held before the United States Bankruptcy Court for the Southern District of West Virginia (the "Bankruptcy Court") on January 19, 2022 at 9:30 a.m. (Prevailing Eastern Time) (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that the Hearing will be conducted pursuant to the procedures in the Case Management Order as may be modified by further orders of the Court from time to time. Any party wishing to be heard must comply with the terms and provisions of the Case Management Order.

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the relief requested in the Motion must be in writing and conform to the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court, and the procedures described in the Case Management Order. Any responses or objections shall be served in an accordance with the Case Management Order on the following parties: (i) counsel for the Movant, Squire Patton Boggs (US) LLP, 201 E. Fourth Street, Suite 1900, Cincinnati, Ohio 45202, Attn: Stephen D. Lerner (stephen.lerner@squirepb.com), Travis A. McRoberts (travis.mcroberts@squirepb.com), and

[1] The former Debtors in these chapter 11 cases and the last four digits of each former Debtor's taxpayer identification number are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213). The mailing address for each of the former Debtors is located at 999 17th Street, Suite 700, Denver, Colorado 80202, Attn: David J. Beckman.

Kyle F. Arendsen (kyle.arendsen@squirepb.com); and (ii) local counsel for the Movant, Supple Law Office, PLLC, 801 Viand Street, Point Pleasant, West Virginia 25550, Attn: Joe M. Supple (joe.supple@supplelawoffice.com).

**PLEASE TAKE FURTHER NOTICE** that any response to the Motion must be filed and served no later than on January 12, 2022 at 11:59 p.m. (Prevailing Eastern Time). If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the Motion and may enter an order granting that relief.

Respectfully submitted, this 20th day of December 2021.

**SUPPLE LAW OFFICE, PLLC**

Joe M. Supple, Bar. No. 8013
801 Viand St.
Point Pleasant, WV 25550
Telephone: 304.675.6249
Facsimile: 304.675.4372
joe.supple@supplelawoffice.com

– and –

**SQUIRE PATTON BOGGS (US) LLP**

*/s/ Stephen D. Lerner*
Stephen D. Lerner (admitted *pro hac vice*)
Travis A. McRoberts (admitted *pro hac vice*)
Kyle F. Arendsen (admitted *pro hac vice*)
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201
stephen.lerner@squirepb.com
travis.mcroberts@squirepb.com
kyle.arendsen@squirepb.com

*Co-Counsel to the Blackjewel Liquidation Trust, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Blackjewel, L.L.C., *et al.*, | ) | Case No. 19-30289 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

**LIQUIDATION TRUSTEE'S MOTION**
**FOR ENTRY OF AN ORDER (I) COMPELLING KOPPER GLO TO COMPLY WITH THE SALE ORDER, ASSIGNMENT AGREEMENT, AND ROYALTY AGREEMENTS, (II) HOLDING KOPPER GLO IN CONTEMPT AND SANCTIONING KOPPER GLO AND ITS DIRECTORS AND OFFICERS TO THE EXTENT NECESSARY, AND (III) GRANTING RELATED RELIEF**

The Liquidation Trustee (the "Trustee") for the Blackjewel Liquidation Trust (the "Trust"), successor for certain purposes to the estates of the former debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby moves this Court for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (a) compelling Kopper Glo Mining, LLC and INMET Mining, LLC ("INMET," together with Kopper Glo Mining, LLC, "Kopper Glo") to comply with the following:

i. *Order (I) Approving the Sale of Certain Assets to Kopper Glo Mining, LLC Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 1096] (the "Sale Order");

ii. Assignment and Assumption Agreement and Bill of Sale Regarding Specific Assets, dated September 7, 2019, between the Debtors and INMET (the "Assignment Agreement");[2]

[1] The former Debtors in these chapter 11 cases and the last four digits of each former Debtor's former taxpayer identification number are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213). The mailing address for each of the former Debtors is located at 999 17th Street, Suite 700, Denver, Colorado 80202, Attn: David J. Beckman.
[2] A copy of the Assignment Agreement is attached hereto as **Exhibit B**.

iii. Royalty Agreement, dated September 7, 2019, between the Debtors and Kopper Glo, pursuant to which Kopper Glo agreed to pay a fixed amount royalty interest equal to the aggregate net present value amount of $9,100,000 in annual fixed installments of $2,738,092 commencing September 7, 2020 (the "Base Royalty Agreement");[3] and

iv. Royalty Agreement, dated September 7, 2019, between the Debtors and Kopper Glo, pursuant to which Kopper Glo agreed to pay a royalty in the aggregate amount of $550,000 upon recommencement of the purchased mining operations at the Black Mountain and Lone Mountain mining operations situated in Harlan, County, Kentucky, Letcher County, Kentucky, and Wise County, Virginia (collectively, the "Purchased Mines") continuing for 24 months thereafter (the "Employee Royalty Agreement" and together with the Base Royalty Agreement, the "Royalty Agreements"),[4]

(b) holding Kopper Glo in contempt and sanctioning Kopper Glo and its directors and officers to the extent necessary, and (c) granting related relief. In support of this motion, the Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

1. For over eighteen months, Kopper Glo has completely failed to meet its obligations to the Debtors' estates, and now the Trust, under the Sale Order, Assignment Agreement, the Royalty Agreements, and all related agreements between the Debtors and Kopper Glo (collectively, the "Kopper Glo Sale Agreements"). Notwithstanding Kopper Glo's defaults and delinquencies, representatives of the Debtors' estates and the Trust have repeatedly attempted to resolve various issues with Kopper Glo without resorting to litigation or seeking Court intervention. Kopper Glo has ignored all efforts at resolution and remains in default. As a result, the Trust can no longer wait and, thus, seeks the Court's intervention to provide appropriate relief.

---

[3] A copy of the Base Royalty Agreement is attached hereto as **Exhibit C**.
[4] A copy of the Employee Royalty Agreement is attached hereto as **Exhibit D**.

2. In June 2020, September 2020, and December 2021, Kopper Glo was notified in writing[5] of (a) the amounts owed to the Trustee, which is currently no less than $19,178,086.37, and (b) the numerous defaults under its agreements with the Debtors, including the following:

i. failure to furnish reports since the second quarter of 2020 setting forth the gross production and fair market value of the operation of the Purchased Mines within 45 days following the end of each calendar quarter until the royalty obligations are satisfied (the "Reporting Obligations");[6]

ii. failure to remit any of the $17,331,782.19 of royalty payments due under the Royalty Agreements and the Trustee's election to accelerate the outstanding royalty payments due under the Base Royalty Agreement (together, the "Royalty Payment Obligations");[7]

iii. failure to pay the $826,304.18 of liabilities associated with the Purchased Mines that were assumed by Kopper Glo after September 7, 2019 (the "Post-Effective Date Obligations");[8] and

iv. failure to (i) reimburse the Debtors for various employee related costs in the aggregate amount of $1,020,000 over a 6 month period through March 2020 (the "Employee Reimbursement Obligation," collectively with the Reporting Obligations, Payment Obligations, and Post-Effective Date Obligations, the "Obligations"), and (ii) execute a formal promissory note obligating Kopper

[5] Copies of the June 2020 correspondence, September 2020 correspondence, and December 2021 correspondence are attached hereto as **Exhibits E-F**, respectively.

[6] Royalty Agreements, § 4.

[7] The entire $550,000 royalty payment is due under the Employee Royalty Agreement because, based on a fourth quarter 2019 mining report from Kopper Glo, Kopper Glo recommenced mining operations more than two years ago. Employee Royalty Agreement, § 1 ("The Royalty shall be paid beginning upon recommencement of mining operations at the Purchased Mines and continuing for twenty-four (24) months thereafter (or sooner in the event that the entire Royalty amount is paid in less than 24 months)."). Pursuant to section 9(i) of the Base Royalty Agreement, the Trustee has elected to accelerate the outstanding $16,781,782.19 of royalty payments due to the Trustee. Base Royalty Agreement, § 9(i) (an event of default, which includes Kopper Glo's failure "to make when due any payment required by this Agreement," grants the Trustee the right to "accelerate any or all then remaining unpaid payments required by this Agreement."). The Base Royalty Agreement royalty amount reflects the accrued interest through December 7, 2021 for the first two annual royalty payments ($3,034,459.90 for 2020 and $2,794,954.29 for 2021) and the last four outstanding royalty payments ($10,952,368 for 2022 through 2025). Base Royalty Agreement, § 2 (Kopper Glo is required to make royalty payments to the Trustee "in annual fixed amounts of $2,738,092 for each year during the period beginning on [September 7, 2019] and ending on the date that is six (6) years after [September 7, 2019] . . . ." "Any annual Payment that is not paid when due shall accrue interest at an annual rate equal to the prime rate as published in the *Wall Street Journal*, plus 5%, compounded monthly, which shall be payable on demand.")

[8] Assignment Agreement, Exhibit F(e) (Kopper Glo agreed to assume, on September 7, 2019 and moving forward, "all Liabilities of any kind or character resulting from or arising out of or in connection with [Kopper Glo's] use, operation, possession or ownership of or interest in the Purchased Assets after the Effective Date").

> Glo to pay the Employee Reimbursement Obligations after agreeing to such terms in writing on October 3, 2019.[9]

In addition to formally notifying Kopper Glo of its defaults, the estates' professionals, including counsel, the Trustee, and others, have repeatedly attempted to engage with Kopper Glo's representatives through correspondence, telephone calls, and in person meetings at Kopper Glo's offices in an effort to resolve Kopper Glo's defaults.

3. Unfortunately, Kopper Glo has steadfastly refused to engage in any meaningful way, cure defaults, make payments due to the Trust, or otherwise make any form of serious proposal. To say that the Trustee is disappointed with Kopper Glo's continued flaunting of its obligations under the Kopper Glo Sale Agreements is an understatement.[10] The Trustee believes Kopper Glo's behavior has left him no choice but to seek an order of this Court compelling Kopper Glo to satisfy the requirements of the Kopper Glo Sale Agreements. Kopper Glo's continued refusal to meet its obligations simply cannot be allowed to continue and should not be countenanced by this Court. Kopper Glo's behavior has harmed every creditor in these cases and jeopardizes the Trustee's ability to maximize the value of the Debtors' estates.

4. Moreover, to the extent necessary to compel Kopper Glo's performance, the Trustee requests that the Court hold Kopper Glo in contempt for failing to satisfy the Obligations and, to the extent the Obligations are not promptly satisfied and defaults cured, sanction Kopper Glo and/or its directors and officers personally for their conduct. Kopper Glo's outright refusal to live up to the terms of the Kopper Glo Sale Agreements are unreasonable and all parties should

[9] Assignment Agreement, ¶ 9 (Assignment Agreement may be amended upon a written commitment by the party whom enforcement is sought).

[10] The Trustee received a quarterly report for the fourth quarter of 2019 from Kopper Glo related to Kopper Glo's gross production at the Purchased Mines. Therefore, Kopper Glo may have been generating revenue from operating the Purchased Mines for **over the past two years**. The Trustee has not received quarterly reports from Kopper Glo since the first calendar quarter of 2020, and therefore cannot confirm the extent to which operations continued at the Purchased Mines during 2020 and 2021.

understand that their actions, especially defiance of Court orders and Court-approved agreements, have consequences.

5. Accordingly, for the reasons set forth in this motion, the Trustee requests that the Court compel Kopper Glo to immediately pay the Trust the Obligations and otherwise comply with the Kopper Glo Sale Agreements.

## JURISDICTION AND VENUE

6. This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b), and the Trust consents to entry of a final order by the Court in connection with this motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

8. The predicates for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") and Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A. General Background.

9. On July 1, 2019 and July 24, 2019 (together, the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code. No chapter 11 trustee or examiner was appointed in these chapter 11 cases.

10. A description of the Debtors' business and the reasons for filing the chapter 11 cases is set forth in the *Declaration of Jeff A. Hoops, Sr. in Support of Chapter 11 Filings and*

*First Day Motions* [Docket No. 14].[11]

**B. Confirmation and Trustee's Powers.**

11. On March 22, 2021, the Court entered the *Proposed Findings of Fact, Conclusions of Law, and Order (I) Approving the First Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for Blackjewel, L.L.C. and Its Affiliated Debtors, and (II) Confirming the First Amended Joint Chapter 11 Plan of Liquidation for Blackjewel, LLC and Its Affiliated Debtors* [Docket No. 3147] (the "Confirmation Order"), which confirmed the *First Amended Joint Chapter 11 Plan of Liquidation for Blackjewel L.L.C. and Its Affiliated Debtors* [Docket No. 2499] (the "Plan") and approved the *First Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for Blackjewel, L.L.C. and Its Affiliated Debtors* [Docket No. 2500] (the "Disclosure Statement").

12. Pursuant to Paragraphs 5 and 6 of the Confirmation Order, the Court approved the appointment of David J. Beckman as the Trustee and authorized him, among other things, to liquidate the Debtors' remaining assets, including the royalties and other obligations owed by Kopper Glo, in accordance with the Trust Agreement [Docket No. 2602], make distributions to creditors as provided in the Confirmation Order, and otherwise wind up the Debtors' operations.

13. On April 1, 2021, the Debtors filed a *Notice of (A) Entry of Order (I) Approving the First Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for Blackjewel, L.L.C. and Its Affiliated Debtors, and (II) Confirming the First Amended Joint Chapter 11 Plan of Liquidation for Blackjewel, LLC and Its Affiliated Debtors and (B) Occurrence of the Plan Effective Date* [Docket No. 3225] providing notice that the effective date of the Plan occurred on

[11] Hoops resigned his positions as officer and director of each of the Debtors on July 3, 2019 and is no longer involved in the management of the Debtors or their businesses.

April 1, 2021 (the "Effective Date"). Consistent with the Plan and Confirmation Order, the Debtors' estates are being liquidated and administered pursuant to the Plan, Trust Agreement, and Confirmation Order.

**C. Sale Order.**

14. On July 25, 2019, the Debtors filed a motion under section 363 of the Bankruptcy Code that requested, among other things, approval of bidding procedures, an auction process, and one or more sales of their assets [Docket No. 312]. On July 26, 2019, the Court approved the Debtors' requested relief, including the dates for (a) interested parties to bid on the Debtors' assets, (b) the Debtors to administer an auction, and (c) a Court hearing approving the proposed sales [Docket No. 356]. At the auction, among other transactions, the Debtors agreed with Kopper Glo to the terms outlined in the Assignment Agreement and Royalty Agreements. The sale to Kopper Glo became effective by its terms on September 7, 2019, and on September 17, 2019, the Court entered the Sale Order.

15. The Sale Order plainly states that the various sale agreements between the Debtors and Kopper Glo are enforceable against Kopper Glo and that the Assignment Agreement can be modified by a written agreement. Moreover, pursuant to Paragraph 18 of the Sale Order, the (a) Assignment Agreement, (b) Sale Order, and (c) "the transaction contemplated thereby and hereby, shall, as applicable, be specifically enforceable against and be binding in all respects upon, or shall inure to the benefit of, the Debtors, their estates, . . . the Buyer, and their respective affiliates, successors and assigns."

**D. Assignment Agreement: Post-Effective Date Obligations and Employee Reimbursement Obligations.**

16. Pursuant to Paragraph 4 of the Assignment Agreement, Kopper Glo agreed to (a) assume the liabilities listed in Exhibit F of the Assignment Agreement (the "Assumed

Liabilities"), (b) immediately pay the Debtors $6.8 million (which was received by the Debtors), (c) enter into the Base Royalty Agreement, and (d) pay the Royalty Payment Obligations related to the Employee Royalty Agreement. Pursuant to subsection (e) in Exhibit F, Assumed Liabilities, Kopper Glo agreed to assume "all Liabilities of any kind or character resulting from or arising out of or in connection with [Kopper Glo's] use, operation, possession or ownership of or interest in the Purchased Assets after the Effective Date," which is defined in the Assignment Agreement as September 7, 2019.

17. After the Effective Date, the Debtors, on Kopper Glo's behalf and based upon Kopper Glo's promise of reimbursement, incurred and paid the following Post-Effective Date Obligations, which are Assumed Liabilities associated with the Purchased Mines, in the aggregate amount of $826,304.18, all of which are due and owing and remain unpaid by Kopper Glo:

a) $456,007.29 of electricity expenses;[12]

b) $310,635.15 of miscellaneous utility expenses;[13]

c) $29,527.50of security expenses;[14] and

d) $30,134.24 of facility repairs.[15]

18. In mid-November 2019, David J. Beckman, who was then the Debtors' Interim Chief Executive Officer and Chief Restructuring Officer, and a second employee of FTI Consulting, Inc. (the former Debtors' financial advisor) presented the details of these Assumed Liabilities to Kopper Glo's president, Hunter Hobson, in an in-person meeting at Kopper Glo's headquarters in Knoxville, Tennessee (the "In-Person Meeting"). Mr. Hobson did not dispute

---

[12] Electricity expenses relate to account numbers ending in 9072, 8801, and 9015 with Kentucky Utilities.

[13] Utility expenses include payments to vendors including, but not limited to, Windstream, Xerox, Waste Connections of Kentucky, AT&T, Cumberland Valley Electric, Century Link, Comcast, and Verizon.

[14] Security expenses were paid to P&P Construction.

[15] Facility repairs related to pump repair/replacement, cribs and timbers, mine battery services, gravel, and jacks and beams for the Purchased Mines.

Kopper Glo's agreement and obligation to reimburse the Debtors for the Post-Effective Date Obligations.

19. As set forth in Paragraph 9 of the Assignment Agreement, the only means by which the parties can amend the Assignment Agreement is in a writing that references the Assignment Agreement and is signed by the party against whom enforcement is sought. Beginning on September 20, 2019, Mr. Hobson and Mr. Beckman began emailing one another about Kopper Glo paying the Employee Reimbursement Obligation.[16] Although only $206,253 of the $1,020,000 Employee Reimbursement Obligation arose after the Effective Date (and are therefore owed by Kopper Glo by the express terms of the Assignment Agreement),[17] on October 3, 2019, in an email chain related to the Assignment Agreement obligations, Mr. Hobson also agreed to pay the Employee Reimbursement Obligation over a six month period and to execute a promissory note to document Kopper Glo's obligation to the estates. The email was sent from Mr. Hobson's Kopper Glo email, was signed "Hunter Hobson, President," and Mr. Hobson's signature included Kopper Glo's address. Accordingly, Mr. Hobson's written and signed commitment to pay for the Employee Reimbursement Obligation amended the Assignment Agreement in accordance with Paragraph 9 of the Assignment Agreement and Paragraph 25 of the Sale Order. As of the date of this filing, Kopper Glo has not executed the formal promissory note and the $1,020,000 Employee Reimbursement Obligation remains unpaid and is due and owing.

**E. Royalty Agreements: Reporting Obligations and Royalty Payment Obligations.**

20. The Debtors and Kopper Glo executed the Royalty Agreements and attached each agreement as exhibits to the Sale Order. The two material obligations arising out of the Royalty

[16] A copy of the email correspondences are attached hereto as **<u>Exhibit H</u>**.

[17] For the avoidance of doubt, the $206,253 of Employee Reimbursement Obligations are not included in the Trustee's Post-Effective Date Obligations calculation.

Agreements are the Reporting Obligations and the Royalty Payment Obligations. Kopper Glo's Reporting Obligations stem from Paragraph 4 in both Royalty Agreements, which provides that:

> [w]ithin fourty-five (45) days following the end of each calendar quarter until the Royalty has been paid in full, [Kopper Glo] shall furnish to [the Debtors/Trustee] (or its designee) a report setting forth the gross production and fair market value of the operation of the Purchased Mines for such period." within 45 days following the end of each calendar quarter until the royalty obligations are satisfied, Kopper Glo is required to furnish to the Debtors/Trustee a report setting forth the gross production and fair market value of the operation of the Purchased Mines for such period.

As of the date of this filing, Kopper Glo has failed to deliver six production reports, the last received report being for the first calendar quarter of 2020.[18]

21. The Royalty Payment Obligations arise under different sections of each Royalty Agreement. For the Employee Royalty Agreement, section 1 provides that that pursuant to Kopper Glo's purchase of the Purchased Mines, Kopper Glo must pay the estates a "royalty payment [which] shall be equal to $0.25 per ton of coal mined from the Purchased Mines up to an aggregate total of $550,000." Section 1 continues by requiring that:

> The Royalty shall be paid beginning upon recommencement of mining operations at the Purchased Mines and continuing for twenty-four (24) months thereafter (or sooner in the event that the entire Royalty Amount is paid in the last 24 months).

For the Base Royalty Agreement, section 2 provides that:

> [Kopper Glo] shall make royalty payments to [the Debtors/Trustee] in annual fixed amounts of $2,738,092 for each year during the period beginning on the [September 7, 2019] and ending on the date that is six (6) years after [September 7, 2019] (the "Royalty" and each annual payment thereof, an "Annual Payment").[19] The first Annual Payment shall be due no later than the first (1st) anniversary of [September 7, 2019], and each Annual Payment thereafter shall be due no later than each successive anniversary thereof through the sixth (6th) anniversary of [September 7, 2019]. For the avoidance of doubt, the Annual Payment shall be due and payable regardless of whether the Purchased Mines are operating or producing saleable

[18] The Debtors received the fourth quarter 2019 production report and first quarter 2020 production report after each report was due, and only after requesting each report from Kopper Glo.

[19] Lime Rock Partners was assigned the right to receive the first two royalty payments of $2,738,092 under the Base Royalty Agreement.

> coal. Any Annual Payment that is not paid when due shall accrue interest at an annual rate equal to the prime rate as published in the *Wall Street Journal*, plus 5%, compounded monthly, which shall be payable on demand.

22. Section 9 of each Royalty Agreement contain an identical event of default clause and royalty acceleration clause. Section 9(a) states that if Kopper Glo fails to make any royalty payment when due, then such inaction will constitute an event of default under the applicable Royalty Agreement. Section 9(i) continues by stating that upon an event of default, the Trustee "may accelerate any or all then remaining unpaid payments required by this Agreement."

23. For the Employee Royalty Agreement, the Trustee has confirmed that Kopper Glo recommenced mining operations at the Purchased Mines more than two years before the date of this motion, as evidenced by the fourth quarter 2019 production report that Kopper Glo delivered to the Debtors. Therefore, the Trust is owed the full $550,000 royalty from Kopper Glo now that the two year period has expired, notwithstanding that the Trustee previously declared an event of default against Kopper Glo pursuant to Section 9 of the Employee Royalty Agreement.

24. For the Base Royalty Agreement,[20] as documented in the Trustee's previous correspondence and notices of default directed to Kopper Glo and its counsel, pursuant to section 9, the Trustee notified Kopper Glo of the existence of events of default and elected to accelerate the outstanding $16,781,782.19 of royalty payments due to the Trust. The Royalty Payment Obligation arising from the Base Royalty Agreement reflects the accrued interest through December 7, 2021 for the first two annual royalty payments ($3,034,459.90 for 2020 and $2,794,954.29 for 2021) and the last four outstanding royalty payments ($10,952,368 for 2022 through 2025). Accordingly, Kopper Glo owes the Trust $16,781,782.19 under the Base Royalty Agreement and no less than a total of $17,331,782.19 of Royalty Payment Obligations on account

[20] *See* **Exhibit C**.

of both Royalty Agreements.

## RELIEF REQUESTED

25. By this motion, the Trustee respectfully seek entry of the Proposed Order, substantially in the form attached to the motion as **Exhibit A**, (a) compelling Kopper Glo to comply with the Sale Order, Assignment Agreement, and Royalty Agreements by paying the related Obligations to the Trust and transmitting the Purchased Mines quarterly production reports to the Trustee, (b) holding Kopper Glo in contempt and sanctioning Kopper Glo and its directors and officers to the extent necessary, and (c) granting related relief.

## BASIS FOR RELIEF

### A. The Sale Order and Related Agreements Must Be Enforced by the Court.

26. This Court should compel Kopper Glo to honor the terms of the Kopper Glo Sale Agreements. Indeed, the Obligations were a key component of the consideration Kopper Glo agreed to pay and Kopper Glo should not be permitted to ignore its Obligations. The Supreme Court has held when an order and related documents are clear and unambiguous, the Court must carry out and enforce the documents. *Travelers Indem. Co. v. Bailey*, 577 U.S. 137, 150-51 (2009) ("If it is black-letter law that the terms of an unambiguous private contract must be enforced irrespective of the parties' subjective interest, *see* 11 R. Lord, Williston on Contracts § 30:4 (4th ed. 1999), it is all the clearer that a court should enforce a court order, a public governmental act, according to its unambiguous terms."); *see also Fox Grocery Co. v. Mineral Labs, Inc.*, 1992 U.S. App. LEXIS 8619, at *4-10 (4th Cir. Apr. 27, 1992) (affirming lower court's order compelling non-performing party to perform according to the parties' settlement agreement).

27. Moreover, section 105 of the Bankruptcy Code provides this Court with the inherent power and authority to address abuses of judicial process and bad faith conduct. *See In re Correra*, 589 B.R. 76, 124 (Bankr. N.D. Tex. 2018). Of note, section 105 of the Bankruptcy

Code does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986). But section 105(a) does empower "the bankruptcy court to exercise its equitable powers – where necessary or appropriate – to facilitate the implementation of other Bankruptcy Code provisions," such as section 363 of the Bankruptcy Code. *Bessette v. Avco Fin. Servs.*, 230 F.3d 439, 444 (1st Cir. 2000); *see also In re Kalikow*, 602 F.3d 82, 97 (2d Cir. 2010).

28. Here, the Kopper Glo Sale Agreements are clear. Paragraphs 18 and 29 of the Sale Order confirm that the Sale Order and related agreements are enforceable by the Trustee and that each document may be enforced against Kopper Glo. The Assignment Agreement unequivocally transferred the responsibility of paying the Post-Effective Date Obligations to Kopper Glo, yet Kopper Glo has failed to reimburse the Debtors for those expenses. The Sale Order and Assignment Agreement are also clear as to why the Employee Reimbursement Obligation is due and owing by Kopper Glo—the parties agreed and executed, in writing, a promise that the Employee Reimbursement Obligation would be paid by Kopper Glo pursuant to the Assignment Agreement. Paragraph 25 of the Sale Order confirms that no further order of the Court was necessary to make the Employee Reimbursement Obligation enforceable. The Reporting Obligations and Royalty Payment Obligations under the Royalty Agreements are also clear with respect to when the reports had to be delivered, when the royalty payments were due and payable to the estates, and the consequences of Kopper Glo not making such payments (*i.e.*, declaration of an event of default and an election to accelerate the remaining royalty payments).

29. By compelling Kopper Glo to comply with the Kopper Glo Sale Agreements pursuant to the Court's powers under applicable authority and section 105 of the Bankruptcy Code, the Court would simply be ordering the prompt implementation of the Court's previous order

approving the Debtors' sale to Kopper Glo under section 363 of the Bankruptcy Code. Thus, as held by the Supreme Court in the *Travelers Indem. Co.* case, the Court should compel Kopper Glo to carry out and comply with the Obligations under the clear and unambiguous Kopper Glo Sale Agreements and address Kopper Glo's years of flaunting its Obligations.

**B. Kopper Glo Should Be Sanctioned if Kopper Glo Does Not Satisfy the Sale Order Obligations Immediately.**

30. To the extent Kopper Glo continues to fail to satisfy the Obligations, the Trustee requests that the Court impose civil contempt sanctions against Kopper Glo and, as applicable, its directors and officers. The Court has authority to impose sanctions against Kopper Glo. The Supreme Court has confirmed that "civil contempt sanctions, or those penalties designated to compel future compliance with a court order . . . may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard [–] [n]either a jury trial nor proof beyond a reasonable doubt is required." *Int'l Union v. Bagwell*, 512 U.S. 821, 827-28 (1994).

31. Specifically, a bankruptcy court's inherent power to impose sanctions against a party "stems from the very nature of courts and their need to be able to manage their own affairs so as to achieve the orderly and expeditious disposition of the cases." *Chambers v. NASCO*, 501 U.S. 32, 49 (1991); *see also Law v. Siegel*, 571 U.S. 415, 420 (2014) ("A bankruptcy court has statutory authority under section 105 of the Bankruptcy Code to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of' the Bankruptcy Code") (quoting 11 U.S.C. § 105(a)); *In re Babcock*, 258 B.R. 646, 651 (Bankr. E.D. Va. 2001) ("Courts have broad discretion in selecting appropriate contempt sanctions.") (internal citation omitted). The Fourth Circuit has confirmed that the inherent power to sanction litigants for bad-faith conduct applies to bankruptcy courts, in addition to Article III courts. *In re Weiss*, 111 F.3d 1159, 1171-72 (4th Cir. 1997).

32. To demonstrate that civil contempt sanctions are warranted, the movant must provide the court with sufficient evidence regarding the party's misconduct and bad faith. *See, e.g.*, *Allen v. Fitzgerald*, 2019 U.S. Dist. LEXIS 213990 (W.D. Va. Dec. 11, 2019) (bankruptcy court did not abuse its discretion by imposing monetary sanctions against the defendant and imposing a 12-month and 16-month practice revocation against the defendant's lawyers for regularly ignoring, and to a certain extent, encouraging the defendant's misconduct). There are two different types of civil contempt sanctions: (a) compensatory sanctions, and (b) criminal contempt sanctions. As the name implies, compensatory sanctions attempt to indemnify the injured party for the damage caused by the contempt. *In re Terrell*, 2008 Bankr. LEXIS 4977, at *4 (Bankr. E.D. Va. Sept. 23, 2008). With respect to coercive sanctions, in an effort to force the party to comply with a court order, a movant can request that the non-performing party and its responsible parties be fined or even imprisoned. *Id.*

33. Here, the Court has the power to sanction Kopper Glo and its directors and officers according to the Fourth Circuit Court of Appeals in the *Weiss* case. *See, e.g.*, *In re Braxton*, 2014 Bankr. LEXIS 3516, at *35 (Bankr. E.D. N.C. Aug. 20, 2014) ("This Court has the authority to sanction a party, a party's officer, director, agent, or witness when said party fails to obey an order to permit discovery.") If Kopper Glo continues to not comply with the Obligations, the Trustee requests that the Court order compensatory and coercive sanctions against Kopper Glo and its officers and directors. Thereafter, the Trustee may supplement this motion with a request to impose additional sanctions against any agents for Kopper Glo who may have encouraged or assisted Kopper Glo to not satisfy any of its Obligations since early 2020.

34. Sanctions are a serious remedy, and not one that the Trustee takes lightly. However, based on Kopper Glo's multi-year pattern of conduct and flat out ignoring the Obligations, the

Trustee has no other choice but to request civil contempt sanctions if the Obligations are not immediately satisfied by Kopper Glo.

**C. The Bankruptcy Court is the Correct Forum to File This Motion.**

35. The applicable documents in this dispute are the Sale Order, Assignment Agreement, and Royalty Agreements. The Sale Order provides that the Trustee may enforce the Assignment Agreement and Royalty Agreements against Kopper Glo. Sale Order ¶¶ 18, 29. As demonstrated above, the Obligations relate to both the Assignment Agreement and Royalty Agreements. The issue, however, is that the agreements have different forum selection clauses.

36. Paragraph 6 of the Assignment Agreement states that when there is any claim or dispute "which may arise or result from, or be connected with, this [Assignment] Agreement, any breach or default hereunder, or the transaction contemplated under this [Assignment] Agreement," (a) this Court will have "exclusive jurisdiction to enforce the terms of this [Assignment] Agreement," (b) "any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court," and (c) "the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes." Alternatively, in the Royalty Agreements, Paragraph 18 provides that for any dispute "based on or arising out of this Agreement," the parties will "unconditionally and irrevocably submit to the exclusive jurisdiction of the State Courts located in Fayette County, Kentucky." For the reasons stated below, the Assignment Agreement's forum selection clause in favor of this Court should control.

37. The dueling forum selection clauses in this dispute are not a unique issue and are commonly resolved by courts. When courts are faced with adjudicating contracts with competing forum selection clauses, courts often decline to enforce each of the clauses. Courts across the country, including the United States District Court for the Eastern District of Virginia, often decline to enforce "conflicting forum selection clauses governing separate claims raised in a single

action" "out of concern for wasting judicial and party resources" that would otherwise arise from splitting the action into multiple proceedings. *Jones v. Custom Truck & Equip., LLC*, 2011 U.S. Dist. LEXIS 7025, at *10 (E.D. Va. Jan. 24, 2011) (mandatory forum selection clause in one contract prevailed over permissive forum selection clause in a related contract); *Blissfield Mfg. Co. v. Blue H20 Sols., LLC*, 2013 U.S. Dist. LEXIS 140034, at *14 (E.D. Mich. Sept. 30, 2013) (after noting that "other courts have decided not to enforce forum selection clauses when doing so would force Plaintiffs 'to litigate the validity of their claims that depend on the same issue in two different forums [which] would be seriously inconvenient,'" the court declined to enforce dueling mandatory forum selection clauses, retaining jurisdiction in Michigan, one of the clause's forums) (internal citations omitted); *Jon Feingersh Photography, Inc. v. Pearson Educ., Inc.*, 978 F. Supp. 2d 463, 468 (E.D. Pa. 2013) ("courts have refused to enforce conflicting forum selection clauses because enforcement would result in wasteful and inefficient litigation of the same action in multiple forums."). Therefore, a court may adjudicate all of the claims related to one dispute despite competing forum selection clauses governing the claims.

38. Once a court determines that it may enforce only one of the dueling forum selection clauses and adjudicate all of the claims arising from a dispute, it then must determine what forum selection clause to actually enforce. In this analysis, courts will look to the facts of the case and consider factors such as (a) which contract governs more of the claims, (b) if the movant's chosen forum is its home forum where other litigation is ongoing, (c) where the gravity of the dispute occurred, (d) the convenience of the parties, and (e) the breadth and expansiveness of each forum selection clause. *See, e.g.*, *Schrenkel v. Lendus, LLC*, 2018 U.S. Dist. LEXIS 185530, at *15-29 (M.D. Fla. Oct. 30, 2018) (conducting a claim-by-claim analysis to determine which contract, and thus which forum selection clause, governs, and dismissing claims "ultimately based on" contract

with Delaware forum selection clause, in part because another action was already filed in Delaware); *Primary Color Sys. Corp. v. Agfa Corp.*, 2017 U.S. Dist. LEXIS 221512, at *17 (C.D. Cal. July 13, 2017) (applying forum selection clause of the contract from which the majority of the claims arise); *Lewis v. Jayco, Inc.*, 2019 U.S. Dist. LEXIS 135448, at *1-2 (W.D. Va. Aug. 12, 2019) (enforcing only one forum selection clause, which was broad enough to encompass the entire dispute, and that selected the forum where the transaction took place); *Samuels v. Medytox Sols., Inc.*, 2014 U.S. Dist. LEXIS 125525, at *24 (D.N.J. Sep. 8, 2014) (upon weighing factors such as which contract governs more of the claims, the deference to movant's choice of New Jersey (its home forum), the fact that the claim arose in New Jersey, and the convenience of the parties, the court enforced one contract's New Jersey forum selection clause over another contract's Florida forum selection clause).

39. Here, the Court should enforce the Assignment Agreement's forum selection clause and hear all of the claims in the Kopper Glo dispute, regardless of the Royalty Agreement's forum selection clause, because of the following:

a) <u>Assignment Agreement was the Genesis for the Royalty Agreements</u>: The Assignment Agreement relates to all of Kopper Glo's Obligations, while the Royalty Agreements are byproducts of the Assignment Agreement that otherwise would not have been executed;

b) <u>Assignment Agreement Has a Broader Forum Selection Clause</u>: The Assignment Agreement's clause requires the parties to adjudicate any matters "which may arise or result from, or be connected with," the Assignment Agreement, while the Royalty Agreements only require the state court to hear issues "based on or arising out of " the Royalty Agreements;

c) <u>Assignment Agreement Requires Action Related to Three of the Four Obligations</u>: The Post-Effective Date Obligations and Employee Reimbursement Obligation arise from the Assignment Agreement, and Paragraph 4 of the Assignment Agreement requires Kopper Glo to "pay" the Royalty Payment Obligation related to the Employee Royalty Agreement and requires Kopper Glo to "enter into" the Base Royalty Agreement;

d) The Court is the Home Forum for All Matters Related to the Estates: The Assignment Agreement's forum selection clause requires the parties to adjudicate claims in the Court, which is where the Debtors filed for bankruptcy and are currently adjudicating a number of adversary proceedings and winding up the estates;

e) The Obligations Arose From a Sale Approved by the Court: Kopper Glo has breached the Sale Order that (i) was entered by this Court, and (ii) created all of Kopper Glo's rights in the Purchased Mines; and

f) The Court is the Convenient Forum for the Parties: The Trustee is winding up all of the estates in the Court and counsel for both parties are familiar with and have previously appeared before the Court.

For the preceding reasons, it is proper for the Court to adjudicate all of the Obligations owed to the Trustee notwithstanding the Royalty Agreements' forum selection clauses.

## RESERVATION OF RIGHTS

40. This motion is limited to the grounds stated herein. Accordingly, it is without prejudice to the rights of the Trust or any other party in interest to file a motion against Kopper Glo on any other grounds whatsoever and the Trustee expressly reserves all further substantive or procedural rights that may be available, including a request for civil contempt sanctions against Kopper Glo and its directors, officers, and/or agents.

## NOTICE

41. The Trustee, with the assistance of its claims and noticing agent, will provide notice of this motion by email and/or first-class mail to: (a) the Office of the United States Trustee for the Southern District of West Virginia, (b) the Debtors' prepetition secured lenders, (c) the Office of the United States Attorney for the District of West Virginia, (d) the Internal Revenue Service, (e) counsel to Kopper Glo, (f) Kopper Glo, and (g) all parties requesting notices pursuant to Bankruptcy Rule 2002. The Trustee submits that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Trustee respectfully requests that the Court enter the Proposed Order, granting the relief requested in the motion and such other and further relief as may be just and proper.

DATED: December 20, 2021

**SUPPLE LAW OFFICE, PLLC**

Joe M. Supple, Bar. No. 8013
801 Viand St.
Point Pleasant, WV 25550
Telephone: 304.675.6249
Facsimile: 304.675.4372
joe.supple@supplelawoffice.com

– and –

**SQUIRE PATTON BOGGS (US) LLP**

*/s/ Stephen D. Lerner*
Stephen D. Lerner (admitted *pro hac vice*)
Travis A. McRoberts (admitted *pro hac vice*)
Kyle F. Arendsen (admitted *pro hac vice*)
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201
stephen.lerner@squirepb.com
travis.mcroberts@squirepb.com
kyle.arendsen@squirepb.com

*Co-Counsel to the Blackjewel Liquidation Trust, LLC*